UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E.F., on behalf of himself and his minor child, O.F.; J.R. on
behalf of herself and her minor child, K.R., J.F., on behalf of
himself and his minor child, H.F.; L.V., on behalf of herself and
her minor child, N.F., M.S. on behalf of himself and his minor
children, J.S. and Q.S. ,

                                        Plaintiffs,

                    -against-                                        Civ. No. 21-cv-11150

MAYOR BILL DE BLASIO, in his Official Capacity, THE          **COMPLAINT**
CITY OF NEW YORK, CHANCELLOR MEISHA PORTER,
in her Official Capacity, NEW YORK CITY DEPARTMENT
OF EDUCATION; NEW YORK CITY BOARD OF
EDUCATION; COMMISSIONER BETTY ROSA, in her
Official Capacity, NEW YORK STATE EDUCATION
DEPARTMENT, COMMISSIONER JODI KLETTER, in her
Offical Capacity, THE OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS,

                                        Defendants

## PRELIMINARY STATEMENT

1.      This action seeks declaratory and injunctive relief to, *inter alia*, address a federal question as well as ancillary claims arising under state law and to hold Defendants accountable for failing to comply with a 2002 Stipulation and Order of Judge John F. Keenan that required Defendants to provide 45 days' prior notice to co-counsel for the Plaintiffs here, Gary Mayerson, before implementing any plan to effectuate a transfer of special education impartial hearings to New York City's Office of Administrative Trials and Hearings. *See Does, et al v. Outgoing Schools, et al,* 1:02-cv-06495(JFK), Dkt. No. 13

2.      This action is being filed by and on behalf of children with disabilities and their parents who live in New York City and who have or will have rights and entitlements arising under individualized education programs ("IEPs")  pursuant to the due process mandates and related protections embodied throughout the Individuals with Disabilities Education Improvement Act (the "IDEA"), 20 U.S.C. §1400, *et seq.*, the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §1983, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504"), the New York State Constitution, New York State Education Law §§3202, 3203, 4401, *et seq.* (the "New York State Education Laws"), and the regulations promulgated thereunder.

3.      To the extent that Plaintiffs are parents of students receiving special education services and programs, the children all satisfy the criteria to be classified as a "child with a disability" under the IDEA. To the extent that plaintiffs are parents of a child with a disability, they have their own independent rights and entitlements under the IDEA. *See, e.g,  Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516 (U.S. 2007).

2

4.     Whenever a dispute arises under the IDEA concerning an individual student's services, placement, or programming, one of those entitlements is the right to the appointment of an "impartial hearing officer." Here, however, there are no administrative remedies to be exhausted. This action does not concern an individual student's IDEA-based dispute. As alleged below, this action is being brought to enjoin defendants from implementing a misguided and reckless plan that would *systemically* violate a core statutory mandate and entitlement; specifically, plaintiffs' entitlement to an "impartial hearing" being presided over by an "impartial hearing officer" who does not have an impermissible conflict of interest.

5.     Plaintiffs thus seek declaratory and injunctive relief from the following named defendants whose roles and responsibilities in the impartial hearing process are inextricably intertwined: The New York City Department of Education ("DOE"), New York City Board of Education ("Board") and Chancellor of the New York City School District ("Chancellor") (the "DOE Defendants"); The Mayor of the City of New York, the Comptroller of the City of New York and the Commissioner of the New York City Administrative Trials and Hearings Bureau ("OATH") ("the City Defendants"); The Commissioner of the New York State Education Department, the New York State Education Department and the Chancellor of the New York State Board of Regents ("the State Education Defendants").

6.     At issue is Defendants' latest attempt to implement a plan to degrade, dismantle and replace the current Impartial Hearing System; that is, the administrative hearing system mandated and provided for under the IDEA to resolve disputes concerning parents' access to appropriate special education services, programs, and school placements.

7.     Defendants' latest plan was hatched and memorialized between the Thanksgiving and Christmas holidays *via* a Memorandum of Agreement dated December 1, 2021 ("MOA"), just

3

one month before the Mayor leaves office ("OATH Plan"). A copy of the MOA is attached hereto as Exhibit A.

    8.     Then, On December 27, 2021, the Mayor issued Executive Order 91 ("EO 91"). A copy of EO 91 is attached here to as Exhibit B.

    9.     EO 91 purports to create "concurrent jurisdiction" for hearings between the DOE and OATH and effectively transfers the hearing functions to OATH. *See* Exhibit B.

    10.    The proposed OATH plan appears to be one of the current Mayor's many eleventh hour parting gifts to the new administration and Mayor-elect Adams.

    11.    Defendants' plan is to transfer administration of the entire Impartial Hearing System to New York City's Office of Administrative Trials And Hearings and to require that all hearing officers to be employed on a full-time basis by that City agency. *See* Exhibit A.

    12.    According to a December 3, 2021, job posting for "Special Education Hearing Officers" with a "Civil Service Title" of "Executive Agency Counsel," Title Code 95005, Level M1" (the contents of which are attached hereto as Exhibit C), an OATH hearing officer must be a resident of New York City unless a narrow exception applies.

    13.    Upon information and belief, "Executive Agency Counsel" is the same title afforded to the general counsel of the DOE, and all of the rest of the senior lawyers who represent the City and its agencies.

    14.    This plan will effectively eliminate from consideration as OATH IHOs more than half of the current, experienced hearing officers certified to hear cases in New York City who do not live within the City limits or hear cases on a part-time basis. *See* Exhibits A-C.

**Defendants' OATH Plan Violates a Federal Court Order and Stipulation**

15.     Defendants' execution of the MOA and EO 91 violates a federal stipulation that was So Ordered by Judge John F. Keenan in November 2002 in *Does, et al v. Outgoing Schools, et al,* 1:02-cv-06495(JFK).

16.     The last time defendants attempted a similar plan to substitute OATH occurred in 2002, under the auspices of an earlier schools chancellor.

17.     On August 14, 2002, several parents filed suit against various defendants including several of the Defendants here to enjoin a transfer to OATH. *See Does, et al v. Outgoing Schools, et al,* 1:02-cv-06495 (JFK). The parents were represented by Mr. Mayerson, one of the co-counsels for the Plaintiffs here.

18.     In response to the action, Defendants discontinued the plan to transfer the hearings to OATH.

19.     Moreover, to settle the claims, on November 5, 2002, the Court endorsed an Order and Stipulation ("2020 Order and Stipulation") that required Defendants to provide 45 days' prior notice to Plaintiffs' counsel, Mr. Mayerson, before implementing any plan to effectuate a transfer to OATH.

20.     In the 2002 Order and Stipulation, Defendants agreed to provide plaintiffs' counsel with at least 45 days advance notice if and when any plan to transfer the function of the Impartial Hearing Office to OATH will be implemented. *See Does, et al v. Outgoing Schools, et al,* 1:02-cv-06495(JFK), Docket No. 13. Defendants further agreed to include with such notice a copy of the final proposed regulations relative to such transfer. *Id*.

21.     Neither the Mayor, nor the signatories to the OATH transfer plan have provided written notice or "proposed regulations" to Mr. Mayerson.

22.     Defendants impermissibly have jumped the starting gate and usurped a 45-day head start.

23.     The order at issue is clear and unambiguous and the Defendants did not comply with its obligations to issue notice.

**Defendants' OATH Plan Violates the IDEA and State Law**

24.     Defendants' current OATH Plan ignores one of the most essential procedural safeguard protections: As a matter of law, plaintiffs are entitled to appear before hearing officers who are impartial, neutral, and unbiased and who possess the independence, autonomy, and expertise that the IDEA mandates. They are entitled to "impartial hearing officers" who are not disqualified for service by reason of some demonstrable conflict of interest

25.     The U.S. Supreme Court has repeatedly recognized the significance of the IDEA's due process procedural safeguards protecting parents and children.

26.     Soon after original Act was signed into law, the Court in *Board of Education v. Rowley*, 458 US 176 (1982) recognized the unique nature of the procedural aspects of the federal special education law:

> When the elaborate and highly specific procedural safeguards embodied in §1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures … [demonstrating] the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

27.     Later, the high court reiterated the unique role that the IDEA's procedural protections play in relation to a child's special education entitlements in *Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516 (U.S. 2007): "IDEA's procedural and

6

reimbursement-related rights are intertwined with the substantive adequacy of the education provided to a child."

28.     Defendants' latest plan renders the impartial hearing system "partial" and shifts custody, control, and oversight of the hearing officers to the City and the Mayor, effectively eliminating the IDEA's most important procedural safeguards.

29.     The pretextual reason given for the OATH Plan is the need to reduce and better manage what has now become a sizeable impartial hearing "backlog" of cases waiting for hearing officer assignments.

30.     However, the case backlog is largely due to Defendants' own policies, which caused the filings in the first instance, as well as their historical failure to take the steps needed to attract and retain trained hearing officers to accept case assignments, the most glaring failure being defendants' failure to raise hearing officer compensation rates for many years, and then failing to timely pay them in 2019. The consequences of this "siege" were entirely foreseeable. Many hearing officers who readily accepted hearings in suburban school districts outright refused to accept assignments in the City in exchange for grossly inadequate hourly rates and shabby treatment.

31.     This Court should not allow the exiting administration to throw the Impartial Hearing System into chaos in the middle of a COVID surge, literally days before Mayor-elect Adams and the new Schools Chancellor take over.

**The OATH Plan Creates an Inherent, Structural Conflict of Interest**

32.     Defendant's plan would take the "due" out of due process and make the "impartial" partial, replacing IDEA's impartiality and due process safeguards with an immediate systemic,

insurmountable conflict of interest that would subject the most vulnerable among us to the imminent threat of irreparable harm.

33.     Under the current system, *none* of the impartial hearing officers who are assigned to preside over impartial hearings by the New York City Impartial Hearing Office are employees of New York City or the New York City Department of Education.

34.     Rather, since the inception of the Impartial Hearing System, hearing officers have been independent contractors certified by the New York State Education Department.  Under New York State law, IHOs are assigned by a neutral, alphabetical-based rotational system over which the City and DOE are to have no control or role.

35.     In fact, as part of an established policy and practice going back for decades, impartial hearing officers are required to make a disclosure on the record before a hearing proceeds on the merits, affirmatively representing that they are not employees of New York City or the DOE and therefore have no conflict of interest that would interfere with their impartiality.

36.     The absence of an employment relationship between impartial hearing officers and the City or its Department of Education inspires public confidence in the integrity, independence, and impartiality of the hearing system, as it assures parents that the hearing officer being asked to adjudicate claims that the City and the DOE may have to pay for does not have an insurmountable conflict of interest at the outset by virtue of being employed by the City or its DOE.

37.     Unlike the current hearing officers deciding IDEA-based impartial hearings, the proposed plan's OATH's fact-finders are not able to assure the public that they have no conflict of interest and are not employed by or working at the direction of the City.  In point of fact, under Defendants' plan, they would all be employees of a city agency (OATH), whose Commissioner and Chief Administrative Law Judge serves at the pleasure of the Mayor.

38.     The OATH Plan gives the Mayor direct control, management and oversight of the hearing officers and the hearing system. The Mayor appoints the Schools Chancellor and the OATH Commissioner, and is in control of the DOE, whose policies, procedures, conduct, and program are at issue in the hearing, and is charged by the City Council, for developing the City's budget. The New York City Comptroller's Office has a critical role in preventing mandatory resolution hearings, approving settlements of hearings, as well as in connection with authorizing hearing officer compensation.

39.     Further, this is not a situation in which the Mayor is many steps removed from the issue. Quite the contrary: the Mayor has had an intimate, personal role in policies impacting the impartial hearing process.

