UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E.F., on behalf of himself and his minor child, O.F.; J.R. on behalf
of herself and her minor child, K.R.; J.F., on behalf of himself and
his minor child, H.F.; L.V., on behalf of herself and her minor
child, N.F.; M.S. on behalf of himself and his minor children, J.S.;
and Q.S., and all other similarly situated,

                              Plaintiffs,

          -against-                                           Civ. No. 21-cv-11150 (ALC)


MAYOR BILL DE BLASIO, in his Official Capacity; THE CITY
OF NEW YORK, CHANCELLOR MEISHA PORTER, in her          **FIRST AMENDED**
Official Capacity; NEW YORK CITY DEPARTMENT OF          **CLASS ACTION**
EDUCATION; NEW YORK CITY BOARD OF EDUCATION;            **COMPLAINT**
COMMISSIONER BETTY ROSA, in her Official Capacity;
NEW YORK STATE EDUCATION DEPARTMENT;
COMMISSIONER JONI KLETTER, in her Official Capacity;
COMMISSIONER JODI KLETTER, in her Official Capacity;
THE OFFICE OF ADMINISTRATIVE TRIALS AND
HEARINGS,

                              Defendants.

## PRELIMINARY STATEMENT

1.      This action seeks declaratory and injunctive relief to, *inter alia*, address a federal question as well as ancillary claims arising under state law, and to hold Defendants accountable for failing to comply with a 2002 Stipulation and Order of Judge John F. Keenan, which required Defendants to provide 45 days' prior notice to co-counsel for the Plaintiffs here, Gary Mayerson, before implementing any plan to effectuate a transfer of special education impartial hearings to New York City's Office of Administrative Trials and Hearings. *See Does, et al. v. Outgoing Schools, et al.,* 1:02-cv-06495(JFK), Dkt. No. 13.

2.      Plaintiffs are parents of children with eligible disabilities (and their respective children) who are entitled to a Free Appropriate Public Education ("FAPE") and related due process protections and safeguards guaranteed by, *inter alia*, the Individuals with Disabilities Education Improvement Act (the "IDEA"), 20 U.S.C. § 1400, *et seq.*, the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), the New York State Constitution, New York State Education Law §§ 2590-b, 2590-h, 4401, *et seq.* (the "New York State Education Laws"), and the regulations promulgated thereunder.

3.      To the extent that plaintiffs are parents of a child with a disability, they have their own independent rights and entitlements under the IDEA. *See, e.g.*, *Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516 (2007).

4.      As alleged below, this action is being brought to enjoin defendants from implementing a misguided and reckless plan that would *systemically* violate a core statutory mandate and entitlement: specifically, plaintiffs' entitlement to an "impartial hearing" being

presided over by an "impartial hearing officer" who does not have an impermissible conflict of interest.

5.      Plaintiffs thus seek declaratory and injunctive relief from the following named defendants, whose roles and responsibilities in the impartial hearing process are inextricably intertwined: The New York City Department of Education ("DOE"), New York City Board of Education ("Board") and the current and former Chancellor of the New York City School District ("Chancellor") (collectively, the "DOE Defendants"); the current and former Mayor of the City of New York, the Comptroller of the City of New York and the Commissioner of the New York City Administrative Trials and Hearings Bureau ("OATH") (collectively, "the City Defendants"); The Commissioner of the New York State Education Department, the New York State Education Department and the Chancellor of the New York State Board of Regents (collectively, "the State Defendants").

6.      When disputes arise under the IDEA concerning a student's services, placement, or programming, the IDEA's most important due process entitlement is the right to an impartial hearing presided over by a neutral, unbiased "impartial hearing officer" ("IHO"). The IDEA guarantees the right to an IHO who (1) is free from any conflicts of interest; (2) is not an employee of the school district or the agency financially and/or managerially responsible for the provision of services; and (3) has demonstrable expertise in the area of special education. 20 U.S.C. §§ 1415(f)(3)(A)(i), (ii).

7.      For decades, IHOs in New York have been independent contractors certified by the New York State Education Department ("NYSED"). Since 1993, New York State law has required school districts to appoint IHOs in accordance with a rotation system.

8.      NYSED has reported that parents in New York City filed approximately 14,000 hearings in the 2020-2021 school year. As of October 2021, NYSED reported a backlog (or "waiting list") of 7,000 cases in New York City.

9.      Upon information and belief, the backlog is now down to below 6,700 cases.

10.     According to the Second Circuit, "[a] system perceived by parents as tainted by biased adjudicators would deter parents from fulfilling their role under the [IDEA]." *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 155 (2d Cir. 1992). The Second Circuit's holding is, in simplest terms, the impetus for Plaintiffs' request for Emergency Relief.

11.     Plaintiffs' motion seeks to restrain and enjoin Defendants from taking any further steps to implement their latest plan to degrade, dismantle, and replace the current impartial hearing system in New York City by replacing the NYSED-certified IHOs with full-time employees of OATH ("OATH Plan").

12.     The OATH employee hearing officers would operate under the control of the Mayor and a Commissioner who serves at the pleasure of the Mayor.

13.      Defendants' current OATH Plan ignores one of the most essential procedural safeguard protections under the IDEA: as a matter of law, plaintiffs are entitled to appear before hearing officers who are impartial, neutral, and unbiased, and who possess the independence, autonomy, and expertise that the IDEA mandates. They are entitled to "impartial hearing officers" who are not disqualified for service by reason of some demonstrable conflict of interest.

14.     Defendants' plan, if implemented, would take the "due" out of due process and make the "impartial" partial. It would replace the IDEA's impartiality and due process safeguards with a system imbued with systemic, insurmountable conflicts of interest that will subject

vulnerable disabled children and their parents to the imminent threat of irreparable harm and deter parents from enforcing their children's substantive rights.

15.     The OATH plan was hatched and memorialized by Defendants *via* a Memorandum of Agreement dated December 1, 2021 ("MOA") at the 11th hour during the holidays, days before former Mayor de Blasio left office and the New York State Governor signed a new law taking clear and decisive action to clear the current backlog. The MOA is attached hereto as Exhibit ("Ex.") A and incorporated by reference herein.

16.     Defendants' latest plan to shift control of the hearing system to OATH is being made under the pretext of addressing the backlog of hearings causing delays in IHO assignments in the City.

17.     In fact, the current OATH plan is a desperate, last-ditch attempt to circumvent the New York State legislature's *rejection* of proposed amendments to the N.Y. Education Law Section 4404(1)(a) (allegedly authored by DOE's lawyers) to transfer hearings to OATH in June 2021 to address the backlog.

18.     Rather than allow defendants to use the current backlog as pretext to replace the system of independent hearing officers, the legislature recently passed a bill to remedy the backlog, which the Governor signed into law *last week* that wipes the slate clean and would effectively default New York City on all cases delayed more than 196 days. *See* Chapter 812 of the New York State Law.

19.     Yet, on December 27, 2021, just two days before Governor Hochul signed the legislation, the former Mayor issued Executive Order 91 ("EO 91"), attempting to transfer jurisdiction for federally created IDEA claims to OATH to implement the plan. A copy of EO 91 is attached here to as Exhibit B and incorporated herein by reference.

20.     According to the Governor, Chapter 851 will:

[E]nsure that special education students receive the services they need - and that are required by law - within a timely manner. Many cases of this type have languished for years without appointment of IHOs to hear claims; New York City currently has a backlog of several thousand such cases. New York City and the Stated Education Department have recently commenced plans to hire more IHOs to hear these cases, and this legislation will further ensure that parents and students receive necessary services without delay.[1]

21.     Despite the above, Defendants are pushing forward with the OATH plan, which systemically replaces the system of independent IHOs with lower paid, inexperienced city employees who lack impartiality and have an insurmountable conflict of interest.

22.     Further, the OATH Plan is designed to effectively eliminate from consideration as OATH IHOs more than half of the current, experienced hearing officers certified to hear cases in New York City who do not live within the City limits or hear cases on a part-time basis, and replace them with lower paid lawyers who are employees of the City.

23.     According to the job descriptions, which are attached hereto as Exhibit C and incorporated herein by reference, the new City-employee IHOs will have the title of "Executive Agency Counsel" – *e.g.*, lawyers for the city agency. *See* Exs. A, C. These city-attorney IHOs will be controlled, managed, supervised, trained, hired, disciplined, overseen and even terminated, by an OATH Commissioner. Exs. A-C. The implementation process is underway.

24.     Upon information and belief, OATH is actively interviewing applications, and trainings for new OATH hearing officers are scheduled for January 2022. Ex. A.

25.     This is the second time Defendants have tried to grab direct control over the impartial hearings and the IHOs.

---

[1]     *See*   https://www.governor.ny.gov/news/governor-hochul-announces-historic-240-million-increase-investment-schools-serving-children (last visited Jan. 6, 2022).

26. In 2002, defendants launched a similar plan to dismantle the IDEA hearing system of independent IHOs and transfer it to OATH under the Mayor's control.

27. When parents, represented by co-counsel Gary S. Mayerson here, filed suit, defendants discontinued the plan. *See Does, et al. v. Outgoing Schools, et al.*, 1:02-cv-06495 (JFK). As part of the Honorable John F. Keenan's Order of Dismissal and Settlement dated August 2002 (*see* 1:02-cv-06495, dkt. no.13), defendants were obligated to provide plaintiffs' counsel 45 days' notice if they ever again tried to implement a transfer to OATH. However, defendants issued the MOA and EO 91 without any notice to Mr. Mayerson.

28. By hastily implementing their OATH transfer plan without providing 45 days' notice to plaintiffs' counsel, defendants have violated, and continue to flagrantly violate, Judge Keenan's Order.

29. The Mayor, the City, its agencies, the DOE, and the Board, are inextricably intertwined for purposes of special education services. The Mayor, who appoints both the Chancellor and OATH Commissioner, has been intimately involved in due process hearings and controls both special education policy and funding.

30. Defendants are motivated to gain control of the hearings, to try to reduce the costs of the relief ordered that must be borne by the City itself, as the remedy for hearings comes directly from the City's budget. Those costs have been growing exponentially.

31. According to the New York City Independent Budget Office, the City has determined that these costs need to be controlled, and "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors" one of which is tuition costs, and the other is "*how often parents succeed when seeking reimbursement for services to meet their children's needs*."

32.     Defendants' plan violates federal and state law and subjects Plaintiffs and other similarly situated families to the threat of imminent and irreparable harm.

33.     IHOs under the current system are required to be specially trained independent contractors with expertise who are not employees of the City, the DOE or the Board, or subject to any conflict of interest. In contrast, OATH's hearing officers are required to be employed by and answerable to OATH and can be terminated by OATH and the Mayor and thus would have a disqualifying conflict of interest and not be impartial and independent, as required by federal and state law.

34.     The OATH Plan purports to delegate what are non-delegable duties under the IDEA and state law.

35.     While Defendants' plan would immediately entail transferring *thousands* of hearings to OATH during the COVID pandemic and its unhelpful resurgences and variants, OATH and its judges simply do not have the training and experience needed to adjudicate and reconcile IDEA-based claims and New York law.

