UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E.F. *et al.,*

                                    Plaintiffs,

                    -vs-                                    Civ. No.: 21-cv-11150 (ALC)

Mayor Bill de Blasio, *et al.*

                                    Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS                                            Page

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  LEGAL FRAMEWORK .............................................................................. 9

     A. State and DOE Defendants' Obligations Under the IDEA ................................. 9

     B. New York State Law Guarantees an Independent Rotation System ..................... 15

III. SYSTEMIC FACTS .................................................................................. 16

     A. New York City, the Mayor, the Chancellor, the DOE, and the Board Are Inextricably
        Related for Purposes of Special Education and Impartial Hearings ................... 16

     1. State Law Places the City and Mayor in Charge of the Chancellor and the City's Schools
        in Terms of Policy and Finances While the Board Oversees Hearings ................. 18

     2. The Ambiguous Nature of the DOE as an Entity ....................................... 18

     3. OATH Was Created by the Charter and Is Controlled by the Mayor ................... 21

     4. Impartial Hearings in New York ...................................................... 23

     5. Defendants are Using the Backlog as a Pretext to Dismantle and Shift Control of the
        Hearing System to the City Defendants .............................................. 28

     6. Defendants Are Trying to Evade Implementation of the Legislature's Chosen Solution to
        the Hearing Backlog ................................................................... 31

     7. Defendants Have Failed to Allow Time for Remedial Measures to Work and Ignored
        Solutions from and Concerns of the Representatives of the Families ................. 32

     8. The MOA and Executive Order Seek an Unfair Advantage Against Families ........... 34

     9. OATH Job Postings Reveal Defendants' Efforts to Eliminate the Existing IHOs and
        Substitute IHOs Who Lack the Required Expertise ................................... 34

     i. Despite Defendants' Recognition that IHO Compensation Is Critical to Attracting
        Adequately Experienced IHOs, OATH IHOs Will Make Less Yet Have Caseloads Four
        Times Higher than Independent IHOs in New York State ............................. 36

     ii. The Supervisory Job Postings Expose the Level of Oversight and Control that the City
        Plans to Assert Over the New IHOs .................................................. 37

IV.  ARGUMENT ....................................................................................... 37

     A. The Plaintiffs Have Established Likelihood of Success on the Merits and Sufficiently
        Serious Questions Going to the Merits that the OATH Plan Violates the IDEA ......... 38

     1. The OATH Plan Creates a Structural Conflict Prohibited by the IDEA ................ 38

     2. The OATH Plan Violates Plaintiffs' Right to Hearing Officers with Expertise and
        Adequate Training in Special Education .............................................. 42

     3. Defendants Lack Jurisdiction or Authority for the OATH Plan and Are Improperly
        Delegating Duties Under the IDEA and State Law .................................... 44

     i. The Board, DOE and Chancellor Can Not Delegate the Hearing Function ............. 44

i.  The OATH Plan Violates Section 4404 Which is Enforceable under the IDEA ............... 46

ii.  The Mayor Lacked Authority to Vest OATH with Jurisdiction or Transfer the Hearing Functions under Other State Law ................................................................. 47

4.  The OATH Plan Violates the 2002 Order and Stipulation................................... 48

5.  Defendants Failed to Give Notice or Hold Hearings......................................... 48

6.  On its Face, the OATH Plan Will Substantially Undermine and Prejudice the Hearing System ....................................................................................................... 48

7.  The OATH Plan Violates the Due Process Clauses of the U.S. and New York State Constitutions................................................................................................ 49

8.  The DOE's Obligations Under Section 504 Mirror its IDEA Duties................................ 49

B.  The Harm Faced by Plaintiffs and Other Similarly Situated Families Is Irreparable ........ 50

C.  A TRO/Injunction Is in the Public Interest and the Balance of Hardships Tips Heavily in Plaintiffs' Favor.......................................................................................... 51

D.  An Automatic Injunction is Warranted Based on Pendency Rights................................... 52

VII.  CONCLUSION ................................................................................................ 52

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) ..................................... 51

*B.G. by J.A.G. v. Bd. of Educ. of City of Chicago*, 901 F.3d 903 (7th Cir. 2018) ....................... 44

*Blackman v. Dist. of Columbia*, 185 F.R.D. 4 (D. D.C. 1999) ..................................... 13

*Bd. of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176 (1982) ..................................................................... 2, 10, 13, 47

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003) ..................................... 38

*Burilovich ex rel. Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560 (6th Cir. 2000) ................................................................................................. 44

*Burlington v. Dep't of Educ.*, 736 F.2d 773 (1st Cir. 1984) ..................................... 47

*Burr by Burr v. Ambach*, 863 F.2d 1071 (2d. Cir. 1988) ..................................... 40

*Colin K. v. Schmidt*, 715 F.2d 1 (1st Cir. 1983) ..................................... 41

*D. D. by and through Ingram v. Los Angeles Unified School District*, 18 F.4th 1043 (9th Cir. 2021) ................................................................................................. 43

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004) ..................................... 44

*Dellmuth v. Muth*, 491 U.S. 223 (1989) ..................................... 41

*Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440 (2d Cir. 2015) ..................................... 12

*Evans v. Evans*, 818 F. Supp. 1215 (N.D. Ind. 1993) ..................................... 47

*F.C. v. New York City Dep't of Educ.*, 2016 WL 8716232 (S.D.N.Y. Aug. 5, 2016) ................. 52

*Food Mktg. Inst. v. Argus Leader Media*, 139 S.Ct. 2356 (2019) ..................................... 45

*Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006) ..................................... 12

*G.R. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 441(RWS), 2012 WL 310947 (S.D.N.Y. Jan. 31, 2012) ................................................................................................. 50

*Gregory K. v. Longview School Dist.*, 811 F.2d 1307 (9th Cir. 1987) ..................................... 44

*Hayes Through Hayes v. Unified School Dist. No. 377*, 877 F.2d 809 (10th Cir. 1989)............. 44

*Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148 (2d Cir. 1992) ...................................... *passim*

*Heldman on Behalf of T.H. v. Sobol*, 846 F. Supp. 285 (S.D.N.Y. 1994) ................................... 40

*Helms v. McDaniel*, 657 F.2d 800 (5th Cir. 1981) ...................................................... 41

*Holmes by Holmes v. Sobol*, 690 F. Supp. 154 (W.D.N.Y. 1988)................................................ 41

*Honig v. Doe*, 484 U.S. 305 (1988) ...................................................................... 2, 50

*J.S. Cave v. East Meadow Union Free School Dist.*, 514 F.3d 240 (2d Cir. 2008)..................... 43

*Jacky W. v. New York City Bd. of Educ.*, 848 F.Supp. 358 (E.D.N.Y. 1994).............................. 42

*James v Fariña*, No. 450170/16, 2019 WL 1120143 (N.Y.A.D. 1 Dept., Mar. 12, 2019).......... 17

*Jennings v. Rodriguez*, 138 S.Ct. 830 (2018) .............................................................. 45

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) ................................... 45

*LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48 (2d Cir. 2004) ........................... 50

*Landers v. Samuelson*, No. 12cv703, 2012 WL 825117 (E.D.N.Y. March 8, 2012) .................. 38

*LIH v. New York City Bd. of Educ.*, 103 F. Supp. 2d 658 (E.D.N.Y. 2000)................................ 47

*Louis M. by Velma M. v. Ambach*, 714 F. Supp. 1276 (N.D.N.Y. 1989) ..................................... 41

*LV v. New York City Dep't of Educ.*, 2021 WL 663718 (S.D.N.Y. Feb. 18, 2021) ..................... 16

*M.G. by and through R.G. v. New York City Department of Education*, 2021 WL 3560764 (S.D.N.Y. March 8, 2021).......................................................................................... 16

*M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216 (S.D.N.Y. 2016) ........................... 17

*M.G. v. New York City Dept. of Educ.*, 982 F. Supp. 2d 240 (S.D.N.Y. 2013) ...................... 38, 50

*M.H. v. New York City Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012)................................... 12, 44

*M.W. v. New York City Dep't of Educ.*, No. 15cv5029, 2015 W.L. 5025368 (S.D.N.Y. Aug. 25, 2015)............................................................................................................... 38, 50

*Massey v. District of Columbia,* 400 F. Supp. 2d 66 (D. D.C. 2005) ............................... 13, 50, 52

*Mayson by Mayson v. Teague*, 749 F.2d 652 (11th Cir. 1984) ...................................... 42

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984) ....................................................... 38

*Muth v. Central Bucks School Dist.*, 839 F.2d 113 (3rd Cir. 1988) ........................... 41, 43

*Octavia P. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990) ................................................. 43

*Perez v. Sturgis Public Schools*, 3 F.4th 236 (6th Cir. 2021) ....................................... 44

*Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, 288 F.3d 478 (2d Cir. 2002) ....................................................................................................... 43

*Raila v. United States*, 355 F.3d 118 (2d Cir. 2004) ................................................. 45

*Robert M. v. Benton*, 634 F.2d 1139 (8th Cir. 1980) ................................................. 41

*Sarah M. v. Weast*, 111 F. Supp. 2d 695 (D. Md. 2000) ............................................ 47

*Sobol v. Burr*, 492 U.S. 902 (1989) ...................................................................... 41

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148(WHP), 2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) ......................................................................... 50

*The Beginning with Children Charter School v New York City Dept. of Educ.*, 2016 N.Y. Slip Op. 51184(U), 2016 WL 4198869 (Sup Ct. Aug. 03, 2016) ..................................... 21

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) 14

*Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516 (2007) ...................... 13

*Ximines v. George Wingate High School*, 516 F.3d 156 (2d Cir. 2011) ..................................... 19

*Y.S. on behalf of Y.F. v. New York City Dep't of Educ.*, 2021 WL 1164571 (S.D.N.Y. March 26, 2021) ................................................................................................. 51

*Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904 (2d Cir. 1982) .................................... 3

**Statutes**

20 U.S.C. § 1400 ................................................................................. 1, 9, 10

20 U.S.C. § 1401 ................................................................................. 9, 10, 11

20 U.S.C. § 1407 ...................................................................................... 11

20 U.S.C. § 1412 ........................................................................... 9, 11, 44, 46

20 U.S.C. § 1414 .................................................................................................... 9, 10, 11

20 U.S.C. § 1415 .......................................................................................................... *passim*

20 U.S.C. § 1464 .................................................................................................................. 46

28 U.S.C. § 455 ................................................................................................................... 40

29 U.S.C. § 794 .......................................................................................................... 15, 50

34 C.F.R. § 300.511 ............................................................................................................ 15

42 U.S.C. § 1983 ................................................................................................................. 15

Chapter 812 of the Laws of 2021 ....................................................................................... 32

Municipal Home Rule Law § 11 ......................................................................................... 47

N.Y. Educ. Law § 2590 ....................................................................................................... 48

N.Y. Educ. Law § 2590-b ............................................................................................. 17, 18

N.Y. Educ. Law § 2590-h ............................................................................................. 17, 18

N.Y. Educ. Law § 2590-t .................................................................................................... 19

N.Y. Educ. Law § 4401 ...................................................................................................... 10

N.Y. Educ. Law § 4404 ................................................................................................. *passim*

New York City Charter § 1041 ........................................................................................... 21

New York City Charter § 1048 ............................................................................... 21, 22, 48

New York City Charter § 1098 ........................................................................................... 47

New York City Charter § 93 ............................................................................................... 19

**Rules and Regulations**

34 C.F.R. § 104.36 .............................................................................................................. 50

34 C.F.R. § 300.115 ............................................................................................................ 10

34 C.F.R. § 300.320 ............................................................................................................ 10

34 C.F.R. § 300.322 ............................................................................................. 11

34 C.F.R. § 300.324 ............................................................................................. 10

34 C.F.R. § 300.9 ................................................................................................. 11

8 N.Y.C.R.R. § 200.1 ........................................................................................... 16

8 N.Y.C.R.R. § 200.13 ......................................................................................... 10

8 N.Y.C.R.R. § 200.2 ........................................................................................... 14

8 N.Y.C.R.R. § 200.4 ........................................................................................ 9, 10

8 N.Y.C.R.R. § 200.5 ................................................................................. 11, 14, 15

Fed. R. Civ. P. 65 ............................................................................................... 1, 11

N.Y. Rules of Prof. Con. Rule 1.7 ....................................................................... 35

New York City Schools Chancellor's Regulation A-710 ...................................... 50

**Constitutional Provisions**

NY Const. Art. I .................................................................................................... 49

U.S. Const. Amend. XIV ...................................................................................... 49

**Secondary Authorities**

Assembly Bill No. A7943 Sponsor Memorandum ................................................ 32

H.R. Rep. No. 94–332 (June 26, 1975) ................................................................... 2

"Is Special Education Improving? Case Evidence From New York City," Stiefel, L. PhD, *et al.*,
    published at https://journals.sagepub.com/doi/10.1177/1044207320934810 .......................... 16

New York State Register, Vol XLIII, Issue 48, Dec. 1, 2021 .................................... 34

"State Due Process Hearing Systems Under the IDEA: An Update," Perry A. Zirkel, *et al.*,  30
    Journal of Disability Policy Studies (2019) ........................................................... 12

Sen. Rept. No. 94-95 (Nov. 14, 1975) ................................................................... 38

Senate Bill No. S7183 Sponsor Memorandum ..................................................... 32

## I.      PRELIMINARY STATEMENT

This Memorandum of Law and the accompanying declarations of Gary S. Mayerson, Esq. ("Mayerson Decl.") and Elisa Hyman, Esq. ("|Hyman Decl."), as well as the exhibits attached thereto and relevant documents published on government websites, are respectfully submitted in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Emergency Relief") pursuant to Fed. R. Civ. P. 65.

