REPORT
EXTERNAL REVIEW OF
THE NEW YORK CITY IMPARTIAL HEARING OFFICE


Submitted by:

Deusdedi Merced
External Reviewer

Special Education Solutions, LLC




Filed

February 22, 2019

## TABLE OF CONTENTS

**I.    INTRODUCTION**................................................................6

**II.   INITIATION OF EXTERNAL REVIEW AND SCOPE** ................................7

    A.    Foundation for the Findings in this Report................................8

    B.    Structure of the Report...............................................10

**III.  OVERVIEW**................................................................11

    A.    In General...........................................................11

    B.    By the Numbers.......................................................11

        1.    Comparison to States with Similar Demographics and Issues........11

        2.    Number of Due Process Complaints Filed.......................13

        3.    Number of Hearings and Conferences Scheduled in NYC Per Day.........................................................15

        4.    Number of Hearings Adjudicated...............................15

        5.    Number of Pendency Hearings..................................16

        6.    Number of Extensions and Recusals............................16

        7.    Average Case Length (in days)................................18

        8.    Number of IHOs...............................................19

        9.    In Sum.......................................................19

    C.    Key Observations.....................................................20

        1.    Two Masters..................................................20

        2.    SED's Commitment to Change...................................20

        3.    Interconnectedness...........................................22

Hyman Decl.  Ex. U- 2

**IV.    ADDITIONAL FINDINGS SPECIFIC TO TARGETED AREAS**.................22

    A.      NYCIHO – Generally.................................................................22

            1.      Impartiality.................................................................22

            2.      Physical Space............................................................24

            3.      Budget and Availability of Funds..................................27

    B.      IHO Compensation Policy........................................................29

    C.      Insufficient Number of Hearing Rooms......................................32

    D.      Insufficient Number of School District Representatives...........................33

    E.      Appointment and Recusal.........................................................34

    F.      Extensions...............................................................................35

    G.      Decision Process......................................................................36

**V.    DUE PROCESS IMPLICATIONS**....................................................37

    A.      Physical Space.........................................................................37

            1.      Inadequate Number of Hearing Rooms...........................37

            2.      Poor Ventilation/Temperature Control...........................37

            3.      Unkempt Hearing Rooms.............................................38

            4.      Confidentiality Breaches..............................................38

                     a.      Open Doors...........................................38

                     b.      Poor/Non-Existent Insulation...................38

                     c.      Storing Evidence in Room 202C.................38

             5.      Lack of Amenities......................................................39

             6.      Inadequate Waiting Area.............................................39

Hyman Decl.  Ex. U- 3

B.      Payments and Compensation........................................................39

    1.      Payment Delays...........................................................39

    2.      IHO Compensation.......................................................40

C.      School District Representatives....................................................42

    1.      Limited Number of School District Representatives......................42

D.      Hearing Process.....................................................................42

    1.      Timely Appointment of IHOs and Subsequent Recusals................42

    2.      Questionable Extensions..................................................43

    3.      Decision Processing.......................................................44

**VI.   SED's AUTHORITY TO ENSURE COMPLIANCE**........................................44

**VII.  RECOMMENDATIONS – FOR IMMEDIATE ACTION**..............................44

A.      Physical Space......................................................................45

    1.      Expansion of the NYCIHO to Accommodate Additional
    Hearing Rooms...........................................................45

    2.      Ventilation/Temperature Control.........................................45

    3.      Cleanliness and Upkeep..................................................45

    4.      Sound Proofing...........................................................45

    5.      Access to Amenities......................................................46

    6.      Waiting Area and Access to Privacy......................................46

B.      Payments and Compensation........................................................46

    1.      Prompt Payments.........................................................46

    2.      IHO Compensation .......................................................46

C.      School District Representatives....................................................47

D.  Hearing Process.......................................................................................47

    1.  Appointment of IHOs and Recusals................................................47

    2.  Extensions......................................................................................47

    3.  Decision Processing.......................................................................47

    4.  Pendency Orders............................................................................48

**VIII.  ADDITIONAL CONSIDERATIONS**................................................48

**IX.  CONCLUSION**.................................................................................49

## I.      INTRODUCTION

Under the Individuals with Disabilities Education Act (IDEA)[1] and its implementing regulations[2], a free and appropriate public education (FAPE) must be available to all students residing in the State between the ages of 3 and 21.[3]  In New York State, children with disabilities between the ages of 3 and 5, as well as 18 through 21, are entitled to FAPE.[4]  Whenever a dispute arises between the student's parent(s) and the school district on any of the matters relating to the identification, evaluation or educational placement of a student with a disability or the provision of a FAPE to the student, the parent(s) or the school district must have an opportunity for an impartial due process hearing.[5]  The hearing must be conducted by the New York State Education Department (SED),[6] and an impartial hearing officer (IHO) must be appointed to hear and decide the dispute between the parent(s) and the school district.[7]

The IDEA sets forth minimum qualifications for hearing officers who preside over IDEA hearings.[8]  Consistent with the IDEA, New York State sets forth specific qualifications for hearing officers.  Specifically, the hearing officer must be admitted to the practice of law in New York; have a minimum of two years practice/experience in education/special education/disability rights/civil rights; have access to support/equipment necessary to perform duties; and be certified by the New York State Commissioner of Education as an impartial hearing officer, which requires, among other things, successful completion of training/update programs and annual submission of a certification that these requirements have been met.[9]

In New York State, each school district must adopt a written policy that establishes administrative practices and procedures for the selection and appointment of an impartial hearing officer consistent with procedures set forth in the Regulations of

---

[1] In 2004, Congress reauthorized the Individuals with Disabilities Education Act as the Individuals with Disabilities Education Improvement Act.  The amendments provide that the short title of the reauthorized and amended provisions remains the Individuals with Disabilities Education Act.  *See* Pub. L. 108-446, § 101, 118 Stat. at 2647; 20 U.S.C. § 1400 (2006) ("This chapter may be cited as the 'Individuals with Disabilities Education Act.'").

[2] Implementing regulations followed the reauthorized IDEA in August 2006.  *See* 34 C.F.R. Part 300 (August 14, 2006).  In December 2008, the regulations were clarified and strengthened in the areas of parental consent for continued special education and related services and non-attorney representation in due process hearings.  *See* 34 C.F.R. Part 300 (December 1, 2008).  In June 2017, the regulations were further amended to conform to changes made to the IDEA by the Every Student Succeeds Act (ESSA).

[3] 34 C.F.R. § 300.101(a).

[4] N.Y. EDUC. LAW Art. 89 § 4402.

[5] 20 U.S.C. § 1415(b)(6)(A); 34 C.F.R. §§ 300.507(a), 300.511(a).

[6] 34 C.F.R. § 300.511(b).

[7] 8 NYCRR §§ 200.2(b)(9), 200.2(e)(1), 200.5(j)(3).

[8] *See, generally*, 20 U.S.C. § 1415(f)(3)(A).

[9] 8 NYCRR § 200.1(x)(1) – (4).

Hyman Decl.  Ex. U- 6

the Commissioner of Education.[10]  Accordingly, the New York City Department of Education (NYCDOE) has done so and created the New York City Impartial Hearing Office (NYCIHO) to oversee the "administrative and clerical aspects of [IDEA] impartial [due process] hearings" for the NYCDOE.[11]  Specifically, the NYCIHO –

> is responsible for processing requests for impartial hearings, appointing [IHOs], calendaring hearing dates, communicating with parties, providing transcription, interpretation, translation, other hearing-related services, processing evidence, and issuing reports analyzing these processes.[12]

## II.   INITIATION OF EXTERNAL REVIEW AND SCOPE

On January 24, 2018,[13] Assistant Commissioner Christopher Suriano notified the NYCIHO and the NYCDOE in writing of SED's plan to implement an independent review of the NYCIHO (Suriano Letter).[14]  The purpose of the review was broad – to better understand the functioning of the NYCIHO and its policies, procedures and practices specific to special education impartial hearings.[15]  In scope, however, the review focused on, though not limited to, the assignment of hearings to IHOs, the payment structure for IHOs, the specific assistance provided to IHOs by the NYCIHO, and the observation, availability and suitability of hearing room space.[16]

---

[10] 8 NYCRR §§ 200.2(b)(9).

[11] *See* New York City Department of Education, *Standard Operating Procedures Manual:  Impartial Hearing Office* (SOPM), p. 6. (March 2018) (on file with the NYIHO).

[12] *Id.*

[13] Delays to the prompt completion of this independent review are directly attributable to actions taken by the NYCIHO and/or NYCDOE, including, for example, requiring that SED share the independent reviewer's contract with the SED to verify his access to personally identifiable information despite the notice given to the NYCIHO and NYCDOE clearly specifying that the reviewer was authorized to access personally identifiable information; scheduling meetings for weeks later than requested (e.g., notice given on February 6, 2018 with proposed meeting dates – five in total – in late February but meeting not taking place until March 19, 2018 despite reviewer offering additional dates in early March 2018); and, the NYCIHO releasing requested documents and information in piecemeal fashion after "management's approval."  In a number of occasions, the SED was called up to assist the reviewer in securing the full and prompt cooperation of the NYCIHO and NYCDOE despite the NYCIHO and NYCDOE being informed that the reviewer had SED's "full authority."

[14] *See* Letter from Christopher Suriano, Assistant Commissioner, Office of Special Education, New York State Department of Education, to Chief Administrator, Impartial Hearing Office, New York City Department of Education (January 24, 2018) (on file with the New York State Education Department) (Suriano Letter).

[15] *Id.*

[16] *See id.*

This written report is intended to help the SED better understand the functioning of the NYCIHO and to determine whether its policies, procedures, and practices specific to special education impartial hearings in the areas identified in the Suriano Letter are consistent with basic elements of due process hearings and the rights of the parties set out in the IDEA and New York State law.  The time period for this review[17] and limited resources available to the reviewer[18] did not permit for a more comprehensive and forensic review of the NYCIHO.  Nonetheless, it is felt that sufficient, appropriate information and evidence was obtained to provide a reasonable basis for the findings and conclusions included in this report and that the objectives of the review have been met.

A.     Foundation for the Findings in this Report

Various information sources were relied upon in reaching the findings, conclusions and recommendations contained in this report.  These sources include key interviews of NYCIHO staff and stakeholders, the review of documents and information provided by the NYCIHO and stakeholders, and informal observations of the reviewer.  Specifically, the primary activities that were undertaken include:

1.     Interview of Chief Administrator, NYCIHO.

2.     Interview of Deputy Chief Administrator, NYCIHO.

3.     Interview of Operations Manager, NYCIHO.

4.     Interviews of various NYCIHO personnel:  I.H.S. System Administrator; Recusal Processor; Case Manager; Accounting Clerk; Hearing Room

---

[17] Though SED did not set a specific timeline by when the review was to be completed and this report submitted, SED's on-going monitoring activities and the reviewer's preliminary findings suggests that a crisis is imminent that may compromise access to due process for students residing in the New York City school district requiring immediate, written feedback to SED from the reviewer.

[18] In scope, this review, as proposed by the reviewer as an alternative to developing a formal, IHO evaluation protocol as required under the contract between Special Education Solutions, LLC and SED, was simply intended to *identify* "any practices that are inconsistent with standard and best legal practices and/or may impede the timelines and efficiency of the hearing system."  It had not been intended to be a formal audit of the NYCIHO.  *See* Draft Letter from Deusdedi Merced, Managing Member, Special Education Solutions, LLC, to Cathryn Tisenchek, Supervisor, Due Process Unit, Office of Special Education, New York State Education Department (May 26, 2017) (on file with the New York State Education Department).  As such, this report does not provide an in-depth analysis of identified practice failures.

Coordinator; Decision Processor; Claims Processor[19]; Appeals Processor[20]; and Case Non-Compliance Support[21].

5.  Interview of Managing Attorney 1, Managing Attorney 2, and Attorney, Special Education Unit, Office of General Counsel, NYCDOE.

6.  Interview of Senior Director of Representation and Deputy Director, Impartial Hearing Representation Office (IHRO), Special Education Office, Division of Specialized Instruction and Student Support, NYCDOE.

7.  Interview of Executive Director and Senior Policy Advisor, Committees on Special Education, NYCDOE.

8.  Discussion with General Counsel and Director of Settlements and Adjudications, Office of the Comptroller of the City of New York.

9.  Discussions with numerous IHOs, both individually and in an open meeting of IHOs who wished to attend held on Tuesday, November 13, 2018.

10. Discussions with numerous attorneys of prominent legal services agencies and private law firms who appear before the NYCIHO.