**In Administering Impartial Hearings Brought Under IDEA, the Respective Roles, Responsibilities And Functions of the City and it's Department of Education Are Inextricably Intertwined**

40.     Plaintiffs readily acknowledge the line of authority that holds that for purposes of asserting a claim to recover money damages, the City cannot be held liable for the acts or omissions of the Department of Education because the DOE, in that context, is considered to be a separate legal entity. *See, e.g., Romero v. City of New York, 839 F.Supp.2d 588 (E.D.N.Y.,2012). See also Perez ex rel. Torres v City of New York, No. 13084/04, 9789, 9790, 837 N.Y.S.2d 571, 2007 N.Y. Slip Op. 05657, 2007 WL 1841077 (N.Y.A.D. 1 Dept., June 28, 2007)*

41.     Plaintiffs urge, however, that in order to ensure and enforce IDEA's due process requirement of judicial impartiality for hearing officers who are presiding over impartial hearings, this Court should recognize a material distinction between the situation where a litigant is wielding a claim for money damages as a "sword" against the City and the defensive "shield" situation presented in the case at bar, where plaintiffs are seeking to *protect* students with disabilities from

being prejudiced by the serious conflict of interest that would arise here to impair plaintiffs' due process entitlement to an "impartial" hearing.

42.     The "separate" status of the City and its DOE for purposes of imputing financial liability for purposes of *respondeat superior* does not apply here (a) where the Chancellor is selected and serves at the pleasure of the Mayor of the City, who sets education policy for the DOE, including policy for how the DOE handles hearings as a party; (b) where the DOE is treated as a de facto municipal  agency, financially responsible for the costs of the relief awarded in hearings and subject to audit and financial control of the New York City's Comptroller in relation to impartial hearings; (c) where the Mayor also oversees OATH and selects the OATH Commissioner; (d) where OATH's hearing officers are required to be City employees who also reside in the City. In the context of administrating impartial hearings with the impartiality and procedural safeguards required by law and state, plaintiffs allege and urge that the roles and functions of the City and its Department of Education are inextricably intertwined and impermissibly so relative to the OATH plan.

43.     For many years, the Impartial Hearing System has been a challenging political and financial issue.

44.     Until 2014, the City assumed an aggressive litigation stance against parents.  Six months into Mayor De Blasio's first term, he determined to revamp the City's strategy around hearings.

45.     In June 2014, the Mayor adopted and announced a plan pursuant to which the City would stand back from litigating claims and move to settle claims with parents beginning in September 2014.

46.     This agreement, upon information and belief, was a political deal made by the Mayor with a broad coalition of legislators, including former Speaker Sheldon Silver, Senator Simcha Felder and Assemblyperson Helene Weinstein, to avoid a particular bill that would have made tuition funding permanent for certain private school families. *See* Mayor de Blasio and Speaker Silver Announce New Steps to Help Families of Students with Disabilities, June 24, 2014.[1]

47.     Concerning that initiative, the Mayor announced:

The special education placement process has been fraught with contention and litigation in recent years. The changes announced today will simplify and expedite the process for families with valid claims. The Department of Education is committing to render decisions about whether to settle cases within 15 days, to expedite reimbursements to parents, and to limit the paperwork they are required to submit. The changes were developed in consultation with Speaker Silver and the New York State Assembly.

Every child in this city deserves a quality education. But for years, parents of children with special needs have had to wait for the City to settle legitimate claims for tuition reimbursement. Today, we are turning the page, making changes that will ease the burden on these parents. We are cutting red tape, speeding up the process, and reaching outcomes that do right by families," said Mayor Bill de Blasio.

*Id*.

48.     At a June 24, 2014, press conference announcing this initiative, the Mayor noted that  "what was increasingly clear was we needed a streamlined, parent friendly, family friendly, respectful approach. It didn't matter how good your lawyers were or how much money you had to spend on lawyers, but actually tried to address the family's needs." He claimed that the changes afforded the City an opportunity to "right some wrongs" for those families whose children's needs could not be met by the school system.  He stated that while the prior, ostensibly more aggressive

---

[1] Published at https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (last visited December 17, 2021).

approach may have represented a "good litigation strategy," it was "not a humane way to run a school system, it was not fair to families, it was not fair to children who had the needs."

49. The plan was thus allegedly designed to "reduce extended legal battles" pursuant to which the DOE would "refrain from re-litigating settled or decided cases, unless there is a change in the IEP placement recommendation" and "avoid unnecessary litigation in cases where the agency is unable to offer a placement, or when a child is about to enter the final grade of a school." Further the plan was designed to reduce paperwork for families and also facilitate expedited tuition payments by the DOE.

50. At the press conference, then Speaker Sheldon Silver noted that this commitment shows "administrative actions that will bring fairness and justice to children and families."

51. There was widespread support for this plan from a wide group of stakeholders.

52. Unfortunately, however, the DOE's Office of General Counsel did not implement the resources needed to effectively manage this reform initiative and failed to ensure that the impartial hearing system and the DOE's Special Education Unit charged with settlement were aligned and had resources in place to implement such policy.

53. The DOE's requests to the New York City Comptroller for settlement authority, combined with the DOE's failure to ensure that the impartial hearing system procedures were adequate to support the initiative, combined with other factors to create a "perfect storm" with the hearing system nearing crisis on the front end, and payment processing delays worsening on the back end.

54. After the plan was implemented, upon information and belief, the number of hearings increased from 5,000 during the 2015-2016 school year to 14,266 during the 2020-2021 school year.

55.     Further, according to a March 2021, NYC Independent Budget Office ("IBO") brief, the cost of impartial hearings to the City grew from $200 million in 2014 to $700 million in 2020.

56.     The IBO noted that the "rapidly growing cost [of hearings] has drawn increasing attention and *prompted efforts to control future growth*" (emphasis added). The IBO concluded that "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors that are out of the department's control: private school tuition costs and *how often parents succeed when seeking reimbursement for services to meet their children's needs*" (emphasis added).

57.     Due to the above, and other factors as alleged herein, such as insufficient and disparate compensation policies for hearing officers presiding over New York City hearings, lack of space for hearings, and management issues at the hearing office, a backlog of hearings developed.

58.     As set forth herein, since 2018, there have been various efforts to address problems with the impartial hearing system.

59.     By the current OATH Plan, the defendants appear to have come up with a stealth way to undermine the hearing process by summarily decertifying all current hearing officers who are relied upon by District Courts as educational experts and placing the hearing process under the custody, control, and oversight of an entirely new cadre of full-time city employee hearing officers who would be responsible for rendering decisions directly under the incoming Mayor's control.

**The OATH Plan Effectively Removes the Majority of the Experienced Hearing Officers**

60.     In addition to the structural conflict of interest that the OATH plan proposes, the proposed OATH Plan, as implemented, is also designed to remove the majority of the long-term

hearing officers with IDEA and related special education expertise and replace them with lower paid OATH employees who do not possess such expertise.

61.     The majority of the most experienced hearing officers are either (a) working part-time or (b) live outside of the City limits and do not fall into one of the exceptions. As such, they are ineligible to apply for the position.  *See* Exhibit C.

62.     Moreover, the OATH plan is moving forward at the speed of light, days before the administration change, in a haphazard fashion, with insufficient training and oversight for new IHO's who are not being required to have any IDEA experience as a condition of their employment. In rushing to implement the OATH plan, defendants recklessly failed to honor their affirmative obligation to provide plaintiffs' counsel with at least 45 days' prior notice of such plan, as directed by Judge Keenan in his 2002 Order and Stipulation.

63.     In addition to the above, as well as the other allegations alleged herein, the current OATH plan violates New York State Education Law, as well as the New York City Charter.

64.     The OATH plan should be immediately and temporarily enjoined.  Once the OATH plan moves forward at the beginning of the year, it could become very difficult, if next to impossible, to unscramble the egg and will cause additional irreparable harm, injury and delay to the vulnerable children and families who have invoked or will invoke due process.

65.     On the other hand, in equity and fairness, particularly given Defendants' failure to comply with Judge Keenan's 2002 Stipulation and Order directing Defendants to provide Plaintiffs' counsel with 45 days' advance notice of any further plan to substitute OATH, defendants will not suffer any hardship by a delay of this plan, as the existing hearing system will merely continue to operate just as it has been for more than twenty years.

## JURISDICTION AND VENUE

66.     This Court has jurisdiction under 28 U.S.C. §1331 in that claims are asserted under the laws of the United States, under 28 U.S.C. §1343(a) in that claims are asserted under laws providing for the protection of civil rights, and under 20 U.S.C. §1415, Title II of the ADA, 42 U.S.C. § 12133, 42 U.S.C. §1983, and 29 U.S.C. §794, *et. seq*.

67.     This Court has jurisdiction over Plaintiffs' pendent State law claims pursuant to 28 U.S.C. § 1367. Plaintiffs also seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

68.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which Defendants are situated and/or reside.

## PARTIES

69.     All Plaintiffs parents and their children live in New York City.

70.     E.F. is the parent of O.F., a child with a disability under the IDEA.  O.F. has filed impartial hearings on behalf of his child and will continue to do so long as New York City does not offer O.F. the educational resources that O.F. needs in order to learn.

71.     J.R. is the parent of K.R., a child with a disability under the IDEA.   J.R. has filed impartial hearings on behalf of her child and will continue to do so long as New York City does not offer J.R. the educational resources that she needs in order to learn.

72.     J.F. is the parent of H.F., a child with a disability under the IDEA.  J.F. has filed four impartial hearings on behalf of his child and plans to file a fifth hearing for the 2021-2022 school year, as H.F. was not offered any program or placement.

73.     L.V. is the parent of N.F., a child with a disability under the IDEA.  L.V. has filed four impartial hearings on behalf of her child.  The DOE failed to offer N.F. an IEP for several

school years.  Based on the lack of services and programs for children with Autism with N.F.'s unique profile, it is not speculative that L.V. will have to file for due process in the future.

74.     M.S. is the Parent of J.S. and Q.S., two children with disabilites under the IDEA. M.S. has filed impartial hearings on behalf of both of his children and will continue to do so long as New York City does not offer J.R. the educational resources that she needs in order to learn.

75.     All plaintiff children are also qualified individuals with disabilities the impact their major life functioning as those terms are defined under Section 504.

76.     Initials are used throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 ("FERPA").

77.     Defendant MAYOR BILL DE BLASIO is the Mayor of New York City for the next week until December 31, 2021.

78.     Defendant THE NEW YORK CITY BOARD OF EDUCATION (the "Board of Education" or the "Board") is the body charged with promulgation of responsibilities under N.Y. Educ. Law § 2590-b and N.Y. Educ. Law § 4404.

79.     Defendant MEISHA PORTER is the Chancellor of the New York City School District (the "Chancellor") and is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h.  Commissioner Porter was appointed by Mayor De Blasio.

80.     Upon information and belief, Defendant THE NEW YORK CITY DEPARTMENT OF EDUCATION ("Department" or "DOE") was created by the Board pursuant to the Board's By-Laws.

81.     Chancellor Porter is about be replaced by DAVID BANKS, selected by Mayor-elect Adams.  Incoming Chancellor Banks will be the successor-in-interest to Chancellor Porter.

82.     Defendant JONI KLETTER is the Commissioner and Chief Administrative Law Judge of OATH, appointed by Mayor De Blasio.

83.     The Local Educational Agency ("LEA") is responsible for providing a Free Appropriate Public Education (a "FAPE") under the IDEA to all disabled children in New York City.