36.     Defendants' plan, if implemented, would only exacerbate a current backlog of hearings by, *inter alia*, (i) moving the hearings to another City agency with no expertise in the subject matter, (ii) disqualifying and reducing the number of trained and impartial hearing officers who otherwise would have been able to hear and adjudicate such hearings, and (iii) causing a chaotic situation, for which two hearing systems would operate concurrently in New York, affording different due process standards and procedures for different families.

37.     Defendants' transfer of the impartial hearing system in the City to OATH under the guise of clearing the backlog is pretextual. Among other things, defendants are trying to reduce

the amount of money that the City spends on special education claims and are trying to thwart the will of the New York State legislature and the Governor.

38.     Further, defendants cannot attempt to clear the backlog by substituting one violation of the IDEA for another, thereby destroying the core protections of the IDEA.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction under 28 U.S.C. § 1331 in that claims are asserted under the laws of the United States, under 28 U.S.C. § 1343(a) in that claims are asserted under laws providing for the protection of civil rights, and under 20 U.S.C. § 1415, Title II of the ADA, 42 U.S.C. § 12133, 42 U.S.C. § 1983, and 29 U.S.C. § 794, *et. seq.*

40.     This Court has jurisdiction over Plaintiffs' pendent State law claims pursuant to 28 U.S.C. § 1367. Plaintiffs also seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

41.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which defendants are situated and/or reside.

## PARTIES

42.     All Plaintiffs parents and their children live in New York City.

43.     E.F. is the parent of O.F., a child with a disability under the IDEA. E.F. has filed impartial hearings on behalf of his child and will continue to do so long as New York City does not offer O.F. the educational resources that O.F. needs in order to learn.

44.     J.R. is the parent of K.R., a child with a disability under the IDEA.  J.R. has filed impartial hearings on behalf of her child and will continue to do so long as New York City does not offer K.R. the educational resources that she needs in order to learn.

45.     J.F. is the parent of H.F., a child with a disability under the IDEA. J.F. has filed four impartial hearings on behalf of his child and plans to file a fifth hearing for the 2021-2022 school year, as H.F. was not offered any program or placement.

46.     L.V. is the parent of N.F., a child with a disability under the IDEA.  L.V. has filed four impartial hearings on behalf of her child. The DOE failed to offer N.F. an IEP for several school years. Based on the lack of services and programs for children with Autism with N.F.'s unique profile, it is not speculative that L.V. will have to file for due process in the future.

47.     M.S. is the parent of J.S. and Q.S., two children with disabilites under the IDEA. M.S. has filed impartial hearings on behalf of both of his children and will continue to do so long as New York City does not offer J.S. and Q.S. the educational resources that they need in order to learn.

48.     All plaintiff children are also qualified individuals with disabilities that impact their major life functioning as those terms are defined under Section 504.

49.     Initials are used throughout this Amended Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 ("FERPA").

50.     Defendant MAYOR BILL DE BLASIO is the former Mayor of New York City.

51.     Defendant MAYOR ERIC ADAMS is the Mayor of New York City as of January 1, 2022, and the successor-in-interest to Mayor de Blasio.

52.     Defendant THE NEW YORK CITY BOARD OF EDUCATION (the "Board of Education" or the "Board") is the body charged with promulgation of responsibilities under N.Y. Educ. Law § 2590-b and N.Y. Educ. Law § 4404.

53.     Defendant DAVID BANKS is the Chancellor of the New York City School District (the "Chancellor") and is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h. Commissioner Banks was appointed by Mayor Adams.

54.     Defendants MEISHA PORTER was the former Chancellor. Commissioner Porter was appointed by Mayor de Blasio.

55.     Upon information and belief, Defendant THE NEW YORK CITY DEPARTMENT OF EDUCATION ("Department" or "DOE") was created by the Board pursuant to the Board's By-Laws.

56.     Defendant JONI KLETTER is the Commissioner and Chief Administrative Law Judge of OATH, appointed by Mayor de Blasio.

57.     The Local Educational Agency ("LEA") is responsible for providing a Free Appropriate Public Education (a "FAPE") under the IDEA to all disabled children in New York City.

58.     All City Defendants either jointly and/or individually constitute the "Local Educational Agency" under the IDEA.

59.     New York State has chosen to receive funding under the IDEA and has established procedures for providing special educational services to children with disabilities, as set forth in N.Y. Educ. Law § 4401, *et seq*. and 8 N.Y.C.R.R. Part 200.

60.     Defendant NYSED is the State Educational Agency ("SEA") in New York State pursuant to the IDEA.

61.     Defendant DR. BETTY A. ROSA, COMMISSIONER OF EDUCATION ("Commissioner Rosa"), is in charge of NYSED.

62.     All Defendants are being sued in their official capacity.

63. The City, the Board, the DOE, NYSED, and the Commissioner are recipients of funding under the IDEA.

64. The City, the Board, the DOE, NYSED, and the Commissioner are recipients of funding as that phrase is defined under Section 504.

## LEGAL AND STRUCTURAL FRAMEWORK

**Applicable Provisions of the IDEA**

65. Congress enacted the IDEA to ensure that "all children with disabilities have available to them a free appropriate public education" and "that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A), (B). Defendants are obligated to ensure that a FAPE is provided to all eligible children, ages three through twenty-one. 20 U.S.C. § 1412(a)(1).

66. A FAPE must, *inter alia*, "include an appropriate" *preschool, elementary or secondary education in the State involved*," and be provided pursuant to individualized education programs ("IEPs"). 20 U.S.C. §§ 1401(9) (emphasis added); *see also* 20 U.S.C. § 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii). A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A)-(B); *see also Bd. of Educ. v. Rowley*, 458 U.S. 176, 203 (1982) (a FAPE is "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" provided in conformity with an IEP developed pursuant to the IDEA's procedures).

67. An IEP must be individually tailored and is meant to serve as a blueprint for each child's program, services, accommodations, and modifications. 20 U.S.C. § 1414(d). By the

beginning of each school year, defendants must have IEPs in place that offer a FAPE to each eligible child. 20 U.S.C. § 1414(d)(2).[2]

68.    Mandated services under the IDEA include "special education" generally defined as "specially designed instruction . . . to meet the unique needs of a child with a disability", 20 U.S.C. § 1401(29), and "related services," which are "such developmental, corrective, and other supportive services … as may be required to assist a child with a disability to benefit from special education…." 20 U.S.C. § 1401(26)(A). Defendants must adopt a "continuum of alternative placements" that must include, *inter alia*, regular class, special classes, special schools, and instruction *at home,* and must make provision for "supplementary services." 20 U.S.C. § 1401(29); 34 C.F.R. § 300.115. [3]

69.    Under the Act, NYSED and its head, the Commissioner (as the SEA), are responsible for the "general supervision" of implementation of the IDEA in the state. This supervision includes adopting IDEA-compliant policies, rules and regulations and otherwise ensuring that all of the mandates of the IDEA are met by districts and other responsible agencies. *See* 20 U.S.C. §§ 1407(a)(b), 1412(a)(11). As such, State Defendants also have an obligation to monitor and enforce City Defendants' compliance with the IDEA and ensure that City and DOE Defendants maintain adequate policies and procedures under the IDEA. *Id.* Moreover, the SEA is the "guarantor" of FAPE, in that it is required to step in when districts are unable to comply with the law. 20 U.S.C. § 1412(g).

---

[2] The IDEA and state and federal regulations prescribe, in detail, the process for developing IEPs and their contents. 20 U.S.C. § 1414(d)(1)(A), (d)(2); 34 C.F.R. §§ 300.320(a)(2)-(3), 300.324; N.Y. Educ. Law § 4401, *et seq.*; 8 N.Y.C.R.R. § 200.4(d)(2)(iii).

[3] "Supplementary aids and services" are "aids, services, and other supports that are provided" to enable children to be educated in the LRE. 20 U.S.C. § 1401(33). State regulations mandate that certain services are made available for children with autism, including but not limited to services to facilitate their eventual inclusion, to address their language needs as well as parent training and counseling. 8 N.Y.C.R.R. § 200.13.

70.     The IDEA requires that each SEA and local educational agency ("LEA") "establish and maintain procedures" to "ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. § 1415. An LEA is defined as a "public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(19)(A).

71.     The City Defendants (as the LEA) are required to provide a FAPE in the first instance and to, *inter alia*, "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. §§ 1414, 1415. Woven throughout the IDEA is a complex set of mandated due process rights, notices, and procedural safeguards that are designed to facilitate parental participation and protect plaintiffs' rights.[4] These procedural rights are the cornerstone to ensure substantive educational rights afforded to children under the Act.

72.     The Second Circuit has described this set of rights as follows:

> Rather than detailing the precise substantive rights applicable to all affected children, Congress opted for individually tailored programs—programs crafted by parents and educators working together to determine what is appropriate for each child. Congress recognized that such an unconventional approach would require extensive procedural safeguards to protect the educational rights of children with disabling conditions. Thus, the scope of these procedural protections … must be determined in light of their role in ensuring the appropriate application of the Act.

*Heldman*, 962 F.2d at 151.

---

[4] *See, e.g.*, 20 U.S.C. §§ 1415(b)(1), (b)(3)(B), (d)(2)(E); 34 C.F.R. §§3 00.9(a), 300.322(e); 8 N.Y.C.R.R. § 200.5(d).

73.     A parent has a right to file a complaint concerning any matter relating to the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which *shall* be conducted by the [SEA] or by the [LEA] as determined by State law or by the [SEA]" 20 U.S.C. § 1415(f)(1)(A) (emphasis added).

74.     New York is one of the only remaining a "two-tier" due process systems in which hearings are held at the LEA level, with appeals required at the SEA level, prior to filing in court. *See* 20 U.S.C. § 1415(g)(1). [5] In most states, the SEA conducts the hearings for the entire state. In New York, the State Review Officer ("SRO") hears appeals from impartial hearings. *See* N.Y. Educ. Law § 4404.

75.     Once it is determined that a child has been denied a FAPE for any reason, a factfinder has broad equitable jurisdiction to award relief, as well as statutory remedies. *See*, *e.g*, *Doe v. E. Lyme Bd. of Educ*., 790 F.3d 440, 454 (2d Cir. 2015) (citations omitted); *M.H. v. New York City Dep't of Educ*., 685 F.3d 217 (2d Cir. 2012); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006).

76.     The Supreme Court noted in *Rowley* that the IDEA's procedural due process protections are of central importance to facilitating the Act's goals to provide a FAPE to children. 458 U.S. at 205-206.

77.     In 2007, the Supreme Court reiterated the unique role that the IDEA's procedures play in relation to a child's right to a FAPE: "IDEA's procedural and reimbursement-related rights

---

[5] *See* "State Due Process Hearing Systems Under the IDEA: An Update," Perry A. Zirkel, *et al.*, 30 Journal of Disability Policy Studies, at 156-163 (2019) (noting as of 2018 only 7 states had a second-tier level of review) In 2021, North Carolina just amended their law to eliminate the second tier. *See* https://www.wral.com/state-overhauls-appeals-system-for-parents-of-disabled-students/20040529/.

are intertwined with the substantive adequacy of the education provided to a child." *Winkelman*, 550 U.S. at 531-532.