Plaintiffs are parents of children with eligible disabilities (and their respective children) who are entitled to a Free Appropriate Public Education ("FAPE") and related due process protections and safeguards guaranteed under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400, *et seq*. *See* First Amended Complaint ("FAC") at ¶¶ 1-10. The injunctive relief being sought on this motion seeks to protect some of the essential safeguards.

Plaintiffs' motion seeks to restrain and enjoin Defendants from taking any further steps to implement their latest plan to degrade, dismantle, and replace the current impartial hearing system in New York City required by the IDEA by replacing the state-certified Impartial Hearing Officers ("IHOs") with full-time employees of New York City's Office of Administrative Trials and Hearings ("OATH") ("OATH Plan"). Under the OATH Plan, the current roster of independent hearing officers would be eliminated and replaced by employees of the City, which is the financially responsible party-in-interest in the impartial hearings.

The OATH plan would place the hearing officers under the control of the City, Mayor, and a Commissioner who serves at the pleasure of the Mayor.[1] Defendants' plan, if implemented,

---

[1] "Defendants" include the current and former Mayor of New York City, the City of New York, the OATH Commissioner, OATH, the current and former Chancellor of the City's schools, the New York City Department of Education ("DOE"), and the New York City Board of Education ("Board", and together with the Chancellor and DOE, the "DOE Defendants") (collectively, the "City Defendants"), the

would take the "due" out of due process and make the "impartial" partial. It would replace the IDEA's impartiality and due process safeguards with a system imbued with systemic, insurmountable conflicts of interest that will subject vulnerable disabled children and their parents to the imminent threat of irreparable harm and deter parents from enforcing their children's substantive rights.

The IDEA is a funding statute that "represents an ambitious federal effort to promote the education of handicapped children and was passed in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out.'" *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 179 (1982) (quoting H.R. Rep. No. 94–332, p. 2 (June 26, 1975)).[2] Thus, the purpose of the IDEA was to address the funding gaps and discriminatory practices at the state and local school district level, which led to children with disabilities being unserved and underserved.

As discussed herein, the IDEA has a unique structure. Rather than prescribe any particular level of education required, the Act contains "elaborate and highly specific procedural safeguards" designed to effectuate the Act's goal of providing a FAPE and protecting the rights of parents and their children. *Id*. at 205; *see also Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 155 (2d Cir. 1992).

The IDEA's most important due process entitlement is the right to an impartial hearing presided over by a neutral, unbiased IHO when disputes arise under the IDEA concerning a

---

Commissioner of the New York State Education Department, and the New York State Education Department ("NYSED") (collectively, the "State Defendants").

[2] *See also Honig v. Doe*, 484 U.S. 305, 324 (1988) (Congress passed PL 94-142 "after finding that school systems across the country had excluded one out of every eight disabled children," and that these children were often labeled "hard to handle" children with "behavior problems").

student's services, placement, or programming. The hearings most often involve "disagreements between the parent and the public agency regarding the availability of an appropriate program *and who will pay for it*…." *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 907 (2d Cir. 1982) (emphasis added).

Thus, to guard against the powerful financial pressures on states and districts that led to the exclusion of students in the first instance to impact the hearing process, the IDEA guarantees the right to an IHO who (1) is free from any conflicts of interest; and (2) is not an employee of the school district or the agency financially and/or managerially responsible for the provision of services. *See* 20 U.S.C. §§ 1415(f)(3)(A)(i). The goal of these provisions is to prevent the hearing officers from being employed by the entity financially responsible for the education of the children whose parents assert that their rights are being violated. Moreover, the Act requires that IHOs have demonstrable expertise in the area of special education and the IDEA. *See* 20 U.S.C. § 1415(f)(3)(A)(ii)-(iv).

As the Second Circuit explained, "[a] system perceived by parents as tainted by biased adjudicators would deter parents from fulfilling their role under the [IDEA]." *Heldman*, 962 F.2d at 155. The Second Circuit's holding is, in simplest terms, the impetus for Plaintiffs' request for Emergency Relief.

For decades, IHOs in New York have been independent contractors certified by NYSED. Since 1993, New York State law has required school districts to appoint these independent IHOs in accordance with a neutral rotation system. *See* N.Y. Educ. Law § 4404.

Defendants are about to destroy that system and replace it with a structurally biased process, in violation of the IDEA.

The OATH plan was hatched and memorialized by Defendants *via* a Memorandum of Agreement dated December 1, 2021 ("MOA") at the 11th hour during the holidays, days before former Mayor de Blasio left office, and days before the New York State Governor signed a new law taking clear and decisive action to clear an impartial hearing "backlog" (or waiting list) of cases causing delays in IHO assignments in the City. *See* FAC, Ex. A. The backlog was created by Defendants. *See* Hyman Decl. Exs. U, Z, AA, NN.

NYSED reported that (a) parents filed approximately 14,000 hearings in the 2020-2021 school year in New York City, and (b) as of October 2021, there was a backlog of 7,000 cases in the City waiting to be assigned.[3] Upon information and belief there are now 6,000 cases.

Defendants' first attempt to implement a transfer to OATH was in 2002. *See generally* Mayerson Decl. Defendants' latest plan to shift control of the hearing system to OATH is being made under the pretext of addressing this backlog.

In fact, the current OATH plan is a desperate, last-ditch attempt to circumvent the state legislature's *rejection* of proposed amendments to the N.Y. Education Law Section 4404(1)(a) (which were allegedly authored by DOE's lawyers) to transfer hearings to OATH in June 2021 to address the very same backlog.

Rather than allow Defendants to use the current backlog as pretext to replace the system of independent hearing officers, the legislature recently passed a bill to remedy it, which Governor Hochul signed *last week. See* Hyman Decl. Exs. C, D. According to the Governor:

> This legislation will ensure that special education students receive the services they need - and that are required by law - within a timely manner. Many cases of this type have languished for years without appointment of IHOs to hear claims; New York City currently has a backlog of several thousand such cases. New York City and the Stated Education Department have recently commenced plans to hire more

---

[3] *See* Hyman Decl. Exs. A at 4, B at 4. Despite this volume, historically, only a small number of cases result in a final decision. Hyman Decl. Exs. U at 15-16, NN at 37-38.

IHOs to hear these cases, and this legislation will further ensure that parents and students receive necessary services without delay.[4]

On December 27, 2021, just two days before the Governor signed the new legislation, the former Mayor issued Executive Order 91 ("EO 91"), attempting to transfer jurisdiction for federally created IDEA claims to OATH to implement the plan. *See* FAC, Ex. B.

The OATH plan would systemically replace the current system of independent IHOs with lower paid, inexperienced city employees who lack impartiality and have an insurmountable conflict of interest. FAC at A, C. These employees carry the title of "Executive Agency Counsel," that is, lawyers for the city agency. *See* FAC at A, C. These city-attorney IHOs will be controlled, managed, supervised, trained, hired, disciplined, overseen, and even terminated, by an OATH Commissioner. FAC, Exs. A-C; Hyman Decl. Ex. E. The implementation process is underway. Job postings appeared within two days of the MOA. FAC, Ex. C.

Upon information and belief, OATH is actively interviewing applications, and trainings for new OATH hearing officers are scheduled for January 2022. *See* FAC, Ex. A.

City Defendants first attempted to grab control of the IHOs in the summer of 2002, on the eve of a change of administration at the DOE from former Chancellor Harold Levy to former Chancellor Joel Klein. *See* Mayerson Decl. ¶¶ 4-8, Ex. A. On August 14, 2002, Mr. Mayerson filed suit on behalf of parents of students with disabilities who opposed the transfer. *See Does, et al. v. Outgoing Schools, et al.*, 1:02-cv-06495 (JFK); Mayerson Decl. ¶ 9. After the suit was filed, the majority of IHOs with cases in New York filed a letter opposing the change. *See* Mayerson Decl., Ex. B.

Shortly after *Does, et al. v. Outgoing Schools, et al.* was filed, Defendants communicated that they were prepared to voluntarily abandon their plan. *See* Mayerson Decl. ¶ 9. Due to the

---

[4] *See* Hyman Decl. Ex. D.

same concerns present here, that Defendants could attempt a rushed transfer to OATH at any time, the parties agreed that Defendants would give adequate notice of any future transfer, so that the thousands of families affected should not have to "scramble against the clock" should Defendants change their mind again. *See* Mayerson Decl. ¶¶ 10-11. Thus, the parties stipulated that Defendants would be required to provide Mr. Mayerson's firm with at least 45 days' prior notice "if and when any plan to transfer the function of the Impartial Hearing Office to OATH will be implemented," as well as a copy of the proposed regulations. *See Outgoing Schools*, Dkt. No. 13; Mayerson Decl. Ex. C. The Court's docket reflects that Judge Keenan "so ordered" the agreement. *Id.*[5] Defendants here have failed to adhere to the Court's order and failed to afford Mr. Mayerson, or any of the impacted parents, advance notice of the current implementation of the transfer to OATH. Thus, Defendants violated and continue to violate Judge Keenan's Order.

The OATH Plan is infirm under the applicable laws. The Mayor, the City, its agencies, the DOE, and the Board are inextricably intertwined for purposes of special education services. The Mayor, who appoints both the Chancellor and OATH Commissioner, has been intimately involved in due process hearings and controls both special education policy and funding.

Defendants are motivated to gain control of the hearings to try to reduce the costs of the relief ordered that must be borne by the City itself, as any financial consequence from hearings comes directly out of the City's budget. Those costs have been growing exponentially and are up to hundreds of millions of dollars. Hyman Decl. Exs. F, O at 3, 9-10, 12-15. According to the New York City Independent Budget Office, the City has

---

[5] Since ECF was not yet in place in 2002, the electronic copies of the documents are not available. Due to COVID, and the extremely last-minute and rushed nature of Defendants' actions, Mr. Mayerson's office has not yet been able to request and obtain a copy of the physical file from the Court.

determined that these costs need to be controlled, and "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors" one of which is tuition costs, and the other is "*how often parents succeed when seeking reimbursement for services to meet their children's needs*." Hyman Decl. Ex. F at 3 (emphasis added).

As shown below and in the moving declarations, Plaintiffs' motion should be granted because, among other reasons:

(a)     Defendants' plan violates federal and state law and subjects Plaintiffs and other similarly situated families to the threat of imminent and irreparable harm;

(b)     IHOs under the current system are required to be specially trained independent contractors with expertise who are not employees of the City, the DOE, or the Board, or subject to any conflict of interest. In contrast, OATH's hearing officers are required to be employed by and answerable to OATH, and can be terminated by OATH and the Mayor and thus would have a disqualifying conflict of interest and not be impartial and independent, as required by federal and state law;

(c)     The OATH Plan purports to delegate what are non-delegable duties under the IDEA and state law;

(d)     While Defendants' plan would immediately entail transferring *thousands* of hearings to OATH during the COVID pandemic and its resurgences and variants, OATH and its judges simply do not have the training and experience needed to adjudicate and reconcile complex IDEA-based claims and New York law;

(e)      Defendants' plan, if implemented, would only exacerbate a current backlog of hearings by, *inter alia*, (i) moving the hearings to another City agency with no expertise in the subject matter, (ii) disqualifying and reducing the number of trained and impartial hearing officers who otherwise would have been able to hear and adjudicate such hearings, and (iii) causing a chaotic situation, for which two separate but unequal hearing systems would operate concurrently in New York, affording different due process standards and procedures for different families depending only on where they live[6];

(f)      The equities tip decidedly in Plaintiffs' favor and an injunction is supportive of the public interest here where Defendants' attempted implementation of their OATH transfer plan violates Judge Keenan's August 2002 Order, which directed Defendants to provide Plaintiffs' co-counsel, Mr. Mayerson and the firm of Mayerson & Associates, with 45 days' prior notice before implementing any plan to transfer the impartial hearing process and its infrastructure to OATH. Here, Defendants did not provide even one day's notice of their hurried and reckless plan or engage in any formal rule-making or hearing process relative to the changes;

(g)      Defendants' intended transfer of the impartial hearing system in the City to OATH under the guise of clearing the backlog is pretextual. Among other things, Defendants are trying to reduce the amount of money that the City spends on special education claims, and are thwarting the will of the legislature;

---

[6] Eighty-three percent of the school-age children with IEPs in New York City are children of color, compared to forty-two percent of school-age children with IEPs in the rest of the state. *Compare* Hyman Decl. Ex. G *with* data tables of school-age children in New York by race published at https://www2.ed.gov/programs/osepidea/618-data/static-tables/index.html.