11. Review of numerous documents and information provided by the NYCIHO.

12. Review of various Audit Reports authored by the Office of the Comptroller of the City of New York.

13. Review of various documents and information provided by attorneys of prominent legal services agencies and private law firms who appear before

---

[19] In the initial organizational chart dated March 12, 2018, provided by the NYCIHO to the reviewer, Claims Processor had been identified under the branch titled "Attorneys." A corresponding Job Description titled "Attorneys" was provided to the reviewer. The Job Description document does not include the role of "Claims Processor." On November 30, 2018, the NYCIHO provided a revised organizational chart dated November 29, 2018, identifying Claim Processor as the "Claims Processor."

[20] Appeals Processor, like Claims Processor, had initially been identified under the branch titled "Attorneys." Subsequently, as of November 29, 2018, Appeals Processor was identified as the "Appeals Processor."

[21] In the March 12, 2018, organizational chart, Case Non-Compliance Support had been identified under the branch titled "System Administrators." He presented himself during the interview as the "CFUS Processor." The November 29, 2018, organizational chart identifies him under the branch titled "Case Non-Compliance Support."

Hyman Decl.  Ex. U- 9

the NYCIHO in support of concerns brought to the reviewer's attention.

14.     Discussion with SED personnel from the Office of Special Education and Office of Counsel.

15.     Review of data provided by SED.

16.     Informal observations of available hearing rooms and day-to-day functioning of the NYCIHO (i.e., three full-day site visits).

Discussions with IHOs and attorneys of prominent legal services agencies and private law firms were held in confidence to increase level of participation and information sharing.[22]  As such, this report does not attribute to the IHOs or the attorneys of prominent legal services agencies and private law firms their individual comments.

The documents and informal observations were used to inform the interview process, corroborate the interview content, and to help generate the findings, conclusions and recommendations included in this report.

B.      <u>Structure of the Report</u>

This report provides a general overview of the New York State hearing system and, in particular, how New York City compares to the rest of the State.  The overview is then followed by various findings related to the operation of the NYCIHO.  The purpose of the overview and findings is to provide context to the recommendations included within this report.

---

[22] Initially, few IHOs shared information with the reviewer.  However, in time, with additional outreach by the reviewer and his visibility during the three onsite visits to the NYCIHO, and assurances that information shared would not identify the source, more IHOs contacted the reviewer to informally share their experiences and thoughts regarding the various matters within the scope of the review.  The same was true of the attorneys of prominent legal services agencies and private law firms.  Though the level of participation improved over time, greater participation would have been preferable but, as explained by those who guardedly participated, participation was stifled by fear of retaliation or other adverse consequences and a sense of futility fed by cynicism about whether anything would change.

Hyman Decl.  Ex. U- 10

## III.   OVERVIEW

A.   In General[23]

Like most States, and consistent with the IDEA, New York State offers three dispute resolution options:  mediation,[24] a written state complaint process,[25] and due process hearings.[26]  Between September 1, 2015 and August 31, 2018, SED also offered – on a pilot program basis – IEP facilitation[27] to all Long Island school districts and a limited number of New York City community school districts and committees on special education.  In September 2018, there was a limited expansion of IEP facilitation statewide, and SED anticipates a permanent SED-sponsored statewide IEP facilitation program in January 2020.

B.   By the Numbers

*1.*   *Comparison to States with Similar Demographics and Issues*

The number of due process complaints filed in New York State is considerable. The most recent data available, i.e., school year (SY) 2016-17, illustrates New York State's dominance over the other six States that comprise the 7-PAK States (i.e., New York, California, Florida, Illinois, New Jersey, Pennsylvania, and Texas),[28] with New York State having 35%[29] more than California, 3106% more than Florida, 1850% more than Illinois, 366% more than New Jersey, 658% more than Pennsylvania, and 1870% more than Texas.  (*See* Figure 1.)  In fact, New York State, in SY 2016-17, almost matched the total number of due process complaints filed in the other six States,

---

[23] The reviewer acknowledges with appreciation source material provided by SED.

[24] 8 NYCRR § 200.5(h).

[25] 8 NYCRR § 200.5(l).

[26] 8 NYCRR § 200.5(i).  An ancillary dispute resolution process associated with due process hearings is the resolution meeting process required by IDEA and, accordingly, offered in New York State.  8 NYCRR § 200.5(j)(2).

[27] Facilitated IEP team meetings is a rapidly growing alternative process available to school districts and parents who may be experiencing difficulty in reaching agreement during the IEP development process.  A neutral third party, known as a facilitator, who is not a member of the IEP team and does not have a relationship with either the school district or the parent(s), works with the IEP team when there is impasse or a strained relationship between the school district and the parent(s) to help guide the process.

[28] The 7-PAK States is a consortium of the seven largest States that the National Association of State Directors of Special Education, Inc. (NASDSE) determined to have both similar demographics (e.g., general population, diversity, significant rural and inter-city populations) and issues in the delivery of special education programs to its students with disabilities.  (NASDSE Representative, personal communication, January 11, 2019).

[29] Percentages are rounded up to the next whole number at .5 or above.

missing the mark by approximately 1300 due process complaints. The trend points higher. (*See* Figure 2.)

**Figure 1**[30]
**2016-17 Comparisons with Similar Size States**

|  | NY | CA | FL | IL | NJ | PA | TX |
|---|---|---|---|---|---|---|---|
| **DPCs FILED** | 6027 | 4467 | 188 | 309 | 1292 | 795 | 306 |
| **RESOLUTION MEETINGS HELD** | 5785 | 1434 | 54 | 40 | 42 | 534 | 87 |
| **RESOLUTION MEETING AGREEMENTS** | 164 | 448 | 16 | 17 | 30 | 172 | 31 |
| **FULLY ADJUDICATED HEARINGS** | 683 | 134 | 9 | 10 | 75 | 45 | 14 |
| **DECISIONS WITHIN 45-DAY TIMELINE** | 96 | 31 | 3 | 2 | 52 | 13 | 1 |
| **DECISIONS WITHIN EXTENDED TIMELINES** | 482 | 102 | 6 | 8 | 22 | 32 | 13 |
| **DPCs PENDING** | 2363 | 1031 | 25 | 36 | 169 | 173 | 66 |
| **DPCs CLOSED OTHER THAN BY DECISION**[31] | 2981 | 3302 | 154 | 263 | 1048 | 577 | 226 |

---

[30] The data represented here is compiled from a review of The Center for Appropriate Dispute Resolution in Special Education (CADRE) State (Part B) Dispute Resolution Data Summaries. CADRE is funded by the Office of Special Education Program (OSEP) at the U.S. Department of Education to serve as the National Center on Dispute Resolution in Special Education. OSEP administers the IDEA. The information in the Data Summaries is provided by each State to OSEP on an annual basis.

[31] This number represents due process complaints that were withdrawn, dismissed, or resolved without a hearing.

Hyman Decl. Ex. U- 12

**Figure 2**[32]
**NYC Trend**

|  | SY 2014-15 | SY 2015-16 | SY 2016-17 | SY 2017-18 | SY 2018-19 |
|---|---|---|---|---|---|
| **STATEWIDE** | 5200 | 5464 | 6282 | 7635 | 6972 (as of 01/11/19) |
| **NYC** | 4734 (91%) | 5026 (92%) | 5779 (92%) | 7144 (94%) | 6723 (96%) |
| **ROS** | 466 (9%) | 438 (8%) | 503 (8%) | 491 (6%) | 249 (4%) |

LEGEND:        STATEWIDE – ALL LOCAL EDUCATIONAL AGENCIES IN NYS
                       NYC – NEW YORK CITY
                       ROS – REST OF STATE

2.     *Number of Due Process Complaints Filed*

The overwhelming number of due process filings are in New York City, with the school district consistently commanding over 90% of the total number of due process complaints filed statewide since the 2014-15 school year.[33] (*See* Figure 2, above.) Further, within a four-school year span (i.e., 2014-15 through 2017-18), New York City had a 51% increase in the number of due process complaints filed (*see id.*), with the average number of due process complaints filed per day steadily increasing (*see* Figure

----

[32] The data points in Figure 2 were provided by SED.  The numbers in Figure 2 do not correspond with the numbers reported to OSEP on an annual basis because there are a number of DPCs Filed prior to July 1 each year that are entered after the federal reporting date of July 1.  *Compare* Figure 1, DPCs Filed for SY 2016-17 (i.e., 6027), *with* Figure 2, DPCs Filed for SY 2016-17 (i.e., 6282).

[33] Noteworthy, the number of due process complaints filed in New York City does not include thousands of other requests for tuition reimbursement sought through a 10-Day Notice (TDN) alone.  (Interview of Managing Attorney 1, Managing Attorney 2, and Attorney, Special Education Unit, Office of General Counsel, NYCDOE.)  Under IDEA, a parent may file a due process complaint seeking tuition reimbursement from the school district for alleged denials of a free appropriate public education.  IDEA requires that the parent provide the school district with timely notice of the claim.  The failure to provide timely notice is a consideration in whether to award reimbursement.  In 2014, New York City "fast-tracked" reimbursement claims by permitting families to file a TDN alone without a corresponding due process complaint.  *See* Press Release, Office of the Major, Mayor de Blasio and Speaker Silver Announce New Steps to Help Families of Students with Disabilities, June 24, 2014, https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0.  Accessed Jan. 18, 2019.  It is estimated that between 13,000 and 15,000 TDNs and due process complaints were filed in New York City in 2017 and 2018. (Interview of Managing Attorney 1, Managing Attorney 2, and Attorney, Special Education Unit, Office of General Counsel, NYCDOE.)

Hyman Decl.  Ex. U- 13

3).  The reasons for this are beyond the scope of this review, though some attribute it to administrative changes made by Mayor Bill de Blasio in 2014 that made it easier and less litigious for families with students with disabilities in private schools to seek reimbursement of tuition and related expenses.[34]

**Figure 3**[35]
**Average NYC Filings Per Day**

| SCHOOL YEAR | AVG. PER DAY |
|:---:|:---:|
| 2014-15 | 19 |
| 2015-16 | 20 |
| 2016-17 | 23 |
| 2017-18 | 29 |
| 2018-19 | 51<br>(as of 01/14/19) |

The transactional costs of these claims to the New York City school district is substantial.  For example, in fiscal year (FY) 2017,[36] New York City processed 4184 special education claims resulting in approximately a $280 million payout, which represents 82% of all claims paid out by New York City in FY 2017.[37]  In FY 2015, after Mayor de Blasio's administrative changes, the number of special education claims increased by 73% (with 4479 in FY 2015 as compared to 2582 claims in FY 2014) but have since leveled off in the 4000 range since the initial uptick.[38]

---

[34] *See*, *e.g.*, Zimmerman, Alex. "New York City Now Spends $325 Million A Year to Send Student with Disabilities to Private Schools." *Chalkbeat*, Jan. 7, 2019, https://www.chalkbeat.org/posts/ny/2019/01/07/private-school-tuition-reimbursement/. Accessed Jan. 12, 2019.

[35] The data points in Figure 3 were provided by SED.

[36] July 1, 2016 through June 30, 2017.

[37] Stringer, Scott M. (2018). *Claims Report: Fiscal Year 2017*.  Retrieved from the Office of the Comptroller of the City of New York website: https://comptroller.nyc.gov/wp-content/uploads/documents/Claims-Report-FY-2017.pdf. Accessed 12 Jan. 2019.  Special education claims include both "claims on behalf of parents for the reimbursement of special education services costs and tuition, and claims for statutory attorneys' fees where an underlying claim for special education reimbursement has been successful." *Id.*

[38] *Id.*

3.    *Number of Hearings and Conferences Scheduled in NYC Per Day*

Given the total number of due process complaints filed in New York City, the number of matters listed on the hearing calendar in New York City on a per day basis (i.e., days in which the NYCIHO is open for business) is not particularly surprising. And, given all else, this number is also rising.  (*See* Figure 4.)

**Figure 4**[39]
**Calendared Matters**

| SCHOOL YEAR | AVG. PER DAY |
|:---:|:---:|
| 2014-15 | 55 |
| 2015-16 | 69 |
| 2016-17 | 89 |
| 2017-18 | 106 |
| 2018-19 | 122<br>(as of 01/14/19) |

4.    *Number of Hearings Adjudicated*

Few hearings are actually fully adjudicated.  For example, in SY 2016-17, only 11% of the total number of due process complaints filed resulted in written decisions.[40]  (*See* Figure 1, above.)  Of the 11%, the majority (482 or 71%) were decided within extended timelines,[41] 96 (or 14%) were decided within the 45-day timeline, 105 (or 15%) were untimely.[42]  Forty-nine percent (49%) of the due process complaints filed were

---

[39] The data points in Figure 4 were provided by SED.  The per day average represents both scheduled hearings and conferences whether or not held.