84.     All City Defendants either jointly and/or individually constitute the "Local Educational Agency" under the IDEA.

85.     New York State has chosen to receive funding under the IDEA and has established procedures for providing special educational services to children with disabilities, as set forth in N.Y. Educ. Law §4401, *et seq*. and 8 N.Y.C.R.R. Part 200.

86.     Defendant NEW YORK STATE EDUCATION DEPARTMENT ("NYSED") is the State Educational Agency ("SEA") in New York State pursuant to the IDEA.

87.     Defendant DR. BETTY A. ROSA, COMMISSIONER OF EDUCATION ("Commissioner Rosa"), is in charge of NYSED.

88.     All Defendants are being sued in their official capacity.

89.      The City, the Board, the DOE, NYSED and the Commissioner are recipients of funding under the IDEA.

90.     The City, the Board, the DOE, NYSED and the Commissioner are recipients of funding as that phrase is defined under Section 504.

## LEGAL AND STRUCTURAL FRAMEWORK

**Applicable Provisions of the IDEA**

91.     The IDEA guarantees that all eligible children with disabilities, ages three through twenty-one, must be offered a FAPE.  20 U.S.C. § 1412(a) (1).

92.     A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d) (1) (A)-(B).

93.     A FAPE must "include an appropriate . . . secondary school education in the State involved"; and (d) be provided in conformity with an IEP.  *See* 20 U.S.C. §§ 1401(9), 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).

94.     To be entitled to a FAPE, a child must have one or more of thirteen disabling conditions and, by reason of his/her disability, require "special education" and "related services." 34 C.F.R. § 300.8(a)(1).

95.     By the beginning of each school year, Defendants must have an Individualized Education Program, or "IEP" in place that offers a FAPE to each eligible child.  20 U.S.C. §1414(d)(2).  An IEP must be individually tailored to each student and is meant to serve as a blueprint for each child's special education services.  20 U.S.C. § 1414(d).

96.     The IDEA and state and federal regulations prescribe, in detail, the process for developing IEPs and their contents.   20 U.S.C. § 1414(d)(1)(A), (d)(2); 34 C.F.R. §§ 300.320(a)(2)-(3); 300.324; N.Y. Educ. Law § 4401, *et seq.;* and 8 N.Y.C.R.R.§ 200.4(d)(2)(iii).

97.     DOE Defendants are responsible for providing a FAPE to all eligible children in New York City and for promulgating policies and procedures in accordance with the IDEA.

98.     State Defendants are guarantors of FAPE under the IDEA and are responsible for the provision of a FAPE, if City Defendants are unwilling or unable to provide

99.     State Defendants are obligated to have policies, procedures, protocols, and regulations to ensure the right to FAPE and protect due process rights of children with disabilities and their parents that comply with the IDEA and Section 504.

100.     State Defendants also have an obligation to monitor City Defendants' compliance with the IDEA and to ensure that City Defendants maintain adequate policies and procedures under the IDEA

101.     State Defendants and DOE Defendants are required to establish and maintain procedures in accordance with the IDEA to "ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]." 20 U.S.C. § 1415.

102.     The IDEA contains a complex array of procedural safeguards to protect parents' rights.

103.     One of the IDEA's most well-known due process rights is the right to file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of [a] child" or the provision of FAPE to a child. 20 U.S.C. §1415(b)(6).

104.     Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State Educational Agency or by the Local Educational Agency as determined by State law or by the State Educational Agency." 20 U.S.C. §1415(f)(1)(A).

105.     Plaintiffs urge that the IDEA creates a non-delegable duty to hold the hearings on the part of the State Educational Agency "SEA" (here NYSED) or the "Local Educational Agency" ("LEA") as defined by state law or the SEA. *See* 20 U.S.C. § 1415(f)(1)(A).

106.     An LEA is defined as a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools  *See* 20 U.S.C. § 1401(19)(A).

107.    New York is considered a "two-tier" system in that impartial hearings are held at the district or LEA level, with an appeal to the SEA, in New York, the State Review Officer. *See* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404.

108.    The IDEA requires administrative exhaustion of claims before a parent can litigate claims under other federal statutes:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be *exhausted to the same extent* as would be required had the action been brought under this subchapter.

> 20 U.S.C. § 1415(l).

109.    This provision is relevant, as it shows that hearing officers are also required to be able to preside over complex issues of federal law, other than the IDEA itself.

110.    The IDEA and its regulations set forth detailed requirements for hearing procedures and IHO qualifications.  20 U.S.C. § 1415(f); 34 C.F.R. §§ 300.511-516.

**Hearing Officers Must be Neutral, Impartial and be Free from Conflict of Interest**

111.    The IDEA places restrictions on the qualifications of the "[p]erson conducting hearing."  A hearing officer shall not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing."  20 U.S.C. § 1415(f)(3)(A).[2]

---

[2] If an appeal is taken to the "State Educational Agency" the agency "shall conduct an impartial review of the findings and decision appealed" and "shall make an independent decision upon completion of such review." 20 U.S.C. § 1415(g).

112.    The IDEA regulations clarify that source of payment is not determinative as to a hearing officer's status: "[a] person who otherwise qualifies to conduct a hearing under paragraph (c)(1) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer."  34 C.F.R. § 300.511.

113.    The Second Circuit has taken a strong stand on the importance of the IDEA's guarantee of neutral hearing officers.  In *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148 (2d Cir. 1992), the Court held that "IDEA's language, legislative history, structure, and implementing regulations all bear witness that the Act prohibits the use of biased adjudicators—a prohibition that section 1415(e) permits parents to enforce in federal court."

**Hearing Officers Must be Experts in Special Education**

114.    In addition, the IDEA requires a hearing officer to: "possess knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to [the IDEA] and legal interpretations of [the IDEA] by Federal and State courts," "possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice" and "|possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice."

115.    The Second Circuit and district courts in the Circuit, as well as many courts in other Circuits interpret the IDEA as guaranteeing a hearing officer be an individual with experience and expertise in the area of special education.

116.    This is particularly the case when Courts highlight the structural importance of exhausting administrative remedies prior to seeking relief in Court.

117.    In *Heldman v. Sobol,* 962 F.2d at 159, for example, the Court noted the administrative exhaustion requirement through the impartial hearing process "prevents courts from

undermining the administrative process and permits an agency to *bring its expertise* to bear on a problem as well as to correct its own mistakes." (*emphasis added*). Later, in *Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, 288 F.3d 478 (2d Cir. 2002), the Court held that the "[t]he IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply *administrators' expertise* in the area and promptly resolve grievances." (*emphasis added*).

118.    Further, courts regularly defer to the IHO's decision based on the assumption that the IHOs presiding over these proceedings have extensive expertise in IDEA matters and are more experienced and knowledgeable about the IDEA than judges on the federal bench.

119.    Moreover, a parent has a "right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities" in a hearing. 20 U.S.C. § 1415(h)(1). Thus, while lawyers do represent parents in hearings, many parents are assisted by "advocates" who do not attend law school. Similarly, the DOE has mainly been represented at hearing by non-attorney administrators.

**Applicable Provisions of Section 504**

120.    Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance." 29 U.S.C. § 794(a).

121.    All City Defendants receive federal financial assistance.

122.    Section 504 and the IDEA are often seen as "complementary" statutes that, to a degree, mandate parallel requirements on schools to provide special education and related services.

123.    Section 504 also mandates that the City Defendants provide students who with disabilities a free appropriate public education.

124.    The Section 504 regulations require City Defendants to set up an impartial hearing system to hear and exhaust Section 504 claims. Specifically, the regulations require City Defendants to:

establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of disability,  need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.  *See* 34 C.F.R. 104.36.

125.    The Section 504 regulations provide that compliance with the "procedural safeguards" of Section 1415 of the IDEA is "one means of meeting this requirement."

126.    Section 504 hearing officers must also be neutral, impartial, and free from any conflict of interest.

**Applicable Provisions of New York State Law – Impartial Hearings**

127.    Pursuant to the IDEA's mandate, New York apparently adopted Section 4404 of the Education Law.  Section 4404 provides that upon the filing of a complaint by a parent, district, or other authorized party, the "board of education" or "state agency" "*shall* appoint an impartial hearing officer" to preside over a hearing and render a decision. *See* N.Y. Educ. Law § 4404(1).

128.    Section 4404(2) provides for a rotation system for hearing officers:

Individuals so appointed by a board of education or a state agency shall be selected from a list of available impartial hearing officers who have successfully completed an impartial hearing officer training program conducted by the department according to a rotation selection process prescribed in regulations of the commissioner; *except that a city school*

*district of a city having a population of more than one million inhabitants shall be exempt from such regulations to the extent it maintains its rotational selection process in effect prior to July first, nineteen hundred ninety-three.*

*Id.*

129.    Each district must maintain a rotational selection list, with the names of state-certified IHO's listed alphabetically; selection is made on a rotational basis beginning with the first name appearing after the IHO that last served. 8 N.Y.C.R.R. 200.2(e)(I)(ii).

130.    A 2018 NYSED guidance document underscores the need for an IHO's neutrality:

> No individual employed by a school district, school or program serving students with disabilities placed there by a school district CPSE or CSE may serve as an IHO and no individual employed by such schools or programs may serve as an IHO for two years following the termination of such employment, provided that a person who otherwise qualifies to conduct a hearing under this section must not be deemed an employee of the school district, school or program serving students with disabilities solely because he or she is paid by such schools or programs to serve as an IHO.[3]

131.    Section 4404 provides that the New York State Commissioner of Education "shall establish a department training program which shall be completed to the satisfaction of the commissioner as a condition of certification." N.Y. Educ. Law 4404(c). NYSED is responsible for certifying IHOs. See 8 N.Y.C.R.R. § 200.1(x)(4).

132.    Moreover, Section 4404 provides that IHOs must have the qualifications set forth in the IDEA §1415(f), implementing regulations and the regulations of the Commissioner. N.Y. Educ. Law 4404(c).

133.    The Commissioner is charged with promulgating regulations to ensure that "no individual employed by a school district, school or program serving students with disabilities

---

[3] http://www.p12.nysed.gov/specialed/dueprocess/impartial-hearing-guidance-jan-2018.htm (last visited on December 22, 2021).

placed by a school district committee on special education acts as an impartial hearing officer" within two years of holding that position.  Educ. Law § 4404(c).

134.    Finally, the Commissioner is charged with setting "maximum rates for the compensation of impartial hearing officers subject to the approval of the director of the division of the budget," rather than "minimum rates." *Id*.

135.    With regard to neutrality, the Commissioner's Regulations mandate that a hearing officer:

> be independent, shall not be an officer, employee, or agent of the school district or of the board of cooperative educational services of which such school district is a component, or an employee of the Education Department, ***shall not have a personal or professional interest which would conflict with his or her objectivity in the hearing***, and shall not have participated in any manner in the formulation of the recommendation sought to be reviewed.

8 N.Y.C.R.R. § 200.1(x)(3) (emphasis added).

136.    The New York State regulations were recently amended to further dilute the already watered-down qualifications for IHOs.  Under the current version of the regulations, the State Defendants claim an IHO need only be "admitted to the practice of law and currently in good standing with a minimum of *one year* of practice and/or experience in one of the following areas: education, special education, disability rights, civil rights or administrative law." 8 N.Y.C.R.R. § 200.1(x)(1).

a.    In addition to the above, the regulations require the IHO to "possess knowledge of, and the ability to understand, the provisions of federal and State law and regulations pertaining to IDEA and legal interpretations of such law and regulations by federal and State courts" (8 N.Y.C.R.R. § 200.1(x)(4)(iv)); "possess knowledge of, and the ability to conduct hearings in accordance with appropriate standard legal practice and to render and write decisions in

25

accordance with appropriate standard legal practice" (8 N.Y.C.R.R. § 200.1(x)(4)(v)); "have access to the support and equipment necessary to perform the duties of an IHO" (8 N.Y.C.R.R. § 200.1(x)(2)); "successfully complete a training program" by NYSED (8 N.Y.C.R.R. § 200.1(x)(4)(i), as well as attend periodic trainings (8 N.Y.C.R.R. § 200.1(x)(4)(ii).