78.    A deprivation of a hearing that complies with the IDEA amounts to a deprivation of a FAPE.

**Hearing Officers Must Be Neutral, Impartial and Free from Conflict of Interest**

79.    The IDEA places restrictions on the qualifications of the person conducting a hearing. A hearing officer shall not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A).[6]

80.    The IDEA regulations clarify that source of payment is not determinative as to a hearing officer's status: "[a] person who otherwise qualifies to conduct a hearing under paragraph (c)(1) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer." 34 C.F.R. § 300.511.

81.    The Second Circuit has taken a strong stand on the importance of the IDEA's guarantee of neutral hearing officers. In *Heldman*, the Court held that "IDEA's language, legislative history, structure, and implementing regulations all bear witness that the Act prohibits the use of biased adjudicators—a prohibition that section 1415(e) permits parents to enforce in federal court." 962 F.2d at 155.

**Hearing Officers Must Be Experts in Special Education**

---

[6] If an appeal is taken to the SEA, the agency "shall conduct an impartial review of the findings and decision appealed" and "shall make an independent decision upon completion of such review." 20 U.S.C. § 1415(g).

82.     In addition, the IDEA requires a hearing officer to: "possess knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to [the IDEA] and legal interpretations of [the IDEA] by Federal and State courts," "possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice" and "possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice." 20 U.S.C. § 1415(f)(3)(A)(ii)-(iv).

83.     The Second Circuit and district courts in the Second Circuit, as well as many courts in other circuits, interpret the IDEA as guaranteeing a hearing officer be an individual with experience and expertise in the area of special education.

84.     This is particularly the case when courts highlight the structural importance of exhausting administrative remedies prior to seeking relief in court.

85.     In *Heldman v. Sobol*, for example, the Second Circuit noted the administrative exhaustion requirement through the impartial hearing process "prevents courts from undermining the administrative process and permits an agency to *bring its expertise* to bear on a problem as well as to correct its own mistakes." 962 F.2d at 159 (emphasis added). Later, in *Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, the Court held that the "[t]he IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply *administrators' expertise* in the area and promptly resolve grievances." 288 F.3d 478 (2d Cir. 2002) (emphasis added).

86.     Further, courts regularly defer to the IHOs' decisions based on the assumption that the IHOs presiding over these proceedings have extensive expertise in IDEA matters and are more experienced and knowledgeable about the IDEA than judges on the federal bench.

87.     Moreover, a parent has a "right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities" in a hearing. 20 U.S.C. § 1415(h)(1).  Thus, while lawyers do represent parents in hearings, many parents are assisted by "advocates" who do not attend law school.  Similarly, the DOE has mainly been represented at hearing by non-attorney administrators.

**Applicable Provisions of Section 504**

88.     Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance."  29 U.S.C. § 794(a).

89.     All City Defendants receive federal financial assistance.

90.     Section 504 and the IDEA are often seen as "complementary" statutes that, to a degree, mandate parallel requirements on schools to provide special education and related services.

91.     Section 504 also mandates that the City Defendants provide students with disabilities with a free appropriate public education.

92.     The Section 504 regulations require City Defendants to set up an impartial hearing system to hear and exhaust Section 504 claims. Specifically, the regulations require City Defendants to:

> establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of disability, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

34 C.F.R. § 104.36.

93.     The Section 504 regulations provide that compliance with the "procedural safeguards" of Section 1415 of the IDEA is "one means of meeting this requirement."

94.     Section 504 hearing officers must also be neutral, impartial, and free from any conflict of interest.

**Applicable Provisions of New York State Law – Impartial Hearings**

95.     New York apparently adopted Section 4404 of the Education Law pursuant to the IDEA's mandate. Section 4404 provides that upon the filing of a complaint by a parent, district, or other authorized party, the "board of education" or "state agency" "*shall* appoint an impartial hearing officer" to preside over a hearing and render a decision. N.Y. Educ. Law § 4404(1) (emphasis added).

96.     Section 4404(2) provides for a rotation system for hearing officers:

Individuals so appointed by a board of education or a state agency shall be selected from a list of available impartial hearing officers who have successfully completed an impartial hearing officer training program conducted by the department according to a rotation selection process prescribed in regulations of the commissioner; *except that a city school district of a city having a population of more than one million inhabitants shall be exempt from such regulations to the extent it maintains its rotational selection process in effect prior to July first, nineteen hundred ninety-three.*

*Id.* (emphasis added).

97.     Each district must maintain a rotational selection list, with the names of state certified IHOs listed alphabetically. Selection is made on a rotational basis beginning with the first name appearing after the IHO that last served. 8 N.Y.C.R.R. § 200.2(e)(I)(ii).

98.     Upon information and belief, the IDEA creates a floor, and state law and regulations are incorporated by reference into the IDEA and are directly enforceable under the IDEA, or as pendent claims.

99.     Section 4404 provides that the New York State Commissioner of Education "shall establish a department training program which shall be completed to the satisfaction of the commissioner as a condition of certification." N.Y. Educ. Law 4404(c). NYSED is responsible for certifying IHOs. *See* 8 N.Y.C.R.R. § 200.1(x)(4).

100.    Moreover, Section 4404 provides that IHOs must have the qualifications set forth in the IDEA § 1415(f), and in the implementing regulations of the Commissioner. N.Y. Educ. Law § 4404(c).

101.    The Commissioner is charged with promulgating regulations to ensure that "no individual employed by a school district, school or program serving students with disabilities placed by a school district committee on special education acts as an impartial hearing officer" within two years of holding that position. N.Y. Educ. Law § 4404(c).

102.    Finally, the Commissioner is charged with setting "maximum rates for the compensation of impartial hearing officers subject to the approval of the director of the division of the budget," rather than "minimum rates." *Id*.

103.    With regard to neutrality, the Commissioner's Regulations mandate that a hearing officer:

> be independent, shall not be an officer, employee, or agent of the school district or of the board of cooperative educational services of which such school district is a component, or an employee of the Education Department, *shall not have a personal or professional interest which would conflict with his or her objectivity in the hearing*, and shall not have participated in any manner in the formulation of the recommendation sought to be reviewed.

8 N.Y.C.R.R. § 200.1(x)(3) (emphasis added).

104.    The New York State regulations were recently amended to further dilute the already watered-down qualifications for IHOs. Under the current version of the regulations, the State Defendants claim an IHO need only be "admitted to the practice of law and currently in good

standing with a minimum of *one year* of practice and/or experience in one of the following areas: education, special education, disability rights, civil rights or administrative law." 8 N.Y.C.R.R. § 200.1(x)(1) (emphasis added)

105.    In addition to the above, the regulations require the IHO to "possess knowledge of, and the ability to understand, the provisions of federal and State law and regulations pertaining to IDEA and legal interpretations of such law and regulations by federal and State courts" (8 N.Y.C.R.R. § 200.1(x)(4)(iv)); "possess knowledge of, and the ability to conduct hearings in accordance with appropriate standard legal practice and to render and write decisions in accordance with appropriate standard legal practice" (8 N.Y.C.R.R. § 200.1(x)(4)(v)); "have access to the support and equipment necessary to perform the duties of an IHO" (8 N.Y.C.R.R. § 200.1(x)(2)); "successfully complete a training program" by NYSED (8 N.Y.C.R.R. § 200.1(x)(4)(i)); and attend periodic trainings (8 N.Y.C.R.R. § 200.1(x)(4)(ii)).

106.    Recently, amendments to the Part 200 regulations were proposed that would, *inter alia*, set minimum caseloads for IHOs.

107.    In virtually every other school district except for New York City, IHOs are fully independent and are appointed by the boards of education from the list of certified IHOs as part of a neutral, alphabetically-based rotational system.

108.    Upon information and belief, in every other school district except for New York City, when an IHO is assigned, that IHO is responsible for all of the work involved in scheduling, coordinating, managing a hearing, hearing motions, reviewing, and issuing subpoenas, holding hearings, reviewing briefs, conducting legal research, and issuing decisions.

109.    Upon information and belief, in every other school district except for New York City, the independent IHOs (many of whom are also certified in New York City) are paid $100

per hour for any and all work that is necessary, within the IHO's discretion to perform, relative to the hearing process.

110.    Upon information and belief, in every other school district except for New York City, there are no caps or restrictions on work or types of activities that the IHO can perform based on payment. This is not the situation in New York City and will be even more improper after the move to OATH.

## SYSTEMIC FACTS

**New York City, the Mayor, the Chancellor, the DOE, and the Board Are Inextricably Related for Purposes of Special Education and Impartial Hearings**

111.    During the 2021 fiscal year, New York City's public schools enrolled 1.14 million public school students, out of which 292,065 received special education services. Of those, 260,482 were school-age public school students and 31,583 were preschool students. Newly appointed Chancellor Banks has recently called the public school system "fundamentally flawed," particularly failing significant numbers of students of color.[7] Nowhere is this failure more evident than in the special education system. The system is plagued with numerous problems, causing students to be unserved and/or underserved.

112.    Despite these flaws, even with a recent increase in hearings to approximately 14,000 cases, less than 5% of parents take advantage of due process, primarily due to lack of information and resources for attorneys.

113.    In the context of administrating special education, and impartial hearings with the impartiality and procedural safeguards required by law, the Mayor, the City, DOE, Board and Chancellor are inextricably intertwined and impermissibly so relative to the OATH plan,

---

[7] "Incoming Chancellor David Banks says NYC's school system is 'fundamentally flawed' and promises reforms," Chalkbeat, Dec. 9, 2021, published at https://ny.chalkbeat.org/2021/12/9/22826524/david-banks-chancellor-eric-adams (last visited Jan. 9, 2022).

particularly since the City is the true financial party interest. This is true regardless of whether or not the DOE is deemed to be an agency of the City.

114.    In the circumstances at bar, (a) the Chancellor is selected and serves at the pleasure of the Mayor, who sets his salary (*see* N.Y. Educ. Law § 2590-h), as well as education policy for the DOE, including how the DOE responds to and handles hearings as a party; (b) the DOE is considered a *de facto* municipal agency which is not even referenced in the state law; (c) the City is financially responsible for the costs of the relief awarded in hearings and the DOE is subject to audit and financial control of the New York City Comptroller in relation to all of its functions, including impartial hearings; (d) the Mayor appoints the OATH Commissioner and oversees OATH; and (e) OATH's new impartial hearing officers are all required to be City employees in the position of agency counsel.

**State Law Places the Mayor in Charge of the Chancellor and the City's Schools in Terms of Policy and Finances While the Board Oversees Hearings**

115.    As of 2002, the Board was increased from seven to thirteen members, with the Mayor being vested with eight appointees. *See* N.Y. Educ. Law § 2590-b. As of 2020, the Board was increased to fifteen members, with nine to be appointed by the Mayor. *Id.*

116.    The powers of the Board and the Chancellor are enumerated in state law. *See* N.Y. Educ. Law §§ 2590-b, 2590-h. However, the New York State legislature did not give the Chancellor, the party responsible for special education services and programs, the right to administer impartial hearings.

117.    Impartial hearing function remained with the "Board" or the "State Agency." *See* N.Y. Educ. Law § 4404(1).

**The Ambiguous Nature of the DOE as an Entity**

118.   The New York City Charter did not create the DOE, unlike other city agencies. Further, the DOE was not created under the New York State Education Law. Rather, the DOE was created by the Board, and it is circularly defined.