(h)     Further, Defendants cannot attempt to clear the hearing backlog by replacing one violation of the IDEA with another violation, which is even more harmful than delayed hearings;

(i)     In addition, an injunction would be supportive of the public interest here where (a) virtually all attorneys representing families in the impartial hearing system object to the OATH plan (Hyman Decl. Exs. H, EE at 33-34); (b) Defendants are not trying to implement any other IDEA-compliant changes designed to address the backlog; (c) the aspect of the plan to directly employ, control and oversee the IHOs is not obviously related to clearing the backlog and thus plainly has another motivation; and (d) Defendants are themselves responsible for the circumstances that have caused the hearing backlog (*see*, *e.g.*, Hyman Decl. Exs. O, P, U, AA, NN) and have similarly ignored any alternative legitimate to minimize the disputes in the first instance or to quickly resolve them.

## II.     LEGAL FRAMEWORK

### A.  State and DOE Defendants' Obligations Under the IDEA

Congress enacted the IDEA to ensure that "all children with disabilities have available to them a free appropriate public education" and "that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A), (B). Defendants are bound to ensure that a free appropriate public education ("FAPE") is provided to all eligible children, ages three through twenty-one. 20 U.S.C. § 1412(a)(1).

A FAPE must, *inter alia*, "include an appropriate *preschool*, *elementary or secondary education in the State involved*," and be provided pursuant to individualized education programs

("IEPs"). 20 U.S.C. §§ 1401(9) (emphasis added); *see also* 20 U.S.C. § 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii). A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A)-(B); *see also Rowley*, 458 U.S. at 203 (a FAPE is "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" provided in conformity with an IEP developed pursuant to the IDEA's procedures).

An IEP must be individually tailored and is meant to serve as a blueprint for each child's program, services, accommodations, and modifications. 20 U.S.C. § 1414(d). By the beginning of each school year, Defendants must have an IEP in place that offers a FAPE to each eligible child. 20 U.S.C. § 1414(d)(2).[7]

Mandated services under the IDEA include "special education" generally defined as "specially designed instruction . . . to meet the unique needs of a child with a disability" (*see* 20 U.S.C. § 1401(29)), and "related services," which are "such developmental, corrective, and other supportive services … as may be required to assist a child with a disability to benefit from special education …." 20 U.S.C. § 1401(26)(A). Defendants must adopt a "continuum of alternative placements" that must include, *inter alia*, regular class, special classes, special schools, and instruction at home*,* and must make provision for "supplementary services." 20 U.S.C. § 1401(29); 34 C.F.R. § 300.115. [8]

---

[7] The IDEA and state and federal regulations prescribe, in detail, the process for developing IEPs and their contents. 20 U.S.C. §§ 1414(d)(1)(A), (d)(2); 34 C.F.R. § 300.320(a)(2)-(3); 34 C.F.R. § 300.324; N.Y. Educ. Law § 4401, *et seq.*; 8 N.Y.C.R.R. § 200.4(d)(2)(iii).

[8] "Supplementary aids and services" are "aids, services, and other supports that are provided" to enable children to be educated in the least restrictive environment. 20 U.S.C. § 1401(33). State regulations mandate that certain services are made available for children with autism, including but not limited to services to facilitate their eventual inclusion, to address their language needs as well as parent training and counseling. 8 N.Y.C.R.R. § 200.13.

10

Under the Act, NYSED and its head, the Commissioner (as the state educational agency ("SEA")), are responsible for the "general supervision" of implementation of the IDEA in the state. This supervision includes adopting IDEA-compliant policies, rules, and regulations and otherwise ensuring that all of the mandates of the IDEA are met by districts and other responsible agencies. *See* 20 U.S.C. §§ 1407(a)(b), 1412(a)(11). As such, State Defendants also have an obligation to monitor and enforce City Defendants' compliance with the IDEA and ensure that City and DOE Defendants maintain adequate policies and procedures under the IDEA. *Id.* Moreover, the SEA acts as the "guarantor" of FAPE, in that it is required to step in when districts are unwilling or unable to comply with the law. 20 U.S.C. § 1412(g).

The IDEA requires that each SEA and local educational agency ("LEA") "establish and maintain procedures" to "ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. § 1415. An LEA is defined as a "public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(19)(A).

The City Defendants (as the LEA) must provide a FAPE in the first instance and must, *inter alia*, "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. §§ 1414, 1415. Woven throughout the IDEA is a complex set of mandated due process rights, notices, and procedural safeguards that are

designed to facilitate parental participation and protect Plaintiffs' rights.[9] These procedural rights are the cornerstone of the Act to ensure that the substantive educational rights are afforded to children under the Act. As the Second Circuit has explained:

> Rather than detailing the precise substantive rights applicable to all affected children, Congress opted for individually tailored programs—programs crafted by parents and educators working together to determine what is appropriate for each child. Congress recognized that such an unconventional approach would require extensive procedural safeguards to protect the educational rights of children with disabling conditions. Thus, the scope of these procedural protections … must be determined in light of their role in ensuring the appropriate application of the Act.

*Heldman*, 962 F.2d at 151.

A parent has a right to file a complaint to challenge *any* matter relating to the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which *shall* be conducted by the [SEA] or by the [LEA] as determined by State law or by the [SEA]." 20 U.S.C. §1415(f)(1)(A) (emphasis added). New York State is one of the only remaining "two-tier" due process systems in which hearings are held at the LEA level, with appeals then filed at the SEA level. *See* 20 U.S.C. § 1415(g)(1). [10] In most states, the SEA conducts the hearings for the entire state. *Id.* In New York, the State Review Officer ("SRO") hears appeals from impartial hearings. *See* N.Y. Educ. Law § 4404. A further appeal may be filed in state or federal district court. *Id.*

---

[9] *See*, *e.g.*, 20 U.S.C. §§ 1415(b)(1), (b)(3)(B), (d)(2)(E); 34 C.F.R. §§ 300.9(a), 300.322(e); 8 N.Y.C.R.R. § 200.5(d).

[10] *See* Perry A. Zirkel, *et al.*, "State Due Process Hearing Systems Under the IDEA: An Update," 30 Journal of Disability Policy Studies, at 156-163 (2019) (noting as of 2018 only seven states had a second-tier level of review) In 2021, North Carolina just amended their law to eliminate the second tier. *See* https://www.wral.com/state-overhauls-appeals-system-for-parents-of-disabled-students/20040529/.

Once it is determined that a child has been denied a FAPE for any reason, a factfinder has broad equitable jurisdiction to award relief, as well as statutory remedies.[11] *See, e.g., Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015) (citations omitted); *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006).

The Supreme Court noted in *Rowley* that the IDEA's procedural due process protections are of central importance to facilitating the Act's goals to provide a FAPE:

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.*, §§ 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard.

458 U.S. at 205-206. In 2007, the Supreme Court reiterated the importance of the IDEA's hearing procedures to the right to a FAPE. *See Winkelman ex rel. Winkelman v. Parma City School Dist.*, 550 U.S. 516, 531-532 (2007) ("IDEA's procedural and reimbursement-related rights are intertwined with the substantive adequacy of the education provided to a child."); *see also Heldman*, 962 F.2d at 155 ("IDEA's procedural guarantees … serve not only to guarantee the substantive rights accorded by the Act; the procedural rights, in and of themselves, form the substance of IDEA.").[12]

---

[11] The IHO's power does not, however, extend to the injunctive relief at issue on this motion.

[12] Further, Congress intended that the IDEA's due process system deviate from, and be more robust than, traditional administrative law principles.

Therefore, as here, deprivation of a hearing that complies with IDEA amounts to a deprivation of a FAPE. *Heldman*, 962 F.2d at 151 ("Congress intended to create procedural rights the violation of which would constitute injury in fact.").[13]

As stated above, the IDEA places restrictions on the qualifications of the person conducting a hearing. A hearing officer shall not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A)(i);[14] *see also* 34 C.F.R. §§ 300.511-516. Defendant Commissioner is charged with promulgating regulations to ensure that IHO qualifications satisfy the IDEA, including ensuring that "no individual employed by a school district, school or program serving students with disabilities placed by a school district committee on special education acts as an impartial hearing officer" within two years of holding that position. N.Y. Educ. Law § 4404(c); *see also* 8 N.Y.C.R.R. § 200.5(j).

In addition, as discussed in greater detail below, IHOs must have expertise in special education law and educational policy. The IHO's decision must be made on "substantive grounds based on a determination of whether the child received" a FAPE. 20 U.S.C. § 1415(f)(3)(E). Moreover, the IDEA requires exhaustion of other federal claims to the "same extent" as IDEA claims, including claims under Section 504 and 42 U.S.C. § 1983, unless, as here, an exception applies. *See* 20 U.S.C § 1415(l).

---

[13] *See*, *e.g.*, *Massey v. District of Columbia,* 400 F. Supp. 2d 66, 75 (D. D.C. 2005); *Blackman v. Dist. of Columbia*, 185 F.R.D. 4, 7 (D.D.C. 1999).

[14] The source of payment is not determinative as to a hearing officer's status: "[a] person who otherwise qualifies to conduct a hearing under paragraph (c)(1) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer." 34 C.F.R. § 300.511.

To ensure that an IHO can fulfill his or her duties, the IDEA requires an IHO to "possess knowledge of" the IDEA, federal and state regulations, as well as "legal interpretations of [the IDEA] by federal and State courts." 20 U.S.C. § 1415(f)(3)(A)(ii). IHOs also must have the "ability to conduct hearings, render and write decisions in accordance with appropriate, standard legal practice." § 1415(f)(3)(A)(iii). As discussed *infra.* at p. 43, the courts interpret the IDEA as requiring IDEA hearings officers to have expertise in special education and education policy *beyond* the level of expertise of federal judges. NYSED is responsible for certifying and training hearing officers. *See* N.Y. Educ. Law § 4404; 8 N.Y.C.R.R. § 200.1(x)(4).

### B.  New York State Law Guarantees an Independent Rotation System

Section 4404 of the New York State Education law provides that upon the filing of a complaint, the "board of education" or "state agency" "*shall* appoint" an IHO to preside over a hearing and render a decision. N.Y. Educ. Law § 4404(1)(a) (emphasis added). Section 4404 further requires a mandatory rotation system for the selection of hearing officers: "Individuals so appointed by a board of education or a state agency shall be selected from a list of available impartial hearing officers who have successfully completed an impartial hearing officer training program conducted by the department according to a rotation selection process prescribed in regulations of the commissioner…." § 4401(1)(c); *see also* 8 N.Y.C.R.R. § 200.5(j)(3)(i).

Each district must maintain an alphabetical rotation list comprised of IHOs certified by NYSED. 8 N.Y.C.R.R. § 200.2(e)(1)(ii). NYSED has issued guidance memoranda confirming that the IHO rotational system is required under the Commissioner's regulations.[15] NYSED is

---

[15] *See* Hyman Decl. I. The Court should take judicial notice of documents published on Defendants' websites, as well as government websites of agencies, including agencies and subdivisions of Defendants. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp.3 d 156 (S.D.N.Y. 2015). This is particularly warranted here, given the emergency nature of the action and the fact that Plaintiffs have not yet had the opportunity for discovery.

responsible for guarding the neutrality of this process closely in school districts outside of the City. However, pursuant to the OATH Plan, NYSED and the other Defendants are threatening to subject parents of children in the City to non-neutral adjudicators who are controlled by the City.

Since 1996, boards of education must appoint independent contractor hearing officers from NYSED's list of trained and certified hearing officers. N.Y. Educ. Law § 4404. In 2001, NYSED set the "maximum" compensation rate at $100 per hour, and has not changed this rate for more than twenty-years. *Id.*; *see also* Hyman Decl. Exs. J, K. Outside of New York City, in areas where the cost of living is far less, school district boards of education pay $100 per hour to hearing officers for all pre-hearing, hearing, and post-hearing activities. Hyman Decl. Ex. K. As discussed below, the City has never paid IHOs consistent with other districts.

## III.   SYSTEMIC FACTS

### A. New York City, the Mayor, the Chancellor, the DOE, and the Board Are Inextricably Related for Purposes of Special Education and Impartial Hearings

During the 2021 fiscal year, New York City's public schools enrolled 1.14 million public school students, out of which 292,065 received special education services.[16] Of those, 260,482 were school-age public school students and 31,583 were preschool students. *Id*. Newly appointed Chancellor Banks has recently called the public school system "fundamentally flawed," particularly failing significant numbers of students of color.[17] Nowhere is this failure more evident than in the special education system, which is plagued with numerous problems, causing students

---

[16]*See* Hyman Decl. Ex. L at 295.

[17] "Incoming Chancellor David Banks says NYC's school system is 'fundamentally flawed' and promises reforms," Chalkbeat, Dec. 9, 2021, published at https://ny.chalkbeat.org/2021/12/9/22826524/david-banks-chancellor-eric-adams (last visited Jan. 9, 2022).

to be unserved and/or underserved.[18] Despite these flaws, even with a recent increase in hearings to approximately 14,000 cases (*see* Hyman Decl. Ex. A at 4), less than 5% file for due process, primarily due to lack of information about it and access to representation.

In the context of administrating special education and impartial hearings, the Mayor, the City, DOE, Board, and Chancellor are inextricably intertwined and impermissibly so relative to the OATH plan, particularly since the City is the real financial party interest. This is true regardless of whether the DOE is officially deemed to be an agency of the City.