[40] It is noted that 39% (or 2363) of the due process complaints filed were pending at the time the data was submitted to OSEP.  The number of fully adjudicated hearings may have been higher than 11% in SY 2016-17.

[41] For purposes here, the validity of the extended timelines is assumed. Allegations of IHOs unilaterally extending the timelines were raised with the reviewer.

[42] IDEA and its implementing regulations require that a final decision, in non-disciplinary cases, be reached and mailed to each of the parties not later than 45 calendar days after the expiration of the 30-day resolution period, or the adjusted time periods described in 34 C.F.R. § 300.510(c).  34 C.F.R. § 300.515(a).  A hearing officer

withdrawn, dismissed, or resolved without a hearing, with only 6% (or 164 of the 2981) resulting in resolution meeting agreements.

5.    *Number of Pendency Hearings*

An anomaly in the numbers is the number of pendency hearings relative to the number of fully adjudicated hearings.  This discrepancy is explained, in part, by the NYCDOE's ongoing practice of not maintaining a student's *uncontested* current educational placement absent a written order from an IHO.[43]

**Figure 5**[44]
**Comparison of Fully Adjudicated Hearings with Pendency Hearings**

|  | SY 2014-15 | SY 2015-16 | SY 2016-17 | SY 2017-18 | SY 2018-19 |
|---|---|---|---|---|---|
| **STATEWIDE FULLY ADJ. HEARINGS** | 459 | 453 | 683 | 877 | 847 (as of 1/15/19) |
| **PENDENCY HEARINGS HELD – NYC** | 584 | 714 | 902 | 1425 | 1482 (as of 1/15/19) |
| **PENDENCY HEARINGS HELD – ROS** | 1 | 12 | 9 | 6 | 2 |

6.    *Number of Extensions and Recusals*

The number of extensions granted in New York State is exceptionally high.  (*See* Figure 6.)  In SY 2017-18, for example, there were 36,369 requests granted statewide.[45] New York City alone accounts for 97% of all extensions granted in SY 2017-18.  In fact, since SY 2014-15, New York City has decisively taken the lead in the number of requests

---

may grant specific extensions of time beyond the 45-day period at the request of either party.  34 C.F.R. § 300.515(c); 8 NYCRR § 200.5(j)(5)(i).

[43] *See Letter to Goldstein*, 60 IDELR 200 (OSEP 2012).  *See also* SOPM at 18 ("The NYCDOE requests a written Order of Pendency in each case in which pendency is sought by the Parent, regardless of whether pendency is disputed by the school district."). This practice continues, as confirmed by discussions with IHOs serving in New York City.

[44] The data represented here is from the CADRE Dispute Resolution Data Summaries and data points provided by SED.

[45] In fact, there were 36370 requests for extensions filed.  All but one was granted.

granted statewide, owning between 94 to 97% of the total number.  To put this in perspective, the other 732 school districts in New York State,[46] account for 3 to 6% of the total requests granted during the same period.

**Figure 6**[47]
**Number of Granted Extensions**

|  | SY 2014-15 | SY 2015-16 | SY 2016-17 | SY 2017-18 | SY 2018-19 |
|---|---|---|---|---|---|
| **STATEWIDE** | 15067 | 17447 | 24778 | 36369 | 20810 <br>(as of 01/15/19) |
| **NYC** | 14111 <br>(94%) | 16599 <br>(95%) | 23768 <br>(96%) | 35157 <br>(97%) | 20173 <br>(97%) |
| **ROS** | 956 (6%) | 848 (5%) | 1010 (4%) | 1212 (3%) | 637 (3%) |

LEGEND:  STATEWIDE – ALL LOCAL EDUCATIONAL AGENCIES IN NYS
NYC – NEW YORK CITY
ROS – REST OF STATE

Just as startling are the number of recusals in New York City, with 5634 in the school year that just ended (2017-18).  The current school year (2018-19) has already surpassed last school year's number and there are approximately six more months remaining to the school year.[48]  (*See* Figure 7.)

And, here again, the New York City school district has the highest incidents of recusals as compared to rest of State (*see* Figure 7), with the number of recusals per IHO (serving New York City) varying widely (*see* Figure 8).

These disproportionate number of recusals are an impediment to the timely completion of due process hearings.[49]

---

[46] SED.  (2018).  *New York State Education At A Glance* (web page).  Retrieved from https://data.nysed.gov/.  Accessed Jan. 14, 2019.

[47] The data points in Figure 6 were provided by SED.

[48] The use of the term "recusal" as applied to the New York City school district is a misnomer.  Recusal is the process by which an IHO is disqualified on objection of either party or disqualifies him/herself from presiding over a hearing because of self-interest, bias or prejudice.  *See* Black's Law Dictionary (10th ed. 2014).  In practice, however, the IHOs in New York City are assigned due process complaints on an automatic rotational appointment basis.  An IHO who is appointed but simply unavailable, or is available but for some reason chooses not to accept the appointment, is deemed to have recused him/herself.

[49] For an explanation on how the high number of recusals impede timely completion of due process hearings, *see* discussion on *Timely Appointment of IHOs and Subsequent Recusals* on page 41.

Hyman Decl.  Ex. U- 17

**Figure 7**[50]
**Number of Granted Recusals**

|  | SY 2014-15 | SY 2015-16 | SY 2016-17 | SY 2017-18 | SY 2018-19 |
|---|---|---|---|---|---|
| **STATEWIDE** | 3333 | 1704 | 3959 | 5664 | 6979 (as of 01/15/19) |
| **NYC** | 3309 (99%) | 1697 (100%) | 3942 (100%) | 5634 (99%) | 6968 (100%) |
| **ROS** | 24 (1%) | 7 (0%) | 17 (0%) | 30 (1%) | 11 (0%) |

LEGEND:       STATEWIDE – ALL LOCAL EDUCATIONAL AGENCIES IN NYS
              NYC – NEW YORK CITY
              ROS – REST OF STATE

**Figure 8**[51]
**Recusal Per IHO in NYC**

| Number of Recusals | IHOs Within Range in 2017 | IHOs Within Range in 2018 |
|---|---|---|
| 0 to 25 | 25 | 23 |
| 26 to 50 | 12 | 7 |
| 51 to 75 | 15 | 6 |
| 76 to 100 | 9 | 11 |
| 101 to 125 | 8 | 2 |
| 126 to 150 | 4 | 5 |
| 151 to 175 | 1 | 3 |
| 176 to 200 | 1 | 3 |
| 201 + | 0 | 11 |
| 301 + | 0 | 4 |

7.      *Average Case Length (in days)*

The average number of days a case is open in New York State far exceeds the abbreviated timeline established in the IDEA and what is reasonable under an extended timeline.  (*See* Figure 9.)  The failure to promptly resolve due process complaints keeps

---

[50] The data points in Figure 7 were provided by SED.

[51] The data points in Figure 8 were provided by SED and are current as of November 8, 2018.

Hyman Decl.  Ex. U- 18

children in "administrative limbo"[52] and, for some, delays access to free appropriate public education to which they are entitled.

**Figure 9**[53]
**Average Case Length (in days)**

|  | SY 2014-15 | SY 2015-16 | SY 2016-17 | SY 2017-18 | SY 2018-19 |
|---|---|---|---|---|---|
| **STATEWIDE** | 146 | 155 | 175 | 196 | 219 (as of 01/15/19) |
| **NYC** | 149 | 159 | 181 | 202 | 225 |
| **ROS** | 115 | 114 | 114 | 120 | 140 |

LEGEND:      STATEWIDE – ALL LOCAL EDUCATIONAL AGENCIES IN NYS
             NYC – NEW YORK CITY
             ROS – REST OF STATE

*8.    Number of IHOs*

The number of IHOs in New York State has remained constant for the past five (5) years (2014-18), with an average of 110 IHOs per year.[54]  IHOs are part-time, independent contractors,[55] and many hold other part and full-time jobs.[56]

*9.    In Sum*

The high number of due process complaints filed in New York City – the majority of which are resolved in favor of parents, as indicated by, for example, New York City's $280 million payout –raises valid questions of the school district's ability to offer free appropriate public education to its students with disabilities.  This apparent failure is longstanding as indicated by the exponential growth in the number of due process complaints since, at the least, SY 2014-15.  Further study, followed by immediate, decisive action, is indicated.

---

[52] *Engwiller v. Pine Plains Cent. Sch. Dist.*, 110 F. Supp. 2d 236, 33 IDELR 90 (S.D.N.Y. 2000) ("[T]he brevity of the 45-day requirement indicates Congress's intent that children not be left indefinitely in an administrative limbo while adults maneuver over the aspect of their lives that would, in large measure, dictate their ability to function in a complex world.").

[53] The data points in Figure 9 were provided by SED.

[54] Within these five (5) years, New York reached a high in 2015 with 125 IHOs and a low in 2018 with 98 IHOs.  In the current calendar year (2019), there are 108 IHOs.  (Data points provided by SED.)

[55] *See* 8 NYCRR § 200.1(x).

[56] Discussions with IHOs.

Conflating an already precarious situation is the high number of extensions and recusals in New York City, as well as the prolonged delays in resolving due process complaints, either by decision or otherwise. These systemic deficiencies are symptomatic of an unhealthy hearing system that requires immediate intervention.

Root causes of these systemic deficiencies are discussed below.

C.    Key Observations

1.    *Two Masters*

Throughout the review, NYCIHO interviewees guardedly engaged with the reviewer. Though this phenomenon was not widespread, it was most pronounced during discussions with the senior staff and attorneys, who sidestepped with greater frequency pointed questions probing potential process failures. The participation of the NYCDOE's Office of the Auditor General only served to complicate the situation.

This protectionist mindset is understandable, in part.

The NYCIHO functions to "oversee[] the administrative and clerical aspects of impartial hearings *for the [NYC]DOE*."[57] Its primary purpose, however, is to support the work of the IHOs. This dichotomy in functions has the NYCIHO balancing the needs of two masters, the first of which controls its purse strings while the second is not constrained by the financial limitations of the first. Yet, any complicitness in concealing the shortfalls that plagues it to protect the first master, diminishes the value of the second whose need is the reason for the NYCIHO's very existence.

2.    *SED's Commitment to Change*

In September 2016, OSEP determined that New York State had a high rate of fully adjudicated hearings with extended timelines and that it did not have procedures in place to ensure that IHOs are granting extensions consistent with 34 C.F.R. § 300.515(c). OSEP further determined that New York State "is not exercising its general supervisory responsibility to ensure that [IHOs] adhere to the 45-day timeline for issuing final decisions in due process hearings."[58]

SED shares OSEPs commitment to improving New York States' due process system's efficiency, timeliness, and overall operation. To this end, SED has taken, and

---

[57] SOPM at 6 (emphasis added). Specifically, the NYCIHO calendars hearing dates, communicates with parties, provides recording equipment and the individuals to operate it, secures translation/interpretation and transcription services, and provides clerical support inclusive of decision/order formatting and the processing of evidence. *Id.* at 6, 8.

[58] *See* New York Monitoring and Support Visit Summary and Next Steps, OSEP (September 28-30, 2016) (on file with the New York State Education Department).

continues to take, corrective action to address the overuse of extended timelines, including:

- Initiating a compliance assurance plan requiring the NYCIHO to revise the IHO appointment process to ensure the availability of an IHO prior to his/her appointment to a case and to limit recusals;

- Releasing in September 2017 a memorandum to the field advising and reminding all parties of important procedural requirements relating to special education due process hearings;

- Releasing in January 2018 a Q & A to the field on impartial hearings procedures;

- Increasing monitoring of hearing timelines by SED Office of Special Education staff;

- Providing in September 2017, with a follow-up review in May 2018, focused training to all certified IHOs on impartial hearing timelines and extensions, and providing on an as needed basis additional training to IHOs identified by SED as requiring technical assistance;

- Collaborating and discussing with the National Center for System Improvement (NCSI) on New York State's due process system, including determination of root cause and the identification of strategies to address timeliness of due process hearings;

- Increasing the number of certified IHOs by recruiting and training 10 new IHOs who were added to the IHO roster in November 2018;

- Establishing an internal work group to review New York State's two-tier system and discuss how it might be improved; and,

- Initiating the independent review of the NYCIHO, which is the subject of this report

This review uncovered sincere disagreements on how process failures of the NYCIHO might be improved. Yet, it revealed wide consensus on the need to make changes to how the NYCIHO operates, as well as a shared commitment to its improvement. To this end, despite the possibility that this review may also unveil SED's own shortcomings, SED's steadfast commitment to an utterly objective and candid review of the NYCIHO by a reviewer granted SED's "full authority," is commended. Indeed, though laudable, it is simply a start. More needs to be done and will be done. For SED will be measured not by what it learned in this report but rather by what decisive actions it takes moving forward and the resulting outcomes.