137. Recently, amendments to the Part 200 regulations were promulgated that would, *inter alia*, set minimum caseloads for IHOs.

138. In virtually every other school district except for New York City, IHOs are fully independent and are appointed by the boards of education from the list of certified IHOs as part of a neutral, alphabetically-based rotational system.

139. Upon information and belief, in every other school district except for New York City, when an IHO is assigned, that IHO is responsible for all of the work involved in scheduling, coordinating, managing a hearing, hearing motions, reviewing, and issuing subpoenas, holding hearings, reviewing briefs, conducting legal research, and issuing decisions.

140. Upon information and belief, in every other school district except for New York City, the independent IHOs (many of whom are also certified in New York City) are paid $100 per hour for any and all work that is necessary, within the IHO's discretion to perform, relative to the hearing process.

141. Upon information and belief, in every other school district except for New York City, there are no caps or restrictions on work or types of activities that the IHO can perform based on payment. This is not the situation in New York City and will be even more improper after the move to OATH.

142.    Upon information and belief, the IDEA creates a floor and state law and regulations are incorporated by reference into the IDEA and are directly enforceable under the IDEA, or as pendent claims.

**Applicable Provisions of New York State Law: Mayoral Control of the City's School System**

143.    In June 2002, former Governor Pataki signed landmark legislation establishing "Mayoral Control" over the City's school system.

144.    Prior to the adoption of this legislation, the schools were run by thirty-two separate community school districts, and the "Board of Education," which had previously been responsible for both developing policies and selecting and appointing the New York City Schools chancellor.

145.    Under the 2002 Mayoral Control legislation, the Board was increased from seven to thirteen members; with the Mayor being vested with eight appointees, the remainder to be appointed by the borough presidents. N.Y. Educ. Law § 2590-b.  As of 2020, the board was increased to fifteen members, and was to be comprised of "one member to be appointed by each borough president of the city of New York, one member to be elected by community district education council presidents, and nine members to be appointed by the mayor of the city of New York." *Id*.

146.    In addition to having controlling seats on the Board of Education, the Mayor appoints the New York City Schools Chancellor. N.Y. Educ. Law § 2590-h.  The Chancellor has a salary "to be fixed by the mayor" and shall have the "powers and duties as the superintendent of schools and chief executive officer for the city district." *Id.*

147.    Section 2590-h affords the Chancellor fifty-five enumerated powers and duties in Section 2590-h alone, and also incorporates additional powers referenced in other sections of the New York Law, including N.Y. Educ. Law §§ 912, 2554 and the 2590-r.

148.    Among other powers and duties, under Mayoral Control, the Chancellor was vested with the authority to "control and operate . . all special education programs and services."  N.Y. Educ. Law § 2590-h(1)(c).   However, New York State law did not also afford the Chancellor the duty or authority over the impartial hearing process or any aspect of Section 504.

149.    As part of Mayoral Control, the role of the Board of Education was curtailed.  It retained the role of "advising" the Chancellor on "policy affecting the welfare of the city school district and its pupils," but was thereafter banned from any management functions: "[e]xcept as otherwise provided by law, the board shall exercise no executive power and perform no executive or administrative functions." N.Y. Educ. Law § 2590-b.

150.    Notably, the Board remained the "government or public employer of all persons appointed or assigned by the city board or the community districts," which has now developed into one source of the confusion concerning relationships between the parties. N.Y. Educ. Law § 2590-b(2).

151.    Among other things, the Board also retained the power to "approve standards, policies, objectives and regulations proposed by the chancellor directly related to educational achievement and student performance" as well as "maintaining the internal fiscal integrity of administrative operations by the chancellor, the community districts and the schools."  Id. Further, the Board retained the power to "consider and approve any other standards, policies, objectives and regulations at the request of the chancellor, or otherwise only as specifically authorized or required by state or federal law or regulation. *See* N.Y. Educ. Law § 2590-b(1)(a)-(c).

152.    After the Mayoral Control legislation was passed, the Board voted to name itself the "Panel for Educational Policy ("PEP")." *See* PEP Bylaws.

153.    Under Section 4404, the responsibility for appointing hearing officers certified by NYSED remained with the Board.

**The New York City Department of Education**

154.    The DOE is not a creature of either New York State or federal law.

155.    Rather, the PEP Bylaws created the "Department of Education" which was defined in the PEP's By-Laws:

> The PEP is a part of the governance structure responsible for the City School District of the City of New York, subject to the laws of the State of New York and the regulations of the State Department of Education. Other parts of the structure include the Chancellor, superintendents, community and citywide education councils, principals, and school leadership teams. Together this structure shall be designated as the Department of Education of the City of New York.

> *See* PEP Bylaws.

156.    The DOE is not a city agency created by the New York City Charter.

157.    The DOE appears to be considered a municipal agency for certain purposes, while not considered an agency for others.

158.    Courts are also split on this issue, depending on the context.

159.    Regardless of whether the DOE is or is not formally an agency of New York City, the DOE, the Mayor, and the City are interrelated for the purposes relevant to the issues in this case.

160.    As alleged elsewhere herein, the Mayor's office has an intimate, involved relationship with the impartial hearing procedures, and the City's financial obligation as a result of the Impartial Hearings causes an inherent conflict of interest for any hearing officers who would be selected, employed, controlled, and supervised by the City.

161.    The DOE's relationship with the New York City Comptroller further underscores the DOE's level of enmeshment with the City as a whole, particularly in relation to impartial hearing operations.

162.    Among other things, although the DOE is not a city agency created by the Charter, and the New York City Comptroller's authority is limited to city agencies (*see* N.Y.C. Charter Sec. 91), the Defendants and the City Comptroller both believe that the DOE is subject to the City of New York City Charter § 93(i).

163.    According to a DOE report, "New York City Charter § 93(i) which provides that only the New York City Comptroller may settle claims against or on behalf of the City where there is a monetary component to the settlement terms. The DOE is therefore prohibited from entering into settlements for monetary relief" after an impartial hearing is filed without Comptroller approval.

164.    In a letter to NYSED in 2019, DOE further highlighted the manner in which the Comptroller's involvement and control over the DOE distinguishes it from the rest of the state:

We recognize that NYSED oversees the impartial hearing process across New York State. It is important to note that New York City's process is different from the rest of the state due to the requirements of the City Charter. We understand that NYSED would like for NYCDOE to reduce unnecessary hearings by authorizing staff to enter into settlements at impartial hearings, but because of the City Charter requirement for Comptroller authority, NYCDOE must undertake a detailed legal and financial review of each case in order to make an informed recommendation for Comptroller approval.

**Applicable Provisions of New York City Law: Jurisdiction and Mayoral Control of OATH**

165.    OATH is a creature of the New York City Charter.

166.    The New York City Charter provides that "[t]here shall be an office of administrative trials and hearings which shall conduct adjudicatory hearings for all agencies of the

city unless otherwise provided for by executive order, rule, law or pursuant to collective bargaining agreements." *See* New York City Charter § 1048(1).

167.    Moreover, just like the Chancellor of the City's Schools, the "chief administrative law judge " of OATH "shall be appointed by the mayor." *Id*.

168.    Mayor De Blasio appointed Defendant Kletter to this position.

169.    According to the OATH website, Ms. Kletter is the former Director of the Mayor's Office of Appointments where she oversaw and coordinated "candidate recruitment, sourcing, and vetting of candidates, including interviewing for agency Commissioners and senior-level staff, as well as the Mayor's appointees to over two hundred Boards and Commissions."

170.    Ms. Kletter's biography notes that before she served as Director of the Mayor's Office of Appointments, "she served as First Deputy Director and Counsel in the Mayor's Office for City Legislative Affairs. There, she played a central role in shaping the Administration's public policy; advancing the Administration's local legislative agenda; negotiating City Council legislation; and preparing agencies and Commissioners for City Council hearings."

171.    Presumably this would have included education policy and education-related legislation.

172.    Upon information and belief, Ms. Kletter also served as Treasurer of the Mayor's 2017 election campaign.

173.    At some point, when Mayor-elect Adams assumes the position of Mayor, he will have the authority to designate one of his close, political allies to the position held by Ms. Kletter.

174.    Under the New York City Charter, "the mayor shall be authorized to designate by executive order the office of administrative trials and hearings as the tribunal for the impartial administration and conduct of adjudicatory hearings for violations of this charter, the

administrative code of the City of New York, rules promulgated pursuant to this charter or such code and any other laws, rules, regulations or other policies enforced or implemented by the agencies of the city through the conduct of adjudications." New York City Charter § 1048(2)

175.    OATH's jurisdiction is limited to City agencies. New York City Charter § 1048.

176.    Upon information and belief, OATH's authority under the New York Charter is limited to New York City laws, rules, and codes.

177.    Neither state nor federal law has vested OATH with jurisdiction under federal statutes and regulations or New York state special education law.

178.    A review of the kinds of cases assigned to OATH underscores its limited jurisdiction.

179.    OATH has two divisions responsible for adjudicating City matters: the OATH Trials Division and the OATH Hearings Division.

180.    The 2021 Mayor's Management Report describes the Trials Division as follows:

The Trials Division adjudicates a wide range of issues that can be referred by any City agency, board, or commission. Its caseload includes employee discipline and disability hearings for civil servants, Conflicts of Interest Board cases, proceedings related to the retention of seized vehicles by the police, City-issued license and regulatory enforcement, real estate, zoning and loft law violations, City contract disputes, paid sick day violations and/or fair workweek violations and human rights violations under the City Human Rights Law.

181.    Upon information and belief, the OATH Trials Division employs approximately thirteen Administrative Law Judges (ALJ's).

182.    According to the 2021 Mayor's Management Report, less than 2700 cases are filed with the Trial's Division each year. The 2021 Mayor's Management report claims that anywhere from 184-200 cases were "processed" by each ALJ and the OATH Trial Division closed less than

2400 cases each year.    However, OATH does not report on the number of cases closed by the issuance of a decision.

183.    The 2021 Mayor's Management Report describes the Hearings Division of OATH, which holds hearings "on summonses issued by different City enforcement agencies for alleged violations of law or City rules" such as " the Departments of Buildings, Sanitation, Environmental Protection, Consumer and Worker Protection, Health and Mental Hygiene and the Taxi and Limousine Commission, among others."

184.    Upon information and belief, the Hearings Division is staffed with a variety of full-time, part-time and *per diem* "hearing officers."

185.    According to the 2021 Mayor's Management Report, pre-COVID, for the fiscal year 2019, the Hearings Division received 837,778 summonses from the various City agencies. Out of those, 340,563 were "adjudicated"; 663,327 were "processed" and "261,906" cases resulted in decisions.

186.    OATH does not report hearing officer caseloads in the statistics in the Mayor's Management Report.

187.    Further, even for City agencies, the Charter contains specific provisions that must be followed before an agency can transfer City agency hearings to OATH.