119.   In 2002, the Board renamed itself the Panel for Educational Policy ("PEP") and then, through its By-Laws, created the DOE:

> The PEP is a part of the governance structure responsible for the City School District of the City of New York, subject to the laws of the State of New York and the regulations of the State Department of Education. Other parts of the structure include the Chancellor, superintendents, community and citywide education councils, principals, and school leadership teams. Together this structure shall be designated as the Department of Education of the City of New York. [8]

120.   While many cases conflate the DOE and the Board or treat them as one entity, they are distinct, with different status and powers under the law. The Second Circuit has recognized these differences, as well as the ambiguous status of the DOE, in *Ximines v. George Wingate High School*, 516 F.3d 156 (2d Cir. 2011).

121.   Regardless of the confusing nature of the structures of defendants here, importantly, the City is the real party in interest as it pays for the DOE's adjudicated failures within the hearing system.

122.   As such, this explains why the DOE insists that the City itself, as well as any of its employees, agents, and assignees, must be a released party as part of any settlement agreement.

123.   In relation to responsibility for payments, the DOE's relationship with the New York City Comptroller further underscores the DOE's level of enmeshment with the City as a whole, particularly in relation to impartial hearing operations.

---

[8] *See* Board By-Laws published at https://www.schools.nyc.gov/about-us/leadership/panel-for-education-policy/pep-bylaws.

124.    As part of the 2002 change in governance, state law was amended to give the Comptroller "authority to conduct operational and programmatic audits, in addition to financial audits, of the city district to the same extent that such comptroller has such authority for agencies of the city of New York." N.Y. Educ. Law § 2590-t. However, Defendants and the City Comptroller both believe that the DOE is subject to additional oversight by the Comptroller pursuant to New York City Charter § 93(i).

125.    The Comptroller actively audits the DOE as a "municipal agency."

126.    Further, the Comptroller assumes and wields authority over the settlement and resolution of every single hearing filed in New York.

127.    According to documents filed by the DOE with State Defendants, "New York City Charter § 93(i) … provides that only the New York City Comptroller may settle claims against or on behalf of the City where there is a monetary component to the settlement terms. The DOE is therefore prohibited from entering into settlements for monetary relief" after an impartial hearing is filed "without Comptroller approval."

128.    Further, DOE Defendants informed NYSED in 2019 that the City's "process is different from the rest of the state due to the requirements of the City Charter. We understand that NYSED would like for NYCDOE to reduce unnecessary hearings by authorizing staff to enter into settlements at impartial hearings, but because of the City Charter requirement for Comptroller authority, NYCDOE must undertake a detailed legal and financial review of each case in order to make an informed recommendation for Comptroller approval."

129.    As such, a city agency cannot employ, oversee, supervise, manage, or control the hearing officers who preside over the cases. They must remain fully independent and not be infected with an insurmountable conflict of interest.

**OATH Was Created by the Charter and Is Controlled by the Mayor**

130.    OATH is a creature of the New York City Charter. The Charter states that "[t]here shall be an office of administrative trials and hearings which shall conduct adjudicatory hearings *for all agencies of the city unless otherwise provided for by executive order, rule, law* or pursuant to collective bargaining agreements." New York City Charter § 1048(1) (emphasis added). The Mayor appoints the "chief administrative law judge" and Commissioner of OATH. *Id.*

131.    Further, "the mayor shall be authorized to designate by executive order the office of administrative trials and hearings as the tribunal for the impartial administration and conduct of adjudicatory hearings for violations of this charter, the administrative code of the City of New York, rules promulgated pursuant to this charter or such code and any other laws, rules, regulations or other policies enforced or *implemented by the agencies of the city* through the conduct of adjudications." New York City Charter § 1048(2) (emphasis added).

132.    Thus, it is beyond cavil that under the Charter, OATH's jurisdiction is limited to "*agencies of New York City.*" New York City Charter § 1048 (emphasis added).

133.    City agencies must comply with the New York City Administrative Procedures Act ("CAPA") relative to any rulemaking and/or changes in policies, such as the kind of change at issue here. *See* New York City Charter § 1041.

134.    Notably, the DOE does not consider itself a city agency for purposes of CAPA and takes no steps to comply with it in general, or in this instance.[9] It would be impossible for the DOE to be excused from CAPA, while still falling under the scope of the Mayor's authority to designate OATH to hear cases for city agencies.

---

[9] *See*, *e.g.*, *The Beginning with Children Charter School v New York City Dept. of Educ.*, 2016 N.Y. Slip Op. 51184(U), 2016 WL 4198869 (Sup Ct. Aug. 03, 2016) (unreported and cited here for the purpose of establishing DOE's position that it is not an agency under the Charter).

135.     Former Mayor de Blasio appointed Defendant Kletter to the Commissioner's position. She is a close ally of the former Mayor, who had "played a central role in shaping" the City's public policy and legislative agenda.[10]

136.     OATH's jurisdiction is limited to issues concerning City laws, regulations, and city agency rules and guidance. *See* New York City Charter §§ 1048(1)-(2).

137.     According to the 2021 Mayor's Management Report ("2021 MMR")[11], OATH has two division to hear "City matters": the Trials Division and the Hearings Division. The Trials Division only hears issues of City law, including employee civil service hearings, City seizures, City-issued license and regulatory enforcement, real estate violations, and City contract disputes.[12]

138.     Upon information and belief, the OATH Trials Division employs approximately seventeen Administrative Law Judges ("ALJs") that earn approximately $161,000 per year. All ALJs hired in the past year were former lawyers for a city agency or senior administrators for a City agency.

139.     It is significant to note, however, that OATH receives less than 2600 petitions per year. Upon information and belief, last year, with almost 20 ALJs, OATH held 500 bench trials and 1,500 settlement conferences. Approximately 184-200 cases were "processed" by each ALJ, and the OATH Trial Division closed less than 2,400 cases each year. *See* 2020 MMR at 161-165.

140.     In contrast, the "Hearings Division" holds hearings on summonses issued by 25 different City enforcement agencies for alleged violations of law or City rules. *Id*.

---

[10] *See* "Mayor de Blasio Appoints Joni Kletter as Commissioner and Chief Administrative Law Judge of the Office of Administrative Trials and Hearings", March 13, 2020, published at https://www1.nyc.gov/office-of-the-mayor/news/139-20/mayor-de-blasio-appoints-joni-kletter-commissioner-chief-administrative-law-judge-the     (last visited Jan. 6, 2021) (last visited Jan. 9, 2022).

[11] See https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2021/2021_mmr.pdf.

[12] *Id*.

141.    Upon information and belief, the Hearings Division is staffed with a variety of full-time, part-time and per diem "hearing officers."

142.    Pre-COVID, for the fiscal year 2019, the Hearings Division received 837,778 summonses from the various City agencies. Out of those, 340,563 were "adjudicated"; 663,327 were "processed"; and 261,906 cases resulted in decisions. *Id*. OATH does not report Hearing Division caseloads, but the numbers suggest that they would be astronomical.

143.    Further, by definition, and by the statistical reporting, the Hearings Division officers do not have independent adjudication authority. They are "agency" decisionmakers whose decisions may be influenced and/or directed and modified by external individuals. *Accord*, New York City Charter § 1049. Upon information and belief, the Hearings Division is neither neutral nor unbiased in its design.

144.    Notably, the City's agencies prevail (*i.e.*, violations are admitted or upheld) in the overwhelming majority of cases, and in some cases one hundred percent of the time.

**Impartial Hearings in New York**

145.    Since the precursor statute to the IDEA was adopted in the 1970s, special education hearings have been presided over by independent contractors as hearing officers.

146.    Since at least the mid-1990s, New York City has maintained a list of independent contractor IHOs certified by NYSED as IHOs. However, at some point on or before 2021, the NYC IHO unilaterally abandoned the state-mandated rotational system with the consent of NYSED, yet without an actual change in law.

147.    Aside from eligibility disputes, hearings in New York City generally involve claims that the DOE has denied a child a FAPE. These hearings seek one or more of the following types of remedies: (a) reimbursement for, direct payment for or satisfaction of a debt for private school

tuition or private special education or related services; (b) compensatory education (an equitable remedy for a child who was denied a FAPE); (c) funding for services that the DOE does not offer on their menu of options through an IEP; (d) funding for services that the DOE recommended but did not provide; (e) transportation; and (f) payment for independent evaluations.

148.    As a review of the hearing decisions and the State Review Officer decisions on NYSED's website show, impartial hearings can often involve multiple school years, complex clinical and legal issues, motion practice, expert witnesses, and thousands of pages of exhibits.

149.    Hearings may last from one day to multiple days and decisions may be very long and include extended legal analysis.

150.    Given the underlying dysfunctionality of the special education system in New York City, and the failure of that system to fulfill its federal and state mandates, most cases are not contested, and either settle or the parent prevails.

151.    For many years, the Impartial Hearing System has been a challenging political environment, given the amount of money at stake for which the City is responsible as the real party-in-interest. According to the New York City Independent Budget Office ("IBO"), the cost to the City for certain types of remedies in impartial hearings grew from $200 million in 2014 to $700 million in 2020 and reached $807 million in 2021.[13]

152.    The IBO noted that the "rapidly growing cost [of hearings] has drawn increasing attention and *prompted efforts to control future growth*." *Id.* (emphasis added). The IBO noted that "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors that are out of the department's control: private

---

[13]    *See*    https://ibo.nyc.ny.us/iboreports/carter-case-spending-for-students-with-special-needs-continues-to-grow-rapidly-march-2021.pdf.

school tuition costs and *how often parents succeed when seeking reimbursement for services to meet their children's needs*." *Id.* (emphasis added).

153.    The Comptroller has issued reports to all City agencies decrying the amount of money spent on special education claims that are filed.

154.    Further, despite the above, in the City's proposed November 2021 budget plan, the City anticipates that spending on impartial hearings in the City will decrease by $142 million in FY 2022 before falling another $220 million in FY 2023.[14]

155.    Thus, Defendants have a powerful financial incentive for the City to gain control of the hearings and the IHOs.

156.    Moreover, the City's Mayors are not absent managers, disengaged from the DOE's litigation strategy at hearings. Rather, they have been intimately involved with litigation and policy concerning how the DOE, as a party, responds to parents when hearing requests are filed. Nothing illustrates this more than the deal made by former Mayor de Blasio and New York State legislators, which the former Mayor and others announced at a press conference in June 2014.[15]

157.    Until 2014, the City assumed an aggressive litigation stance against parents. In June 2014, the Mayor adopted and announced a plan pursuant to which the DOE staff were directed to refrain from re-litigating settled or decided cases in the future years they were re-filed, unless there was a defensible change in the IEP placement recommendation. *Id.* The plan also directed DOE to "avoid unnecessary litigation in cases where the agency is unable to offer a placement, or when a child is about to enter the final grade of a school." *Id.*

---

[14] *See* https://www.osc.state.ny.us/files/reports/osdc/pdf/report-16-2022.pdf.

[15] *See* "Mayor de Blasio and Speaker Silver Announce New Steps to Help Families of Students with Disabilities," June 24, 2014, published at https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (last visited Jan. 6, 2022).