In the circumstances at bar, (a) the Chancellor is selected and serves at the pleasure of the Mayor, who sets his salary (*see* N.Y. Educ. Law § 2590-h), as well as education policy for the DOE, including how the DOE responds to and handles hearings *as a an opposing party to parents who file*; (b) the DOE is considered a *de facto* municipal agency; (c) the City is financially responsible for the costs of the relief awarded in hearings and the DOE is subject to audit and financial control of the New York City Comptroller in relation to all of its functions, including impartial hearings; and (d) the Mayor appoints the OATH Commissioner and oversees OATH. Further, as the OATH statistics show, decisions weigh very heavily in favor of the City.

---

[18] In 2020, the City's four-year special education graduation rate was 52% for students with disabilities, compared to 78% for students without disabilities (*see* Hyman Decl. Ex. M) and a national rate of 68% as of 2018-2019. *See* "Public high school 4-year adjusted cohort graduation rate," NCES, published at https://nces.ed.gov/ccd/tables/ACGR_RE_and_characteristics_2018-19.asp (last visited January 9, 2022). *See also, e.g.,* Hyman Decl. Ex. AA; *M.G. by and through R.G. v. New York City Dep't of Educ.*, 2021 WL 3560764 (S.D.N.Y. March 8, 2021) (settling class action of students in the Bronx who were not receiving related services); *LV v. New York City Dep't of Educ.*, 2021 WL 663718 (S.D.N.Y. Feb. 18, 2021) (in class action, court ruled DOE has systematically failed to implement hearing orders issued by IHOs); *James v Fariña*, No. 450170/16, 2019 N.Y. Slip Op. 01729, 2019 WL 1120143 (N.Y.A.D. 1 Dept. Mar. 12, 2019) (noting the DOE's admissions that it's citywide special education data system has failed and needs to be replaced); *M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216 (S.D.N.Y. 2016) (certifying class of children with autism who claim, *inter alia*, that they systemically denied certain services mandated under the IDEA).

17

1. **State Law Places the City and Mayor in Charge of the Chancellor and the City's Schools in Terms of Policy and Finances While the Board Oversees Hearings**

As of 2002, the Board was increased from seven to thirteen members, with the Mayor being vested with eight appointees. *See* N.Y. Educ. Law § 2590-b. As of 2020, the Board was increased to fifteen members, with nine to be appointed by the Mayor. *Id.* The powers of the Board and the Chancellor are enumerated in state law. *See* N.Y. Educ. Law §§ 2590-b, 2590-h. The state law gave the Chancellor certain specific powers under the New York City Charter. *See* N.Y. Educ. Law §§ 2590-h(6), 18, 36(a)(iii). However, the New York State legislature did not give the Mayor or Chancellor the powers that they seek to use here involving OATH or impartial hearings. Further, neither the Mayor, the City, or the Chancellor (the party responsible for special education services and programs) has the right to administer impartial hearings. Rather, the impartial hearing function remains with the "Board" or the "State Agency." *See* N.Y. Educ. Law § 4404(1). This was not an oversight.[19] This also makes sense as the Chancellor was given the duty to implement special education programs and services (*see* N.Y. Educ. Law § 2590-h(1)(c)) and thus could not also have been given the power to control the hearing officers and system designed to challenge it under the IDEA.

2. **The Ambiguous Nature of the DOE as an Entity**

Unlike many other city agencies, the New York City Charter did not create the DOE. Further, the DOE was not created under the New York State Education Law. Rather, the DOE was created by the Board, and it is circularly defined. In 2002, the Board renamed itself the Panel for Educational Policy ("PEP") and then, through its By-Laws, created the DOE:

> The PEP is a part of the governance structure responsible for the City School District of the City of New York, subject to the laws of the State of New York and the regulations of the State Department of Education. Other parts of the structure

---

[19] Sections 4404, 2590-h and 2590-b have been amended multiple times since 2002 without changing the entity responsible for hearings. *See* N.Y. Educ. Law § 2590-h(1)(c).

include the Chancellor, superintendents, community and citywide education councils, principals, and school leadership teams. Together this structure shall be designated as the Department of Education of the City of New York.[20]

While many cases conflate the DOE and the Board or treat them as one entity, they are distinct, with different status and powers under the law. The Second Circuit recognized these differences, as well as the ambiguous status of the DOE, in *Ximines v. George Wingate High School*, 516 F.3d 156 (2d Cir. 2011):

> We understand that the Board [in 2002] … adopted a by-law that purported to change its name . . . and to create something called the New York City Department of Education …. We leave it to the district court on remand to determine whether the Board, by amending its by-laws, (a) effectively created an entity called the New York City Department of Education and, if so, whether that entity is a subdivision of the Board as opposed to a department of the City of New York, and (b) invested any such entity with the capacity to be sued. In this regard, we note that departments of the City of New York typically, perhaps uniformly, have been created by the City Charter, wh*ich does not create a New York City Department of Education.*

516 F.3d. at 159 (emphasis added and citations omitted).[21]

Regardless of the confusing nature of the structures of Defendants here, importantly, the City is the true party in interest as it pays for the DOE's adjudicated failures within the hearing system. *See* Hyman Decl. Exs. F, O at 9-10, 12-15, X at 4, 14-15. As such, this explains why the DOE insists that the City itself, as well as any of its employees, agents, and assignees, must be a released party as part of any settlement agreement.[22]

In relation to responsibility for payments, the DOE's relationship with the New York City Comptroller further underscores the DOE's level of enmeshment with the City as a whole, particularly in relation to impartial hearing operations. As part of the 2002 change in governance,

---

[20]*See* Hyman Decl. Ex. N.

[21] The plaintiff in *Ximines* amended the complaint after the remand and, thus, the district court never had the opportunity to address and analyze this issue.

[22] *See, e.g.*, 1:20-cv-01362-MKV (Dkt. No. 29); 1:18-cv-09544-VEC (Dkt. No. 10); 1:18-cv-10380-LGS (Dkt. No. 20).

state law was amended to give the Comptroller "authority to conduct operational and programmatic audits, in addition to financial audits, of the city district to the same extent that such comptroller has such authority for agencies of the city of New York." N.Y. Educ. Law § 2590-t. However, Defendants and the City Comptroller both believe that the DOE is subject to additional oversight by the Comptroller pursuant to New York City Charter § 93(i).

The Comptroller actively audits the DOE as a "municipal agency."[23] Further, the Comptroller assumes and wields authority over the settlement and resolution of every single hearing filed in New York. According to the DOE, "New York City Charter § 93(i) … provides that only the New York City Comptroller may settle claims against or on behalf of the City where there is a monetary component to the settlement terms. The DOE is therefore prohibited from entering into settlements for monetary relief" after an impartial hearing is filed "without Comptroller approval." *See* Hyman Decl. Exs. P at 6. In a 2019 Letter to NYSED, DOE wrote that the City's "process is different from the rest of the state due to the requirements of the City Charter. We understand that NYSED would like for NYCDOE to reduce unnecessary hearings by authorizing staff to enter into settlements at impartial hearings, but because of the City Charter requirement for Comptroller authority, NYCDOE must undertake a detailed legal and financial review of each case in order to make an informed recommendation for Comptroller approval." Hyman Decl. Ex. Q at 2.

As such, a city agency cannot employ, oversee, supervise, manage, or control the hearing officers who preside over the cases. They must remain fully independent and not be infected with an insurmountable conflict of interest.

---

[23] *See* Hyman Decl. Exs. O, R-T.

### 3.   OATH Was Created by the Charter and Is Controlled by the Mayor

OATH is a creature of the New York City Charter. The Charter states that "[t]here shall be an office of administrative trials and hearings which shall conduct adjudicatory hearings *for all agencies of the city unless otherwise provided for by executive order, rule, law* or pursuant to collective bargaining agreements." New York City Charter § 1048(1) (emphasis added). The Mayor appoints the "chief administrative law judge" and Commissioner of OATH. *Id.* Further, "the mayor shall be authorized to designate by executive order the office of administrative trials and hearings as the tribunal for the impartial administration and conduct of adjudicatory hearings for violations of this charter, the administrative code of the City of New York, rules promulgated pursuant to this charter or such code and any other laws, rules, regulations or other policies enforced or *implemented by the agencies of the city* through the conduct of adjudications." New York City Charter § 1048(2) (emphasis added).

Thus, pursuant to the Charter, OATH's jurisdiction is limited to "*agencies of New York City.*" New York City Charter § 1048 (emphasis added). City agencies must comply with the New York City Administrative Procedures Act ("CAPA") relative to any rulemaking and/or changes in policies, such as the kind of change at issue here. *See* New York City Charter § 1041. Notably, the DOE does not consider itself a city agency for purposes of CAPA and takes no steps to comply with it in general, or in this instance.[24] It would be impossible for the DOE to be excused from CAPA, while still falling under the scope of the Mayor's authority to designate OATH to hear cases for city agencies.

---

[24] *See, e.g., The Beginning with Children Charter School v New York City Dept. of Educ.*, 2016 N.Y. Slip Op. 51184(U), 2016 WL 4198869 (Sup Ct. Aug. 03, 2016) (unreported and cited here for the purpose of establishing DOE's position that it is not an agency under the Charter).

Former Mayor de Blasio appointed Defendant Joni Kletter to the Commissioner's position. She is a close ally of the former Mayor, who had "played a central role in shaping" the City's public policy and legislative agenda.[25] OATH jurisdiction is limited to issues concerning City laws, regulations, and city agency rules and guidance. *See* New York City Charter §§ 1048(1)-(2). According to the 2021 Mayor's Management Report ("2021 MMR"), OATH has two division to hear "City matters": the Trials Division and the Hearings Division.[26] The Trials Division only hears issues of City law, including employee civil service hearings, City seizures, City-issued license and regulatory enforcement, real estate violations, and City contract disputes.[27] Upon information and belief, the OATH Trials Division employs approximately seventeen Administrative Law Judges ("ALJs") that earn approximately $161,000 per year. *See* Hyman Decl. Exs. L at 165-170, KK. All ALJs hired in the past year were former lawyers for a city agency or senior administrators for a City agency. *See* Hyman Ex. KK.

It is significant to note, however, that OATH receives approximately 2,600 petitions per year. *See* Hyman Decl. Ex. L at 167. Upon information and belief, last year, with almost 20 ALJs, OATH held 500 bench trials and 1,500 settlement conferences. Hyman Decl. Ex. KK. Approximately 184-200 cases were "processed" by each ALJ, and the OATH Trial Division closed less than 2,400 cases each year.[28]

In contrast, the "Hearings Division" holds hearings on summonses issued by different City enforcement agencies for alleged violations of law or City rules. Hyman Decl. Ex. L at 165. Upon

---

[25] See "Mayor de Blasio Appoints Joni Kletter as Commissioner and Chief Administrative Law Judge of the Office of Administrative Trials and Hearings" (March 13, 2020) published at https://www1.nyc.gov/office-of-the-mayor/news/139-20/mayor-de-blasio-appoints-joni-kletter-commissioner-chief-administrative-law-judge-the ((last visited Jan. 9, 2022).

[26] *See* Hyman Decl. Ex. L at 165-170.

[27] *Id*.

[28] *See* Hyman Decl. Ex. L at 167.

information and belief, the Hearings Division is staffed with a variety of full-time, part-time and per diem "hearing officers." Pre-COVID, for the fiscal year 2019, the Hearings Division received 837,778 summonses from the various City agencies. Hyman Decl. Ex. L at 168. Out of those, 340,563 were "adjudicated", 663,327 were "processed", and 261,906 cases resulted in decisions. *Id*. OATH does not report Hearing Division caseloads, but the numbers suggest that they would be astronomical.

Further, by definition, and by the statistical reporting, the Hearings Division officers do not have independent adjudication authority. They are "agency" decisionmakers whose decisions may be influenced and/or directed and modified by external individuals. *Accord*, New York City Charter § 1049. Upon information and belief, the Hearings Division is a "mill," which is neither neutral nor unbiased in its design. Notably, the City's agencies prevail (*i.e.*, violations are admitted or upheld) in the overwhelming majority of cases, and in some cases one hundred percent of the time. *See*, *e.g.,* Hyman Decl. Ex. L at 116, fn. 12 (92% win rate for the City), 173 (80 to 100% win rates for the City), 174 (100% win rate), 183 (84-86% win rates), 189 (81-91% win rates), 220 (90-94.5 % win rates), 232 (79% win rate as of last fiscal year, doubled from the prior four years), 346 (84.4 to 92.8% win rates).

### 4. Impartial Hearings in New York

Since the precursor statute to the IDEA was adopted in the 1970s, special education hearings have been presided over by independent contractors as hearing officers. Exs. U, JJ. Since at least the mid-1990s, New York City has maintained a list of independent contractor IHOs certified by NYSED as IHOs. *Id*.; *see also* Ex. A. However, at some point in or before 2021, the NYC IHO unilaterally abandoned the state-mandated rotational system with the consent of NYSED, yet without an actual change in law. Hyman Decl. Ex. V.