Hyman Decl.  Ex. U- 21

*3.      Interconnectedness*

This review identified substantial deficiencies in the policies, procedures and practices specific to special education impartial hearings in New York City, including the high rate of extensions granted, the considerable number of recusals, the inadequate payment structure for IHOs, and the insufficient number of hearing rooms available to accommodate the day-to-day hearing schedule.  Each presents a threat to due process.  Collectively, however, they render an already fragile hearing system vulnerable to imminent failure and, ultimately, collapse.

That it has not yet collapsed is remarkable given the staggering numbers of due process complaints filed in New York City.  (*See* Figure 2, above.)  A plausible explanation for this may be the mutually beneficial relationships that have formed to allow IHOs, parties (inclusive of the NYCDOE), and the NYCIHO to coexist by "turning a Nelson's eye."  Though the NYCIHO finds itself between the proverbial rock and a hard place, serving two masters, such does not excuse any failure to comply with basic tenets of due process, including, for example, having an adequate number of hearing rooms available to accommodate the elevated number of hearings on a day-to-day basis and fairly compensating IHOs commensurate with their responsibilities.

## IV.   ADDITIONAL FINDINGS SPECIFIC TO TARGETED AREAS

The following additional findings help inform the recommendations included in this report.

A.      NYCIHO – Generally

*1.      Impartiality*

The NYCIHO maintains some degree of autonomy and independence, though it reports to the Deputy Chancellor of School Planning and Development.  The Office of School Planning and Development oversees for the NYCDOE space planning and management, school design and charter partnerships, nonpublic schools, and the Education Construction Fund.[59]

With respect to impartiality, the NYCIHO's stated objective is to "remain impartial at all times," communicating with parties and IHOs in a professional and free of bias manner.[60]  This rings true, with one notable exception – the degree of access

---

[59] *See* Chancellor Carranza Announces Streamlined Support and Leadership Structure for New York City Schools, (2018), https://www.schools.nyc.gov/about-us/news/announcements/contentdetails/2018/06/27/chancellor-carranza-announces-streamlined-support-and-leadership-structure-for-new-york-city-schools (last visited Jan. 15, 2019).
[60] SOPM at 6.

NYCDOE personnel have to the NYCIHO's Impartial Hearing System (IHS).[61]  Limited access to IHS is granted to district representatives of the committees on special education, the Office of the General Counsel, including the attorneys assigned to cases before the NYCIHO, and representatives of the Impartial Hearing Representation Office, whose staff represents the interest of the NYCDOE in claims filed with the NYCIHO.[62]  Read-only access is granted to other NYCDOE employees and IHOs.[63]  Parents or their representatives are not granted access whatever.[64]  Such operational practice can be perceived as providing preferential treatment to one party to the disadvantage of the other.

Such perception is not without substance.  For example, in the New York City school district, when the parent files the due process complaint, the commencement of the 45-day timeline is triggered when a school-district level representative enters information relating to the resolution process into IHS, or the 30-day resolution period has elapsed, whichever comes first.[65]  Only then is the assigned IHO notified of the need to schedule the prehearing conference or hearing within 14 days.[66]  A lapse in entering

---

[61] IHS is a web-based case management system for collecting and maintaining information related to due process complaints filed in New York City.  SOPM at 8.

[62] Interview of System Administrator, NYCIHO.  *See also* Memorandum from Appeals Processor to Unknown (undated) (on file with the NYCIHO) (addressing outage to IHS and how it would affect user, including "Impartial Hearing Office, Hearing Officers, District Representatives, the Office of General Counsel, and the Implementation Office").

[63] *Id.*

[64] Interview of System Administrator, NYCIHO.

[65] Interview of Case Coordinator, NYCIHO.  The 30-day resolution period must be adjusted in three circumstances:  (1) both parties agree in writing to waive the resolution meeting; (2) the mediation or resolution meeting starts but before the end of the 30-day period, the parties agree in writing that no agreement is possible; and, (3) both parties agree in writing to continue the mediation at the end of the 30-day resolution period, but later, the parent or the LEA withdraws from the mediation process.  34 C.F.R. § 300.510(c).

[66] New York, unlike the IDEA, sets a timeline by when the hearing officer must initiate either the prehearing conference or the hearing.  Specifically, the hearing officer must commence the prehearing conference or the hearing within the first 14 days after the hearing officer is appointed, if the school district filed the complaint.  8 NYCRR § 200.5(j)(5), § 200.5(j)(3)(iii)(a).  Similarly, if the parent filed the complaint, the prehearing conference or the hearing must commence within the first 14 days of *receipt* by the hearing officer of the parties' written waiver of the resolution meeting, written confirmation that a mediation or resolution meeting was held but no agreement could be reached, or written notification that either party withdrew from mediation (after having agreed to continue mediation beyond the 30-day resolution period).  8 NYCRR § 200.5(j)(5), § 200.5(j)(3)(iii)(b).  The prehearing conference or hearing must also commence within 14 days of the expiration of the 30-day resolution period, unless the parties agree in writing to continue mediation at the end of the 30-day resolution period.  *Id.*

the information only serves to delay the commencement of the hearing process for the parent.

2.      *Physical Space*

The NYCIHO is located in downtown Brooklyn, at 131 Livingston Street.  It is easily accessible by nine (9) subway lines, making it a desirable, central location for those traveling from surrounding neighborhoods, boroughs, and other counties.  The building housing the NYCIHO has six (6) floors, with the NYCIHO occupying space on the second floor.  The IHRO also occupies space on the second floor.  The second floor is L shaped.

The NYCIHO has 17 rooms on the second floor and the IHRO has four (4).  There are also two sizable computer rooms, a sizable lunch room, and two bathrooms.  Access to the second floor is either through two sets of stairs or two elevators, one of each on either end of the L-shaped floor.

Seven (7) of the 17 rooms available to the NYCIHO are designated administrative offices/space.  The remaining 10 rooms are designated hearing rooms, with one of these rooms (Room 202C) also substituting as work space for IHOs.[67]  An additional conference room on the third floor belonging to another office is available to the NYCIHO for use as a hearing room between the hours of 9 a.m. and 5 p.m.[68]

All hearing rooms have access to corded, table-mounted office telephones with built-in speakers and microphones.  There are no Polycom Sound Stations (or similar telephone conference system) in any of the hearing rooms.  Call/voice-quality control of existing telephones was not assessed.

Some hearing rooms are smaller than others, restricting the number of people who can sit comfortably in each.  Nonetheless, seating is adequate, and tables are appropriately proportional to individual room sizes.  Rooms were observed to be unkempt, cluttered, and having bare walls.

---

[67] Room 202C is used for "overflow," hearing matters.  (Interview of Hearing Room Coordinator, NYCIHO.)  Typically, only prehearing conferences are scheduled for this room.  In-person participation in prehearing conferences held in Room 202C by school district personnel is not atypical.  (Interview of Operations Manager, NYCDOE.)  Evidence of pending hearings is stored in unlocked cabinets on shelves in boxes in this room and IHO mailboxes are also situated in the room.  (Interviews of Hearing Room Coordinator and Operations Manager.)  The appropriateness of using Room 202C for any hearing matters with one or both parties present in person is highly questionable given IDEA and Family Educational Rights and Privacy Act (FERPA) confidentiality requirements.  *See* 20 U.S.C. §§ 1412(a)(8), 1417(c); 20 U.S.C. § 1232g.

[68] Interview of Hearing Room Coordinator.

Technical specification as to whether hearing rooms are soundproofed is unavailable.[69]  Sound bleeding was observed in Room 204H with conversations in the adjacent rooms (204I and 208) discernible.[70]  Similar leakage is also present in other hearing rooms.[71]

Posted signs near hearing rooms remind others of the need to keep noise to a minimum.  The Hearing Room Coordinator "monitors" the hallway during hearing hours to ensure compliance.[72]

Access to computer terminals and printers by IHOs and parties is restricted.  Only two (2) of the 11 rooms were observed to have computers but no printers,[73] one of which was Room 202C, which is used predominantly by IHOs.  In the second, the computer was not connected to an electrical outlet or ethernet/USB lines.  Access to a copier is restricted to NYCIHO personnel and IHOs.  The inability of parties, particularly school district personnel with access to student records, to have use of computer terminals and a copier has resulted in delays in the past and continues to hinder the timely completion of hearing proceedings.[74]

All hearing rooms are WiFi accessible.[75]  Access to it is granted to IHOs but not parents or their representatives or school district personnel other than NYCIHO staff.[76]

An adequate number of electrical outlets were observed in most hearing rooms, with at least three of the four walls each having an outlet.

---

[69] Written Response to Reviewer Question Provided by Chief Administrator, NYCIHO (November 30, 2018) (on file with the NYCIHO).

[70] The Operations Manager has received complaints about the sound bleeds.  Interview of Operations Manager, NYCIHO.

[71] Interview of Hearing Room Coordinator.

[72] Interview of Deputy Chief Administrator, NYCIHO.

[73] It is noted that the use of a network printer might be an option.

[74] Discussions with IHOs; Interview of Senior Policy Advisor, Committees on Special Education, NYCDOE.  Conflicting information was provided to the reviewer regarding the ability of school personnel to have access to computers and a copier while present in the NYCIHO.  Senior Policy Advisor acknowledged that the NYCIHO does not provide access to its computers and copier to school district personnel but indicated that Committee on Special Education 8, which is also housed in 131 Livingston Street, now provides school personnel with access to its computers and copier.  (Interview of Senior Policy Advisor.)  IHOs interviewed related that access continues to be limited and can disrupt hearing proceedings when prolonged breaks must be taken to allow school personnel to acquire or copy necessary documents.  (Discussions with IHOs.)

[75] The NYCIHO installed the WiFi in late 2017.  Interview of Hearing Room Coordinator.

[76] *Id.*

Appropriate room ventilation and temperature regulation is an ongoing problem with the hearing rooms.  Hearing rooms are either "very hot" or "notoriously cold."[77] Cooling is achieved through the use of air conditioning and/or fans:  one (1) hearing room has central air conditioning; five (5) hearing rooms have either window or portable air conditioning units; and, five (5) hearing rooms do not have air conditioning whatever.  The window and portable air conditioning units are loud and affect the quality of the electronic recording of the proceedings.[78]

Poor ventilation has resulted in hearing cancellations.[79]

All hearing rooms have fans.  Radiators heat the rooms.

Inadequate ventilation and temperature control in the hearing rooms has resulted in hearings being conducted with doors open.[80]  This is a long-standing issue that the NYCIHO had been directed to correct.[81]  It has not done so.[82]

The lunch room serves multiple purposes.  It is managed by the NYCDOE's Field Support Center – Brooklyn North.[83]  Personnel from all offices residing at 131 Livingston Street have access to it.[84]  It has typical furnishings of a lunch room, including round tables, chairs, cabinets, and a working sink.  Two vending machines are also present.

In addition to its obvious purpose, the lunch room is also used as the NYCIHO's waiting room and as one of the Field Support Center's holding rooms for reassigned teachers.[85]  In the four days the reviewer completed a site visit of the NYCIHO, there were as many as 20 reassigned teachers by early morning.[86]  Coveted spaces – tables

[77] Interviews of Senior Director of Representation and Deputy Director, Impartial Hearing Representation Office (IHRO), Special Education Office, Division of Specialized Instruction and Student Support, NYCDOE; Discussions with IHOs.  Corroborated by Hearing Room Coordinator and Deputy Chief Administrator.

[78] Discussions with IHOs; Interview of Hearing Room Coordinator.

[79] IHO written feedback.

[80] Interview of Hearing Room Coordinator; Discussions with IHOs.

[81] Letter from Patricia J. Geary, Coordinator, Office of Special Education, SED, to Executive Director, Division of Financial Operations, NYCIHO (November 10, 2014) (on file with SED) (Letter to Executive Director).

[82] The reviewer observed multiple hearings being conducted with doors open on all four days that he was onsite.  Conversations with participants in these hearing rooms confirmed that ventilation / temperature control were the reasons for keeping the doors open.