188.    Under the Charter, the Mayor may issue an Executive Order to "transfer entire tribunals or parts thereof, or categories of adjudications" to OATH, "which may perform such responsibilities, including responsibilities delegated elsewhere by this charter or other law, as the mayor shall direct in such order."  *See* New York City Charter § 1048(3)-(4).

189.     However, prior to a transfer, the Mayor ***must*** convene a committee to evaluate the adjudicatory functions and publish a final report concerning the findings. *See* New York City Charter § 1048(4)(a).

190.     Further, "[b]efore recommending transfers of tribunals or parts thereof, or of categories of adjudications, the committee shall solicit comments from the public, including, to the extent practicable, any segments of the public particularly affected by such transfers. In furtherance of such solicitation, the committee or a person or agency designated by the committee shall hold a public hearing, on notice of at least twenty days published in the City Record. Such notice shall specify the transfers that are under consideration by the committee for recommendation to the mayor." New York City Charter § 1048(4)(b).

191.     Upon information and belief, the provisions in the Charter for moving hearings to OATH were not followed here.

## SYSTEMIC FACTS

192.     In Fiscal Year 2021, the Mayor's Management Report indicated that there were 292,065 students in New York City receiving special education services. Of those, 260,482 were school-age public school students and 31,583 were preschool students.

193.     The New York City special education system is plagued with numerous problems, causing students to be unserved and/or underserved. The overall special education graduation rate is approximately 30 percentage points lower than the general education graduation rate and falls 10, 20 and even 30% less than the national graduation rate for students with disabilities in certain community school districts.  Further, even when students graduate, they do not graduate college nor are they work-ready.

194.    Notably, while a FAPE is required to be individualized, the DOE has a limited menu of options, requiring families to request hearings merely to obtain an off-menu service that should be – but is not – offered at IEP meetings.  Moreover, under the City's policies, parents have to file hearings, year-after-year, usually for the same relief, as prevailing for a child in one year will not ensure the services for any future year without litigation being re-filed.  Upon information and belief, a significant percentage of hearings are repeated filings.

195.    As noted above, when the DOE fails to offer a FAPE to a child, which it often does, a parent may seek a hearing to obtain a remedy.

196.    In general, parents seek the following remedies hearings: tuition for a private school, compensatory education (*i.e.,* services to make up for past denials of a FAPE), transportation, payment for additional services, funding for mandated services that are not being provided but which the DOE agrees are required based on the student's educational plan, changes to a child's IEP, independent evaluations, and Section 504 plans.

197.    While many of the parents are seeking reimbursement for or direct payment of tuition, a growing number of parents are seeking compensatory education, to make up for past deprivations, as many families are unaware of, cannot afford to or cannot access a private school and make a unilateral placement. That remedy is often funding for tuition for a private special education school, or for other services, such as tutoring for children with learning disabilities, Applied Behavior Analysis for children with Autism, funding for IEP-mandated services that are not being provided including special education teacher services, and various therapies that include occupational therapy, speech and language therapy and physical therapy.

198.    Hearings are generally filed by five categories of litigants: parents who pay their attorney and seek reimbursement of tuition or other services; parents who cannot afford to pay

tuition or for services, who are represented by lawyers in nonprofit agencies or private public interest firms and who do not charge the parents up front retainers and who primarily seek fees under the IDEA's fee-shifting model, parents who are assisted by non-attorney advocates, and parents who are *pro se*.

199.     The fifth category of hearings, and a large part of the increase in filings, are filed by advocates and lawyers who are not seeking a FAPE under the IDEA, but who are seeking funding for services owed under a New York State statute (N.Y. Educ. Law § 3602-c) that provides children in religious and secular schools to receive "equivalent" special education services even if a FAPE is made available. Thus, New York State expanded the due process rights to this group of families, some of whom would not be able to file a hearing under the IDEA, depending on the nature of the claims.

200.     Hearings are supposed to be less formal legal proceedings, which parents can access on a *pro se* basis. Hearsay is permitted and strict rules of procedure and evidence are not applied. Until the OATH plan was implemented, the DOE rarely assigned attorneys to litigate hearings. The DOE was mostly represented by non-attorney representatives.

201.     The majority of cases settle and/or are decided in favor of the parent and student.

202.     Over the life of the hearing system, only a small number of cases proceed to decision.

**Defendants Have a Powerful Financial Incentive to Reduce Parent Success in Hearings**

203.     Defendants collectively and individually have a powerful financial incentive to try to reduce the success rate of families who file for hearings.

204.    As noted by the New York City Independent Budget Office in their March 2021 briefing, "Carter Case Spending for Students With Special Needs Continues to Grow Rapidly," the cost of the hearings has grown 500% since 2014.

205.    Although this brief references "Carter Cases," upon information and belief, it refers to the full range of impartial hearing cases as it notes: "the number of Carter students has risen steadily in recent years, from roughly 5,300 in 2015 to almost 14,000 so far this year."

206.    This matches the overall number of hearings.

207.    The IBO Brief notes that "Carter Cases are a relatively little-known section of the DOE's expense budget, *although their rapidly growing cost has drawn increasing attention and prompted efforts to control future growth*." (emphasis added).

208.    The brief notes that "In September 2014, the DOE implemented a set of changes to simplify and expedite the reimbursement process for parents. First, the DOE set a goal of settling Carter Cases within a 15-day window after receiving notice of private school placement. Second, the DOE said it would not re-litigate settled cases unless a student's IEP is changed or when the child enters the final grade of his or her school. Third, the DOE would only require paperwork from parents every three years."

209.    The IBO Brief noted the growing costs of the cases:

The addition of $220 million to the current year's budget for Carter Cases brings the 2021 budget for these expenses to $653 million. Forty percent of the increase was due to settlements of cases from prior years. Similarly, last year's Preliminary Budget included a $150 million increase in 2020 for prior year Carter Cases that raised the budget at that time to more than $540 million. Nonetheless, actual expenditures for Carter Cases in 2020 were $710 million, 31.4 percent higher than the budgeted amount. Despite this rapid growth, the additional $220 million added to the Preliminary Budget is only a one-year adjustment for this fiscal year and has not been included (baselined) beyond 2021.

210.    "Total expenditures for Carter Cases, adjusted for inflation, grew by more than 500 percent over a little more than a decade, from $107 million in 2010 to $710 million in 2020."

211.    Funding for tuition and services constitutes the majority of the budget, while legal fees and litigation costs have only amounted to 2.2 to 6.6 percent of the total costs within the past ten years

212.    The most troubling part of the IBO Brief ends with this conclusion: "[f]rom the DOE's fiscal perspective, Carter Case expenditures are difficult to budget for because they are largely determined by two factors that are out of the department's control: private school tuition costs and *how often parents succeed when seeking reimbursement for services to meet their children's needs*" (emphasis added).

213.    Thus, the City Defendants have an incentive to try to influence the outcomes of these hearings and make it more difficult for parents to prevail, as they are attempting to with the OATH plan.

214.    However, when averaged across all litigants who filed hearings in the 2020-2021 school year, the average cost per case is approximately only $50,000, approximately half of what the DOE allocates for each student who attends a special education class in the City's special education District 75.

**The State Education Defendants Have a Powerful Incentive to Curb Relief in Hearings**

215.    The State Defendants also have a vested interest in the outcome of certain cases, given their supervisory role under the IDEA and state law.

216.    State Defendants have fiscal liability to the federal government if they fail to supervise or ensure that the DOE is adequately implementing the IDEA.

217.    State Defendants have repeatedly proposed legislation and policy changes that would curb parents' rights and limit their ability to obtain relief through impartial hearings, in an effort to reduce special education hearing costs and limit parents' access to due process.   The documents generated in support of the effort highlight the goal of limiting access to due process and reducing the costs of paying for failures in the system.

**The Current Hearing System and Backlog**

218.    As set forth above, NYSED is responsible for recruiting, training, and certifying IHOs for the entire state of New York and more then 800 school districts.

219.    Historically, IHOs in the state have been independent contractors.

220.    Until the proposed move to OATH, the DOE has operated the New York City Impartial Hearing Office ("NYCIHO").

221.    Upon information and belief, the NYCIHO functions to "oversee the administrative and clerical aspects of impartial hearings" for the DOE.

222.    New York City has maintained a rotational list of independent contractors certified by NYSED as IHOs that have agreed to accept New York City cases.  Some of the IHOs worked on a full-time basis, while others worked on a part-time basis while maintaining a law practice.

223.    Until last year, IHOs were assigned pursuant to a rotational system.

224.    However, last year, the DOE illegally abandoned the rotational system with the consent of NYSED.

225.    In addition to processing IHO assignments when cases are filed, the NYCIHO office employs case managers who assist with scheduling and uploading information into the impartial hearing date system.  That office also processes exhibits, transmits records on appeal to the State Review Officer and processes payments to IHOs.

226.    The NYCIHO promulgates an elaborate Compensation Schedule, pursuant to which certain tasks of IHOs are compensated, while others are not.

227.    NYC does not pay IHOs the rate of $100 per hour paid by districts outside of the City.

228.    In 2018, Assistant Commissioner Christopher Suriano of NYSED retained a consultant to implement an independent review of the NYCIHO.

229.    The stated purpose of review "as broad – to better understand the functioning of the NYCIHO and its policies, procedures and practices specific to special education impartial hearings. In scope, however, the review focused on, though not limited to, the assignment of hearings to IHOs, the payment structure for IHOs, the specific assistance provided to IHOs by the NYCIHO, and the observation, availability and suitability of hearing room space." *See* External Review Of The New York City Impartial Hearing Office, February 22, 2019 ("Merced Report").

230.    The Merced Report was issued in February 2019.

231.    The Merced Report found that despite the large volume of hearings, few cases were fully adjudicated. He noted that in fiscal year 2017, only 11% of cases resulted in a written final decision and 49% of cases were withdrawn, dismissed, or settled.

232.    The Merced report highlighted a number of deficiencies in the impartial hearing process as operated by NYSED and the DOE.

233.    Among other things, the report noted that there were insufficient facilities for holding hearings, delays in processing documents, a failure to settle and resolve cases and unnecessary hearings being held for matters that the DOE should not be contesting. Further, the report found that IHO compensation was severely deficient in that IHOs were not being adequately compensated for their work, as IHOs in other parts of the state are.

40

234.    Leading up to the Merced Report, among other things, complaints had been raised by lawyers for parents due to an increased number of recusals of IHOs, causing delays in access to due process.

235.    NYSED has long failed to adequately recruit and certify new IHOs for New York City. One of the barriers to recruiting IHOs for New York City has been the problematic compensation policy and delays in payments to IHOs.

236.    The Merced Report highlighted deficient IHO compensation, among other things, as part of the challenge of recruiting qualified IHOs and Mr. Merced concluded that the system was heading toward collapse:

> This review identified substantial deficiencies in the policies, procedures and practices specific to special education impartial hearings in New York City, including the high rate of extensions granted, the considerable number of recusals, the inadequate payment structure for IHOs, and the insufficient number of hearing rooms available to accommodate the day-to-day hearing schedule. Each presents a threat to due process. Collectively, however, they render an already fragile hearing system vulnerable to imminent failure and, ultimately, collapse.

> That it has not yet collapsed is remarkable given the staggering numbers of due process complaints filed in New York City. (See Figure 2, above.) A plausible explanation for this may be the mutually beneficial relationships that have formed to allow IHOs, parties (inclusive of the NYCDOE), and the NYCIHO to coexist by "turning a Nelson's eye." Though the NYCIHO finds itself between the proverbial rock and a hard place, serving two masters, such does not excuse any failure to comply with basic tenets of due process, including, for example, having an adequate number of hearing rooms available to accommodate the elevated number of hearings on a day day-to-day basis and fairly compensating IHOs commensurate with their responsibilities.