158.    This agreement was a political deal made by the former Mayor with a broad coalition of legislators, to avoid another bill that would have made tuition funding permanent for certain private school families. *Id.* Former Mayor de Blasio issued the following statement on the initiative:

> The special education placement process has been fraught with contention and litigation in recent years. The changes announced today will simplify and expedite the process for families with valid claims. . . The changes were developed in consultation with Speaker Silver and the New York State Assembly…. [F]or years, parents of children with special needs have had to wait for the City to settle legitimate claims for tuition reimbursement. Today, we are turning the page, making changes that will ease the burden on these parents. We are cutting red tape, speeding up the process, and reaching outcomes that do right by families. [16]

159.    In a video of a press conference, the former mayor speaks in great detail about the hearings, making it clear that he was intimately involved in revising how the DOE, as an opposing party to the parents, would respond to litigation. He cited the goal of creating "a streamlined, parent friendly, family friendly, respectful approach," which would not depend on a parent's ability to retain an expensive lawyer, but instead would be a process that "tried to address the family's needs."[17] He touted this new initiative as a way for the City to "right some wrongs" for those families whose children's needs could not be met by the system.

160.    He also contrasted the strategy of his predecessor, Mayor Bloomberg, whose more aggressive approach may have represented a "good litigation strategy," but was "not a humane way to run a school system, it was not fair to families, it was not fair to children who had the needs." Former Mayor de Blasio was not the only "involved" mayor regarding special education hearings. Former Mayor Bloomberg tried to lobby to change the special education law to shift the

---

[16] *Id.*

[17]    *See*    https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (Last visited January 9, 2022).

burden of proof to families, rather than on the DOE where it currently lies under Section 4404.[18]
As noted throughout, Mayor Bloomberg also tried to move the hearings to OATH, well before
there was any "backlog."

161.    Similarly, former Mayor Giuliani and then-Chancellor Crew were focused on
eliminating referrals to special education because it was "providing very little to help students and
costing way too much."[19] The state has also long desired to reduce parent access to due process.

162.    Thus, at the highest levels, both the Mayor and Chancellor, as well as state
politicians, have been privy to and directly influenced day-to-day aspects of the DOE's litigation
strategy and focused on reducing special education costs. This focus on costs is the exact type of
pressure that Congress sought to protect against when it ensured that families had access to
independent adjudicators when disputes about special education arose.

**Defendants Are Using the Backlog as a Pretext to Dismantle and Shift Control of the Hearing
System to the City Defendants**

163.    According to NYSED, the number of hearings in the City increased from 5,000
during the 2015-2016 school year to 14,266 during the 2020-2021 school year.

164.    The 2014 Plan was not properly implemented and that, among other things, the
Mayor and City failed to allocate adequate resources to the New York City Comptroller and the
DOE to effectively manage this reform initiative, and also mismanaged the hearing system.

165.    Due to the above, and other factors as alleged herein, a hearing officer shortage
occurred, and eventually, over the past two years, a backlog of hearings developed, causing delays
in the hearing process.

---

[18] https://www.wnyc.org/story/195004-bloombergs-testimony-on-the-state-budget/

[19]    *See* "Rudys Say They've Stemmed Tide Of Special Education, "Aug. 19, 1999 published at
https://nypost.com/1999/08/19/rudys-say-theyve-stemmed-tide-of-special-education/ (last visited Jan. 8, 2022).

166.    By 2018, the situation had deteriorated.

167.    Rather than taking decisive action to address what were obvious issues, in January 2018, NYSED engaged a consultant, Deusdedi Merced, Esq., to conduct an independent review of the New York City Impartial Hearing Office ("NYCIHO"), which was supposed to handle the administrative operations for hearings (processing complaints, scheduling, and processing orders and payments to IHOs).

168.    Defendants did not act for the entire year the consultant's report was being prepared, even though State Defendant had an obligation to monitor and oversee the DOE and this process, and should have already been aware of the issues.

169.    The stated purpose of the review was "to better understand the functioning of the NYCIHO and its policies, procedures and practices specific to special education impartial hearings."

170.    In scope, however, the review focused on, though was not limited to, the assignment of hearings to IHOs, the payment structure for IHOs, the specific assistance provided to IHOs by the NYCIHO, and the observation, availability and suitability of hearing room space.

171.     The report was issued in February 2019 ("Merced Report").[20]

172.    The Merced Report found that despite the large volume of hearings, few cases were fully adjudicated. He noted that in fiscal year 2017, only 11% of cases resulted in a written final decision and 49% of cases were withdrawn, dismissed, or settled.

173.    The Merced Report highlighted a number of deficiencies in the impartial hearing process as operated by NYSED and the DOE.

---

[20] *See* https://www.politico.com/states/f/?id=00000170-9867-d855-a3f7-d8ff5cdb0000.

174.     Among other things, the Merced Report noted that there were insufficient facilities for holding hearings, delays in processing documents, a failure to settle and resolve cases, and unnecessary hearings being held for matters that the DOE should not be contesting.

175.     NYSED has long failed to adequately recruit and certify new IHOs for New York City. One of the barriers to recruiting IHOs for New York City, however, was the City Defendants' problematic compensation policy and delays in payments to IHOs.

176.     The Merced Report found that IHO compensation was severely deficient in that IHOs were not being adequately compensated for their work, while IHOs in other parts of the state are.

177.     The Merced Report highlighted deficient IHO compensation, among other things, as part of the challenge of recruiting qualified IHOs. Mr. Merced concluded that the system was heading toward collapse:

> This review identified substantial deficiencies in the policies, procedures and practices specific to special education impartial hearings in New York City, including the high rate of extensions granted, the considerable number of recusals, the inadequate payment structure for IHOs, and the insufficient number of hearing rooms available to accommodate the day-to-day hearing schedule. Each presents a threat to due process. Collectively, however, they render an already fragile hearing system vulnerable to imminent failure and, ultimately, collapse.

> That it has not yet collapsed is remarkable given the staggering numbers of due process complaints filed in New York City. (See Figure 2, above.) A plausible explanation for this may be the mutually beneficial relationships that have formed to allow IHOs, parties (inclusive of the NYCDOE), and the NYCIHO to coexist by "turning a Nelson's eye." Though the NYCIHO finds itself between the proverbial rock and a hard place, serving two masters, such does not excuse any failure to comply with basic tenets of due process, including, for example, having an adequate number of hearing rooms available to accommodate the elevated number of hearings on a day day-to-day basis and fairly compensating IHOs commensurate with their responsibilities.

Merced Report at 22.

178.    Instead of taking decisive action, after the Merced Report, State Defendants began to point fingers at the DOE and the DOE responded, this back-and-forth lasted for over one year.

179.    In May 2019, State Defendants issued the DOE a Compliance Assurance Plan ("CAP").

180.    The CAP was an extensive monitoring report citing the DOE with multiple violations, including violations in the hearing system, many of which were caused by State Defendants' actions and inaction.

181.    State Defendants identified "noncompliance with respect to NYCDOE's obligations to maintain a functioning due process hearing system" including that the DOE (a) generally ["f]ails to provide parents access to adequate due process after a complaint has been filed" and (b) "does not defend numerous cases at hearing but rather admits that it did not provide FAPE and [yet still] does not offer to settle these cases, adding to the unacceptable number of due process complaints filed." The CAP directed the DOE to provide a "corrective action plan to correct its failure to provide students with disabilities and their parents all the rights and procedural safeguards required by federal and State law and regulation."

182.    One of the CAP requirements was for the DOE to revise IHO compensation.

183.    The DOE submitted a Corrective Action Plan in the spring of 2019.

184.    The DOE claimed that it was taking steps to increase staffing at NYCHIO, expand hearing space, provide adequate payment to IHOs, as well as a reshuffling of the deck, pursuant to which DOE moved hearings from one DOE division to another.

185.    These negotiations between State and City Defendants continued throughout the year, well into 2020.

186.   Notably, DOE – through NYCIHO – had promulgated an elaborate Compensation Schedule, which was insufficient to ensure IHO recruitment and retention, and pursuant to which certain tasks of IHOs were to be compensated, while others were not.

187.   These anomalies were flagged by the Defendants and their agents as a significant problem for IHO recruitment and retention. As part of the CAP, the DOE revised its compensation policy.

188.   Notably, NYC still does not pay IHOs the rate of $100 per hour paid by districts outside of the city for all tasks they believe should be completed within their discretion, but rather micromanages their tasks, still paying for some activities but not others, or capping time allowed to be spent on writing decisions.

189.   In early 2020, rather than fix the underlying issues facing the system, NYSED tried to remove the requirement that IHOs are lawyers, a mandate added many years ago to the regulations after the due process system almost collapsed from unqualified non-lawyers presiding over hearings.

190.   All but seven states require IHOs to be lawyers. After widespread opposition to watering down due process in this fashion to cure the backlog, the regulations were not amended.

191.   In February 2020, a class action was filed against DOE and State Education Defendants alleging that hearings were delayed beyond the mandated timelines. *See J.S.M., et al. v. N.Y.C. Dep't of Educ., et al*., 20-cv-705 (EK)(RLM), Dkt. No. 1.

192.   On June 18, 2020, the Court so ordered a stipulation certifying a class consisting of "[i]ndividuals who file or have filed due process complaints, and the children on whose behalf due process complaints are filed, when the due process complaints are unresolved and the decisions on

36

such complaints have not been timely provided under applicable federal and New York State law."

*Id*.

193.    According to the docket, the *J.S.M.* plaintiffs and State and City Defendants were in "settlement discussions" following class certification.

194.    The *J.S.M.* case does not involve any of the issues raised here. The OATH Plan post-dates *J.S.M*, was not negotiated with *J.S.M.* class counsel, and is not a part of that action.

**Defendants Are Trying to Evade Implementation of the Legislature's Chosen Solution to the Hearing Backlog**

195.    The New York legislature has rejected the proposed OATH plan by, instead, passing its decisive solution through alternative legislation that will remediate the backlog. The Governor signed this new measure on December 29, 2021, with implementation within 90 days.

196.    During the 2021 New York State legislative session, upon information and belief, lawyers for the DOE drafted a bill designed to amend Section 4404 to move the hearings to OATH and obtained sponsors in both the Assembly and the Senate at the 11th hour, days before the session was going to end.

197.    The Sponsor Memoranda for Assembly Bill No. A7943 and Senate Bill No. S7183 both cite the backlog as justification for the proposed change in the law.

198.    The Sponsor Memoranda further cite a lack of minimum caseloads for hearing officers, and the large number of filings.

199.    The Sponsor Memo for Bill No. A7943 noted that "[t]he proposed legislation would replace the current system for the City School District with a full-time administrative adjudicatory system, with the goal of efficaciously eliminating the backlog and providing timely hearings going forward. The New York City Office of Administrative Trials and Hearings ('OATH'), a component of New York City government, not DOE, would be responsible for the new system."

200.    However, after facing stakeholder opposition, *the legislature rejected this amendment*.

201.    Instead, the legislature passed, and, on December 29, 2021, the Governor signed legislation to amend N.Y. Educ. Law 4404 to provide an expeditious solution to the backlog: starting in 90 days, where an IHO has not been appointed for 196 days, the law provides that an IHO will be assigned for the limited purpose of so-ordering relief proposed by a parent. *See* Chapter 812 of the Laws of 2021.