Aside from eligibility disputes, hearings in New York City generally involve claims that the DOE has denied a child a FAPE. These hearings seek one or more of the following types of remedies: (a) reimbursement for, direct payment for or satisfaction of a debt for private school tuition or private special education or related services; (b) compensatory education (an equitable remedy for a child who was denied a FAPE); (c) funding for services that the DOE does not offer on their menu of options through an IEP; (d) funding for services that the DOE recommended but did not provide; (e) transportation; and (f) payment for independent evaluations.[29] Hearings can often involve multiple school years, complex clinical and legal issues, motion practice, expert witnesses, and thousands of pages of exhibits. Hearings may last from one day to multiple days (Hyman Decl. Ex. A at 6) and decisions "may be lengthy and include extended legal analysis." *See* Hyman Decl. Ex. W. Given the underlying dysfunctionality of the special education system in New York City, and the failure of that system to fulfill its federal and state mandates, most cases are not contested, and either settle or the parent prevails.

For many years, the Impartial Hearing System has been a challenging political environment, given the amount of money at stake for which the City is responsible as the real party-in-interest. According to the New York City Independent Budget Office ("IBO"), the cost to the City for certain types of remedies in impartial hearings grew from $200 million in 2014 to $700 million in 2020, and reached $807 million in 2021. Hyman Decl. Exs. F at 1, X at 14.[30]

---

[29] *See generally*, Hyman Decl. Ex. A at 22-23. *See also* Impartial Hearing Decisions in New York (2011-2018), published at http://www.p12.nysed.gov/specialed/dueprocess/decisions/home.html, SRO Decisions for New York, published at https://www.sro.nysed.gov/decision-search.

[30] It is notable that all of the budget documents refer to "Carter Cases", which is a specific type of case pursuant to which a parent is reimbursed for tuition that was already expended. Upon information and belief, either (a) the budgetary numbers in the government documents cited herein referring to "Carter Cases" include all payments made as relief in hearings; or (b) the costs of hearings are higher than reflected. Plaintiffs do not yet have access to discovery to clarify this issue.

The IBO noted that the "rapidly growing cost [of hearings] has drawn increasing attention and *prompted efforts to control future growth*." *Id.* (emphasis added). The IBO noted that "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors that are out of the department's control: private school tuition costs and *how often parents succeed when seeking reimbursement for services to meet their children's needs*." *Id.* (emphasis added).

The Comptroller has issued reports to all City agencies decrying the amount of money spent on special education claims that are filed. Hyman Decl. Ex. O. The report "examine[d] claims filed against and on behalf of the City of New York and outline[d] trends by claim type across City agencies." *Id.* The report stated the following regarding special education claims:

> In FY 2020, the City settled non-tort claims … [DOE) special education claims, for a total of $486.2 million, a 34 percent increase from the $363.2 million paid out in FY 2019. Of these law claims, 75 percent of the settlement payments were related to claims for reimbursement of special education tuition and services. The amount of settlements paid out for DOE special education claims in FY 2020 increased by 27 percent to $363.5 million …. Notably, payouts in FY 2020 were 179 percent greater than the settlement costs of DOE special education claims in FY 2014.

*Id.* at 3, *see also id.* at 9-10, 12-15. In its proposed November 2021 budget plan, the City "anticipates that spending on Carter cases will decrease by $142 million in FY 2022 before falling another $220 million in FY 2023." *See* Hyman Decl. Ex. X at 14.

Thus, Defendants have a powerful financial incentive for the City to gain control of the hearings and the IHOs.

Moreover, the City's Mayors are not absent managers, disengaged from the DOE's litigation strategy at hearings. Rather, they have been intimately involved with litigation and policy concerning how the DOE, as a party, responds to parents when hearing requests are filed. Nothing

illustrates this more than the deal made by former Mayor de Blasio and New York State legislators, which the former Mayor and others announced at a press conference in June 2014.[31]

Until 2014, the City assumed an aggressive litigation stance against parents. In June 2014, the Mayor adopted and announced a plan pursuant to which the DOE staff were directed to refrain from re-litigating settled or decided cases in the future years they were re-filed, unless there was a defensible change in the IEP placement recommendation. Hyman Dec. Ex. Z at 4. The plan also directed DOE to "avoid unnecessary litigation in cases where the agency is unable to offer a placement, or when a child is about to enter the final grade of a school." *Id.*

This agreement was a political deal made by the former Mayor with a broad coalition of legislators, to avoid another bill that would have made tuition funding permanent for certain private school families. *Id.* Former Mayor de Blasio issued the following statement on the initiative:

> The special education placement process has been fraught with contention and litigation in recent years. The changes announced today will simplify and expedite the process for families with valid claims. . . The changes were developed in consultation with Speaker Silver and the New York State Assembly…. [F]or years, parents of children with special needs have had to wait for the City to settle legitimate claims for tuition reimbursement. Today, we are turning the page, making changes that will ease the burden on these parents. We are cutting red tape, speeding up the process, and reaching outcomes that do right by families. [32]

*Id.* In a video of a press conference, the former mayor speaks in great detail about the hearings, making it clear that he was intimately involved in revising how the DOE, as an opposing party to the parents, would respond to litigation. He cited the goal of creating "a streamlined, parent friendly, family friendly, respectful approach," which would not depend on a parent's ability to

---

[31] *See* "Mayor de Blasio and Speaker Silver Announce New Steps to Help Families of Students with Disabilities," June 24, 2014, published at https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (last visited Jan. 6, 2022). *See also* Hyman Decl. Ex. Z.

[32] *Id.*

retain an expensive lawyer, but instead was a process that "tried to address the family's needs."[33]
He touted this new initiative as a way for the City to "right some wrongs" for those families whose
children's needs could not be met by the system. *Id*. He also contrasted the strategy of his
predecessor, Mayor Bloomberg, whose more aggressive approach may have represented a "good
litigation strategy," but was "not a humane way to run a school system, it was not fair to families,
it was not fair to children who had the needs." *Id*.

Former Mayor de Blasio was not the only "involved" mayor regarding special education
hearings. Former Mayor Bloomberg tried to lobby to change the special education law to shift the
burden of proof to families, rather than on the DOE where it currently lies under Section 4404.
Hyman Decl. Ex. LL. As noted throughout, Mayor Bloomberg also tried to move the hearings to
OATH, well before there was any "backlog." *See generally* Mayerson Decl. Similarly, former
Mayor Giuliani and then-Chancellor Crew were focused on eliminating referrals to special
education because it was "providing very little to help students and costing way too much."[34] The
state has also long desired to reduce parent access to due process.

Thus, at the highest levels, both the Mayor and Chancellor, as well as state politicians, have
been privy to and directly influenced day-to-day aspects of the DOE's litigation strategy and
focused on reducing special education costs. This focus on costs is the exact type of pressure that
Congress sought to protect against when it ensured that families had access to independent
adjudicators when disputes about special education arose.

---

[33] *See* https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (last visited Jan. 9, 2022).

[34] *See* "Rudys Say They've Stemmed Tide Of Special Education," Aug. 19, 1999, published at https://nypost.com/1999/08/19/rudys-say-theyve-stemmed-tide-of-special-education/ (last visited Jan. 8, 2022).

5. **Defendants Are Using the Backlog as a Pretext to Dismantle and Shift Control of the Hearing System to the City Defendants**

According to NYSED, the number of hearings increased from 5,000 during the 2015-2016 school year to 14,266 during the 2020-2021 school year. Hyman Decl. Ex. A. Plaintiffs allege here that the 2014 Plan was not properly implemented and that, among other things, the Mayor and City failed to allocate adequate resources to the New York City Comptroller and the DOE to effectively manage this reform initiative, and also mismanaged the hearing system. Hyman Decl. Ex. NN.

Due to the above, and other factors as alleged herein (*see generally* the FAC), a hearing officer shortage occurred, and eventually, over the past two years, a backlog of hearings developed, causing delays in the hearing process. Hyman Decl. Exs. A, U, V, EE, NN.

By 2018, the situation had deteriorated. Rather than taking decisive action, in January 2018, NYSED engaged a *consultant* to conduct an independent review of the New York City Impartial Hearing Office ("NYCIHO"), which was supposed to handle the administrative operations for hearings (processing complaints, scheduling, and processing orders and payments to IHOS). *See* Hyman Decl. Ex. U ("External Review of the New York City Impartial Hearing Office by Deusdedi Merced, dated February 2, 2019") ("Merced Report). It is unclear why NYSED needed yet another consultant, in light of its obligation in the first instance to monitor and supervise the DOE.

The Merced Report took one year to complete and was issued in February 2019. *Id*. During the entire year the Merced Report was being prepared, Defendants failed to take action to address any of the obvious problems with the system. The Merced Report eventually highlighted numerous obvious deficiencies in the impartial hearing process, including insufficient facilities for holding hearings, delays in processing at the NYCIHO office due to lack of staff, a failure to settle and

resolve cases, and unnecessary hearings being held for matters that the DOE should not be contesting. *Id.*

The Merced Report found that IHO compensation was severely deficient in that IHOs were not being timely or fairly compensated for their work, compared to other parts of the state and the rates of experienced education lawyers, and that the compensation prevented recruitment of appropriate hearing officers. *Id.* at 22, 29-32. The Merced Report concluded that the system was heading toward collapse. *Id.* at 22 ("This review identified substantial deficiencies in the policies, procedures and practices specific to special education impartial hearings in New York City…. Each presents a threat to due process. Collectively, however, they render an already fragile hearing system vulnerable to imminent failure and, ultimately, collapse)."

Instead of taking decisive action, after the Merced Report, State Defendants began to point fingers at the DOE and the DOE responded. This lasted for over a year. In May 2019, State Defendants issued the DOE a Compliance Assurance Plan ("CAP"). Hyman Decl. Ex. AA. The CAP was an extensive monitoring report citing the DOE with multiple violations, including violations in the hearing system, many of which were caused by State Defendants' actions and inaction. *See* Hyman Decl. Exs. AA at 19-23, NN. State Defendants identified "noncompliance with respect to NYCDOE's obligations to maintain a functioning due process hearing system," including that the DOE (a) generally ["f]ails to provide parents access to adequate due process after a complaint has been filed" and (b) "does not defend numerous cases at hearing but rather admits that it did not provide FAPE and [yet still] does not offer to settle these cases, adding to the unacceptable number of due process complaints filed." *Id.* The CAP directed the DOE to provide a "corrective action plan to correct its failure to provide students with disabilities and their parents

all the rights and procedural safeguards required by federal and State law and regulation." *Id.* at 22. One of the CAP requirements was for the DOE to revise IHO compensation. *Id.* 18-22.

The DOE submitted a Corrective Action Plan in the spring of 2019. Hyman Decl. Exs. Q, P. The DOE claimed that the DOE was taking steps to increase staffing at NYCHIO, expand hearing space, and provide adequate payment to IHOs. *Id.* The DOE also referenced a reshuffling of the deck, under which DOE moved hearings from one DOE division to another. *Id.* These negotiations between State and City Defendants continued throughout the year, well into 2020. Hyman Dec. Ex. NN.

Notably, DOE, through NYCIHO, had promulgated an elaborate Compensation Schedule, which was insufficient to ensure IHO recruitment and retention, and pursuant to which certain tasks of IHOs were to be compensated, while others were not. Hyman Decl. Ex. AA. These anomalies were flagged by the Defendants and their agents as a significant problem for IHO recruitment and retention. Hyman Decl. Exs. P, U, Q, AA, DD, NN.

As part of the CAP, the DOE revised its compensation policy. Hyman Decl. Ex. CC. Notably, NYC still does not pay IHOs the rate of $100 per hour paid by districts outside of the city for all tasks they believe should be completed within their discretion (*see* Hyman Decl. Ex. K), but rather micromanages their tasks, still paying for some activities but not others, or capping time allowed to be spent on writing decisions. *See* Hyman Decl. Ex. CC.

In early 2020, rather than fix the underlying issues facing the system, NYSED tried to remove the requirement that IHOs are lawyers, a mandate added many years ago to the regulations after the due process system almost collapsed from unqualified non-lawyers presiding over hearings.[35] All but seven states require IHOs to be lawyers. After widespread opposition to

---

[35] Commissioner Rosa was quoted in the press as saying "I am a big supporter of loosening up this issue . . ." Hyman Decl. Ex. FF.

watering down due process in this fashion as a way to cure the backlog (*see* Hyman Decl. Ex. EE at 1-14), the regulations were not amended. *Id*.

In February 2020, a class action was filed against DOE and State Education Defendants alleging that hearings were delayed beyond the mandated timelines. *See J.S.M., et al. v. N.Y.C. Dep't of Educ., et al.*, 20-cv-705 (EK)(RLM), Dkt. No. 1. On June 18, 2020, the Court so ordered a stipulation certifying a class consisting of "[i]ndividuals who file or have filed due process complaints, and the children on whose behalf due process complaints are filed, when the due process complaints are unresolved and the decisions on such complaints have not been timely provided under applicable federal and New York State law." *Id*. According to the docket, the *J.S.M.* plaintiffs and State and City Defendants were in "settlement discussions" following class certification. The *J.S.M.* case does not involve any of the issues raised here. The OATH Plan post-dates *J.S.M*, was not negotiated with *J.S.M.* class counsel, and is not a part of that action.

**6. Defendants Are Trying to Evade Implementation of the Legislature's Chosen Solution to the Hearing Backlog**

The emergency relief is in the public interest because the New York legislature has rejected the proposed OATH plan by, instead, passing its decisive solution through alternative legislation that will remediate the backlog. The Governor signed this new measure on December 29, 2021, with implementation within 90 days.