[83] Interview of Hearing Room Coordinator.

[84] *Id.*

[85] Reassigned teachers are NYCDOE employees who are the subject to an investigation dealing with potential misconduct.

[86] Identification of the reassigned teachers was aided by the Hearing Room Coordinator and by the reviewer's own observations.

and chairs near electrical outlets – were mostly taken by eight in the morning.[87]  By nine in the morning most tables were occupied by either reassigned teachers, IHOs, parents and/or their representatives, and school district personnel.

On days that there are considerable number of hearing matters on the NYCIHO calendar, there is an insufficient number of tables and chairs to accommodate everyone in the lunch room, in part, because of the space taken up by the reassigned teachers.[88]  Overflow spills into the hallway.[89]  Milling around in the hallways and near hearing rooms was observed.

Security concerns regarding the reassigned teachers were brought to the reviewer's attention, with women feeling most vulnerable.  No specific incidents were reported but all who spoke with the reviewer were judged to be sincere in their concerns.

School safety officers patrol the second floor.[90]  This was observed by the reviewer.  Near the main entrance to the second floor sits a security desk.  However, in the four days that the reviewer was onsite, the desk was unmanned on three of the four days and for a limited time on the fourth.

There is no designated area on the second floor for parent attorneys/advocates to have confidential discussion with their clients.[91]  Attorneys were observed having discussions with their clients in the lunch room, hallway, and stairwells within earshot of others.  The need for privacy to have confidential discussions with clients has been brought to the attention of the Hearing Room Coordinator.[92]  IHOs have requested of the Deputy Chief Administrator confidential space for themselves and for parent attorneys.[93]

*3.*     *Budget and Availability of Funds*

The cost of operating the NYCIHO is considerable.  IHO compensation accounts for two-thirds of hearing related expenses.  Transcription services account for 30% of hearing related expenses.  (*See* Figure 10.)

---

[87] Interestingly, by day two of the site visit, it was apparent to the reviewer that preferred tables were "claimed."

[88] Discussion with IHOs; Interview of Hearing Room Coordinator; Reviewer Observation.

[89] *Id.*  It was also reported that that there is no cell service in the lunchroom, which may explain why some individuals find their way into the hallway.  (Discussion with IHO.)

[90] Interview of Deputy Chief Administrator.

[91] Interviews of Hearing Room Coordinator and Deputy Chief Administrator; Discussions with IHOs.

[92] Interview of Hearing Room Coordinator.

[93] Interview of Deputy Chief Administrator; Discussions with IHOs.

Hyman Decl.  Ex. U- 27

**Figure 10**[94]
**Hearing Related Expenses − FY 17, 18, and 19**

| FISCAL YEAR | 2017 | 2018 | 2019 (as of 11/30/18) |
|---|---|---|---|
| PRINT SHOP | $10,993 | $39,000 | $23,163 |
| HEARING OFFICERS | $3,873,780 | $4,204,635 | $3,429,716 |
| TRANSCRIPTS | $1,873,481 | $1,647,816 | $1,525,651 |
| TRANSLATION SERVICES | $153,626 | $168,506 | $171,771 |
| **TOTAL** | **$5,911,880** | **$6,059,957** | **$5,150,301** |

Payment amounts to IHOs vary, with most IHOs billing $100k or less and few exceeding $150k.  (*See* Figure 11.)

**Figure 11**[95]
**IHO Payments**

| PAYMENT RANGE (in thousands) | FY 18 | FY 17 | FY 16 |
|---|---|---|---|
| **0-50** | 32 | 39 | 54 |
| **51-100** | 26 | 24 | 16 |
| **101-150** | 10 | 8 | 7 |
| **151-200** | 3 | 3 | 0 |

"Funds do run out" during the fiscal year, and the NYCIHO seeks additional allocations of money.[96]  In FY 2018 alone, there were two reported lapses in payments exceeding a few months.[97]  These lapses have resulted in IHOs taking themselves off rotation or declining appointments of cases.[98]

---

[94] The data points in Figure 10 were provided by NYCIHO.

[95] These data points were provided by the NYCDOE and were current as of November 29, 2018.  Payments are not apportioned to the fiscal year in which the work is completed but, rather, to when invoices were presented and paid.  Interview of Accounting Clerk, NYCDOE.

[96] Interview of Accounting Clerk.  *See also* Email Correspondence from Chief Administrator, NYCIHO, to Cathryn Tisenchek, Supervisor, Office of Special Education, NYSED (July 11, 2018) (on file with NYSED).

[97] Discussions with IHOs.  Interview of Chief Administrator, NYCIHO ("Typical wait 90 days.").

[98] Discussions with IHOs.

B.   <u>IHO Compensation Policy</u>

In 2001, New York State approved a *maximum* compensation rate for IHOs of $100 per hour for prehearing, hearing, and post-hearing activities.[99]   The IHO compensation rate has not been revised in 17 years.   The compensation rate is significantly lower than the attorneys who appear before the IHOs.[100]   An IHO with "impressive credentials" and "very experienced … in IDEA matters" can see a bump of 350% to their hourly rate (assuming the maximum rate of $100 is paid) simply by litigating IDEA cases rather than deciding them.[101]

SED's compensation rate policy does not prescribe with specificity a payment schedule.   Each school district is tasked with adopting a written policy for the selection and appointment of an IHO.[102]   There is no requirement for a detailed written policy.[103]

IHOs serving in New York City are not compensated on an hourly basis.   The NYCDOE has adopted a detailed compensation policy, last updated in FY 2014.[104]   The rates have remained unchanged since 1998.   The Compensation Policy sets forth a fee schedule of various IHO tasks that are compensable.   Fees are capped for each task.[105] Actual time invested relative to the undertaking is of no significance. [106]   The maximum number an IHO can bill per task per case is also capped.[107]   Travel and other expenses (e.g., postage) are not reimbursable.[108]

---

[99] Memorandum from Lawrence C. Gloeckler, to District Superintendents, et. al (August 2001), http://www.p12.nysed.gov/specialed/publications/policy/ihocompmemo.html, Accessed Jan. 17, 2019.  In New York State, pursuant to Education Law 4404, the Commissioner of Education establishes the maximum rates for IHO compensation *subject to* the approval of the Director of the Division of the Budget.  N.Y. EDUC. LAW Art. 89 § 4404(1)(c).

[100] *See, e.g.*, *M.K. v. Arlington Central Sch. Dist.*, 119 LRP 347 (S.D.N.Y. 2019) (finding that an hourly rate of $450 is reasonable for an attorney with "impressive credentials" and "very experienced … in IDEA matters").

[101] In *M.K.*, *supra*, IHO Barbara Ebenstein was awarded $450 per hour for work associated with the prosecution of an impartial hearing under IDEA.  The court noted IHO Ebenstein's experience as a hearing officer to determine what a reasonable rate would be for someone with her experience.  *See id.*, n.5.

[102] 8 NYCRR § 200.2(b)(9).

[103] *Id.*

[104] *See* NYCDOE, Impartial Hearing Officer Compensation Policy (FY 2014) (on file with the NYCIHO) (Compensation Policy).

[105] *Id.*

[106] *See id.*

[107] *See, e.g.*, *id.* at 4 (entitlement to "*an* administrative fee"; cannot bill for "more than one … [prehearing conference] per case").

[108] *See* Compensation Policy at 6.

Other school districts in New York State compensate IHOs at an hourly rate of $100 and reimburse travel and other expenses.[109]  It is reported that IHOs are paid significantly more outside of New York City for comparable work performed in New York City.[110]  (*See* Figure 12.)

**Figure 12**[111]
**Invoice Comparisons**

|  | TOTAL HOURS BILLED | TRAVEL & EXPENSES, IF ANY | TOTAL AMOUNT BILLED | AMOUNT, IF BILLED TO NYC | PERCENT DECREASE |
|---|---|---|---|---|---|
| **SAMPLE 1** | 175.5 | $370.21 | $17,920.21 | $3460 | 81% |
| **SAMPLE 2** | 73.5 | 0 | $7350 | $1900 | 74% |
| **SAMPLE 3** | 30.7 | $511.89 | $3581.89 | $1190 | 67% |
| **SAMPLE 4** | 216.88 | 525 | $22,483 | $5300 | 76% |

The NYCIHO has held internal meetings to review the Compensation Policy and has submitted proposed revisions to "upper management."[112]  Management has "denied" these requests.[113]

The NYCIHO does not compensate IHOs for performing functions essential to the efficient and timely administration of due process complaints, including:

- Conducting more than one prehearing conference per case, unless the due process complaint has been amended.[114]
- Drafting a written summary of the prehearing conference.[115]
- Conducting status conferences.[116]

---

[109] Discussions with IHOs; review of various invoices for services rendered by an IHO (on file with reviewer).

[110] Discussions with IHOs; review of a sampling of invoices submitted by IHOs for work performed *outside* of New York City delineating what the payment would have been if the work had been performed in New York City.

[111] The data points were provided by IHOs who voluntarily submitted their invoices to the reviewer for review.  For purposes of this illustration, the accuracy of the invoices is assumed.  It is not known whether the amounts billed were actually paid. The hourly rate billed in all three sample invoices for the work performed was $100 per hour.

[112] Interviews of Claims Processor, Appeals Processor, Accounting Clerk, and Operations Manager.

[113] Interview of Operations Manager.

[114] *See* Compensation Policy at 4.

[115] *See id.* at 6.

[116] *See id.* at 5.

Hyman Decl.  Ex. U- 30

- Drafting interim orders on any other matter other than pendency, sufficiency, and consolidation.[117]
- Reviewing transcripts and legal memoranda submitted by the parties.[118]
- Certifying the record[119]

"Soft policies" have resulted in the NYCIHO not following the Compensation Policy as written. [120]  These "soft policies" are not published, resulting in varying billing practices amongst IHOs.[121]

Inadequate compensation has resulted in IHOs engaging in widespread practices that are inconsistent with appropriate, standard legal practice and best practices,[122] including:

---

[117] *See id*. at 6.  There are many other matters handled by IHOs that may necessitate, or even require, the issuance of an interim, written order, including: requests for extensions of the timeline; appointment of a guardian *ad litem*; requests for independent educational evaluations; and, resolving disputes relating to evidentiary matters, subpoenas, and the statute of limitations.

[118] *See id*. at 5.  The review of transcripts is only compensated upon appointment to a case that was already in progress and previously assigned to another IHO or remanded to the same IHO after an appeal.  *Id*.

[119] *See*, *generally*, Compensation Policy.  The NYCIHO takes the position that the Administrative Fee of $100 covers the cost of certifying the record.  (Interview of Accounting Clerk.)  The Administrative Fee, however, simply covers the cost of transmitting the record.  *See* Compensation Policy at 4.  Transmittal of the record is not the same as certifying the record.  *See* 8 NYCRR § 200.5(j)(5) ("After a final decision has been rendered, the [IHO] shall promptly transmit the record to the school district *together with a certification* of the materials included in the record") (emphasis added).

[120] Interview of Accounting Clerk; Discussions with IHOs.  In a written statement dated December 12, 2018, the NYCIHO informed the reviewer that it "follows the pay policy as it is written…."  (New York City Response to SED (December 12, 2018) (on file with reviewer).)  The accuracy of this statement is not substantiated.  Accounting Clerk credibly acknowledged that the NYCIHO has adopted "soft policies" allowing for additional compensation beyond what is written in the Compensation Policy. Accounting Clerk offered three examples.  An IHO is compensated for more than three (3) hearings per day at an additional fee of $100 per case even though the Compensation Policy limits compensation to no more than three (3) cases per day at a maximum total fee of $300.  IHOs are also compensated for an unlimited number of adjournments per case.  The Compensation Policy limits the number of adjournments to one (1) per case. Finally, an IHO is paid an administrative fee of $100 per case even if the IHO declines the case after appointment for a reason other than a conflict of interest.  The Compensation Policy indicates that an administrative fee would not be paid "for any reason other than a conflict of interest" or where the IHO is "appointed in error (i.e., invalid case, keystroke/data entry error)."  Accounting Clerk's representation is credited as confirmed in discussions with IHOs.

[121] Discussions with IHOs.

[122] Discussions with IHOs and party representatives.