> *See* Merced Report at 22.

**Defendants' Finger Pointing Following the Merced Report**

237.    The Merced Report contained a number of recommendations. After the Merced Report, State Defendants and City Defendants started a game of finger pointing at each other to try to avoid responsibility for the growing problems in the IHO system.

238.    In May 2019, State Defendants issued the DOE a Compliance Assurance Plan ("Compliance Plan"), which was an extensive monitoring report citing the DOE with multiple violations, including violations in the hearing system, many of which were also caused by State Defendants' actions and inaction.

239.    State Defendants determined that the DOE was not in compliance with its obligation to ensure a functioning due process system.

240.    According to the Compliance Plan, State Defendants identified "noncompliance with respect to NYCDOE's obligations to maintain a functioning due process hearing system" that included claims that the DOE "1. Fails to provide parents access to adequate due process after a complaint has been filed; 2. Fails to provide access to due process data to NYSED; 3. Fails to ensure access to mediation; and 4. Fails to provide prior written notice."

241.    State Defendants noted that by February 22, 2019, there were 7,488 DPCs filed.

242.    In addition, State Defendants also noted that the DOE "does not defend numerous cases at hearing, but rather admits that it did not provide FAPE and [yet still] does not offer to settle these cases, adding to the unacceptable number of due process complaints filed."

243.    The Compliance Plan and the Merced Report documented a range of other problems and issues.

244.    The Compliance Plan directed the DOE to provide a "corrective action plan to correct its failure to provide students with disabilities and their parents all the rights and procedural safeguards required by federal and State law and regulation."

245.    On or about this time, the nonprofit special education bar began advocating for measures to address the delays.

246.    In June 2019, the DOE responded to NYSED by letter (the "2019 Letter"), noting that as of June 14, 2019, there were only nine IHOs in rotation with over 9,000 hearings filed in 2018-2019.

247.    The 2019 Letter ironically noted that the DOE was "committed" to "ensure" that "families are empowered to support their children in the best way possible. This includes working with families who believe that the NYCDOE has failed to provide their children with disabilities with a free appropriate public education (FAPE) and are pursuing their due process rights through the impartial hearing process."

248.    However, the 2019 Letter describes a reshuffling of the deck, pursuant to which the responsibility for the hearings was transferred from the Division of Finance to the Division of School Planning and Development (DSPD).

249.    The 2019 Letter claims the DOE was taking steps to "Increase in the number of staffing resources to" NYCIHO, procure additional hearing space and to ensure that the allocation of resources is adequate to ensure regular, prompt payment to IHOs.

250.    In early 2020, State Defendants bizarrely determined that a solution to the IHO shortages would be to revert back to a decades-old policy that did not require IHOs to be lawyers. However, years ago, the requirement that an IHO had to be a lawyer was added to the state law because the system that had been presided over by individuals without law degrees was denying families due process.

251.    The special education bar as well as some legislators and interest groups representing the interests of parents united against this proposal and NYSED determined not to pursue the regulatory amendment that would have permitted it.

**During COVID-19, Changes Were Made that Have Begun to Improve the Delays**

252.     In mid-March 2020, due to COVID-19, the NYCIHO closed down their offices and impartial hearings began to be held telephonically. This shift happened relatively seamlessly, as many witnesses already were testifying by phone even when the hearings were held in person. Further, it eliminated waiting time and resolved space issues.

253.     As a result, the parent's bar, as well as the Defendants, realized that that remote hearings were effective and should be continued beyond COVID.

254.     Further, the continued practice of holding remote hearings could solve the problem of having an insufficient number of "experts" in special education to preside over hearings in New York City, as well as solve the facilities challenges that had been plaguing the system.

255.     However, it was generally agreed that video conferencing should be made available.

256.     Hearings were held successfully by telephone since March 2020.

257.     A new video conferencing system designed by the DOE was just implemented as of December 20, 2021.

258.     Moreover, during the Pandemic, NYSED started to actively recruit and train new classes of IHOs.

259.     Since January 2020, NYSED claims to have certified more than 100 new IHOs to work exclusively in New York City.

260.     Upon information and belief, a significant number of the New York City IHOs trained and certified on the rotation in New York City do not currently live within New York City.

261.    Moreover, legislation was passed by both the New York State Assembly and Senate during the 2021 New York legislative session which is awaiting signature by the Governor that provides for a remedy when a hearing officer cannot be timely appointed.

**JSM Litigation**

262.    On February 20, 2020, several parents filed a class action against DOE and State Education Defendants alleging that hearings were delayed beyond the timelines mandated by the IDEA and state law. *See J.S.M., et al. v. N.Y.C. Dep't of Educ., et al.*, 20-cv-705 (EK)(RLM), Dkt. No. 1.

263.    Defendants did not oppose class certification and on June 18, 2020, the Court so ordered a stipulation certifying a class consisting of "[i]ndividuals who file or have filed due process complaints, and the children on whose behalf due process complaints are filed, when the due process complaints are unresolved and the decisions on such complaints have not been timely provided under applicable federal and New York State law."

264.    Upon information and belief, the J.S.M. plaintiffs and State and City Defendants were alleged in "settlement discussions" following class certification.

265.    Further, the J.S.M. case is restricted to timelines and contains no allegations concerning the substance of the hearing system, or qualifications of IHOs being alleged here.

266.    Upon information and belief, the OATH Plan is not part of the J.S.M. litigation or settlement process.

**DOE's Efforts to Legislate A Change to OATH in June 2021 Were Unsuccessful**

267.    Upon information and belief, the City Defendants have been focused on dismantling the current hearing system, ridding the bench of experienced IHOs that the DOE

perceives as ruling too frequently for Parents and seeking to gain complete control over the IHO's and their decision making process.

268.    Two prior chancellors have proposed the transfer of power to OATH, well before there were any issues with shortages and backlogs.

269.    However, the DOE defendants believed that New York State law would have to be amended before an OATH transfer plan could be effectuated.

270.    Thus, upon information and belief, during the 2021 New York State legislative session, the attorneys at the DOE's Office of Legal Services drafted and obtained a sponsor for legislation designed to amend Section 4404 to move the hearings to OATH.

271.    The City Defendants did not seek input from any of the individuals impacted by the hearings before making this proposal.

272.    Similar to the manner in which the Defendants have hatched the MOA here, the DOE obtained sponsors and introduced the bill with less than one week before the close of the legislative session in Albany in June 2021.

273.    The Sponsor Memoranda for Assembly Bill No. A7943 and Senate Bill No. S7183 both have the following justification:

> Currently, there are thousands of due process complaints that have been filed with the New York City Impartial Hearing Office for which an IHO has not been assigned. This is the result of several factors. First, to maintain certification, an impartial hearing officer need only accept one case every two years. Second, between roughly July and October every school year, thousands of DPCs are filed with the New York City Impartial Hearing Office (from July - October 2020 there were around 6500). Thus, not only is the current number of DPC filings extremely large, but also each year's DPC filings adds to the backlog. Third, the current roster of IHOs assigned to the New York City Impartial Hearing Office is insufficient to handle the caseload. There is no requirement that an IHO carry a minimum case load; indeed more than half of IHOs carry twelve or fewer cases. Thus, the current system is not working, with the result that all parties are being deprived of timely due process.

274.    The Sponsor Memo for Bill No. A7943 noted that "[t]he proposed legislation would replace the current system for the City School District with a full-time administrative adjudicatory system, with the goal of efficaciously eliminating the backlog and providing timely hearings going forward. The New York City Office of Administrative Trials and Hearings ('OATH'), a component of New York City government, not DOE, would be responsible for the new system."

275.    However, after facing stakeholder opposition, ultimately, the bills did not pass and, upon information and belief, the prior sponsors will not be resubmitting this legislation, having been advised of the strong opposition from the parent representatives.

276.    Thus, Defendants were aware that the stakeholders generally opposed a change of the law pursuant to which the IHOs would be

277.    Thus, despite the fact that the DOE Defendants appeared to believe a change in State Law was needed to effectuate this change, after that change did not occur, they barreled ahead, hoping to blindside the special education bar in the middle of the holiday season, mere days before the Mayor is scheduled to end his term.

**NYSED's Request for Information**

278.    The next step in this saga happened in September 2021, at which point NYSED issued a "Request for Information (RFI) for the Office of Special Education: Impartial Hearing Officer System in New York City."

279.    The introduction of the RFI reads, as follows:

The New York State Education Department (NYSED) hereby issues this "Request for Information" (RFI) to solicit information from attorneys, law firms, law schools, institutions of higher education, current impartial hearing officers or administrative law judges, offices of court administration, centers for dispute resolution, non-profit or for-profit entities, and/or other State or local agencies  regarding the creation of a new Impartial Hearing Officer (IHO) system for special education due process hearings in New York City. Specifically, NYSED is looking for information on creating a new system of full-time IHOs to resolve several thousand special education due process complaints

annually.   NYSED is considering how contractual or other relationships, either with individual IHOs or a management entity, could resolve outstanding noncompliance with respect to New York City Department of Education's (NYCDOE) obligation to maintain a functional special education due process system.

280.    The RFI clarifies that "the board of education" is required to arrange an impartial due process hearing including appointment of an IHO and appoint an IHO.

281.    The RFI indicates that the following number of complaints were filed during the prior five years.

| 15-16 | 5,026 |
|-------|-------|
| 16-17 | 5,779 |
| 17-18 | 7,144 |
| 18-19 | 9,694 |
| 19-20 | 10,794 |
| 20-21 | 14, 266 |

282.    Further, the RFI reads, in part:

[c]urrently, NYCDOE's special education due process hearing system is overwhelmed with an unprecedented number of due process complaints.  Additionally, there is class action litigation pending (J.S.M., et al. v. N.Y.C. Dep't of Educ., et al.) wherein plaintiffs allege that New York City students with disabilities are being denied a free appropriate public education (FAPE) due to delays in hearings and decisions on impartial due process complaints.

Data shows a dramatic annual increase in special education due process complaint filings. In the 2020-2021 school year more than 14,000 special education due process complaints were filed in New York City (in comparison to the 2019-2020 school year wherein New York City received 3,469 fewer due process complaint filings).  This volume of cases has resulted in a waitlist of approximately 7,000 due process complaints that do not yet have an IHO appointed.
283.

284.    This data does not match the data that had been reported by Merced, State Education Defendants or DOE Defendants in relation to the CAP report.

285.    Upon information and belief, a large volume of complaints was filed in 2020-2021 because (a) a large volume of cases that had been approved by DOE for settlement had not been resolved by the DOE and were reaching the statute of limitations; and (b) COVID-19 lockdowns and the like were depriving students of the right to a FAPE.

286.    The RFI further notes that "Training new IHOs requires significant resources to recruit, interview, train, and certify candidates."

287.    Further, NYSED noted that "it takes many newly certified IHOs a substantial amount of time to get comfortable with the New York City impartial hearing system and begin taking cases."

288.    Upon information and belief that is because NYSED refuses to ensure that IHOs are properly compensated so that lawyers who have experience in special education law will be interested in the position.  As a result, many of the new IHOs had no experience in or knowledge of the IDEA, Section 504 or New York State education law and no practical experience.

289.    Some of the IHOs had no litigation experience whatsoever.

290.    The RFI indicated that it was designed to investigate "developing an impartial hearing officer system in New York City based on contracting with each IHO or contracting with a management entity that would commit to resolving a minimum number of cases annually by providing full-time IHO candidates (to be certified by NYSED)."