**Defendants Have Failed to Allow Time for Remedial Measures to Work and Ignored Solutions from and Concerns of the Representatives of the Families**

202.    As the heading implies, Defendants took steps to improve the process, only to dismantle them by way of the OATH plan.

203.    In mid-March 2020, due to COVID-19, the NYCIHO closed their offices and impartial hearings began to be held telephonically.

204.    This shift happened relatively seamlessly, as most witnesses testified by phone even when the hearings were held in person.

205.    As a result, the parents' bar, as well as the defendants, realized that those remote hearings were effective and should be continued beyond COVID.

206.    The continued practice of holding remote hearings could solve the problem of having an insufficient number of "experts" in special education to preside over hearings in New York City, as IHOs could be recruited from across the state and country, and could handle more cases if they were not traveling.

207.    Further, remote hearings solved the facilities challenges that had been plaguing the system.

208.    Hearings have been held successfully by telephone since March 2020.

209.   However, it was generally agreed that video conferencing should be made available.

210.   After months in development, the DOE rolled out a new videoconferencing program for (remote) hearings on December 20, 2021.

211.   In addition, NYSED reports that it certified 107 new hearing officers to work exclusively in New York City since January 2020 through November 2021.

212.   Those IHOs are just beginning to accept a larger volume of cases.

213.   However, many of these IHOs (solo practitioners) do not live in New York City; they accepted the position in order to work from home.

214.   With the new videoconferencing capability, additional experienced hearing officers can now be recruited to work remotely, *i.e.*, the new normal these days.

215.   Defendants are also ignoring proposed solutions by hearing officers, who have told NYSED they could clear and manage the backlog.

216.   In September 2021, NYSED issued a "Request for Information (RFI) for the Office of Special Education: Impartial Hearing Officer System in New York City."[21]

217.   Upon information and belief, in response to the RFI, sixty-four of the existing experienced and trained IHOs proposed an annual commitment to hear 13,400 cases.

218.   This proposal was ignored.

219.   Defendants appear to have similarly ignored recommendations and concerns raised by nonprofit groups, as well as scores of members of the private bar, which focused on (a) reducing hearings, (b) managing the hearing process, and (c) making the necessary changes to implement the mandatory resolution process in the IDEA and resolve most cases within 30 days.

---

[21] *See* https://www.p12.nysed.gov/compcontracts/nysed-rfi-21-003-iho-nyc/home.html.

220.    Further, Commissioner's Regulations were recently proposed to adopt a new electronic filing system. This new system would allow hearing officers to extend deadlines beyond 30 days to a period of 60 days, at their discretion, and to establish minimum and maximum caseloads. *See* New York State Register, Vol XLIII, Issue 48, Dec. 1, 2021.

221.    The electronic filing system, extension provisions and minimum caseloads should help the process. However, the state is proposing a "maximum" caseload of 500 hearings per year, which is far too many to ensure a legally adequate hearing consistent with due process.

**The MOA and Executive Order Seek an Unfair Advantage Against Families**

222.    The MOA was executed on December 1, 2021.[22] Ex. A.

223.    Under the MOA, OATH will hire approximately 40 full-time City-employee hearing officers, after which time, all of the current hearing officers who are certified by NYSED will be prevented from accepting hearings in New York City.

224.    Plaintiffs allege that, along with the move to OATH, the DOE was approved to hire approximately 75-80 new attorneys to litigate against parents.

225.    This would have a significant adverse impact, especially for these parents who file on a *pro se* basis, and for the thousands of parents assisted by non-attorney advocates (one of the rights afforded to them under the IDEA (20 U.S.C. § 1415(h)(1)).

226.    As alleged herein, EO 91 was issued on December 27, 2021, and purports to create "concurrent jurisdiction" to hear special education matters arising under federal and state law.

**OATH Job Postings Reveal Defendants' Efforts to Eliminate the Existing IHOs and Substitute IHOs Who Lack the Required Expertise**

---

[22] It was signed by the new General Counsel of the DOE, NYSED's new Counsel and Deputy Commissioner for Legal Affairs and the Commissioner and Chief Administrative Law Judge at the New York City Office of Administrative Trials and Hearings.

227.    According to a job posting for "full-time" "Special Education Hearing Officers" with a "Civil Service Title" of "Executive Agency Counsel," Title Code 95005, Level M1", an OATH hearing officer *must be a resident of New York City* unless a narrow exception applies.

228.    The OATH job posting seeks only "four years" admission to the bar.

229.    The posting does not even require that the hearing officer practiced, or have specific knowledge of, special education law. *Id.* It does not even give preference to individuals who served as hearing officers. *Id.*[23] Further, "Executive Agency Counsel" is the same title afforded to the senior lawyers who represent the City and its agencies.

230.    Thus, IHOs will be "agency attorneys" for the City, and, as such, owe a duty of loyalty to their employer (*see* N.Y. Rules of Prof. Con. Rule 1.7(1)(1)) that is in direct conflict with their obligations as IHOs.

231.    Upon information and belief, more than 50% of the most experienced and/or long-standing hearing officers on the New York City roster would be *eliminated* from consideration as OATH hearing officers based on this posting, due to where they live and the fact that only full-time positions are being contemplated. Moreover, many of the 100-plus new IHOs that the State Defendants recruited and trained over the past several months, are now also ineligible to even apply to be OATH hearing officers, simply because they do not live within New York City.

232.    Under the MOA, the new IHOs ostensibly will be trained, certified, and appointed *two-weeks* after being hired. *See* Exhibit A.

233.    This timetable is not rooted in reality. It is belied by the RFI and Merced Report, both of which underscored the extent of training necessary for new IHOs to be comfortable

---

[23] Instead, the posting bizarrely states that "volunteer" experience is preferred. *Id.* Also, it cites managerial experience one of the two requirements, even though most of the current hearing officers operate as solo practitioners. *Id.*

accepting and handling IDEA cases, and the challenges of recruiting properly experienced attorneys to serve as hearing officers.

234.    By definition, a four-year law graduate or an individual without any IDEA experience and two weeks of training cannot possibly be a suitable IDEA hearing officer as required under the law. The very idea is out of touch and alarming.

**Despite Defendants' Recognition that IHO Compensation Is Critical to Attracting Adequately Experienced IHOs, OATH IHOs Will Make Less Yet Have Caseloads Four Times Higher than Independent IHOs in New York State**

235.    As noted herein, both State and City Defendants identified low compensation rates for IHOs as a source of difficulty in recruiting and retaining trained and experienced IHOs.

236.    Yet, the OATH hearing officer position offers a salary of $130,000 per year that, at best, is an hourly equivalent of slightly more than half of the $100 per hour rate that IHOs outside of the City are paid.

237.    Further, upon information and belief, it is far less than what the independent IHOs made in New York City who took full-time caseloads.

238.    Moreover, based on the number of cases being filed and the plan to hire 40 IHOs, the projected caseloads appear to be 350 cases per IHO.

239.    However, most IHOs surveyed by NYSED reported that a far lower number of cases would be appropriate.

240.    With a caseload of 350, there would not be enough hours in the day for an IHO to give adequate due process to families and would, at best, be able to allocate less than five hours per time to each case, including hearing time, motions, decision-writing and administration.

241.     If Defendant NYSED is permitted to increase caseloads to 500 per IHO, each case will be allocated 3.4 hours per case. The families who will suffer the most under this grossly illegal scheme are those parents without financial resources.

**The Supervisory Job Postings Expose the Level of Oversight and Control that the City Plans to Assert Over the New IHOs**

242.     OATH published many additional job postings, including "Supervising Special Education Hearing Officer," and "Deputy Commissioner" (salary of $170,000-180,000).

243.     The postings demonstrate the City's intent to hire staff to "supervise" and "set policy" in relation to the hearings, and to have oversight of the IHOs. The duties of the Deputy Commissioner, for example, would include: (a) "[o]verse[ing] the hearings process so that students and families received impartial hearing decisions in a timely manner," (b) "[a]dvis[ing] the Commissioner and Chief Administrative Law Judge of OATH in formulating appropriate policy, both legal and administrative, regarding issues affecting the adjudication of disputes about the education of children with disabilities and liability for the payment for such education," and (c) having responsibility "for recruitment, training, and appointment of Special Education Hearings Officers."

**The OATH Plan Creates a Structural Conflict Prohibited by the IDEA**

244.     As noted above, IHOs may not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A).

245.     The legislative history of the IDEA reflects that hearings will not be conducted by the agency, but rather "at the appropriate agency level. by an impartial hearing officer since the

State or local agency or *intermediate unit will be a party to any complaint presented*." Sen. Rept. No. 94-95 (Nov. 14, 1975) at 49 (emphasis added).

246. The language of the IDEA was designed to ensure that employees of entities that were responsible for funding and providing special education, but were not LEAs, were also prevented from serving as IDEA hearing officers.

247. While New York City is not a named party to the hearings, the City is the real party-in-interest. Here, Defendants' plan to use City employees to decide the outcome of special education claims for which the City will be held financially responsible, and which the City has repeatedly said is costing the City too much, would violate Plaintiffs' fundamental right to an impartial due process hearing. Further, it would accomplish City's goal of reducing the number of special education claims by creating a "tainted" system that would chill and deter parents from filing claims.

248. The Second Circuit has taken a strong stand on the importance of, at the time, the IDEA's guarantee of neutral and impartial hearing officers. *See Heldman*, 962 F.2d at 154-155. In *Heldman,* a parent brought a structural challenge to the hearing system, alleging that the New York State rotational system for selecting hearing officers violated the IDEA because it permitted boards of education to choose hearing officers. *Id.* at 154. The plaintiff argued that the system created "a powerful economic and professional incentive for officers to rule in the board's favor" and that "[s]uch an economic stake in the outcome of a hearing … is liable to distort the outcome of the hearing." *Id.*

249. The Second Circuit held that the plaintiff had the standing and the right to lodge a systemic challenge to the legality of the impartial hearing system.

250.     According to the court, "the central role of the IDEA process rights bears witness that Congress intended to create procedural rights the violation of which would constitute injury in fact." *Id.* at 155. One of these undeniable rights is the right to an unbiased adjudicator. *Id.* at 155 (the IDEA "prohibits the use of biased adjudicator.").

251.     On July 21, 1993, the New York State Legislature amended Section 4404 to create the IHO rotational system. *See Heldman on Behalf of T.H. v. Sobol*, 846 F. Supp. 285 (S.D.N.Y. 1994). The legislative history for the 1993 amendments shows that the legislature intended to ensure that the hearing system across the state would comply with the IDEA, with respect to partiality and potential conflicts, as well as the appearance of impartiality which arose when financially interested school districts had the discretion to select and appoint IHOs at will.

252.     This concept is consistent with judicial rules of disqualification. *See* 28 U.S.C.A. § 455 ("[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned").

253.     The IDEA presumes that the agency delivering services is the financially responsible party. Here, however, while the cases are filed against the DOE, the City bears the cost of the hearings *and is the real party in interest*.

254.     Further, it is beyond cavil that the City-employee-as-hearing officer arrangement "might reasonably" be questioned relative to its impact on impartiality.