During the 2021 New York State legislative session, upon information and belief, lawyers for the DOE drafted a bill designed to amend Section 4404 to move the hearings to OATH and obtained sponsors in both the Assembly and the Senate at the 11th hour, days before the session was going to end. *See* Hyman Decl. Ex. GG. The Sponsor Memoranda for Assembly Bill No. A7943 and Senate Bill No. S7183 both cite the backlog as justification for the proposed change in

the law. *Id.*[36] The Sponsor Memoranda further cite a lack of minimum caseloads for hearing officers, and the large number of filings. *Id*. However, after facing stakeholder opposition, *the legislature rejected this amendment*.

Instead, the legislature passed, and, on December 29, 2021, the Governor signed legislation to amend N.Y. Educ. Law 4404 to provide an expeditious solution to the backlog: starting in 90 days, where an IHO has not been appointed for 196 days, the law provides that an IHO will be assigned for the limited purpose of so-ordering relief proposed by a parent. *See* Chapter 812 of the Laws of 2021. Hyman Decl. Exs. C, D.

### 7. Defendants Have Failed to Allow Time for Remedial Measures to Work and Ignored Solutions from and Concerns of the Representatives of the Families

As the heading implies, Defendants took steps to improve the process, only to dismantle them by way of the OATH plan. After months in development, the DOE rolled out a new videoconferencing program for (remote) hearings on December 20, 2021. *See* Hyman Decl. Ex. II. As most witnesses in hearings testify via phone in any event, all stakeholders support permanent remote hearings with a limited in-person option for select cases where remote is not feasible.[37]

NYSED reports that it certified 107 new hearing officers to work exclusively in New York City since January 2020 through November 2021. Hyman Decl. Ex. B. Many of these IHOs (solo

---

[36] The Sponsor Memo for Bill No. A7943 noted that "[t]he proposed legislation would replace the current system for the City School District with a full-time administrative adjudicatory system, with the goal of efficaciously eliminating the backlog and providing timely hearings going forward. The New York City Office of Administrative Trials and Hearings ('OATH'), *a component of New York City government, not DOE, would be responsible for the new system*." Hyman Decl. Ex. GG at 5 (emphasis added).

[37] Ex. NN at 20-21. Since mid-March 2020, due to COVID-19, hearings shifted to remote telephonic hearings. This turned out to be a solution for several of the problems identified in the Merced Report, as they eliminated waiting time and IHO travel time, resolved the physical space issues, and enabled recruitment of hearing officers outside of the City and the state. In general, the use of remote technology is a long-term solution to address the delays and recruitment of experienced IHOs. Stakeholders in this process are overwhelmingly in favor of remote hearings, as much of the testimony in hearings is held by phone in any event and there are rarely in-person witnesses. *Id*. The regulations were revised to reflect use of phone and video.

practitioners) do not live in New York City; they accepted the position in order to work from home. With the new videoconferencing capability, additional experienced hearing officers can now be recruited to work remotely, *i.e.*, the new normal these days.

Defendants are also ignoring proposed solutions by hearing officers, who have told NYSED they could clear and manage the backlog. In September 2021, NYSED issued a Request for Information ("RFI") for "the Office of Special Education: Impartial Hearing Officer System in New York City." Hyman Decl. Ex. A.[38] Upon information and belief, in response to the RFI, 64 of the existing experienced and trained IHOs proposed an annual commitment to hear 13,400 cases. FAC at ¶ 221.[39] This proposal was ignored. City Defendants appear to have similarly ignored recommendations and concerns raised by nonprofit groups, as well as scores of members of the private bar, which were focused on (a) reducing hearings, (b) managing the hearing process, and (c) making the necessary changes to implement the mandatory resolution process in the IDEA and resolve most cases within 30 days. *See*, *e.g.*, Hyman Dec. Exs. EE, NN

Further, Commissioner's Regulations were recently proposed to adopt a new electronic filing system. This new system would allow hearing officers to extend deadlines beyond 30 days to a period of 60 days, at their discretion, and to establish minimum and maximum caseloads. *See* New York State Register, Vol XLIII, Issue 48, Dec. 1, 2021.[40]

---

[38] The RFI sought "information on creating a new system" of full-time IHOs. *See* Hyman Decl. Ex. A at 3, 5. NYSED also acknowledged that "[t]raining new IHOs requires significant resources to recruit, interview, train, and certify candidates." *Id.* at 5. The full set of documents relating to the RFI are published at https://www.p12.nysed.gov/compcontracts/nysed-rfi-21-003-iho-nyc/home.html (last visited Jan. 9, 2022).

[39] While Plaintiffs are aware of this plan, they would need expedited discovery to obtain its details.

[40] The electronic filing system, extension provisions and minimum caseloads should help the process. However, the state is proposing a "maximum" caseload of 500 hearings per year, which is far too many to ensure a legally adequate hearing consistent with due process.

### 8.  The MOA and Executive Order Seek an Unfair Advantage Against Families

The MOA was executed on December 1, 2021.[41] FAC, Ex. A. Under the MOA, OATH will hire approximately 40 full-time City-employee hearing officers, after which time, all of the current hearing officers who are certified by NYSED will be prevented from accepting hearings in New York City. Plaintiffs allege that, along with the move to OATH, the DOE was approved to hire approximately 75-80 new attorneys to litigate against parents. *See* FAC at ¶ 228. This would have a significant adverse impact, especially for these parents who file on a *pro se* basis, and for the thousands of parents assisted by non-attorney advocates (one of the rights afforded to them under the IDEA (20 U.S.C. § 1415(h)(1)). As alleged herein, EO 91 (FAC, Ex. B) was issued on December 27, 2021, and purports to create "concurrent jurisdiction" to hear special education matters arising under federal and state law. *Id.*

### 9.  OATH Job Postings Reveal Defendants' Efforts to Eliminate the Existing IHOs and Substitute IHOs Who Lack the Required Expertise

According to a December 3, 2021 job posting for "full-time" "Special Education Hearing Officers" with a "Civil Service Title" of "Executive Agency Counsel," Title Code 95005, Level M1", an OATH hearing officer *must be a resident of New York City* unless a narrow exception applies. FAC, Ex. C.

The OATH job posting seeks only "four years" admission to the bar. The posting does not require that the hearing officer practiced, or have specific knowledge of, special education law. *Id.* It does not even give preference to individuals who served as hearing officers. *Id.*[42] Further,

---

[41] It was signed by the new General Counsel of the DOE, NYSED's new Counsel and Deputy Commissioner for Legal Affairs and the Commissioner and Chief Administrative Law Judge at the New York City Office of Administrative Trials and Hearings.

[42] Instead, the posting bizarrely states that "volunteer" experience is preferred. *Id.* Also, it cites managerial experience one of the two requirements, even though most of the current hearing officers operate as solo practitioners. *Id.*

"Executive Agency Counsel" is the same title afforded to the senior lawyers who represent the City and its agencies. Thus, IHOs will be "agency attorneys" for the City, and, as such, owe a duty of loyalty to their employer (*see* N.Y. Rules of Prof. Con. Rule 1.7(1)(1)) that is in direct conflict with their obligations as IHOs.

More than 50% of the most experienced and/or long-standing hearing officers on the New York City roster would be *eliminated* from consideration as OATH hearing officers based on this posting, due to where they live and the fact that only full-time positions are being contemplated. Moreover, many of the 100-plus new IHOs that the State Defendants recruited and trained over the past several months are now also ineligible to even apply to be OATH hearing officers, simply because they do not live within New York City.[43]

Under the MOA, the new IHOs ostensibly will be trained, certified, and appointed *two-weeks* after being hired. *See* FAC, Ex. A. This timetable is not rooted in reality. It is belied by the RFI and Merced Report, both of which underscored the extent of training necessary for new IHOs to be comfortable accepting and handling IDEA cases, and the challenges of recruiting properly experienced attorneys to serve as hearing officers. Hyman Decl. Exs. A, U, NN. By definition, a four-year law graduate or an individual without any IDEA experience and two weeks of training cannot possibly be a suitable IDEA hearing officer as required under the law. The very idea is out of touch and alarming.

---

[43] Plaintiffs will be able to prove that even more hearings officers will be disqualified if they are granted expedited discovery of the list of hearing officers, which would reflect business addresses and home addresses. Defendants maintain a list of hearing officers with their addresses on the IHRS system, which can be accessed in less than five minutes.

i.    **Despite Defendants' Recognition that IHO Compensation Is Critical to Attracting Adequately Experienced IHOs, OATH IHOs Will Make Less Yet Have Caseloads Four Times Higher than Independent IHOs in New York State**

As noted herein, both State and City Defendants identified low compensation rates for IHOs as a source of difficulty in recruiting and retaining trained and experienced IHOs. Hyman Decl. Exs. P, U, Q, AA, DD, NN. Yet, the OATH hearing officer position offers a salary of $130,000 per year, which, at best, is an hourly equivalent of slightly more than half of the $100 per hour rate that IHOs outside of the City are paid. Hyman Decl. Exs. J, K, U, NN. Further, upon information and belief, it is far less than what the independent IHOs made in New York City who took full-time caseloads. *Id.* [44] Based on the number of cases being filed and the plan to hire 40 IHOs, the projected caseloads appear to be 350 cases per IHO.[45] However, most IHOs surveyed by NYSED reported that a far lower number of cases would be appropriate.

With a caseload of 350, there would not be enough hours in the day for an IHO to give adequate due process to families and would, at best, be able to allocate less than five hours per time to each case, including hearing time, motions, decision-writing, and administration. If Defendant NYSED were permitted to increase caseloads to 500 per IHO, each case will be allocated 3.4 hours per case. The families who will suffer the most under this grossly illegal scheme are those parents without financial resources.

---

[44] *Compare* Hyman Decl. Exs. A at 11-12 *with* Ex. NN. Plaintiffs do not have access to unredacted caseload information that correlates to IHO compensation. However, upon information and belief, the top 20 hearing officers who have the highest compensation each year have the highest caseloads which should – if reasonably allocated – constitute full-time work as an IHO. Further, upon information and belief, payments were unusually large in 2020 because the DOE had to make up for delayed payments in prior years.

[45] This estimate presumes forty full-time IHOs working a traditional 40-hour workweek, with one hour per day of lunch and three weeks of vacation (which would afford 1,715 working hours per year). At 14,000 hearings per year, and 40 IHOs, each IHO would need 350 cases to complete hearings. Dividing 1,715 hours of work by 350 cases yields an average time per case of 4.9 hours.

### ii.    The Supervisory Job Postings Expose the Level of Oversight and Control that the City Plans to Assert Over the New IHOs

OATH published many additional job postings, including "Supervising Special Education Hearing Officer," and "Deputy Commissioner" (salary of $170,000-180,000). *See* Hyman Decl. Ex. E.[46] The postings demonstrate the City's intent to hire staff to "supervise" and "set policy" in relation to the hearings, and to have oversight of the IHOs. The duties of the Deputy Commissioner, for example, would include: (a) "[o]verse[ing] the hearings process so that students and families received impartial hearing decisions in a timely manner," (b) "[a]dvis[ing] the Commissioner and Chief Administrative Law Judge of OATH in formulating appropriate policy, both legal and administrative, regarding issues affecting the adjudication of disputes about the education of children with disabilities and liability for the payment for such education," and (c) having responsibility "for recruitment, training, and appointment of Special Education Hearings Officers." *Id*.

## IV.    ARGUMENT

The record establishes "(a) the threat of irreparable harm and (b) both (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward" Plaintiffs. *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348–49 (2d Cir.2003); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984); *M.W. v. New York City Dep't of Educ.*, No. 15cv5029, 2015 W.L. 5025368, at *3 (S.D.N.Y. Aug. 25, 2015); *M.G. v. New York City Dept. of Educ.*, 982 F. Supp. 2d 240, 250 (S.D.N.Y. 2013); *Landers v. Samuelson*, No. 12cv703, 2012 WL 825117, *5 (E.D.N.Y. March 8, 2012).

---

[46] All of the OATH positions are posted at https://www1.nyc.gov/site/oath/about/employment-and-business-opportunities.page (last visited on Jan. 9, 2022).

A. **The Plaintiffs Have Established Likelihood of Success on the Merits and Sufficiently Serious Questions Going to the Merits that the OATH Plan Violates the IDEA**

1. **The OATH Plan Creates a Structural Conflict Prohibited by the IDEA**

As noted above, IHOs may not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A).[47]

While the City is not a named party to the hearings, the City is the real party-in-interest. Here, Defendants' plan to use City employees to decide the outcome of special education claims for which the City will be held financially responsible, and which the City has repeatedly said is costing the City too much, would violate Plaintiffs' fundamental right to an impartial due process hearing. Further, it would accomplish City's goal of reducing the number of special education claims by creating a "tainted" system that would chill and deter parents from filing claims.