- low incidence of prehearing conferences;
- premising their acceptance of an appointment on the nature of the due process complaint and/or the parent representative;
- scheduling non-consecutive hearing days over multiple months;
- scheduling multiple matters on the same day to increase the amount that can be billed on a per day basis;[123]
- writing decisions differently than outside of New York City;[124]
- not issuing interim orders for which there is no compensation, including interim orders on requests for extensions of the timeline;
- deciding prehearing matters during the actual hearing (e.g., whether the statute of limitations applies)

C.    Insufficient Number of Hearing Rooms

The number of available hearing rooms (11, including Room 202C) is insufficient to accommodate the number of hearing matters scheduled daily on the calendar. (*See* Figure 4.) The NYCIHO has engaged in a practice of either capping the number of hearing matters that can be scheduled on particular dates or asking IHOs to reschedule hearing matters that are already scheduled on the calendar to other days.[125]

---

[123] For example, the maximum fee for one full-day of hearing for the same case is $300 billed as an "H1." *See* Compensation Policy at 5. Multiple cases, however, can be heard in one day. An IHO, therefore, can schedule eight (8) cases for one day and bill each as an "H3," per "soft policy," which commands $100 per case fee for a total of $800. *See id.* Alternatively, an IHO can schedule a combination of pendency hearings and hearings and increase the total amount s/he can bill for the day. For example, on one of the days this reviewer was onsite at the NYCIHO, one IHO held seven (7) pendency hearings and two (2) hearings, allowing the IHO to bill a *minimum* of $2100. (An additional fee of $150 is paid for each pendency order issued by an IHO.) There is an apparent financial incentive to schedule multiple matters in one day over one full-day of hearing.

[124] An IHO candidly shared, "I write New York City decisions differently than cases upstate ... beautiful job upstate, good job in New York City." Discussion with IHO.

[125] *See*, *e.g.*, Email Correspondence from System Administrator, NYCIHO, to Unknown (August 8, 2017) (on file with NYCIHO) (advising that, due to the number of hearings scheduled for Wednesday, August 9, 2017, the NYCIHO is "unable to add-on any additional hearings" to the calendar); Email Correspondence from System Administrator, NYCIHO, to Unknown (October 9, 2018) (on file with NYCIHO) (advising that, due to the number of hearing scheduled for Thursday, October 11, 2018, the NYCIHO is "unable to add-on any additional hearings" to the calendar); Email Correspondence from System Administrator, NYCIHO, to Unknown (October 9, 2018) (on file with NYCIHO) (asking that, due to the number of hearings scheduled for October 18, 2018, if it is "all possible ... to move a few ... hearing[s] from Thursday to Friday).

The lack of an adequate number of rooms has resulted in prolonged delays (e.g., two-plus hours) in commencing hearings on time.[126]  Hearing room assignments are on a first come, first served basis when there are more hearing matters scheduled for an appointed time than there are available hearing rooms.[127]  As hearing rooms become available, cases are called and assigned hearing rooms.[128]

These prolonged delays have resulted in parties losing witnesses, feeling rushed to complete the presentation of their case, and having to reschedule cases to another day because of IHO time constraints.[129]  At least one IHO reported that, in the absence of a "special situation," the school district is given no "more than 30 minutes beyond the scheduled time to provide … a room or else [the IHO] default[s] the school district."[130]

D.   <u>Insufficient Number of School District Representatives</u>

Three separate offices represent the interests of the NYCDOE before the NYCIHO.  They are the Special Education Unit of the Office of the General Counsel (SEU), the Impartial Hearing Representation Office (IHRO), and the Committees on Special Education (CSE).[131]  Each has responsibility for due process complaints filed in assigned community school districts and/or committees on special education.[132]

The IHRO and the CSE each has approximately 20 school district representatives available to appear at impartial hearings.  The SEU has 62 attorneys of which approximately 35 of them oversee free appropriate public education matters, including representing the NYCDOE in due process hearings.[133]  Availability of an adequate number of school district representatives to cover calendared cases has resulted in hearing delays.[134]  School district representatives are scheduled to appear in multiple cases at the same time, making their availability difficult.[135]

---

[126] Discussions with IHOs and party representatives.

[127] Interview of Hearing Room Coordinator.

[128] *Id.*

[129] Discussions with party representatives.

[130] Written correspondence from IHO.

[131] Interviews of representatives from each of these NYCDOE offices.

[132] *Id.*  The SEU has responsibility for due process complaints filed from committee on special education 9.  The IHRO has responsibility for due process complaints filed from community school districts 1 through 32, District 75, and committee on special education 1.  The CSE has responsibility for due process complaints filed from committees on special education 2 through 8 and 10.  *Id.*

[133] Interviews of representatives from each of these NYCDOE offices.

[134] Discussions with IHOs, parent representatives; Interview of Hearing Room Coordinator.

[135] *Id.* For example, committee on special education 7 processes between 1200 and 1400 due process complaints per year.  (Interview of Executive Director and Senior Policy Advisor.)  Only 4 individuals, however, represent committee on special education 7 in impartial hearings.  (*Id.*) In three of the four days this reviewer was onsite at the NYCIHO, committee on special education 7 had 24, 31, and 32 hearing matters

E.     Appointment and Recusal

    In FY 2018, there were 71 IHOs listed on New York City's rotational appointment list.[136]  The high volume of due process complaints, however, has resulted in many going off list as temporarily unavailable for new appointments, resulting in an inadequate number of available hearing officers to absorb any new complaint filings and to be reassigned cases in which the appointed IHO declined appointment.[137]  The failure to have an adequate number of available IHOs impedes the timely administration of due process complaints.[138]

    The number of recusals in New York City is a significant impairment to the timely adjudication of due process complaints.  Each instance of recusal reviewed by the reviewer resulted in several months of delays.  (*See* Figure 13.)

---

scheduled, respectively. (Review of Scheduled Hearings calendars provided by the NYCIHO.)

    [136] *See* NYCDOE, FY18 – FY14 [sic] Hearing Officer Payments document (November 29, 2018) (on file with the NYCDOE).  This number has remained fairly constant.  In FY 2017 and FY 2016, there were 74 and 77 IHOs listed, respectively.  *Id.*

    [137] *See*, *e.g.*, Email Correspondence from Operations Manager, NYCIHO, to Chief Administrator, NYCIHO (January 4, 2019) (on file with SED) (explaining that 20 IHOs in rotation with 435 recusal requests to process and approximately 30 new complaints filed); Email Correspondence from Cathryn Tisenchek, Supervisor, SED, to Joanne LaCrosse, Coordinator, Office of Special Education, SED (January 18, 2019) (on file with SED) (explaining that 13 IHOs in rotation with 300 recusal requests to process and approximately 59 new complaints filed).

    [138] Email Correspondence from Cathryn Tisenchek, Supervisor, SED, to Joanne LaCrosse, Coordinator, Office of Special Education, SED (January 18, 2019) (advising that, as of January 18, 2019, there were 1670 late cases in New York State; 1645 of those cases were in New York City).

**Figure 13**[139]
**Delays Caused by Recusals**

| CASE STUDY 1 | An expedited due process complaint is filed in March.  Student was suspended from school.  Multiple IHOs recuse.  An IHO finally accepts appointment in June.  Expedited hearing scheduled for July after required statutory timelines for an expedited hearing had lapsed.  By the time due process complaint was heard, student had served entirety of suspension, depriving student of right to challenge exclusion from school. |
|---|---|
| CASE STUDY 2 | A due process complaint is filed in mid-August.  30-day resolution period expired in mid-September and parties informed by NYCIHO that IHO will schedule hearing. However, IHO never communicates directly with parties and in mid-November, after unilaterally extending timeline, scheduled hearing for February. |
| CASE STUDY 3 | A due process complaint is filed in June.  Resolution period expired in July.  As of August, seven IHOs had recused and IHO had not been appointed. |

In New York City, IHOs are appointed automatically without first confirming their availability.[140]  New York City does not impose any time limitation by when an IHO must recuse him/herself for lack of availability.[141]  The primary reason for recusals in New York City is the "unavailability" of the IHO.[142]

F.    Extensions

The validity of reported timeliness in New York City cannot be assumed.

Prevalent practice in New York City is to extend the timeline without a written order meeting the requirements of 8 NYCRR § 200.5(j)(5).[143]  This is so, in part, because in New York City, IHOs are not compensated for interim orders on case extensions.[144]

---

[139] Information, including supporting documentation, provided by parent representatives.  Descriptions purposely kept vague to protect against specific cases being identified.

[140] Interview of Claims Processor.  *See also* Letter from Cathryn Tisenshek, Supervisor, Office of Special Education, SED, to Chief Administrator, NYCIHO (July 28, 2017) (on file with SED) (requiring the NYCIHO to discontinue the practice of appointing an IHO to a due process complaint without first confirming availability).

[141] *Id.*

[142] Discussions with IHOs; review of data provided by SED listing recusal reasons by IHO in calendar years 2017 and 2018 (on file with SED).

[143] Interview of Appeals Processor; Discussion with IHOs.

[144] Interview of Operations Manager.  *See also* Compensation Policy.

Consequently, case extensions are primarily documented through the use of the Case Follow-Up Sheet (CFUS).[145]  The CFUS is not intended to be an extension order.[146]

Incidences of IHOs unilaterally extending timelines (or extending presumably at the request of one party but without consulting the other party) or soliciting extensions from the parties were reported during the review.[147]

G.    Decision Processing

The ability of an IHO to issue a hearing decision or order directly to the parties is "frowned" upon by the NYCIHO.[148]  The NYCIHO directs IHOs not to directly issue their own hearing decisions and orders.[149]

There are three (3) Decision Processors in the NYCIHO, one of which splits her time with evidence processing.[150]  Decision Processors process hearing decisions and orders.[151]  There is no written guidance by when IHOs are expected to submit their hearing decisions and orders to the Decision Processors to allow processing prior to the compliance date.[152]  Decision Processors "have been told" they have seven (7) days to process hearing decisions and five (5) days to process pendency and other interim orders.[153]  IHOs regularly submit their hearing decisions and orders in fewer than seven

---

[145] Interviews of Operations Manager, Appeals Processor, and Case Non-Compliance Support; Discussions with IHOs.  The CFUS is a "data processing sheet" that all IHOs are required to submit in a variety of circumstances, including each time an extension is requested.  (Interview of Appeals Processor.)  (A CFUS is also required when a prehearing conference, pendency hearing, and hearing is scheduled, as well as when a case is withdrawn or dismissed.  *See* NYCIHO Case Follow-Up Sheet (Revised December 4, 2014) (on file with the NYCIHO)).

[146] Interview of Appeals Processor.  It is noted that a number of IHOs have modified the CFUS form to list the cumulative impact factors found in 8 NYCRR § 200.5(j)(5)(ii).  Simply listing the factors on the CFUS form does not meet the regulatory requirements of 8 NYCRR § 200.5(j)(5).  *See* 8 NYCRR § 200.5(j)(5)(iv).

[147] Discussions with parent representatives; Interviews of SEU and IHRO representatives.

[148] Discussion with IHO.  *See also* Email from Chief Administrator, NYCDOE, to Cathryn Tisenchek, Supervisor, Office of Special Education, SED (December 8, 2018) (on file with SED) ("[A]re they instructed to inform the parties that only orders by my office should be deemed official?").

[149] NYCIHO New Hire Training, Attended November 20, 2018; Interview of Decision Processor, NYCDOE.  *See also* SOPM at 18 ("The [NYCIHO] formats and distributes decisions on behalf of Hearing Officers.").

[150] Interview of Decision Processor.

[151] *Id.*

[152] *Id.*

[153] *Id.*

(7) and five (5) days, respectively, and, "often," hearing decisions are received for processing on the actual compliance date.[154]

Staffing allowance, volume of cases, and lack of written guidance by when hearing decisions and orders are to be submitted prior to the compliance date impedes the ability of the NYCIHO to meet statutory and regulatory timeline requirements.

## V.   DUE PROCESS IMPLICATIONS

The primacy of a special education due process hearing system is to ensure that the substantive rights of the parties are protected.  Any shortcomings of the system can lead to denials of due process.  This review identified process failures that impinge upon the ability of the parties to adequately exercise their due process rights.

A.   Physical Space

*1.   Inadequate Number of Hearing Rooms*

The number of available hearing rooms is inadequate to meet the demands of the hearing calendar – 11 hearing rooms is simply not enough, when on average in the past two school years, there have been over 100 matters on the calendar per day.  Both IHOs and parties should reasonably expect that proceedings will begin promptly at their appointed time.  Keeping IHOs and parties waiting until hearing rooms become available has real implications to the administration of due process:  witnesses are lost, parties are made to rush through the presentation of their cases, and cases are adjourned delaying their timely completion.