291.    Further, NYSED noted that "[i]t is the expectation of NYSED that responses to this RFI will address how the requirements of IDEA will be met and how NYCDOE's outstanding

noncompliance with respect to maintaining a functional special education due process system will be resolved."

292.    The due date for comments to the RFI was November 5, 2021.

293.    NYSED has not published the responses to the RFI.

294.    However, upon information and belief, in response, sixty-four of the existing IHOs, submitted a plan that proposed a yearly commitment to hear 13,400 cases.

295.    State Defendants have apparently ignored this proposal.

**The OATH Plan Was Hatched Secretly Weeks and Now Days Before the Mayor Exits**

296.    As noted above, the OATH MOA was executed less than one month before Mayor De Blasio is scheduled to leave office.

297.    The MOA was signed by the new General Counsel of the DOE (who started within the past few weeks), NYSED's Counsel and Deputy Commissioner for Legal Affairs (appointed in December 2020) and the Commissioner and Chief Administrative Law Judge at the New York City Office of Administrative Trials and Hearings (appointed in March 2021).

298.    Under the MOA, OATH will hire approximately 40 full-time City-employee hearing officers, after which time, all of the current hearing officers who are certified by NYSED will be prevented from accepting hearings in New York City.

299.    In connection with the implementation of the OATH plan, the DOE's Office of Legal Services advised their roster of non-attorney hearing representatives that they will be re-deployed and attorneys will take over the hearings for the DOE.

300.    Upon information and belief, along with the move to OATH, the DOE was approved to hire approximately 75-80 new attorneys to litigate against parents with inexperienced IHOs who now report to the Mayor.

301.    Although the MOA itself claims that this new system will be modeled after the Trials Division, that does not appear to be accurate.

302.    According to the Mayor's Management Report in 2021, the caseload of the ALJs the OATH Trials division is approximately 186 per ALJ.

303.    A review of the decisions of the ALJs, show that the issues raised in most cases are far less complex than the claims raised in impartial hearings, particularly those hearings involving students whose families cannot afford unilateral placements.

304.    Further, the ALJs do not issue a large volume of decisions.

305.    Here, if the most recent number of filings (14,266) remain constant or even increases, and OATH plans to hire between 40 and 50 IHOs, the average caseloads will range from 356 (if there are 40 IHOs) to 280 if there are 50 full-time IHOs.

306.    Unlike cases in the federal and state courts, there are no procedures for lengthy discovery and cases are supposed to be heard and determined within less than 45 days after they commence.

307.    Even with full-time IHOs, there will not be enough time to allow parents adequate hearing time to litigate their cases and fully develop the records that are relied upon by appellate courts.

308.    The MOA was first presented to the public in open Court on December 3, 2021, when it was presented to the Court on the record in the J.S.M. litigation as a *fait acompli.*

309.    Upon information and belief, J.S.M. counsel agrees that the OATH MOA is not part of their lawsuit and they were not involved in developing, approving, or negotiating the OATH plan.

310.    The MOA post-dates the J.S.M. lawsuit by almost one year.

311.     Further, the J.S.M. lawsuit does not address any of the issues raised here about the substantive validity of the due process system itself.

**Executive Order 91**

312.     As alleged herein, EO 91 (Exhibit B) was issued on December 27, 2021, less than five days before the Mayor leaves his post.

313.     Further, it was executed after the OATH MOA was executed, in an apparent but misguided attempt to cure the failure to issue it in the first instance.

314.     The EO 91 purports to create "concurrent jurisdiction" to hear special education matters arising under federal and state law.

315.     The Mayor did not have the authority to create concurrent jurisdiction or to transfer jurisdiction to OATH in this fashion.

316.     OATH has limited jurisdiction and has not been afforded judication over federal and state law matters.

317.     Further, the Mayor's effort to transfer cases to OATH underscores the confusion and conflict here, as OATH jurisdiction is limited to that over New York City agencies as created by the Charter.

318.     The Defendants cannot have it both ways – if DOE is a City agency, then OATH – as its sister agency – both supervised by the Mayor- cannot employee, manage, hire, fire and/or control impartial hearing officers.

**The OATH Plan Creates an Impermissible Conflict of Interest**

319.     As set forth herein, the OATH plan creates an inherent, structural, and systemic conflict of interest that is impermissible under the IDEA.

320.    Whether or not the DOE is formally an agency of the City, it is clearly part of the City's governance structure.

321.    Thus, it violates both the letter and spirit of the IDEA, which prohibits IHOs from being LEA employees.

322.    If the IDEA prevents DOE employees from being IHOs, it is axiomatic that it necessarily prevents employees of the umbrella agency that has control over the LEA, its Chancellor, policies, and its budget to select, control, employ and oversee IHOs, who are also City employees.

323.    Moreover. the Mayor's role in appointing and overseeing OATH, as well as appointing the Chancellor, setting policy for special education and his intimate, extensive involvement in the impartial hearing system, as well as the City's obligation to pay the hundreds of millions of dollars for the remedy in IDEA funding, all collectively establish that it is a structural conflict for the IHOs to be City employees.

324.    Further, the OATH plan accomplishes the dangerous situation that the IDEA and State law were designed to eliminate – that a Defendant in the action has control, management, supervision, and power over the individual who is supposed to serve as the neutral, independent fact-finder.

325.    Notably, moreover, many hearings involve challenges to DOE policies and procedures that have to be exhausted under the IDEA.

326.    It is impossible to ensure that City employees will be able to neutrally have the ability to rule on the policies and procedures set by their supervisor's supervisor – *i.e.,* the Mayor.

327.    In addition, the Hearing Officer Job Posting from OATH requires that hearing officers will be designated as "Executive Agency Counsel." *See* Exhibit C.

328.    Upon information and belief, the position of "Executive Agency Counsel" is a position that constitutes a lawyer for one of the agencies. It is the same title afforded to the general counsel of the Defendant DOE, as well as all of the senior attorneys that represent the City and its agencies.

329.    Thus, as a lawyer for New York City, the hearing officers will owe a duty of loyalty to the City that is in conflict with the attorney's duty as a hearing officer.

330.    Further, another structural conflict is that the OATH hearing officers are UFT members, who are called upon to pass judgment on the veracity, credibility and conduct of other members, such as teachers and therapists in the union.

331.    Further, as UFT members, and civil service workers, the hearing officers will be under the management control of the City.

332.    There is no other state in the Country that has set up its hearing system in this way, where the municipality hires, controls, employs and selects the hearing officers  - who also serve as lawyers for the City - who are presiding over disputes under the IDEA.

333.    Post-deprivation challenges to individual IHOs will not solve this structural deficiency.

**The OATH Plan Will Eliminate Most of the Senior Hearing Officers with Experience And Replace them with Lower-Paid, Inexperienced Hearing Officers**

334.    The OATH Plan as implemented will immediately reduce the number of IHOs with expertise and replace them with unqualified IHOs without any experience in special education. That will hardly assist the need to reduce the hearing backlog.

335.    The illogical nature of this plan, which, in a matter of weeks, eliminates scores of experienced hearing officers who have been working as IHOs for years, is highly suspect.

336.     As alleged herein, the IDEA mandates that IHOs have expertise in special education.

337.     The underlying purpose of the administrative process and exhaustion of that process is to have the dispute heard and resolved by a hearing officer with expertise in special education.

338.     Further, the administrative record developed at the hearing is the only record that gets developed before a case is appealed in Court.

339.     Thus, it is critical that parents have a full and fair opportunity to litigate their IDEA claims at the hearing level.

340.     The Defendants' OATH plan is, on its face, objectively at odds with the implementation of a due process system that is presided over by IHOs with expertise.

341.     The plan is intentionally designed to sweep the entire roster of long-term, experienced IHOs off of the bench and substitute them either with junior lawyers who do not have the proper experience or individuals who have no background and/or experience in this area and who are beholden to the City.

342.     The Hearing Officer Job Posting from OATH is limited to (a) full-time hearing officers; (b) who live within the City limits, with one narrow exception. *See* Exhibit C.

343.     The position offers an annual salary of $135,000 to $140,000.

344.     Upon information and belief, defendants wish to take this step not to clear the backlog, but to try to eliminate the IHOs that they feel are too favorable to parents in favor of individuals without expertise and who are under control of the City.

345.     First, large number of experienced, long-term hearing officers who have been carrying the highest caseloads for years, do not live within New York City.

346.    Second, large numbers of experienced, long-term hearing officers work on a part-time basis.

347.    Thus, the posting was designed to prevent these experienced IHOs from applying to OATH.

348.    Moreover, the Merced report documents that one of the problems with recruitment and retention of IHOs was the problematic compensation package.

349.    The proposed salaries for full-time IHOs who must carry hundreds of cases is far lower than the current payments made to IHOs on the roster and is half the amount of money paid to IHOs who preside over hearings in every other part of the state, which is $100 per hour.

350.    Further, given the salaries in the legal field, and cost of living in New York City, the posted salaries of the OATH IHOs for New York City is far too low to ensure that lawyers with expertise in the niche field of special education, who also have the capacity to preside over complex special education matters, will be hired.

351.    Notably, the posting does not include either a requirement that a candidate have experience and knowledge of special education or has served as a hearing officer. In fact, the posting does not even indicate that experience as a hearing officer is "preferred," although "history of volunteerism" is reviewed "favorably."

352.    None of the experience special education lawyers who practice in New York City and who represent parents or the DOE are eligible to apply under applicable state regulations.

353.    Nor would experienced special education lawyers be likely to apply, as hourly rates for experienced special education lawyers who litigate contingency cases range from $300 to $450 per hour, while some private lawyers who charge clients earn even more.

354.     As noted by NYSED's consultant, the problematic compensation scheme for the IHOs prevented the recruitment and retention of qualified IHOs. *See* Merced Report. In response, the DOE finally revised and implemented the IHO compensation scheme within the past year.

355.     It is certain that many of the IHOs who are either ineligible or unwilling to move to work for the City on a full-time, employee basis will likely stop to accept new cases, and then start to seek other work, dropping their caseloads as soon as they find alternative sources of income in what is a favorable job market. Many of the IHOs believe they would have a conflict working for the City and would be subject to undue pressure given the financial stakes.

356.     The MOA fails to ensure that IHOs will be properly experienced and trained.

357.     The RFI noted that it was challenging to train new IHOs and they often needed extensive training to be able to start hearing cases.

358.     Yet, the MOA contemplates that new IHOs who are hired will be trained and ready to begin within two weeks of being hired by OATH.

359.     While any existing IHO who moves to OATH could likely be ready to hear cases immediately, there is zero chance that an individual who accepts the position and who is not already a practicing hearing officer can obtain the requisite "expertise" required to preside over an Impartial Hearing.

**The OATH Plan Violates Federal, State and City Law**

360.     The OATH Plan, as implemented, violates the 2002 Order and Stipulation endorsed by Judge Keegan.

361.     The Mayor's actions in issuing EO 91 lacked legal authority.

362.     The Mayor lacked the legal authority under the IDEA and state law to expand the jurisdiction of OATH to hear IDEA and state law special education claims.

363.     The Mayor lacked the legal authority to transfer functions created by the IDEA and state law that were vested in the Board and/or the DOE to OATH.

364.     The Mayor lacked the legal authority under the IDEA and state law to modify the criteria required for impartial hearing officers and to modify parent's procedural rights as contemplated by the MOA.

365.     The signatories to the MOA lacked the legal authority to execute it.

366.     The signatories of the MOA lacked the legal authority under the IDEA and state law to expand the jurisdiction of OATH to hear IDEA and state law special education claims.