255.     Further, although the IDEA does not expressly prohibit a second-tier review officer from being an employee of a state agency, the Second Circuit has interpreted the IDEA to prohibit that situation. The Second Circuit has held that the Commissioner (a named Defendant here) would not be sufficiently neutral to preside over individual appeals of impartial hearings. *See Burr by Burr v. Ambach*, 863 F.2d 1071 (2d. Cir. 1988), *vacated on other grounds*, *Sobol v. Burr*, 492 U.S.

902 (1989); *see also Holmes by Holmes v. Sobol*, 690 F. Supp. 154 (W.D.N.Y. 1988) (the Commissioner "cannot be presumed to be impartial and independent" even though not technically a NYSED employee); *Louis M. by Velma M. v. Ambach*, 714 F. Supp. 1276 (N.D.N.Y. 1989) (NYSED employees engaged in monitoring could not be review officers).

256.    Given that courts have held that the Commissioner would be inadequately neutral to preside over a single child's hearing, this Court should find the Commissioner to be in a similar conflict relative to whether hearing officers should be City employees.

257.    This is particularly true since NYSED and the Commissioner have, for years, sought to reduce the cost of due process by reducing the limitations period for parents to file hearings below the federal floor.

258.    In sum, Defendants' plan to use City employees as hearing officers violates the IDEA because the OATH employees undoubtedly could be subject to the same type of pressure that Board and/or DOE employees would feel if not more, since the City is the financially responsible party.

**The OATH Plan Violates Plaintiffs' Right to Hearing Officers with Expertise and Adequate Training in Special Education**

259.    Both the plain language of the IDEA, and judicial interpretation of the Act, establish that the IDEA requires hearing officers to have "expertise" in the area of special education, and further, to be "experts" in issues of special education law and policy.

260.    As alleged herein, City Defendants are not just seeking to control, oversee, supervise, and have the power to hire and fire hearing officers. They also are intentionally trying to clear the bench of virtually all of the *existing*, experienced hearing officers in New York City. With a hearing backlog of thousands of cases, it makes no sense for an agency to purge all of the experienced, independent IDEA hearing officers in favor of replacing them with inexperienced

lawyers who are beholden to OATH and the Mayor. Unless, of course, Defendants' real objective is to "stack the deck."

**Defendants Lack Jurisdiction or Authority for the OATH Plan and Are Improperly Delegating Duties Under the IDEA and State Law**

261.    By executing the MOA, the State Defendants abdicated their obligation to supervise and guarantee IDEA procedural safeguards and a FAPE. 20 U.S.C. §§ 1412(g), 1415(a).

262.    In addition, the OATH plan also violates the IDEA and New York State law because the Mayor, DOE, the Chancellor and NYSED lack the authority to implement it.

263.    The DOE, Board and/or Chancellor are not vested with any authority under the IDEA, or state law, to delegate the responsibilities of the impartial hearing system to OATH. The IDEA requires that the SEA and LEA "shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of" a FAPE. 20 U.S.C. § 1415(a).

264.    The IDEA does not authorize delegation of this function or the impartial hearing function.

265.    The IDEA expressly provides that the hearing "*shall* be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A) (emphasis added).

266.    The OATH Plan also deprives Plaintiffs of neutral, independent hearing officers as defined by New York State Educ. Law Section 4404 which, as alleged herein, was amended expressly for the purpose of bringing New York State's due process system into compliance with the IDEA and by taking action to establish independent IHOs who were not subject to conflict or the appearance of conflict.

267.    Section 4404 is enforceable as a federal right under the IDEA as the IDEA "incorporates by reference state standards, be they substantive or procedural, that exceed the federal basic floor of meaningful, beneficial educational opportunity." *Burlington v. Dep't of Educ.*, 736 F.2d 773, 789 (1st Cir. 1984).

268.    The responsibility for the impartial hearing system remained with the Board of Education under Section 4404. N.Y. Educ. Law § 4404(1)(a).

269.    OATH was established under the New York City Charter to hear cases involving "agencies of the city" concerning City laws, regulations, rules, and policies. *See* New York City Charter §1098(1). None of the Defendants had authority under the IDEA or State law to either (a) vest OATH with "concurrent" jurisdiction over federal and state law special education claims, or (b) transfer the impartial functions and IHOs to OATH.

270.    Defendants' unilateral action here would be preempted by the IDEA, as it would conflict with its provisions. 20 U.S.C. § 1415(a). The Charter could not authorize the OATH transfer because it would directly conflict with the IDEA's mandate that the LEA conduct the hearings, using neutral, experienced hearing officers and the doctrine of preemption would apply. 20 U.S.C. § 1415(f)(1)(A).

271.    Further, the New York State Municipal Home Rule Law ("MHRL") § 11 prohibits enactment of any local law that supersedes a state statute "if the local law applies to or affects 'the maintenance, support or *administration of the educational system in such local government*." (emphasis added).

272.    Pursuant to MHRL, the Mayor and other Defendants can point to no authority allowing the Chancellor, Mayor or NYSED to vest OATH with that jurisdiction, or transfer impartial hearings from the DOE to OATH. This is the case even if the former Mayor were to have

complied with the City Charter, or the DOE with their rule-making obligations, which did not occur.

**The OATH Plan Violates the 2002 Order and Stipulation**

273.    As discussed above, Defendants are violating the express terms of the district court's 2002 Order in *Does, et al. v. Outgoing Schools, et al.,* 1:02-cv-06495 (JFK).

274.    Defendants did not provide Mr. Mayerson's firm with any notice, let alone 45 days' notice of the plan to transfer the function of the Impartial Hearing Office to Oath. Defendants' flagrant violation of the 2002 order is sufficient grounds, standing alone, for this Court to grant Plaintiffs' motion and enjoin Defendants from implementing the OATH plan.

**Defendants Failed to Give Notice or Hold Hearings**

275.    As alleged herein, the City Charter created OATH to hear cases involving New York City laws, rules and regulations

276.    Even assuming this aspect of the Charter is not preempted by federal or state law, the Mayor did not comply with the Charter in facilitating the transfer to OATH and issuing EO 91.

277.    Before the Mayor can transfer an agency's hearing functions to OATH, he must first convene a committee to study the transfer and the committee must issue a report. New York City Charter §§ 1048(4)(a)-(b).

278.    After that process, there must be notice to the public and hearings held. *Id.* Upon information and belief, the Mayor did not take any of these actions here.

279.    Further, OATH was subject to the New York City Administrative Procedures Act ("CAPA") but failed to comply with rule-making. Similarly, the Board failed to comply with its rule-making procedures pursuant to N.Y. Educ. Law § 2590(d).

**The OATH Plan Violates the Pendency Provision**

280.   Notwithstanding the above, an injunction to preserve the *status quo* here is fully consistent with and warranted pursuant to the IDEA's "pendency|" provision, popularly known as the "stay put" provision. 20 U.S.C. § 1415(j). Under the IDEA, when a case is filed, the child at issue is entitled to an automatic injunction, without regard to merit, to maintain the current program and placement until the dispute is resolved. 20 U.S.C. § 1415(j).

281.   A significant, material change in hearing procedures would deprive children of a core substantive right to a FAPE.

282.   Thus, the pendency provisions should attach here.

283.   Plaintiffs have no administrative forum in which to enjoin the OATH plan under the pendency provision, as administrative officers lack jurisdiction to effectuate policy or practice changes.

**The OATH Plan Violates the Due Process Clauses of the U.S. and New York State Constitutions**

284.   The OATH plan creates a separate and unequal system of due process for children inside New York City, compared to their peers outside of the City, in suburbs like Scarsdale or Great Neck, which rests only on the residence of the state's children with special needs.

285.   Yet, in the far more expensive jurisdiction of City, families who seek due process will only have access to less experienced hearing officers who are paid half of what an IHO is paid anywhere else in the state, and who will be employed, trained by, supervised, managed, overseen, and restricted by the City.

286.   There is no rational basis for the decision to eliminate independent IHOs for the City's children and this decision should be subject to strict scrutiny, as it violates the Equal Protection Clause. U.S. Const. Amend. XIV, §1; NY Const. Art. I § 11.

287.     Further, as the OATH Plan contemplates that the OATH IHOs will be employed, controlled, and managed by the real party-in-interest, that is, the City, it renders the plan infirm under the Due Process Clause of both the federal and New York Constitutions.

**The OATH Plan Violates Section 504**

288.     Significant numbers of parents seek to exhaust their claims under Section 504 and other federal statutes pursuant to 20 U.S.C. 1415(l). All of the claims, IDEA, Section 504, or Section 1983, are included in one complaint.

289.     Further Section 504 requires City Defendants to operate a hearing system similar to the IDEA system.

290.     Historically, the DOE used the IDEA hearing system for parents to file Section 504 claims.

291.     The MOA does not address Section 504 claims or hearings and does not appear to contemplate a transfer of claims relative to Section 504 or the other types of federal statutes that have to be exhausted, along with IDEA claims.

292.     Even if it did, the plan would similarly destroy the impartiality of Section 504 hearing officers.

**A TRO/injunction Is in the Public Interest and the Balance of Hardships Tips Heavily in Plaintiffs' Favor**

293.     When a preliminary injunction is sought to "affect government action taken in the public interest pursuant to a statute or regulatory scheme," a court must determine whether the injunction is in the public interest. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020); *see also Y.S. on behalf of Y.F. v. New York City Dep't of Educ.*, 2021 WL 1164571 (S.D.N.Y. March 26, 2021). Here, the TRO and injunction weigh in favor of the public interest.

294.     First, the OATH Plan seeks to circumvent the legislature's recent rejection of the OATH plan, as well as the legislature and Governor's solution to the backlog.

295.     Further, the OATH Plan is opposed by the majority of the representatives of the families caught in the backlog.

296.     Even assuming *arguendo* that the OATH plan would improve the backlog, it is not in the public interest to sacrifice the integrity of the entire due process system to speed up the timelines.

297.     This is particularly true, when the backlog is almost entirely of State and DOE Defendants' making, and there are numerous other options for resolving the backlog that Defendants have declined to implement.

298.     There is no compelling evidence to suggest the aspect of the OATH Plan – requiring IHOs to live in New York City and be City lawyers/employees would improve, rather than wreak havoc on, the due process system.

299.      The plan is intentionally designed to sweep the entire roster of long-term, experienced IHOs off of the bench and substitute them either with junior lawyers who do not have the proper experience or individuals who have no background and/or experience in this area and who are beholden to the City.

300.     The illogical nature of this plan, which, in a matter of weeks, eliminates scores of experienced hearing officers who have been working as IHOs for years, is highly suspect.

301.     Further, there is no basis for making the IHOs employees and/or supervised by New York City to facilitate an administrative transfer to OATH (even if this were permitted).

302.     It is clear that OATH does not currently have expertise in managing complex hearings at the level that would need to be addressed in this context.

303.   The OATH Hearings Division has half the number of intended administrative judges and handles only one fifth of the volume of impartial hearing cases. Even with caseloads of less than 200, the OATH ALJs are issuing a mere fraction of the decisions that would be needed for impartial hearings, and they involved much less complicated issues without any clinical component.[24]

304.   On the other hand, the Hearings Unit that handles thousands upon thousands of cases, and win rates overwhelmingly in favor of the City, is grossly inadequate as the apparent model for impartial hearings.