The Second Circuit has taken a strong stand on the importance of the IDEA's guarantee of neutral and impartial hearing officers. *See Heldman*, 962 F.2d at 154-155. In *Heldman*, a parent brought a structural challenge to the hearing system, alleging that the New York State rotational system for selecting hearing officers violated the IDEA because it permitted boards of education to choose hearing officers. *Id.* at 154. The plaintiff argued that the system created "a powerful economic and professional incentive for officers to rule in the board's favor" and that "[s]uch an economic stake in the outcome of a hearing … is liable to distort the outcome of the hearing." *Id.*

---

[47] The legislative history of the IDEA reflects that hearings will not be conducted by the agency, but rather "at the appropriate agency level. by an impartial hearing officer since the State or local agency or *intermediate unit will be a party to any complaint presented.*" *See* Sen. Rept. No. 94-95 (Nov. 14, 1975) at 49 (emphasis added). The language here was designed to ensure that employees of entities that were responsible for funding and providing special education, but were not LEAs, were also prevented from serving as IDEA hearing officers. *Id.* at 31.

38

The Second Circuit held that the plaintiff had the standing and the right to lodge a systemic challenge to the legality of the impartial hearing system. According to the court, "the central role of the IDEA process rights bears witness that Congress intended to create procedural rights the violation of which would constitute injury in fact." *Id.* at 155. One of these undeniable rights is the right to an unbiased adjudicator. *Id.* at 155 (the IDEA "prohibits the use of biased adjudicator."). The court explained as follows:

> The structure of IDEA similarly attests to Congress' concern for adjudicatory independence. The Act relies on parental involvement to contribute to the determination of what constitutes an appropriate education for a child. *A system perceived by parents as tainted by biased adjudicators would deter parents from fulfilling their role under the Act.* The success of IDEA's novel approach to protecting the rights of disabled children, thus, turns on ensuring the right to adjudicative independence.

*Id.* (emphasis added).

On July 21, 1993, the New York State Legislature amended Section 4404 to create the IHO rotational system. *See Heldman on Behalf of T.H. v. Sobol*, 846 F. Supp. 285 (S.D.N.Y. 1994). The legislative history for the 1993 amendments shows that the legislature intended to ensure that the hearing system across the state would comply with the IDEA, with respect to partiality and potential conflicts, as well as the appearance of impartiality which arose when financially interested school districts had the discretion to select and appoint IHOs at will. *See* Hyman Decl. Ex. JJ at 5, 6, 11, 15-17, 19 and 25.

On remand in *Heldman*, the district court explained that the IDEA's protection barring hearing officers who have a personal or professional conflict "would alone be enough to call the practice of utilizing school district employees as hearing officers into question. This regulation … reflects a longstanding and accumulating recognition that such impartiality is necessary for fair

adjudication generally of hearings by officers with a potential personal interest in the outcome is inherently suspect even though its validity may depend on the circumstances." 846 F. Supp. at 289.

This concept is consistent with judicial rules of disqualification. *See* 28 U.S.C.A. § 455 ("[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). It is beyond cavil that the City-employee-as-hearing officer arrangement "might reasonably" be questioned relative to its impact on impartiality.

Further, although the IDEA does not expressly prohibit a second-tier review officer from being an employee of a state agency, the Second Circuit has interpreted the IDEA to prohibit that situation. The Second Circuit has held that the Commissioner (a named Defendant here) would not be sufficiently neutral to preside over individual appeals of impartial hearings. *See Burr by Burr v. Ambach*, 863 F.2d 1071 (2d. Cir. 1988), *vacated on other grounds*, *Sobol v. Burr*, 492 U.S. 902 (1989); *see also Holmes by Holmes v. Sobol*, 690 F. Supp. 154 (W.D.N.Y. 1988) (the Commissioner "cannot be presumed to be impartial and independent" even though not technically a NYSED employee); *Louis M. by Velma M. v. Ambach*, 714 F. Supp. 1276 (N.D.N.Y. 1989) (NYSED employees engaged in monitoring could not be review officers).

Given that courts have held that the Commissioner would be inadequately neutral to preside over a single child's hearing, the Court should find the Commissioner to be in a similar conflict relative to whether hearing officers should be City employees. This is particularly true since NYSED and the Commissioner have, for years, sought to reduce the cost of due process by reducing the limitations period for parents to file hearings below the federal floor.[48]

---

[48] Notably, for years, State Defendants have also been focused on curtailing parents' due process rights, with the goal of saving money. Their annual proposal was to reduce the current two-year statute of limitation

Similarly, courts outside of the Second Circuit have not strictly adhered to the term "employee" in prohibiting arrangements that presented pressures and conflicts similar to those experienced by an employee. *See Muth v. Central Bucks School Dist.*, 839 F.2d 113 (3rd Cir. 1988) (holding that "Congress has indicated its desire to provide parents with decisionmakers who are not subject to the kind of pressures that employees of an educational agency would necessarily feel"), *rev'd on other grounds*, *Dellmuth v. Muth*, 491 U.S. 223 (1989); *Colin K. v. Schmidt*, 715 F.2d 1, 5 n. 3 (1st Cir. 1983); *Helms v. McDaniel*, 657 F.2d 800, 806 n. 9 (5th Cir. 1981) (members of school boards cannot preside over hearings, despite not being "employees" of a public agency), *cert. denied*, 455 U.S. 946 (1982); *Robert M. v. Benton*, 634 F.2d 1139, 1142-43 (8th Cir. 1980) (even though the superintendent was not an employee of the entity that delivered educational services, the court found that he was not impartial). The Eleventh Circuit has stated that "the phrase 'involved in the education or care of the child' [in the IDEA] extends beyond the local school system in which the child is enrolled." *Mayson by Mayson v. Teague*, 749 F.2d 652, 656 (11th Cir. 1984). As such, the court found that no school district employee in the state could serve as an IHO in another district, as the employee would be deemed to have "personal or professional interest[s] which would conflict with [his] objectivity in the hearing," thus making it "unlikely that he could be objective in evaluating a claim involving [any] local school system." *Id.*[49]

---

to 180 days for tuition cases and one year for all other cases, mainly filed by families without resources for or access to private school. *See*, *e.g.*, Hyman Decl. Ex. HH.

[49] The Court explained that "employees of local education systems might be concerned about retribution and about being subjected to adverse decisions." *Id.* The Court even went so far as to disqualify university professors who had been involved in formulation of state policy: "[w]hen a university professor has taken an active part in formulating a state policy in the area of special education, it seems entirely plausible that he could become sufficiently personally or professionally invested in the policy that he would find it difficult to reverse or modify it as a due process hearing officer." *Id.* at 659.

Thus, the courts have not strictly adhered to the definition of "employee," focusing instead on ensuring that individuals who could face the same kinds of pressures and potential conflicts as employees are unable to serve as IHOs. In holding that the system of boards appointing and paying independent IHOs did not violate the IDEA, one court ruled that "the determinative factor" in whether an individual is an employee is the "the entity's ability to exert control over an individual." *Jacky W. v. New York City Bd. of Educ.*, 848 F. Supp. 358 (E.D.N.Y. 1994). The IDEA presumes that the agency delivering services is the financially responsible party; here, however, while the cases are filed against the DOE, the City bears the cost of the hearings *and is the real party in interest*.

Thus, here, OATH-employee hearing officers would "be concerned about retribution and about being subjected to adverse decisions," (*Teague*, 749 F.2d at 656), especially if the costs of special education claims to the City did not decrease. Further, "Congress has indicated its desire to provide parents with decisionmakers who are not subject to the kind of pressures that employees of an educational agency would necessarily feel." *Muth*, 839 F.2d at 124 (holding that the IDEA's prohibition of employees as hearing officers applies to second-tier review officers). Defendants' plan to use City employees as hearing officers violates the IDEA, because the OATH employees undoubtedly could be subject to the same type of pressure that Board and/or DOE employees would feel.

Based on all of the above, the Court should enjoin any further implementation of the OATH Plan insofar as it involves hiring IHOs who would be City employees under the proposed structure.

### 2. The OATH Plan Violates Plaintiffs' Right to Hearing Officers with Expertise and Adequate Training in Special Education

The IDEA requires a hearing officer to: "possess knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to [the IDEA]

and legal interpretations of [the IDEA] by Federal and State courts," "possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice," and "possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice." 20 U.S.C. § 1415(f)(3)(A)(ii)-(iv).

Courts interpret the IDEA to require that hearing officers have "expertise" in the area of special education, and further, to be "experts" in issues of special education law and policy. *See, e.g., Heldman*, 962 F.2d at 159 (administrative exhaustion "prevents courts from undermining the administrative process and permits an agency to *bring its expertise to bear* on a problem") (emphasis added). *See also Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, 288 F.3d 478, 486 (2d Cir. 2002) (holding that "[t]he IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply *administrators' expertise in the area and promptly resolve grievances*") (emphasis added); *J.S. Cave v. East Meadow Union Free School Dist.*, 514 F.3d 240 (2d Cir. 2008) (noting that the purpose of exhaustion was to have cases first addressed through administrative expertise at the hearing level).[50]

Courts also highlight the presumed expertise of hearing officers when deciding how much deference is due to an opinion in the context of an appeal. *See, e.g., M.H.*, 685 F.3d at 246 (holding that where the SRO "rejects a more thorough and carefully considered decision of an IHO, it is

---

[50] Numerous other courts have interpreted the IDEA to require that an IHO has expertise in special education beyond that of the federal judiciary. *See, e.g., D. D. by and through Ingram v. Los Angeles Unified School District*, 18 F.4th 1043 (9th Cir. 2021) ("[e]xhaustion serves Congress's intent that *educational experts*— not the courts—address deficiencies in the provision, construction, or implementation of a student's IEP in the first instance") (emphasis added); *Octavia P. v. Gilhool*, 916 F.2d 865, 869 (3d Cir. 1990) (holding that "[c]ourts require exhaustion where the *peculiar expertise* of an administrative hearing officer is necessary to develop a factual record") (emphasis added); *Frazier v. Fairhaven School Committee*, 276 F.3d 52 (1st Cir. 2002) (same); *Perez v. Sturgis Public Schools*, 3 F.4th 236 (6th Cir. 2021) (same); *Hayes Through Hayes v. Unified School Dist. No. 377*, 877 F.2d 809 (10th Cir. 1989) (same).

entirely appropriate for the court ... to consider the IHO's analysis, *which is also informed by greater educational expertise than that of judges*, rather than to rely exclusively on its own less informed educational judgment") (emphasis added).[51]

Against this tidal wave of settled case law stands the OATH Plan. As noted above, City Defendants are not just seeking to control, oversee, supervise, and have the power to hire and fire hearing officers. They also are intentionally trying to clear the bench of virtually all of the *existing*, experienced hearing officers in New York City. With a hearing backlog of thousands of cases, it makes no sense for an agency to purge all of the experienced, independent IDEA hearing officers in favor of replacing them with inexperienced lawyers who are beholden to OATH and the Mayor. Unless, of course, Defendants' real objective is to "stack the deck."

### 3. Defendants Lack Jurisdiction or Authority for the OATH Plan and Are Improperly Delegating Duties Under the IDEA and State Law

By executing the MOA, the State Defendants abdicated their obligation to supervise and guarantee IDEA procedural safeguards and a FAPE. 20 U.S.C. §§ 1412(g), 1415(a). In addition, the OATH plan also violates the IDEA and New York State law because the Mayor, DOE, the Chancellor, and NYSED lack the authority to implement it.

### i.    The Board, DOE, and Chancellor Can Not Delegate the Hearing Function

The DOE, Board, and/or Chancellor are not vested with any authority under the IDEA, or state law, to delegate the responsibilities of the impartial hearing system to OATH. The IDEA requires that the SEA and LEA "shall establish and maintain procedures in accordance with this

---

[51] *See also Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004) (an IHO "is a representative of the state presumed to have both the educational expertise and the ability to resolve questions of educational methodology that the federal courts do not have."); *Gregory K. v. Longview School Dist.*, 811 F.2d 1307 (9th Cir. 1987) (expertise of the administrative hearing officers is a factor that must be weighed in considering the degree of deference); *Burilovich ex rel. Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 567 (6th Cir. 2000) (IHOs are presumed to be experts); *B.G. by J.A.G. v. Bd. of Educ. of City of Chicago*, 901 F.3d 903 (7th Cir. 2018) (same).

section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of" a FAPE. 20 U.S.C. § 1415(a).

The IDEA does not authorize delegation of this function or the impartial hearing function. The IDEA expressly provides that the hearing "*shall* be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A) (emphasis added). When interpreting a statute, the word "shall" connotes a requirement, while the word "may" implies discretion. *Jennings v. Rodriguez*, 138 S.Ct. 830, 843 (2018) (citing *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016)).[52]

Since the IDEA's provisions are unambiguous on this point, no further analysis should be required. *See Raila v. United States*, 355 F.3d 118, 120 (2d Cir. 2004) ("[s]tatutory construction begins with the plain text, and where the statutory language provides a clear answer, it ends there as well.") (internal quotation marks and citation omitted); *Food Mktg. Inst. v. Argus Leader Media*, 139 S.Ct. 2356, 2364 (2019) ("[i]n statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself" and "[w]here, as here, that examination yields a clear answer, judges must stop") (citations omitted).