Assignment of hearing rooms should not be based on who is able to out-sprint the others and arrive first to the NYCIHO.

*2.   Poor Ventilation / Temperature Control*

Ventilation and heating/cooling concerns have largely gone unaddressed.  In 2014, SED requested of the NYCDOE that it take timely action to ensure appropriate ventilation and temperature control in the hearing rooms.  It did not, and parties continue to choose between exercising their due process rights and being uncomfortable (because it's too cold or too hot), their health,[155] or confidentiality (by keeping doors open during hearing proceedings).

---

[154] *Id.*

[155] An IHO, for example, reported that a hearing had to be canceled after an attorney showed up with a stomach virus that everyone else in the "small, unventilated room was afraid to catch."  (Written feedback from IHO.)

Hyman Decl.  Ex. U- 37

3.    *Unkempt Hearing Rooms*

Poor cleanliness of the hearing rooms erodes respect for and public confidence in the hearing system and demeans the importance of the proceedings.  As one IHO put it, the "abject lack of dignity in the environment … impacts … the parties' perception of the integrity of the proceedings."[156]  And, this assessment may hold true.  Parties describe the hearing rooms as "not a great space" and "dark, dingy, and unpleasant."[157]

4.    *Confidentiality Breaches*

a.    *Open Doors*

The poor ventilation/temperature control in the hearing rooms has resulted in a growing but long-standing practice of hearing proceedings moving forward with doors open.[158]  This is a clear violation of IDEA and FERPA's confidentiality requirements.[159]  While IHOs have ultimate responsibility to ensure the confidentiality of hearing proceedings by keeping doors closed during the proceedings, the NYCDOE/NYCIHO's continued failure to address the poor ventilation/temperature control concerns has legitimized the wrongdoing.  The presence of individuals milling around in the hallway because of an overfilled lunch room makes matters worse.

b.    *Poor/Non-Existent Insulation*

An equally concerning matter is the absence of adequate insulation to prevent the sound bleeds between rooms.  In some respects, the sound bleeds are worse than the open doors.  When the doors are open, the parties are aware of the absence of confidentiality.  On the other hand, when doors are closed, there is an expectation of privacy.  In reality, however, depending on the hearing room, discussions can be overheard in the adjacent room.

c.    *Storing Evidence in Room 202C*

The willingness of the NYCIHO to allow IHOs to store evidence of pending hearings in the hearing office is commendable.  It is a "perk" that avoids the schlepping of hearing files back and forth from an IHO's office or home in cases with multiple hearing days.  Nonetheless, keeping these files in unlocked cabinets that are accessible to other litigants, IHOs, and individuals not associated with the particular cases, is inconsistent with the confidentiality requirements in IDEA and FERPA and can lead to impermissible disclosure of personally identifiable information of students.

---

[156] Written feedback from IHO.

[157] Discussions with party representatives.

[158] In 2014, SED informed the NYCDOE of its concerns regarding the open doors. *See* Letter to Executive Director at 2.

[159] *See* 34 C.F.R. 300.623; 34 C.F.R. 99.30.

Hyman Decl.  Ex. U- 38

5.    *Lack of Amenities*

Though hearing rooms have the basic essentials for the conduct of hearings (i.e., conference tables, chairs, and telephones), the rooms do not include other important amenities, like computers and access to printers.  Use of a copier is restricted to NYCIHO personnel and IHOs.  The lack of access to computers, printers, and a copier (that parties can also use) has resulted in delays to hearing proceedings and inhibits the ability of IHOs and the parties to gain quick access without prolonged delays to information that is digitally stored and readily accessible online.

6.    *Inadequate Waiting Area*

The lunch room presents as an uncomfortable and unprofessional setting. Hearing participants should not need to vie for coveted seats, much less fear for their safety, while waiting for their hearings to start.  The lack of visible security is concerning.

The absence of a designated area for parent attorneys/advocates to have confidential discussions with their clients hinders the right of parents to be "accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities."[160]  IDEA hearings are legal proceedings.  The ability of parents to be able to privately confer with their chosen representatives during the course of hearings is important.

B.    <u>Payments and Compensation</u>

1.    *Payment Delays*

Payment delays of IHO invoices is a frequent occurrence and happen without notice to the IHOs.[161]  In 2018 alone, for example, there were two reported lapses, each lasting several months.[162]  In July 2018, the NYCIHO had over $2 million dollars of unpaid IHO invoices.[163]  These payment delays have resulted in IHOs taking themselves off rotation, declining appointments of cases, or seeking other work, leaving an

---

[160] 34 C.F.R. § 300.512.  The same is true for school district personnel that is being represented by an attorney from the SEU.  However, unlike parents who are without any options, school district personnel and SEU attorneys can access other NYCDOE offices in the building, including the IHRO and the Committee on Special Education 8.

[161] Email Correspondence from Cathryn Tisenchek, Supervisor, Office of Special Education, NYSED, to Chief Administrator, NYCIHO (July 11, 2018) (on file with NYSED).

[162] Discussions with IHOs.

[163] Email Correspondence from Chief Administrator, NYCIHO, to Cathryn Tisenchek, Supervisor, Office of Special Education, NYSED (July 11, 2018) (on file with NYSED).

insufficient number of IHOs to adequately and timely manage any new due process complaint filings.

2.      *IHO Compensation*

New York State's maximum $100 rate for IHO services is not in keeping with prevailing community rates for legal services rendered by attorneys who appear before IHOs.[164]  Worse, New York City does not compensate on an hourly basis whatever, opting for a fee schedule that compensates IHOs per task at rates that are not commensurate with the awesome responsibilities that they have undertaken.  The rates have remained unchanged for 20+ years.  For example, the hearing rate of $300 per day in New York City effectively pays IHOs $40 per hour.[165]  The same hearing officers, however, would be paid $100 per hour in surrounding counties for the same work.  The $40 per hour effective rate is not an appropriate compensation rate for individuals required to be licensed attorneys and highly trained.[166]  IDEA hearings have grown in complexity in the past 20+ years.  What had been a brief administrative hearing is now more litigious with increased legal complexity.

IHOs do, and must, wisely exercise broad authority in their handling of the hearing process.  The IDEA and its implementing regulations delineate the specific rights accorded to any party to a due process hearing.[167]  The IHO is charged with the specific responsibility "to accord each party a meaningful opportunity to exercise these rights during the course of the hearing."[168]  It is further expected that the IHO "ensure that the due process hearing serves as an effective mechanism for resolving disputes between parents" and the school district.[169]  In this regard, apart from the hearing rights set forth in IDEA and the regulations, "decisions regarding the conduct of [IDEA] due process hearings are left to the discretion of the [IHO]," subject to appellate review.[170]

The use of interim orders is an effective tool to managing the process.  Yet, in New York City, IHOs are not compensated for writing interim orders (other than pendency, sufficiency, and consolidation) or for performing functions essential to the efficient and timely administration of due process complaints.[171]  This is simply

---

[164] *See* Footnotes 100 and 101 and accompanying text, *supra*.

[165] Prior to October 1, 2001, New York State had a maximum compensation rate of $40 per hour, not to exceed $300 per day for a 7.5-hour day.  Memorandum from Lawrence C. Gloeckler, to District Superintendents, et. al (August 2001), http://www.p12.nysed.gov/specialed/publications/policy/ihocompmemo.html, Accessed Jan. 17, 2019.

[166] In addition to an initial 40-hour training program, IHOs must participate in one (1) full-day onsite training program and three (3) two-hour webinar programs on an annual basis.  *See* 8 NYCRR §§ 200.1(x)(4)(i) and (ii).

[167] *See* 34 C.F.R. § 300.512.

[168] *Letter to Anonymous*, 23 IDELR 1073 (OSEP 1995).

[169] *Id.*

[170] *Id.*

[171] *See* Footnotes 114 through 119 and accompanying text, *supra*.

inconsistent with appropriate, standard legal practice, which the IDEA mandates. Anything less than what IDEA mandates, denies the parties due process.

Similarly, the lack of adequate compensation for prehearing conferences is the primary reason given by most IHOs for why they do not conduct prehearing conferences in New York City.[172]  An IHO in New York City is compensated a one-time fee per case of $40 for conducting a prehearing conference.  There is no compensation for writing the follow-up summary and order.  Best practice, however, is for IHOs to hold prehearing conferences in every case to discuss the important matters listed at 8 NYCRR § 200.5(j)(3)(xi), including "simplifying or clarifying the issues" for hearing.  Yet, the Compensation Policy financially discourages IHOs from conducting prehearing conferences and issuing prehearing orders, depriving the parties of effectively engaging with IHOs in addressing essential matters in advance of the hearing.[173]

Inadequate compensation is also to blame for decisions that do not reflect appropriate, standard legal practice.[174]  The Compensation Policy allows for one $300 payment for decision writing per case,[175]  with additional decision-writing-day-payments of $300 per day but only for subsequent hearing days lasting longer than four (4) hours.[176]  Compensating for decision writing based on a flat rate of $300 and the

---

[172] A prehearing conference is not required in New York State.  It is discretionary with the hearing officer.  *See* 8 NYCRR § 200.5(j)(3)(xi) ("A prehearing conference with the parties *may* be scheduled.") (Emphasis added.).

[173] For the unrepresented parent (i.e., the *pro se*), the lack of a prehearing conference can have devastating consequences to the parent's ability to exercise the right to due process.  It cannot be over emphasized that for many reasons the prehearing conference is usually the most important strategy an IHO can use to help the unrepresented parent understand and navigate the hearing process.

[174] Pursuant to the IDEA, IHOs must "possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice."  34 C.F.R. § 300.511(c)(1)(iv).  More specifically, and consistent with appropriate, standard legal practice, a well-written decision would include the following basic components:  (i) the specific issues to be decided; (ii) the facts determined to be relevant and relied upon to decide the identified issue(s) (i.e., findings of fact); (iii) the applicable legal standard for each disputed issue and a discussion that applies the law to the facts (i.e., conclusions of law); and, (iv) a simple, concise and comprehensible order that precisely defines for the parties the next steps, if any, to be taken, by whom, and by when.  Early on, in consultation with SED, the training entity responsible for providing professional development programs to IHOs on a yearly basis, identified decision writing as an area in need of improvement.  (This was determined, in part, by an independent review by the training entity of various sample decisions written by New York State IHOs.)  Accordingly, in the past seven (7) years, SED has invested considerable time in training IHOs in writing thorough and well-reasoned decisions, with particular emphasis on the care that should be given to the preparation and presentation of the written decisions consistent with appropriate, standard legal practice.

[175] *See* Compensation Policy at 6.

[176] *Id.*

41

length of the hearing rather than on the actual time needed to write a thorough, careful, and well-reasoned decision is inadequate and fails to take into consideration that some cases are more complex than others and require a greater investment of time. Also, a substandard decision can result in the hearing process being viewed by the losing party as unfair and the outcome suspect, increasing the likelihood of an appeal,[177] not to mention the potential continuing deprivation of appropriate education to the student. And, the State review officer and courts, on appeal, will deem them worthy of little, if any deference.[178]

In all, the Compensation Policy does not reflect the reality of the work that IHOs are required to do, "resulting in IHOs having to figure out ways to do their work in order to end up being compensated fairly."[179]  This includes vetting  cases to refuse appointment of cases with perceived difficult attorneys, complex due process complaints, and *pro so* litigants, who command significantly more of the IHO's time than a represented parent.

C.     School District Representatives

*1.     Limited Number of School District Representatives*

Though New York City is not expected to have as many school district representatives as there are due process complaints filed, the current configuration is wholly inadequate to credibly respond to the school district's daily hearing obligations. IHOs and parents alike have been required to wait for school district representatives that are tied up in other hearing matters, resulting in unnecessary delays.

D.     Hearing Process

*1.     Timely Appointment of IHOs and Subsequent Recusals*

In New York State, upon receipt of the due process complaint, an IHO must be immediately appointed to the case but, in no event, later than two business days of the school district receiving the complaint.[180]  Appointment of an IHO is essential, and the

---

[177] C. Thibaut and L. Walker, Procedural Justice: A Psychological Analysis (Hillsdale, NJ: Lawrence Erlbaum, 1975).

[178] *See Walczak v. Florida U.F.S.D.*, 142 F. 3d 119, 27 IDELR 1135 (2d Cir. 1998) ("Deference is particularly appropriate when … the state hearing officers' review has been thorough and careful.").  *See also P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 66 IDELR 122 (2017) (declining to defer to the IHO decision because it was "rambling, incomplete …, [and] frankly an embarrassment," and directing the school district to send a copy of the judge's decision and the IHO decision "to the NYSED official responsible for certification of IHOs).