367.     The signatories of the MOA lacked the legal authority under the IDEA and state law lacked the legal authority to transfer functions created by the IDEA and state law that were vested in the Board and/or the DOE to OATH.

368.     The signatories of the MOA lacked the legal authority under the IDEA and state law to modify the criteria required for impartial hearing officers and to modify parent's procedural rights as contemplated by the MOA.

369.     The Mayor and the MOA signatories usurped the function of the SEA and LEA, as well as the Board.

370.     The MOA and EO 91 improperly delegates the most important due process protection under the IDEA to an entity neither controlled, supervised, nor monitored pursuant to the IDEA as part of the federal IDEA plan submitted to the U.S. DOE.

371.     The Defendants abdicated their duties and obligations under the IDEA and state law by issuance of EO 91 and the MOA.

372.     The duties of the SEA and LEA cannot be delegated to the City, one of agencies or agency employees as contemplated by EO 91 and the MOA.

373.   New York State law and regulations have not been amended to permit the changes, nor could they be amended to permit the OATH plan without violating the IDEA.

374.   The MOA and EO were issued without public notice and/or any comment period to the parents and other stakeholders.

375.   The OATH plan has not been considered and approved after public notice and comment by the Board.

376.   The OATH plan has not been considered and approved by the New York State Board of Regents.

377.   OATH does not have jurisdiction to hear federal law claims. OATH is charged with adjudicating claims against New York City.

378.   Assuming arguendo that OATH has jurisdiction, the Mayor did not follow the New York City Charter before contemplating the move of the Impartial Hearings to OATH, as set forth in New York City Charter 1098(3) and (4).

379.   Further, none of the actions taken by defendants to transfer to OATH should have been taken until after Defendants provided Plaintiffs' counsel with at least 45 days prior notice of this plan.

**The OATH Plan Violates Section 504**

380.   Significant numbers of parents seek to exhaust their claims under Section 504 and other federal statutes pursuant to 20 U.S.C. 1415(l). All of the claims – IDEA, Section 504, or Section 1983, are included in one complaint.

381.   Further Section 504 requires City Defendants to operate a hearing system similar to the IDEA system.

382.    Historically, the DOE used the IDEA hearing system for parents to file Section 504 claims.

383.    The MOA does not address Section 504 claims or hearings and does not appear to contemplate a transfer of claims relative to Section 504 or the other types of federal statutes that have to be exhausted, along with IDEA claims.

**The OATH MOA Does Not Allow for Timely Pendency Hearings**

384.    The OATH MOA appears to restrict IHOs from holding hearings until the resolution process under the IDEA is completed, restricting the IHO's authority to hold emergency hearings to address disputes about a student's stay-put rights under 20 U.S.C. 1415(j).

**The OATH Plan is Happening Too Quickly, During a COVID**
**Surge, the Holidays, and on the Eve of a Change in the Administration**

385.    Given the long-standing issues, it is grossly irresponsible for the Defendants to have attempted to make this enormous change weeks before Mayor De Blasio is leaving, during the holidays and after the City was aware of the existing COVID surge.

386.    Special education students have been the hardest hit during the Pandemic.

387.    As is alleged herein, the Impartial Hearing System is the last line of relief for families whose children have been denied a FAPE.

388.    The process is happening far too fast, at a breakneck speed. The process should not have even started until defendants had first complied with Judge Keenan's 2002 Stipulation and Order requiring Defendants to give plaintiffs' counsel 45 days' prior notice of any intention to bring in OATH and its deficient infrastructure.

389.    There is simply no way that the due process rights of the children and parents can be adequately protected with the implementation plan proposed in the MOA, particularly under the current circumstances.

390.     Given all of the infirmities raised herein, it is imperative for this plan to be enjoined.

391.     Without an injunction, even if Mayor-Elect Adams determines he disagrees with the OATH plan, it will surely be too late, and the system will already be destroyed, and the bell will not be able to be un-rung.

**The OATH Plan Creates a Separate and Unequal Hearing System for City Children**

392.     The OATH plan creates a wholly separate and unequal system of due process for families in New York City and families outside of the City.

393.     IHOs for families who do not live in New York City will continue to be independent contractors, with the freedom and independence to make independent rulings, use their discretion for the work that is needed and make $100 per hour.

394.     Yet, in the far more expensive City, families who seek due process will only have access to less experienced hearing officers who are paid half of what an IHO is paid anywhere else in the State, and who will be employed, trained by, supervised, managed, overseen, and restricted by the City.

395.     There is no basis for City families to have access to a different level and quality of hearing officers and due process compared to the rest of the state.

**The Plaintiffs will Suffer Irreparable Harm**

396.     If the OATH plan proceeds, it will collapse the current system, effectuate a wholesale violation of the state-mandated rotation system, and destroy the special education hearing system.

397.     As such, if the Court does not enjoin the plan, plaintiff parents and all parents who have due process hearings pending or who will file hearings will suffer irreparable harm.

398.   The balance of hardships tips fully in Plaintiffs' favor, as Defendants will suffer no harm at all if the OATH plan in enjoined.

399.   The Mayor is leaving in a matter of days.

400.   The OATH Commissioner – in her official capacity – has no stake in the outcome of this case.

401.   As for the remaining Defendants, enjoining this plan would merely mean business operations as usual, and a system that has been in place for more than twenty years would continue.

**Plaintiffs Are Not Required to Further Exhaust Their**
**Administrative Remedies, as the Administrative Process Will Be Futile and Ineffective**

402.   Plaintiffs are not required to exhaust their administrative remedies for several reasons.

403.   Plaintiffs challenge the due process procedures themselves, and, therefore, exhaustion is futile.

404.   Plaintiffs face irreparable harm and thus do not need to further exhaust their administrative remedies.

405.   The current due process system is fraught with delays.  Plaintiffs are not required to exhaust their administrative remedies, as the hearing process is too ponderous and delayed.

406.   Plaintiffs' claims that are systemic in nature and allege violations in policies, procedures, and practices as well as to the administrative system as a whole do not need to be exhausted.

407.   Exhaustion is excused to the extent any Plaintiff has already attempted to exhaust claims at the IHO level.

408.    Plaintiffs are not required to exhaust administrative remedies, because they need discovery that is not available through administrative hearings and can only be obtained through the federal court procedures.

409.    Exhaustion is not required because the due process procedures are not available to exhaust all claims that are raised.

## FIRST CLAIM FOR RELIEF
## THE IDEA

410.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

411.    Defendants have violated the procedural due process rights of Plaintiffs under the IDEA.

412.    Defendants have violated the rights of Plaintiffs who are entitled to a due process system that complies with the IDEA.

413.    The State Defendants have failed to supervise, oversee, and guarantee due process rights and FAPE to Plaintiffs.

414.    All Defendants have violated Plaintiffs' right to a due process system that complies with the IDEA.

415.    DOE and State Defendants have improperly delegated their obligations under the IDEA.

416.    DOE and State Defendants have abdicated their duty under the IDEA.

## SECOND CLAIM FOR RELIEF
## SECTION 504 OF THE REHABILITATION ACT

417.    Plaintiff repeats and re-allege the allegations of all the above paragraphs as if fully set forth herein.

418.    Defendants' conduct is knowing, intentional, reckless, and gross.

419.    Plaintiffs are qualified individuals with disabilities entitled to protection under Section 504.

420.    City Defendants violated Section 504 by implementation of the OATH plan.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983

421.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

422.    Defendants have violated 42 U.S.C. §1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

423.    As a direct and proximate result of the Defendants' misconduct, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

## FOURTH CLAIM FOR RELIEF
## DUE PROCESS

424.    Plaintiff repeats and re-allege the allegations of all the above paragraphs as if fully set forth herein.

425.    Defendants are denying Plaintiffs the right to Due Process as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

426. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing this plan.

## FIFTH CLAIM FOR RELIEF
## EQUAL PROTECTION

427. Plaintiff repeats and re-allege the allegations of all the above paragraphs as if fully set forth herein.

428. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

429. Defendants' plan to eliminate IHOs certified by NYSED and delegate to OATH the responsibility for conducting impartial hearings in New York City treats children with disabilities who reside in New York City different from similarly situated children outside of the City.

430. Defendants have no rational basis for eliminating IHOs certified by NYSED only as to children with disabilities who reside in New York City.

431. Upon information and belief, Defendants' plan is motivated by an intent to discriminate against Plaintiffs and deprive them of their rights under the IDEA and New York law.

432. Specifically, upon information and belief, Defendants are seeking to control and limit the awards and expenses made under the current impartial hearing system by using OATH employees instead of IHOs certified by NYSED to conduct hearings in New York City.

433. Defendants' plan thus violates Plaintiffs' equal protection rights under the Fourteenth Amendment.

434. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing this plan.

435.   Defendants are denying Plaintiffs the right to Due Process as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

## SIXTH CLAIM FOR RELIEF
## NEW YORK STATE LAW

436.   Plaintiffs repeat and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

437.   Defendants have violated Plaintiffs' rights under New York Constitution, the New York State Education Law §§ 3202, 3203, 4401, 4404 and 4410 and the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. §200, *et seq.*

## SEVENTH CLAIM FOR RELIEF
## NEW YORK CITY CHARTER

438.   Plaintiffs repeat and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

439.   Defendants have violated the New York City Charter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

i.   Assume jurisdiction over this action;

ii.   Issue a Temporary Restraining Order to immediately enjoin Defendants from taking any further steps to implement the OATH Plan and EO 91 and directing Defendants to comply with the 2002 Order and Stipulation;

iii.   Issue an Order holding Defendants in Civil Contempt of the 2002 Order and Stipulation;

iv.      Issue a preliminary and permanent injunction enjoining further implementation of the OATH plan and the Mayor's Executive Order and directing Defendants to modify their policies, procedures, and practices to ensure that (a) impartial hearings in New York City are presided over by hearing officers who: (i) are neutral, impartial independent contractors who are free from oversight, supervision, management and the threat of termination by any of the City Defendants; (ii) are neutral, independent hearing officers who have the expertise and specialized training required by federal and state law; (iii) continued to be assigned pursuant to the neutral, alphabetical, rotational system required by state law and in existence for decades; and (iv) are neutral, impartial, free from conflict of interest and whose appointment otherwise comports with federal and state law; and (b) the impartial hearing system is implemented consistent with the requirements of federal and state law with respect to responsible entity, jurisdiction and due process.

v.       Issue a Declaratory Judgment on behalf of the Plaintiffs that the policies, procedures, and practices as alleged herein violate the applicable federal, state and laws;

vi.      Award Plaintiffs attorneys' fees and costs incurred with respect to this action; and

vii.     Award such other different, and further, relief as to the Court may seem just and proper.

Dated:      December 29, 2021
            New York, New York

                              Respectfully submitted,
                              MAYERSON & ASSOCIATES

                                  */s/ Gary Mayerson*
                              By_____
                                  Gary S. Mayerson (GM8413)
                                  330 West 38th Street
                                  New York, NY 10018
                                  Phone: (212) 265-7200
                                  Fax: (212) 265-1735
                                  Gary@mayerslaw.com

                              THE LAW OFFICE OF ELISA HYMAN, P.C.

                                  */s/ Elisa Hyman*
                              By_____
                                  Elisa Hyman, Esq. (EH4709)
                                  The Law Office of Elisa Hyman
                                  1115 Broadway, 12th Floor
                                  New York, NY 10010
                                  Phone: (646) 572-9064
                                  Fax: 646-572-9065
                                  elisahyman@gmail.com

                                  *Co-counsel for Plaintiffs*