305.   Further, given these long-standing issues, it is grossly irresponsible for the Defendants to have attempted to make this enormous change weeks before Mayor de Blasio is leaving, during the holidays and after the City was aware of the existing COVID surge.

306.   Special education students have been the hardest hit during the pandemic.

307.   The Impartial Hearing System is the last line of relief for families whose children have been denied a FAPE.

308.   Yet, the transition is happening too fast, at breakneck speed, in the middle of an administration change.

309.   The process should not have even started until defendants had first complied with Judge Keenan's 2002 Stipulation and Order requiring Defendants to give plaintiffs' counsel 45 days' prior notice of any intention to bring in OATH and its deficient infrastructure, as well as complied with their other obligations under the law.

---

[24]   *Compare* the impartial hearing decisions (published at http://www.p12.nysed.gov/specialed/dueprocess/decisions/home.html), SRO decisions published at https://www.sro.nysed.gov/decision-search with the decisions published by the OATH Hearings Division (at http://a820-isys.nyc.gov/ISYS/ISYS.aspx). The Court should take judicial notice of the stark differences in complexity of the issues and the facts.

310.    There is simply no way that the due process rights of the children and parents can be adequately protected with the implementation plan proposed in the MOA, particularly under the current circumstances of a COVID surge.

311.    Given all of the infirmities raised herein, it is imperative for this plan to be enjoined.

312.    Without an injunction, the system will already be destroyed, and the bell will not be able to be un-rung. That would not be in the public interest of the families whose rights are protected by federal law.

313.    In contrast, a delay of the OATH plan merely allows the system to continue as is, until the Governor's legislative solution goes into effect in 90 days, the new regulations are adopted, and the new IHOs who were trained time to increase their caseloads.

314.    Therefore, it is in the public interest to at least pause it if not stop the Plan.

315.    Additionally, in the event it is necessary to balance the hardships that would result from granting Emergency Relief, they tip decidedly in favor of Plaintiffs.

**Plaintiffs Are Not Required to Further Exhaust Their Administrative Remedies, as the Administrative Process Will Be Futile and Ineffective**

316.    Plaintiffs are not required to exhaust their administrative remedies for several reasons.

317.    Plaintiffs challenge the due process procedures themselves, and, therefore, exhaustion is futile.

318.    Plaintiffs face irreparable harm and thus do not need to further exhaust their administrative remedies

319.    Plaintiffs' claims are systemic in nature and allege violations in policies, procedures, and practices as well as to the administrative system as a whole, which, courts have held, do not need to be exhausted.

54

320.    IHOS do not have jurisdiction to hear the challenges and claims raised by Plaintiffs.

321.    Due to the alleged backlog, Plaintiffs would not have access to IHOs in time to prevent the OATH plan.

322.    Plaintiffs need discovery that is not available through administrative hearings and can only be obtained through the federal court procedures.

323.    Exhaustion is not required because the due process procedures are not available to exhaust all claims that are raised.

## CLASS ACTION ALLEGATIONS

324.    The Class members' claims for relief with respect to Defendants' systemic practices, policies, procedures, actions, and failures to act are brought on behalf of themselves, and on behalf of all those similarly situated pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure.

325.    Defendants have acted, or refused to act, on grounds generally applicable to the named Class Plaintiffs and Class members, making relief appropriate, and able to be granted, to the Class as a whole.

326.    The Class is defined as: Parents of children with IEPs who live in New York City who are entitled to impartial hearings conducted by the LEA and presided over by hearing officers who (a) are neutral, independent, and free from an existing conflict or an appearance of a conflict; (b) are not employees of the Defendants, or its agencies, including OATH, or any contracted agency or division over whom any of the Defendants would have control, management, oversight, supervision and influence; and (c) otherwise satisfy the requirements of 20 U.S.C. § 1415(f)(3)(A) and New York State Education Law Section 4404.

327.    The Class is so numerous that joinder of all members is impracticable.

328.   Upon information and belief, there are more than ten thousand Class members per year.

329.   The exact number of the members of the Class and each subclass is unknown but upon information and belief it is approximately 14,000 per year.

330.   The exact number could be easily identified as the NYSED, and City Defendants maintain computerized data systems that have the information available.

331.   Not all Class members have access to lawyers. Further, requiring thousands of Class members to litigate their rights would be futile, as individuals cannot litigate a systemic solution necessary in this case. Further, doing so would impose a significant economic burden on the educational and judicial systems.

332.   There are questions of law and fact in common among named Plaintiffs and the members of the Class, including, but not limited to, whether Defendants, by implementing the OATH Plan or by failing to stop it from proceeding, violated the IDEA, Section 504, the Due Process, Clause of the U.S. Constitution, Due Process Clause of the State Constitution, New York State law and regulations, and/or New York City law.

333.   Plaintiffs' claims are typical of those of the Class that they seek to represent.

334.   Plaintiffs have the same interests as the other Class members in prosecuting claims.

335.   A class action is superior to other available methods for the fair and efficient adjudication of the matter at this time.

336.   Class actions involving similar types of claims and relief are often certified.

337.   The expense and burden of individual litigation make it extraordinarily difficult for Class members to redress the wrongs done to them individually.

338.    Common issues predominate over individual questions and generalized proof will resolve the legal and factual questions raised by Class members.

339.    The named Plaintiffs will adequately represent and protect the interests of the Class, and Plaintiffs know of no conflict of interest among the Class members.

340.    Class Counsel is qualified to represent the classes and subclasses

341.    Class Counsel is experienced in litigating federal systemic actions and class actions on behalf of children with special needs, and their parents, in New York.

342.    Class Counsel has served as counsel on several systemic and class action cases in New York.

## FIRST CLAIM FOR RELIEF
## THE IDEA

343.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

344.    Defendants have violated Plaintiffs' rights to a FAPE under the IDEA.

345.    Defendants have violated the rights of Plaintiffs who are entitled to a due process system that complies with the IDEA in terms of (a) IHO impartiality; and (b) IHO qualifications.

346.    The State Defendants have failed to supervise, oversee, and guarantee due process rights and FAPE to Plaintiffs to ensure that IHOs will be qualified and impartial.

347.    Defendants- by way of the OATH Plan – are financially motivated to reduce parents' access to and ability to prevail in hearings.

348.    Defendants are violating Plaintiffs' stay-put (pendency) rights under the IDEA.

349.    DOE and State Defendants have improperly delegated their obligations under the IDEA in violation of the IDEA.

350.     DOE and State Defendants have abdicated their duties and obligations under the IDEA.

351.     Defendants have violated N.Y. Educ. Law Section § 4404, which is incorporated by reference into and enforceable under the IDEA.

352.     To the extent that New York State law permits the OATH Plan to be implemented (which it does not), the IDEA preempts state law and would conflict with it.

353.     To the extent that New York City Law permits the OATH Plan to be implemented (which it does not), the IDEA preempts local law and would conflict with it.

354.     Plaintiffs suffered and will suffer injury and irreparable harm as a result of Defendants' violations of law.

355.     As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

## SECOND CLAIM FOR RELIEF
## SECTION 504 OF THE REHABILITATION ACT

356.     Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

357.     Defendants' conduct is knowing, intentional, reckless, and gross.

358.     Plaintiffs are qualified individuals with disabilities entitled to protection under Section 504.

359.     City Defendants violated Section 504 by implementation of the OATH plan.

360.     As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

### THIRD CLAIM FOR RELIE
### 42 U.S.C. § 1983

361.   Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

362.   Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

363.   As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

### FOURTH CLAIM FOR RELIEF
### DUE PROCESS

364.   Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

365.   Defendants are denying Plaintiffs the right to Due Process as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

366.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing this plan.

367.   As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

### FIFTH CLAIM FOR RELIEF
### EQUAL PROTECTION

368.   Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

369. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

370. Defendants' plan to eliminate IHOs certified by NYSED and delegate to OATH the responsibility for conducting impartial hearings in New York City treats children with disabilities who reside in New York City different from similarly situated children outside of the City.

371. Defendants have no rational basis for eliminating IHOs certified by NYSED only as to children with disabilities who reside in New York City.

372. Upon information and belief, Defendants' plan is motivated by an intent to discriminate against Plaintiffs and deprive them of their rights under the IDEA and New York law.

373. Specifically, upon information and belief, Defendants are seeking to control and limit the awards and expenses made under the current impartial hearing system by using OATH employees instead of IHOs certified by NYSED to conduct hearings in New York City.

374. Defendants' plan thus violates Plaintiffs' equal protection rights under the Fourteenth Amendment.

375. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing this plan.

376. Defendants are denying Plaintiffs the right to Due Process as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

377. As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

## SIXTH CLAIM FOR RELIEF
## NEW YORK STATE LAW

378.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

379.    Defendants have violated New York State Education Law, including but not limited to §§ 2590-b, 2590-h, 4401, and 4404, a well as the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. §2 00, *et seq.*

380.    To the extent that the New York City Charter or other local law permits implementation of the OATH Plan (which it does not), it would not be enforceable pursuant to the MHRL, § 11.

381.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF
## NEW YORK CITY CHARTER

382.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

383.    Defendants have violated the New York City Charter.

384.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

i.       Assume jurisdiction over this action;

ii.      Issue a Temporary Restraining Order to immediately enjoin Defendants from taking any further steps to implement the OATH Plan and EO 91 and directing Defendants to comply with the 2002 Order and Stipulation;

iii.     Issue a preliminary and permanent injunction enjoining further implementation of the OATH plan and the Mayor's Executive Order and directing Defendants to modify their policies, procedures, and practices to ensure that (a) impartial hearings in New York City are presided over by hearing officers who: (i) are neutral, impartial independent contractors who are free from oversight, supervision, management and the threat of termination by any of the City Defendants; (ii) have the expertise and specialized training required by federal and state law; (iii) continued to be assigned pursuant to the neutral, alphabetical, rotational system required by state law; and (iv) are free from any actual, potential or appearance of conflict of interest and whose appointment otherwise comports with federal and state law; and (b) the impartial hearing system is implemented consistent with the requirements of federal and state law with respect to responsible entity and jurisdiction.

iv.      Issue a Declaratory Judgment on behalf of the Plaintiffs that the policies, procedures, and practices as alleged herein violate the applicable federal, state and laws;

v.       Award Plaintiffs attorneys' fees and costs incurred with respect to this action; and

vi.      Award such other different, and further, relief as to the Court may seem just and proper.

Dated:      January 11, 2022
              New York, New York

Respectfully submitted,
MAYERSON & ASSOCIATES

*/s/ Gary Mayerson*
By_____
      Gary S. Mayerson
      330 West 38th Street
      New York, NY 10018
      Phone: (212) 265-7200
      Fax: (212) 265-1735
      Gary@mayerslaw.com

THE LAW OFFICE OF ELISA HYMAN, P.C.

*/s/ Elisa Hyman*
By_____
      Elisa Hyman, Esq.
      The Law Office of Elisa Hyman
      1115 Broadway, 12th Floor
      New York, NY 10010
      Phone: (646) 572-9064
      Fax: 646-572-9065
      elisahyman@gmail.com

*Co-counsel for Plaintiffs*