However, even if the Court were to delve into statutory construction, a review of the IDEA's other provisions establishes that Congress allowed certain limited core SEA or LEA functions to be delegated and/or assigned, although those provisions were not included in Section 1415. For example, the IDEA provides that the "Governor (or another individual pursuant to State law), consistent with State law, *may* assign to any public agency in the State the responsibility of" supervising and guaranteeing FAPE "with respect to children with disabilities who are convicted

---

[52] Moreover, the phrase "as determined by State law or by the State educational agency" refers to whether the state shas a one-tier system, in which the SEA conducts a hearing, or a two-tiered system where the LEA conducts a hearing. § 1415(f)(1)(A). This provision was not intended and should not be read to allow unfettered delegation to an entity other than the LEA, like OATH, to conduct a hearing.

as adults under State law and incarcerated in adult prisons." 20 U.S.C. § 1412(a)(11)(C) (emphasis added). Similarly, the IDEA provides that "[t]he Chief Executive Officer of a State or designee of the officer" has certain obligations with respect to interagency agreements and coordination. 20 U.S.C. § 1412(a)(12). The only provision of the IDEA that pertains to "delegation" appears in 20 U.S.C. § 1464(a) ("The Secretary shall delegate to the Director of the Institute of Education Sciences responsibility to carry out this section, other than subsections (d) and (f)"). Congress's inclusion of these express provisions for delegation, while excluding delegation from Section 1415, establishes that Congress did not intend the most important due process function under the IDEA to be delegated. Further, it makes sense that Congress would not have contemplated delegation of the core due process function of the IDEA to an entity that might not be subject to IDEA jurisdiction.

### ii.    The OATH Plan Violates Section 4404 Which is Enforceable under the IDEA

The OATH Plan deprives Plaintiffs of neutral, independent hearing officers as defined by New York State Educ. Law Section 4404. As discussed *supra* at p. 40, Section 4404 was amended expressly for the purpose of bringing New York State's due process system into compliance with the IDEA and taking action to establish independent IHOs who were not subject to conflict or the appearance of conflict. *See* Hyman Decl. Ex. JJ. Section 4404 is enforceable as a federal right under the IDEA. "While the IDEA establishes a 'basic floor' of education, state law may mandate a more protective standard of educational services and procedural protection." *LIH v. New York City Bd. of Educ.*, 103 F. Supp. 2d 658. 668 (E.D.N.Y. 2000); *see also Rowley*, 458 U.S. at 203. The IDEA "incorporates by reference state standards, be they substantive or procedural, that exceed the federal basic floor of meaningful, beneficial educational opportunity." *Burlington v. Dep't of Educ.*, 736 F.2d 773, 789 (1st Cir. 1984). Here, as stated earlier, the hearing procedures

46

are considered so important, they are deemed substantive rights under the IDEA and are therefore enforceable under the IDEA.

### iii.     The Mayor Lacked Authority to Vest OATH with Jurisdiction or Transfer the Hearing Functions under Other State Law

The responsibility for the impartial hearing system remained with the Board of Education under Section 4404. N.Y. Educ. Law § 4404(1)(a). OATH was established under the New York City Charter to hear cases involving "agencies of the city" concerning City laws, regulations, rules, and policies. *See* New York City Charter §1098(1). None of the Defendants had authority under the IDEA or State law to either (a) vest OATH with "concurrent" jurisdiction over federal and state law special education claims; or (b) transfer the impartial functions and IHOs to OATH.

Defendants' unilateral action here would be preempted by the IDEA, as it would conflict with its provisions, as set forth *supra*. 20 U.S.C. § 1415(a). The Charter could not authorize the OATH transfer because it would directly conflict with the IDEA's mandate that the LEA conduct the hearings using neutral, experienced hearing officers; thus, the doctrine of preemption would apply. 20 U.S.C. § 1415(f)(1)(A); *accord, Evans v. Evans*, 818 F. Supp. 1215 (N.D. Ind. 1993); *Sarah M. v. Weast*, 111 F. Supp. 2d 695 (D. Md. 2000).

Further, Municipal Home Rule Law §11 prohibits enactment of any local law that supersedes a state statute "if the local law applies to or affects 'the maintenance, support or *administration of the educational system in such local government*." (emphasis added). The Mayor and other Defendants can point to no authority allowing the Chancellor, Mayor, or NYSED to vest OATH with that jurisdiction, or transfer impartial hearings from the DOE to OATH. This is the case even if the former Mayor were to have complied with the City Charter, or the DOE with their rule-making obligations, which, as discussed below, did not occur.

47

### 4. The OATH Plan Violates the 2002 Order and Stipulation

As discussed above, Defendants are violating the express terms of the district court's 2002 Order in *Does, et al. v. Outgoing Schools, et al.,* 1:02-cv-06495 (JFK). *See generally* Mayerson Decl. Defendants did not provide Mr. Mayerson's firm with any notice, let alone 45 days' notice, of the plan to transfer the function of the Impartial Hearing Office to OATH. Defendants' flagrant violation of the 2002 order is sufficient grounds, standing alone, for this Court to grant Plaintiffs' motion and enjoin Defendants from implementing the OATH plan.

### 5. Defendants Failed to Give Notice or Hold Hearings

As noted above, the City Charter created OATH to hear cases involving New York City laws, rules, and regulations. However, even if this aspect of the Charter were not preempted by the IDEA and state law, the Mayor did not comply with the Charter in facilitating the transfer to OATH and issuing EO 91. Before the Mayor can transfer an agency's hearing functions to OATH, he must first convene a committee to study the transfer and the committee must issue a report. New York City Charter §§ 1048(4)(a)-(b). After that process, there must be notice to the public and hearings held. *Id.* Upon information and belief, the Mayor did not take any of these actions here. Further, OATH was subject to the CAPA", but failed to comply with rule-making. Similarly, the Board failed to comply with its rule-making procedures pursuant to N.Y. Educ. Law § 2590(d).

### 6. On Its Face, the OATH Plan Will Substantially Undermine and Prejudice the Hearing System

The evidence shows that the OATH Plan, as contemplated, would not improve, and instead, would wreak havoc on, the due process system. The OATH Hearings Division has half the number of intended administrative judges and handles only one fifth of the volume of impartial hearing cases. Even with caseloads of less than 200, the OATH ALJs are issuing a mere fraction of the

decisions that would be needed for impartial hearings, and they involved much less complicated issues without any clinical component.[53] On the other hand, the Hearings Unit, which handles thousands upon thousands of cases, and boasts win rates overwhelmingly in favor of the City, is grossly inadequate as the apparent model for impartial hearings.

### 7.  The OATH Plan Violates the Due Process Clauses of the U.S. and New York State Constitutions

The OATH plan creates a separate and unequal system of due process for children inside New York City, compared to their peers in suburbs like Scarsdale or Great Neck, which rests only on the residence of the state's children with special needs. There is no rational basis for the decision to eliminate independent IHOs for the City's children and this decision should be subject to strict scrutiny, as it violates the Equal Protection Clause. U.S. Const. Amend. XIV, §1; NY Const. Art. I, § 11. Further, as the OATH Plan contemplates that the OATH IHOs will be employed, controlled, and managed by the real party-in-interest, that is, the City, it renders the plan infirm under the Due Process Clause of both the federal and New York Constitutions. U.S. Const. Amend. XIV, § X, N.Y. Const Art. I, § 6.

### 8.  The DOE's Obligations Under Section 504 Mirror its IDEA Duties

Independent of the IDEA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, requires the DOE Defendants to adopt and implement an impartial hearing process to address Section 504 disputes. 34 C.F.R. § 104.36. A district that adopts the IDEA's impartial hearing procedures complies with Section 504. *Id.* The DOE has, until the OATH plan, elected to use the IDEA impartial hearing process for Section 504 hearings. *See* New York City Schools

---

[53]      *Compare* the impartial hearing decisions (published at http://www.p12.nysed.gov/specialed/dueprocess/decisions/home.html), SRO decisions published at https://www.sro.nysed.gov/decision-search with the decisions published by the OATH Hearings Division (at http://a820-isys.nyc.gov/ISYS/ISYS.aspx). The Court should take judicial notice of the stark differences in complexity of the issues and the facts.

Chancellor's Regulation A-710, Section VII(B)(2).[54] The OATH Plan fails to even mention Section 504.

### B. The Harm Faced by Plaintiffs and Other Similarly Situated Families Is Irreparable

Courts in the Second Circuit define irreparable injuries as those that cannot be adequately compensated by a monetary award. *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55 (2d Cir. 2004); *G.R. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 441(RWS), 2012 WL 310947, *4 (S.D.N.Y. Jan. 31, 2012). The impending harm "must be probable" and "not remote or speculative but ... actual and imminent." *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148(WHP), 2003 WL 22909149, *4 (S.D.N.Y. Dec. 10, 2003) (internal quotation marks and citation omitted). It is blackletter law that a child who is being denied special education services or rights under the IDEA suffers irreparable harm. *See, e.g., Honig*, 484 U.S. at 305, 323-324; *M.W.*, 2015 W.L. 5025368, at *9; *M.G.,* 982 F. Supp. 2d at 240; *Massey,* 400 F. Supp. 2d 66.

Given the size of the DOE, the number of students, and the extensive moving parts involved, Defendants' OATH plan must be enjoined. If Defendants are allowed to break and systemically "cleanse" the hearing system by hiring City/OATH employees as IHOs, the system's integrity will be irretrievably destroyed, and Plaintiffs' claims will be effectively rendered moot. Further, Defendants would be operating two completely different hearing systems as this all unfolds, pursuant to which some parents could end up litigating one hearing for their child with the current (impartial) system, while being forced to proceed with a subsequent due process complaint in the new system.

---

[54] *See* https://www.schools.nyc.gov/docs/default-s*f*ource/default-document-library/a-710-1-20-2011-final-remediated-wcag2-0.

Moreover, Defendants' OATH plan involves significant hiring of a vast administrative staff, which would cause staff and administrators to leave their positions to come to OATH, making their hiring impossible to reverse. Further, in the interim, all the experienced hearing officers on the current roster will be scrambling to find other work and will no longer be available to serve.

## C.  A TRO/Injunction Is in the Public Interest and the Balance of Hardships Tips Heavily in Plaintiffs' Favor

When a preliminary injunction is sought to "affect government action taken in the public interest pursuant to a statute or regulatory scheme," a court must determine whether the injunction is in the public interest. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020); *see also Y.S. on behalf of Y.F. v. New York City Dep't of Educ.*, 2021 WL 1164571 (S.D.N.Y. March 26, 2021). Here, the TRO and injunction weigh in favor of the public interest.

First, the OATH Plan seeks to circumvent the legislature's recent rejection of the OATH plan, as well as the legislature and Governor's solution to the backlog. Further, the OATH Plan is opposed by the majority of the representatives of the families caught in the backlog. Twenty-five of them have submitted declarations in opposition even in this short time frame. *See* Hyman Decl. Ex. H. In contrast, a delay of the OATH plan merely allows the system to continue as is, until the Governor's legislative solution goes into effect in 90 days, the new regulations are adopted, and the new IHOs who were trained time to increase their caseloads. Thus, is it in the public interest to at least pause, if not stop, the Plan and wait for the backlog to be cleared, rather than to permanently destroy the fundamental integrity of the hearing process. Additionally, in the event it is necessary to balance the hardships that would result from granting Emergency Relief, they tip decidedly in favor of Plaintiffs.

**D.     An Automatic Injunction is Warranted Based on Pendency Rights**

Notwithstanding the above, an injunction to preserve the *status quo* here is fully consistent with and warranted pursuant to the IDEA's "pendency|" provision, popularly known as the "stay put" provision. 20 U.S.C. § 1415(j). Under the IDEA, when a case is filed, the child at issue is entitled to an automatic injunction, without regard to merit, to maintain the current program and placement until the dispute is resolved. 20 U.S.C. § 1415(j). A significant, material change in hearing procedures would deprive children of a core substantive right to a FAPE. *Accord*, *Massey,* 400 F. Supp. 2d at 66. Thus, the pendency provisions should attach here. Yet, Plaintiffs have no administrative forum in which to enjoin the OATH Plan under the pendency provision, as administrative officers lack jurisdiction to effectuate policy or practice changes. *See*, *e.g.*, *F.C. v. New York City Dep't of Educ.,* 2016 WL 8716232 (S.D.N.Y. Aug. 5, 2016).

**VII.   CONCLUSION**

Accordingly, for the reasons set forth herein, Plaintiffs are requesting that the Court issue a TRO and a preliminary injunction, enjoining and restraining any further implementation of the OATH Plan, including but not limited to the hiring of hearing officers and any individual who would hire, train, supervise, manage and oversee hearing officers, as well as the transfer or assignment of any impartial hearing cases to OATH, and transferring cases to those employee hearing officers, and grant any other relief that this Court deems just and necessary.

Dated:             January 11, 2022
         New York, New York


                        Respectfully submitted,


MAYERSON & ASSOCIATES          THE LAW OFFICE OF ELISA HYMAN,
                               P.C.


    /s/ Gary Mayerson             /s/ Elisa Hyman
By_____          By_____
    Gary S. Mayerson             Elisa Hyman, Esq.
    330 West 38th Street          James Sanborn, Esq.
    New York, NY 10018           1115 Broadway, 12th Floor
    Phone: (212) 265-7200        New York, NY 10010
    Fax: (212) 265-1735          Phone: (646) 572-9064
    Gary@mayerslaw.com           Fax: 646-572-9065
                                 elisahyman@gmail.com


*Co-counsel for Plaintiffs*         *Co-counsel for Plaintiffs*

53