[179] Discussions with IHOs.

[180] 8 NYCRR § 200.5(j)(3)(i)(a).

State must maintain a list of individuals who are qualified to conduct hearings and render and write decisions in accordance with appropriate, standard legal practice.[181]

The IDEA does not regulate the manner by which an IHO is selected and appointed to a due process hearing. This function is left to the State to decide. New York State has elected a rotation selection process:

> Appointment of [IHOs] ... shall be made only from such list and in accordance with the rotation selection process .... Such names will be listed in alphabetical order. Selection from such list shall be made on a rotational basis beginning with the first name appearing after the impartial hearing officer who last served or, in the event no impartial hearing officer on the list has served, beginning with the first name appearing on such list. Should that impartial hearing officer decline appointment, or if, within 24 hours, the impartial hearing officer fails to respond or is unreachable after reasonable efforts by the district that are documented and can be independently verified, each successive impartial hearing officer whose name next appears on the list shall be offered appointment, until such appointment is accepted. The name of any newly certified impartial hearing officer who is available to serve in the district shall be inserted into the list in alphabetical order.[182]

An IHO may not be appointed to hearing unless s/he is available to make a determination of sufficiency within five (5) days of receiving the notice of insufficiency and to initiate the hearing within 14 calendar days of the applicable time period.[183]

New York City's practice of automatically appointing an IHO to a due process complaint without first confirming his/her availability is inconsistent with the regulatory requirement in 8 NYCRR § 200.2(e)(1)(ii). Further, the failure of New York City to set a time limitation by when an IHO must inform the NYCIHO of his/her unavailability, risks that the hearing decision in the case is not issued within the 45-day timeline. Moreover, because an IHO is appointed without first confirming his/her availability, the IHO is unnecessarily provided with personally identifiable information of the student and is impermissibly allowed to vet the due process complaint before deciding whether to accept the appointment.

Unavailability of IHOs is the primary reason for the high number of recusals in New York City. Each instance of recusal results in delays to the hearing timeline, with a growing number of cases having multiple recusals and extending out by several months.

2.      *Questionable Extensions*

The prevalent practice in New York City of extending hearing timelines without written orders that meet the requirement of 8 NYCRR § 200.5(j)(5) thwarts SED's ability to effectively monitor the timelines. It is more likely than not that New York City

---

[181] *See* 34 C.F.R. § 300.511(c)(3).
[182] 8 NYCRR § 200.2(e)(1)(ii).
[183] 8 NYCRR § 200.5(j)(3)(i)(b).

Hyman Decl.  Ex. U- 43

has a greater number of untimely cases than reported and that the incidence of IHOs unilaterally extending timelines or soliciting extensions from parties is considerable.

*3.      Decision Processing*

Requiring that IHOs submit their hearing decisions and orders for processing and distribution to the parties is resulting in numerous hearing decisions and orders being issued after the compliance date.  Processing includes making minor adjustments to the fonts and margins of each document and, for decisions, adding the caption, list of appearances per hearing day, and typing the list of evidence submitted by each party during the course of the hearing.  (IHOs can ask that their hearing decisions or orders be issued without formatting, but few do.)  The NYCIHO simply does not have the man power to timely process the many hearing decisions and orders that are generated in New York City.

## VI.    SED's AUTHORITY TO ENSURE COMPLIANCE

SED has general supervisory responsibility to *ensure* that each school district is meeting IDEA requirements.[184]  This extends to ensuring that each school district is, not only meeting State educational standards, *but also* other IDEA requirements, like due process.[185]  The authority to monitor and enforce systematic compliance with IDEA and State requirements requires follow through.

[T]he state's role amounts to more than creating and publishing some procedures and then waiting for the phone to ring.  The IDEA imposes on the state an overarching responsibility ....[186]

It's authority to follow through, is not limited.[187]

## VII.   RECOMMENDATIONS – FOR IMMEDIATE ACTION

Indeed, the process failures confirmed in this report are long-standing and allowed to fester with impunity.  Notwithstanding SED's efforts to "right the ship," New York City's hearing system is in rapid, continuing decline.  The problems are many.  And, though this report finds that the NYCIHO shares culpability, it is not entirely to blame – the NYCDOE's macro-level problems feed the NYCIHO's micro-level challenges.  Yet, though this helps to explain the process failures, it does not excuse them.

Change is needed.  Immediately.  And, though the larger NYCDOE is not the subject of this review, its cooperation is essential to SED's efforts to reform the hearing

---

[184] 20 U.S.C. § 1412(a)(11)(A).

[185] *See* 34 C.F.R. § 300.149(a)(2)(ii).

[186] *Cordero v. Commonwealth of Pennsylvania Dept. of Educ.*, 795 F. Supp. 1352, 18 IDELR 1099 (M.D. Pa. 1992).

[187] *See* 20 U.S.C. § 1412(a)(11); 34 C.F.R. § 300.608(b).

Hyman Decl.  Ex. U- 44

system in New York City.  Corrective action, therefore, should be directed to both the NYCDOE and the NYCIHO.

Recommendations follow.

A.    Physical Space

1.    *Expansion of the NYCIHO to Accommodate Additional Hearing Rooms*

The NYCDOE and NYCIHO should be required to expand the number of hearing rooms available.

Expansion will not be easy, given the space constraints on the second floor of 131 Livingston Street.  Nonetheless, the location of the NYCIHO should remain at 131 Livingston Street.  Its proximity to nine (9) subways lines makes it quite accessible for those traveling from surrounding areas.  Consideration, therefore, should be given to moving the IHRO and the two computer rooms to other locations and reconfiguring the floor plan to accommodate additional hearing rooms.  Administrative offices of the NYCIHO that are not essential to the administration of the actual hearings themselves on a day-to-day basis (e.g., file rooms, back-office personnel) should be relocated to other floors within the building.

2.    *Ventilation / Temperature Control*

The NYCDOE and NYCIHO should be required to conduct a comprehensive building condition and HVAC assessment of the second floor of 131 Livingston Street to determine how to improve ventilation in the hearing rooms and regulate temperature. Mini-split systems should be considered for windowless hearing rooms.  The existing window and portable air conditioning units should be replaced with quieter units that emit lower ambient white noise.

3.    *Cleanliness and Upkeep*

The NYCDOE and NYCIHO should be required to maintain the cleanliness and upkeep of the hearing office.  Hearing rooms should be decluttered of any unnecessary furniture.  Consideration of a fresh coat of paint is suggested.

4.    *Sound Proofing*

The NYCDOE and NYCIHO should be required to sound proof hearing rooms to eliminate sound bleeds between hearing rooms.

*5.    Access to Amenities*

The NYCDOE and NYCIHO should be required to equip all hearing rooms with computers attached to the internet and with network printing capabilities. Public access should be restricted, with IHOs being given individual login credentials. Parties should have limited access to a copier, as needed and as directed by IHOs.

*6.    Waiting Area and Access to Privacy*

The NYCDOE and NYCIHO should be required to relocate reassigned teachers to another site. A designated area to allow parents to speak privately with their attorneys/advocates, as needed, should be required and identified.

B.    Payments and Compensation

*1.    Prompt Payments*

The NYCDOE and NYCIHO should be required to allocate sufficient funds based on projected expenses based on prior expenditures and anticipated increases.

The NYCDOE and NYCIHO should further be required to review its IHO payment practices and make necessary changes to ensure that payments are made by no later than 30-calendar days from submission of invoices. Should late payments be anticipated, the NYCIHO should be required to have a process in place to inform IHOs of the reason for any late payments and the anticipated timeline by when payments will be made.

*2.    IHO Compensation*

SED should immediately determine the Compensation Policy to be inconsistent with New York State law and Policy 01-11 and require corrective action.

The NYCDOE and NYCIHO should be required to adopt a Compensation Policy that compensates IHOs for all prehearing, hearing, and post-hearing activities that are consistent with appropriate, standard legal and best practices, as determined by SED in consultation with experts in the field. The revised policy should, at a minimum, require payments for all conferences held (inclusive of an unlimited number of scheduling, prehearing and status conferences), interim orders issued, and essential administrative tasks (such as certification of the record). A reasonable hourly/fee for transcript review and decision writing should be established and payment should be commensurate with the work rendered.

Invoices should be subject to review and challenge, with SED establishing an independent review fast-track process that also permits the IHO to explain questioned tasks.

C.     School District Representatives

The NYCDOE and NYCIHO should be required to have, commensurate with the number calendared hearing matters, a sufficient and reasonable number of school district representatives available to appear in hearing proceedings.

D.     Hearing Process

1.     *Appointment of IHOs and Recusals*

The NYCDOE and NYCIHO should be required to submit a written plan to SED for review and approval regarding the IHO appointment process.  The plan should require the NYCIHO to first ascertain whether an IHO is available to make a determination of sufficiency and to initiate the hearing within 14 calendar days of the applicable time period.  Only then should an IHO be appointed to the complaint and recusal be limited to either a personal or professional interest of the IHO that would conflict with his or her objectivity, or an extenuating personal reason that subsequently makes the IHO unavailable.

SED should issue an advisory to IHOs on the New York City rotation list informing them that the appointment of an IHO who is listed as active will be presumed that s/he will accept the case unless the IHO confirms in writing, with detailed reasons provided, that s/he has either a personal or professional interest that conflicts with his or her objectivity, or s/he becomes unavailable because of a subsequent extenuating personal reason.  Any abuses to appointment process should be reported to SED for investigation and, if substantiated, disciplined.

2.     *Extensions*

SED should issue an advisory to IHOs on the New York City rotation list informing them that a written order that meets the requirements of 8 NYCRR § 200.5(j)(5) is required for each extension request.  The use of the CFUS form should be eliminated and IHOs should be permitted, and compensated for, uploading extension information, including the written order, into IHS by the compliance date or within two (2) business days of granting or denying the extension request, whichever is sooner.

3.     *Decision Processing*

SED should issue an advisory to IHOs on the New York City rotation list informing them that they are to directly issue all hearing decisions and orders within application timelines to the parties.  IHOs should be permitted, and compensated for, uploading the hearing decisions and written orders into IHS by the compliance date or within two (2) business days of issuing the hearing decision or written order, whichever is sooner.

Hyman Decl.  Ex. U- 47

4.     *Pendency Orders*

The NYCDOE and NYCIHO should be required to stop the ongoing practice of not maintaining a student's *uncontested* current educational placement absent a written order from an IHO.  Such practice violates IDEA, delays continued services to students, and increases litigation costs to parents unnecessarily.

## VIII.  ADDITIONAL CONSIDERATIONS

The evident failings in New York City hearing system will not be resolved alone simply by adopting the recommendations above.  It would be naïve to think so.  The larger NYCDOE must do its part to alleviate the stressors on the NYCIHO.  But this would require time.  Considerable time.  But, as mentioned above, though the NYCIHO is not entirely to blame, the pressures brought to bear on it do not excuse its affirmative responsibility to respond to the changing needs.  It has had time to do it – these process failures have been long in the making.  Its ability to effectuate meaningful and sustainable change on its own is uncertain.

And, therefore, SED should consider a system-wide, substantial restructuring of its hearing system.  Further consideration should be given to –

- transitioning from a two-tier to a one-tier hearing system;

- shifting to a contractual full-time IHO model, with provision for part-time IHOs for overflow during peak times or, in the alternative, establishing a uniform, *minimum* hourly rate commensurate with prevailing rates for prehearing, hearing, and post-hearing activities;

- establishing and implementing an IHO evaluation system, inclusive of review of work product;

- adding personnel to the Office of Special Education at SED – if not permanently, at least temporarily – to oversee the NYC due process system changes;

- expanding the systemic oversight of IHOs to include greater monitoring of work-product, technical assistance provided, and intervention and remediation, as needed;

- overhauling State regulations to align hearing procedures to best practices (e.g., mandating prehearing conferences; eliminating 30-day cap to hearing extensions);

- drafting a hearing manual of appropriate standard practices not specifically addressed in regulations; and,

- incorporating model forms and templates to increase uniformity.

## IX.   CONCLUSION

In short, this review confirms that the New York State hearing system is in crisis, particularly because of the number of due process complaint filings in New York City. Process failures in the NYCIHO complicate an already fragile system.  Much is needed.

President John F. Kennedy once said –

*There are costs and risks to a program of action.  But they are far less than the long-range risks and costs of comfortable inaction.*

To this reviewer, there is no doubt:  the time for decisive action is now.

Hyman Decl.  Ex. U- 49