# VERIFIED IMPROPER PRACTICE PETITION

| | | |
|---|---|---|
| **OFFICE OF COLLECTIVE BARGAINING**<br>100 GOLD STREET, SUITE 4800<br>NEW YORK, N.Y. 10038<br>MAILING ADDRESS: PECK SLIP STATION, P.O. BOX 1018<br>NEW YORK, NY 10038<br>PHONE: (212) 306-7160 FAX: (212) 306-7167 | Docket Number | **BCB-4408-20** |
| | Date Filed | **12-21-2020** |

**INSTRUCTIONS:** Consult the New York City Collective Bargaining Law, Chapter 3, Title 12 of the Administrative Code of the City of New York ("NYCCBL"), § 12-306, and the Rules of the Office of Collective Bargaining (Rules of the City of New York, Title 61, Chapter 1) ("OCB Rules"), § 1-07 and § 1-12. File original with OCB, including proof of service, and serve one copy on the designated agent for each Respondent.

## 1. PETITIONER INFORMATION

Name: Local 2, United Federation of Teachers, AFT, AFL-CIO

Address: 52 Broadway, New York, NY  10004

| | |
|---|---|
| Phone: (201) 207-8156 | Email: lori.smith@nysut.org |

## 2. RESPONDENT INFORMATION

Name: City of New York/Office of Administrative Trials and Hearings (OATH)

Address: 100 Church Street, 12th Floor, New York, NY 10007

| | |
|---|---|
| Phone: (212) 933-3003 | Email (optional): |

## 3. ADDITIONAL RESPONDENT (if applicable)

Name:

Address:

| | |
|---|---|
| Phone: | Email (optional): |

## 4. NATURE OF THE CONTROVERSY (failure to provide the following may result in delay or dismissal)

**(a)** List subsections of NYCCBL § 12-306 claimed to have been violated:  (a)1, 4 and 5

**(b) Using separate sheet(s) and numbered paragraphs, state in a clear and concise manner:** the facts, including names, dates, and particular actions constituting <u>each</u> violation. This statement may be supported by attachments but may not consist solely of such attachments. Attach each document as a separate exhibit and explain its relevance;
**(c)** Attach relevant sections of agreements, rules, or policies involved;
**(d)** Provide an explanation why these actions constitute violations of the NYCCBL subsections specified;
**(e)** State the relief sought.

## 5. VERIFICATION

STATE OF NEW YORK   )
COUNTY OF_____) SS.:

_____, being duly sworn deposes and says that (s)he is the petitioner above-named, or its representative, and that (s)he has read the above charge consisting of this and ___ additional pages, and is familiar with the facts alleged herein, which (s)he knows to be true, except as to those matters alleged upon information and belief, which matters (s)he believes to be true.

| | |
|---|---|
| _____ | _____ |
| Signature | Date |

Subscribed and sworn to before me

_____day of _____, 200___

_____
Signature of Notary

## DETAILS OF THE CHARGE

1. The Charging Party, the United Federation of Teachers, Local 2, AFL-CIO ("UFT" or the "Union") is an employee organization and exclusive bargaining representative of Hearing Officers (Per Session) ("HOPS") who preside over adjudications at the Office of Administrative Trials and Hearings ("OATH" of the "Employer") and are employed, in this capacity, by the Respondent City of New York.

2. On September 27, 2007, the UFT was certified by the Office of Collective Bargaining ("OCB") as the exclusive representative of the HOPS and subsequently entered into a collective bargaining agreement ("CBA"). The most recent agreement by and between the parties is annexed hereto as Exhibit "A".

### Unilateral Changes Instituted by the Employer
### Without Notice or Bargaining over Decision or Impact

3. In March 2020 OATH closed its offices due to the Covid-19 pandemic. Beginning around March 23, 2020, OATH began to have certain HOPS work remotely by telephone. Prior to March 2020, the substantial majority of hearings were held in person at the offices of OATH. Although there was a remote unit in the past it was very limited in scope and individuals who were called to work in March were not in the remote unit.

4. A limited number of HOPS have been called upon to work remotely. For example, from the period of March 23, 2020 through May 23, 2020 only around 33 HOPS were scheduled out of a roster of around 350. Moreover, for the period of March 23, 2020 through May 23, 2020 the established practice concerning submission of schedules was not observed and the criteria for selecting these HOPS, and continuing to the present, was said to be based on "agency need" without any description of the qualifications required to meet "agency need" despite requests for further information regarding this issue.

5. In around April 2020, OATH began to hold remote hearings, Beginning around late June 2020, HOPS have been submitting their monthly schedules as per past practice, however, it is unclear what criteria the Employer is using to determine which HOPS are assigned to work remotely.

6. In around April 2020, OATH instituted a remote work platform called "ATAS" that a significant number of HOPS could not utilize due to the lack of proper equipment or training. This has resulted, for all practical purposes, in those HOPS being rendered ineligible for work and removed from the roster contrary to established practice. *See, Affidavit of Ilene Weinerman* ("Affidavit"), at ¶ 6.

7. Beginning in around June 2020, more HOPS were scheduled for remote work. In an effort to receive work, some HOPS have purchased equipment, or an extension for their current computer, at their own expense in order access the remote platform. When assigned work, these employees are not reimbursed for the equipment, paper, printers, ink, phone or other expenses incurred as a result of remote work. In a meeting on June 30, 2020, the Commissioner of OATH stated that some laptops had been distributed but failed to state who received the laptops or how they were selected. Affidavit at ¶ 8.

8. Beginning in around May 2020, OATH unilaterally decided to change the hours of HOPS who are assigned to remote work to the hours of 8:30 a.m. to 4:30 p.m. where pursuant to established practice the HOPS had the ability to work flexible hours less than a full day and starting as early as 8:00 a.m. up to 10:00 a.m.

9. For those HOPS called to perform remote hearings OATH has unilaterally increased the workload substantially with back to back hearings being required with no or minimal time for preparation between hearings permitted. HOPS are monitored on-line by the administration and are immediately scheduled for the next matter. Moreover, HOPS since in around October 2020 HOPS have been required to sign in and out by email every day. Affidavit at ¶ 9.

10. Since around July 2020, OATH has unilaterally changed the breaks allowed for HOPS which were scheduled in the past. Now if a break is required for lunch, or personal needs, the HOPS must request permission for the break from OATH. Moreover, despite the increased workload, OATH unilaterally implemented a limitation on the hours when HOPS are allowed to write decisions. They cannot write decisions on scheduled days, weekends or holidays. This has increased the number of hours which HOPS are required to work beyond their scheduled days. In other communications, the HOPS are required to write up all decisions on the day of the hearings which also requires additional time outside the scheduled working hours.

11. Starting in around October 2020 more HOPS have been returned to work, however, OATH is requiring those HOPS to adjudicate in areas beyond their previously assigned work. Adequate training for such work has not been provided, even though it is necessary for continued employment. *See, DC 37,* 69 OCB 20, at 5-6 (BCB 2002) (Training is a mandatory subject when it is required as a qualification for continued employment or improvement in pay or work assignments). Moreover, OATH has unilaterally instituted a policy of not paying for mandatory CLE if the HOPS are not scheduled to work contrary to the agreement.

12. All of the above unilateral changes have been instituted without prior notice or bargaining with the UFT.

2

**Demands for Bargaining**

13. OATH stated in correspondence dated April 13, 2020 that the "agency will implement applicable safety measures recommended by DCAS and DOHMH for the reconstituting of a work force, such as regular disinfection, staggered work hours, and teleworking." The Union demanded bargaining over those measures and their impact upon the bargaining unit employees in a letter dated April 15, 2020. See letter dated April 15, 2020 annexed hereto as Exhibit "B".

14. By letter dated April 22, 2020, the Acting General Counsel of OATH, Olga Statz, responded that the UFT's concerns regarding the "health and safety of its members will be addressed at the appropriate time". The letter further noted that plans for "safe reconstitution of the office" have not yet been sent by DCAS and DOHMH and that when those recommendations are received they would be discussed with the Union in "the ordinary course and in a manner consistent with the terms of the contract". See letter dated April 22, 2020 annexed hereto as Exhibit "C". The Union responded on May 2, 2020 noting that it wished to discuss the plans before they were finalized and again requested bargaining. See letter dated May 2, 2020 annexed hereto as Exhibit "D".

15. On May 8, 2020, OATH responded that it was premature to discuss implementation of safety procedures and protocols and stated that it would discuss the recommended policies with staff before implementation. The letter also noted that OATH had already reached out to employees by soliciting their input and concerns. This appeared to be a reference to a survey distributed by email which was purportedly voluntary and anonymous. OATH has refused, despite two information requests, to provide copies of the survey sent to bargaining unit members. See copy of letter dated May 8, 2020 annexed hereto as Exhibit "E".

16. On July 2, 2020 the parties scheduled a labor-management meeting to discuss the pending issues and the UFT expressly noted that if there was no resolution the UFT continued to demand bargaining. At the meeting the UFT stated that it wished to discuss, among other issues, concerns over work availability, hours, fairness in work distribution, training, ability to conduct remote hearings and use of personal equipment for remote hearings. OATH stated its implemented policy that HOPS would have to use their own equipment and phones for remote hearing, stated that hours were not guaranteed and deferred about remedial efforts to make the offices safe for reopening.

17. By letter dated August 18, 2020, the UFT, through its Special Representative Ilene Weinerman, demanded bargaining on issues related to remote work and post-pandemic reconstitution of the workforce. An information demand was also sent the same day requested information relevant to bargaining and contract enforcement. See copy of

letter dated August 18, 2020 annexed hereto as Exhibit "F".  See copy of information demand annexed hereto as Exhibit "G".

18. The Employer responded by letter dated August 27, 2020 that the UFT had no right to decisional bargaining under either the CBA or the law.  Although the letter recognized the right to impact bargaining under the law it failed to respond to the request for dates for bargaining.  Moreover, the Employer refused to provide any information requested stating, erroneously, that it had produced much of the information requested.  See letter dated August 27, 2020 annexed hereto as Exhibit "H".

19. The UFT responded by letter dated September 21, 2020 stating that it had repeatedly requested impact, as well as decisional, bargaining over the issues.  The UFT demanded that the Employer meet to engage in impact bargaining over the issues and expressly reserved its right to challenge the Employer's position concerning decisional bargaining.  The letter also repeated the information demand noting that the substantial majority of documents requested had never been produced by the Employer.  See letter dated September 21, 2020 annexed hereto as Exhibit "I".

20. The Employer responded by email on September 25, 2020 that it had received the bargaining demand and information request and that an appropriate response was forthcoming.  To date no response has been received.

## The Employer is in Violation of the NYCCBL

21. As the exclusive representative of the HOPS, the UFT has a legitimate expectation that established terms and conditions of employment, including wages, hours and working conditions will remain unchanged during a contract term.  Pursuant to New York City Collective Bargaining Law ("NYCCBL") a unilateral change in a mandatory subject of bargaining is considered a breach of the duty to bargain under the NYCCBL.  *See, DC 37, Local 1549,* 7 OCB 2d 3, at 17 (BCB 2014).

22. Even in areas which lay outside the scope of mandatory bargaining, when an employer exercises a management right in a manner that has an adverse effect of terms and conditions of employment and thus results in a practical impact, the duty to bargain may arise over the alleviation of that impact.  *Sergeants Benevolent Ass'n.,* Decision No. B-56-88.

23. Mandatory subjects of bargaining include wages, hours and working conditions.  In unilaterally deciding to change to remote work, failing to follow the established procedure for submission of hours, failing to provide equipment or pay for expenditures, changing the hours of HOPS assigned to remote work and failing to provide training to HOPS the Employer changed existing terms and conditions of employment in violation of §§ 12-306(a)(1) and (5) of the NYCCL.  Moreover, the Employer made such changes

without benefit of notice or negotiation with the UFT and it therefore failed and refused to bargain in good faith in violation of §§ 12-306(a)(1) and (4) of the NYCCBL.

24. Even assuming, *arguendo,* that certain of the above-mentioned unilateral changes are deemed to be the exercise of management right, the exercise of the management right had an adverse effect on terms and conditions of employment of the HOPS by rendering them ineligible for work, requiring HOPS to make additional, and substantial, expenditures thereby reducing compensation, failing to provide the training necessary to perform the changed duties of the job and rendering such employees ineligible to perform the changed duties of their positions.  By failing to provide notice and refusing to bargain with the UFT regarding such changes the Employer failed and refused to bargain in good faith in violation of §§ 12-306(a)(1) and (4) of the NYCCBL. *Sergeants Benevolent Ass'n.,* Decision No. B-56-88.

25. The Employer has further failed and refused to bargain with the union over mandatory subjects of bargaining regarding health and safety issues associated with reconstitution of the workforce including but not limited to issues regarding regular disinfection, staggered work hours and continued remote work, issues regarding leave or accommodations, screening processes, impact of potential closures due to infection and other issues relating to safe return to the workplace in violation of §§ 12-306(1) and 4) of the NYCCBL.

26. In soliciting input and concerns directly from employees by survey in around May 2020, the Employer engaged in direct dealing with employees, bypassing the UFT, thereby subverting the HOPS organizational interests and interfering in the HOPS exercise of their rights under § 12-306(1) and (4).  *Uniformed Firefighters Ass'n,* Dec. No. B-5-2002 (BCB 2002) (direct communication subverted members' representational rights). *See also, Wallkill Valley General Hospital,* 288 NLRB 103, 106 (1988) (survey constituted impermissible direct dealing particularly since the survey was issued prior to bargaining).

27. By failing to provide information requested by the UFT which was relevant for the purposes of bargaining over the above matters the Employer violated NYCCBL §§ 12-306(1) and (4) and 306(c)(4).  *Dist. Counsel 37 v. City of N.Y.*, Dec. No. B-35-99 (BCB 1999).

## Remedy

28. This claim is for all relief available under the law to which the UFT is entitled, including but not limited to an order requiring the City to 1) cease and desist from unilaterally changing mandatory terms and conditions of employment; 2) to cease and desist from failing to bargain over both mandatory subjects of bargaining or to engage in impact bargaining; 3) to make unit members whole who have been rendered ineligible for

employment or incurred additional expenses or loss of revenue as a result of the unilateral changes, whole; 4) to bargain over the imposition of, or changes to, mandatory terms and conditions of employment; or in the alternative regarding the practical impact of such changes should such changes be deemed by the OCB to concern non-mandatory subjects; 5) to cease and desist from engaging in direct dealing; 6) to immediately provide information responsive to the information request provided by the UFT; and 7) for such other, further and different relief as is appropriate.

# EXHIBIT A

# AGREEMENT

between

## United Federation of Teachers
## Local 2, American Federation of Teachers, AFL-CIO

and

## The City of New York

covering

## Hearing Officers

## (Per Session)

## September 25, 2007 – November 30, 2018

Hyman Reply Dec. Ex. C - 9

*Art. III*

**AGREEMENT** entered into this 12th day of June, 2015 by and between the City of New York and related public employers pursuant to and limited to their respective elections or statutory requirement to be covered by the New York City Collective Bargaining Law and their respective authorizations to the City to bargain on their behalf (hereinafter referred to as the "Employer") and the United Federation of Teachers, Local 2, AFL-CIO (hereinafter referred to as the "Union" or the "UFT") (collectively "the Parties"), for the period from September 25, 2007 through November 30, 2018.

### WITNESSETH:

**WHEREAS**, the Parties hereto have entered into collective bargaining and desire to reduce the results thereof to writing,

**NOW, THEREFORE**, it is mutually agreed as follows:

### ARTICLE I - UNION RECOGNITION AND UNIT DESIGNATION

**Section 1.**
The Employer recognizes the Union as the sole and exclusive collective bargaining representative for the bargaining unit consisting of employees of the Employer, wherever employed, in the below listed title, and in any successor title(s) that may be certified by the Board of Certification of the Office of Collective Bargaining to be part of the unit herein for which the Union is the exclusive collective bargaining representative:

| Title Code | TITLE |
|---|---|
| 95937 | Hearing Officer (Per Session) |

**Section 2.**
The terms "Employee" and "Employees" as used in this Agreement shall mean only those persons in the unit described in Section 1 of this Article.

### ARTICLE II - DUES CHECKOFF

**Section 1.**
a.   The Union shall have the exclusive right to the checkoff and transmittal of dues on behalf of each Employee in accordance with the Mayor's Executive Order No. 98, dated May 15, 1969, entitled "Regulations Relating to the Checkoff of Union Dues" and in accordance with the Mayor's Executive Order No. 107, dated December 29, 1986, entitled

"Procedures for Orderly Payroll Check-Off of Union Dues and Agency Shop Fees."

b.   Any Employee may consent in writing to the authorization of the deduction of dues from the Employee's wages and to the designation of the Union as the recipient thereof. Such consent, if given, shall be in a proper form acceptable to the City, which bears the signature of the Employee.

**Section 2.**
The Parties agree to an agency shop to the extent permitted by applicable law, as described in a supplemental agreement hereby incorporated by reference into this Agreement.

### ARTICLE III - HOURLY RATE

**Section 1.**
Employees shall be subject to the following specified flat hourly rates. The rates listed below fully and completely satisfy the parties' obligations pursuant to Section 3(J) of the agreement between the City of New York, the UFT, and the New York City Board of Education, dated May 1, 2014.

| Effective September 25, 2007 | | Effective May 1, 2013 | | Effective May 1, 2014 | | Effective September 1, 2014 | |
|---|---|---|---|---|---|---|---|
| Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate |
| $36.60 | $39.47 | $36.97 | $39.86 | $37.34 | $40.26 | $42.57 | $45.90 |

| Effective May 1, 2015 | | Effective October 1, 2015 | | Effective May 1, 2016 | | Effective May 1, 2017 | |
|---|---|---|---|---|---|---|---|
| Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate |
| $43.86 | $47.29 | $43.96 | $47.39 | $45.49 | $49.04 | $47.56 | $51.27 |

| Effective May 1, 2018 | | Effective June 16, 2018 | |
|---|---|---|---|
| Hiring Rate | Incumbent Rate | Hiring Rate | Incumbent Rate |
| $48.49 | $52.28 | $49.94 | $53.85 |

Hyman Reply Dec. Ex. C - 10

**Section 2. New Hires.**

1. A Hearing Officer (Per Session) who has been paid at the "Incumbent Rate" as of the date of the ratification of this Agreement shall continue to be paid at the applicable "Incumbent Rate" as set forth in Section 1.

2. A Hearing Officer (Per Session) who has been paid at the "Hiring Rate" shall continue to be paid at the applicable "Hiring Rate" as set forth in Section 1 until his/her two year anniversary of City employment at which time he/she shall be paid at the applicable "Incumbent Rate" as set forth in Section 1.

3. Any individual first employed as a Hearing Officer (Per Session) after the date of the ratification of this Agreement shall be paid at the applicable "Hiring Rate" as set forth in Section 1 until his/her two year anniversary of City employment at which time he/she shall be paid at the applicable "Incumbent Rate" as set forth in Section 1.

## ARTICLE IV - PRODUCTIVITY AND PERFORMANCE

The Parties acknowledge their mutual rights and obligations under the New York City Collective Bargaining Law including the Employer's right to determine the standards of services to be offered by its agencies; determine the standards of selection for employment; direct its Employees; take disciplinary action; relieve its Employees from duty because of lack of work or for other legitimate reasons; maintain the efficiency of governmental operations; determine the methods, means and personnel by which governmental operations are to be conducted; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work.

At the request of the Union, the Commissioner or his/her designee shall meet at reasonable intervals to discuss issues related to productivity and performance.

## ARTICLE V - GRIEVANCE PROCEDURE

**Section 1. - Definition:**

The term "Grievance" shall mean:

a. A dispute concerning the application or interpretation of the terms of this Agreement;

b. A claimed violation, misinterpretation or misapplication of the written rules or written regulations, existing written policy or written orders of the Employer applicable to the agency which employs the grievant affecting terms and conditions of employment; provided, disputes involving the Personnel Rules and Regulations of the City of New York shall not be subject to the grievance procedure or arbitration;

c. A claimed assignment of Employees to duties substantially different from those stated in their job specifications.

**Section 2.**

The Grievance Procedure shall be as follows:

Employees may at any time informally discuss with their supervisors a matter which may become a grievance. If the results of such a discussion are unsatisfactory, the Employee may present the grievance at Step 1.

All grievances must be presented in writing at all steps in the grievance procedure.

**Step I** The Employee and/or the Union shall present the grievance in the form of a memorandum to the person designated for such purpose by the agency head no later than 120 days after the date on which the grievance arose. The Employee may also request an appointment to discuss the grievance. The person designated by the Employer to hear the grievance shall take any steps necessary to a proper disposition of the grievance and shall issue a determination in writing by the end of the third work day following the date of submission.

**Step II** An appeal from an unsatisfactory determination at STEP I, where applicable, shall be presented in writing to the agency head or the agency head's designated representative who shall not be the same person designated in STEP I. The appeal must be made within ten (10) work days of the receipt of the STEP I determination. The agency head or designated representative, if any, shall meet with the Employee and/or the Union for review of the grievance and shall issue a determination in writing by the end of the tenth work day following the date on which the appeal was filed.

**Step III** An appeal from an unsatisfactory determination at STEP II shall be presented by the Employee and/or the Union to the

3

4

Commissioner of Labor Relations in writing within ten (10) work days of the receipt of the **STEP II** determination. The grievant or the Union should submit copies of the **STEP I** and **STEP II** grievance filings and any agency responses thereto. Copies of such appeal shall be sent to the agency head. The Commissioner of Labor Relations or the Commissioner's designee shall review all appeals from **STEP II** determinations and shall issue a determination on such appeals within fifteen (15) work days following the date on which the appeal was filed.

**Step IV**    An appeal from an unsatisfactory determination at **STEP III** may be brought solely by the Union to the Office of Collective Bargaining for impartial arbitration within fifteen (15) work days of receipt of the **STEP III** determination. In addition, the Employer shall have the right to bring directly to arbitration any dispute between the Parties concerning any matter defined herein as a "grievance." The Employer shall commence such arbitration by submitting a written request therefor to the Office of Collective Bargaining.

A copy of the notice requesting impartial arbitration shall be forwarded to the opposing party. The arbitration shall be conducted in accordance with Section 1-06 of Title 61 of the Rules of the City Of New York. The costs and fees of such arbitration shall be borne equally by the Union and the Employer.

The assigned arbitrator shall hold a hearing at a time and place convenient to the Parties and shall issue an award within thirty (30) days after the completion of the hearing.

The arbitrator's decision, order or award (if any) shall be limited to the application and interpretation of the Agreement, and the arbitrator shall not add to, subtract from or modify the Agreement or any rule, regulation, written policy or order mentioned in Section I of this Article. The arbitrator's award shall be final and binding and enforceable in any appropriate tribunal in accordance with Article 75 of the Civil Practice Law and Rules. The arbitrator may provide for and direct such relief as the arbitrator deems necessary and proper, subject to the limitations set forth above and any applicable limitations of law.

5

**Section 3.**
The Parties agree that the Agency has the discretion to schedule Hearing Officers (Per Session) based on the needs of the Agency.

Because the Parties share a mutual interest in promoting the adjudicative independence of Hearing Officers (Per Session), they agree as follows: The Union and/or an Employee may file an appeal under this Section when an individual Hearing Officer (Per Session) believes that s/he has experienced a denial of hours that substantially deviates from prior scheduling decisions for one of the following reasons:

a.    In retaliation for issuing decisions that were adverse to the City or any agency, or

b.    In retaliation for a refusal to violate a law, regulation, rule, and/or code in the performance or scope of his/her duties.

Such appeals are subject to the following procedure:

**Step I**    The Employee and/or the Union shall present the appeal in the form of a memorandum to the Managing Attorney of the site where the Employee is assigned, or the Managing Attorney's designee, not more than thirty (30) days after the date on which the Employee became aware or should have become aware of the denial of hours that substantially deviates from prior scheduling decisions. The Employee may also request and shall be permitted to have an appointment to discuss the appeal. The Managing Attorney or his/her designee shall take any steps necessary to a proper disposition of the appeal and shall issue a determination in writing by the end of the third day following the date of submission. The failure to issue a determination in writing shall be deemed a denial of the grievance.

**Step II**    An appeal from an unsatisfactory determination at **STEP I** shall be presented in writing by the Employee or the Union to the OATH Commissioner or the Commissioner's designee, who shall not be the person designated at **STEP I**. The appeal must be made within ten (10) working days of the receipt of the **STEP I** determination. The OATH Commissioner or the Commissioner's designee shall meet with the Employee and/or Union for review of the appeal and, in any event, shall issue a determination in writing by the end of the tenth work day following the date on which the appeal was filed. The

6

failure to issue a determination in writing shall be deemed a denial of the appeal.

**Step III**  An appeal from an unsatisfactory determination at **STEP II** may be brought solely by the Union to the Office of Collective Bargaining for impartial arbitration within fifteen (15) days of receipt of the **STEP II** determination. A copy of the notice requesting impartial arbitration shall be forwarded to the Employer. The cost and fees of such arbitration shall be borne equally by the Union and the Employer.

The assigned arbitrator shall hold a hearing at a time and date convenient to the Parties and shall issue an award within thirty (30) days after the completion of the hearing.

The arbitrator's decision, order or award (if any) shall be limited to the application and interpretation of this Article, and the arbitrator shall not add to, subtract from or modify the Agreement or any rule, regulation, written policy or order mentioned in Section I of this Article. The arbitrator's award shall be based on a preponderance of the evidence. The arbitrator shall decide whether the Employer denied the Hearing Officer (Per Session) hours because of the reasons listed above. The arbitrator's award shall be final and binding and enforceable in any appropriate tribunal in accordance with Article 75 of the Civil Practice Law and Rules.

Any remedy ordered pursuant to this appeal procedure shall be prospective in nature, and limited to offering hours equal to the number of hours found to have been improperly denied for the reasons listed above. No Hearing Officer (Per Session) shall receive monetary compensation for hours not worked. There shall not be any retroactive remedy, nor any award of retroactive pay or back pay.

Arbitration proceedings pursuant to this Section shall be governed by the Rules of the Office of Collective Bargaining (Rules of the City of New York, Title 61, Chapter 1) § 1.06, with the following modifications:

* The arbitrator shall be chosen from a panel list established by mutual agreement of the Parties selected from the panel register maintained pursuant to the Rules of the Office of Collective Bargaining § 1.09(b)(1)(iii). The arbitrator in each case will be appointed from the panel list using the selection

method set forth in the Rules of the Office of Collective Bargaining § 1.06(e).
* Fees and expenses related to the arbitration shall be governed by Rules of the Office of Collective Bargaining § 1.09(e) to the extent applicable.
* Hearings are limited to one day per appeal.
* The Parties will exchange all documents and evidence that they each intend to introduce at the hearing to the extent available, no later than one calendar week before the scheduled hearing date.

**Section 4.**
As a condition to the right of the Union to invoke impartial arbitration set forth in this Article, the Employee or Employees and the Union shall be required to file with the Director of the Office of Collective Bargaining a written waiver of the right, if any, of the Employee and the Union to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitrator's award.

**Section 5.**
A grievance concerning a large number of Employees and which concerns a claimed misinterpretation, inequitable application, violation or failure to comply with the provisions of this Agreement may be filed directly at **STEP III** of the grievance procedure. All other individual grievances in process concerning the same issue shall be consolidated with the "group" grievance. Such "group" grievance must be filed no later than 120 days after the date on which the grievance arose, and all other procedural limits, including time limits, set forth in this Article shall apply.

**Section 6.**
If a determination satisfactory to the Union at any level of the Grievance Procedure is not implemented within a reasonable time, the Union may re-institute the original grievance at **STEP III** of the Grievance Procedure; or if a satisfactory **STEP III** determination has not been so implemented, the Union may institute a grievance concerning such failure to implement at **STEP IV** of the Grievance Procedure.

**Section 7.**
If the Employer exceeds any time limit prescribed at any step in the Grievance Procedure, the grievant and/or the Union may invoke the next step of the procedure, except however, that only the Union may invoke impartial arbitration under **STEP IV**.

**Section 8.**
The Employer shall notify the Union in writing of all grievances filed by

7

8



Employees, all grievance hearings, and all determinations. The Union shall have the right to have a representative present at any grievance hearing and shall be given forty-eight (48) hours' notice of all grievance hearings.

**Section 9.**
Each of the steps in the Grievance Procedure, as well as time limits prescribed at each step of this Grievance Procedure, may be waived by mutual agreement of the Parties.

**Section 10.**
This grievance and the arbitration procedures contained in this Agreement shall be the exclusive remedy for the resolution of disputes defined as "grievances" herein. This shall not be interpreted to preclude either party from enforcing and/or vacating the arbitrator's award in court. This Section shall not be construed in any manner to limit the statutory rights and obligations of the Employer under Article XIV of the Civil Service Law.

## ARTICLE VI - BULLETIN BOARDS: EMPLOYER FACILITIES

The Union may post notices on bulletin boards in places and locations where notices usually are posted by the Employer for the Employees to read. All notices shall be on Union stationery, and shall be used only to notify Employees of matters pertaining to Union affairs. Upon request to the responsible official in charge of a work location, the Union may use Employer premises for meetings during Employees' lunch hours, subject to availability of appropriate space and provided such meetings do not interfere with the Employer's business.

## ARTICLE VII - NO STRIKES

In accordance with the New York City Collective Bargaining Law, as amended, neither the Union nor any Employee shall induce or engage in any strikes, slowdowns, work stoppages, mass absenteeism, or induce any mass resignations during the term of this Agreement.

## ARTICLE VIII - EXCLUSION FROM CITYWIDE AGREEMENT

The title under this Agreement, having been classified under City Personnel Rule X, is excluded from coverage of the provisions of the Citywide Agreement.

## ARTICLE IX - UNION ACTIVITY

Time spent by Employee representatives in the conduct of labor relations

9

with the City and on Union activities shall be governed by the terms of Executive Order No. 75, as amended, dated March 22, 1973, entitled "Time Spent on the Conduct of Labor Relations between City and Its Employees and on Union Activity" or any successor thereto.

## ARTICLE X - LABOR-MANAGEMENT COMMITTEE

**Section 1.**
The Employer and the Union, having recognized that cooperation between management and Employees is indispensable to the accomplishment of sound and harmonious labor relations, shall jointly maintain and support a labor-management committee in each of the agencies having at least one hundred (100) Employees covered by this Agreement.

**Section 2.**
Each labor-management committee shall consider and recommend to the agency head changes in the working conditions of the Employees within the agency who are covered by this Agreement. Matters subject to the Grievance Procedure shall not be appropriate items for consideration by the labor-management committee.

**Section 3.**
Each labor-management committee shall consist of six members who shall serve for the term of this Agreement. The Union shall designate three members and the agency head shall designate three members. Vacancies shall be filled by the appointing party for the balance of the term to be served. Each member may designate one alternate. Each committee shall select a chairperson from among its members at each meeting. The chairpersonship of each committee shall alternate between the members designated by the agency head and the members designated by the Union. A quorum shall consist of a majority of the total membership of a committee. A committee shall make its recommendations to the agency head in writing.

**Section 4.**
The labor-management committee shall meet at the call of either the Union members or the Employer members at times mutually agreeable to both Parties. At least one week in advance of a meeting the party calling the meeting shall provide, to the other party, a written agenda of matters to be discussed. Minutes shall be kept and copies supplied to all members of the committee.

## ARTICLE XI - FINANCIAL EMERGENCY ACT

The provisions of this Agreement are subject to applicable provisions of law, including the New York State Financial Emergency Act for the City of New York as amended.

10

Hyman Reply Dec. Ex. C - 14

## ARTICLE XII - APPENDICES

The Appendix or Appendices, if any, attached hereto and initialed by the undersigned shall be deemed a part of this Agreement as if fully set forth herein.

## ARTICLE XIII - SAVINGS CLAUSE

In the event that any provision of this Agreement is found to be invalid, such invalidity shall not impair the validity and enforceability of the remaining provisions of this Agreement.

## ARTICLE XIV - APPLICABILITY

The provisions of this Agreement are expressly made subject to and governed by all applicable existing and future laws and regulations and amendments thereto which are deemed applicable to this Agreement.

## ARTICLE XV - WORKING CONDITIONS

The impact of physical working conditions as it affects professional performance shall be referred to the Labor-Management Committee provided in Article X of this Agreement. To the extent practicable, advance notice of major changes in physical working conditions affecting a substantial number of Employees shall be given to the Union.

## ARTICLE XVI - PERSONNEL FOLDERS

An Employee shall be permitted to view the Employee's personnel folder up to three times a year. The viewing shall be in the presence of a designee of the Employer and held at such time and place as mutually convenient for the Employee and the Employer.

The Employee shall have the right to answer in writing any material relating to the Employee's work performance or conduct and the answer shall be attached to the file copy.

WHEREFORE, we have hereunto set our hands and seals this 12th day of June, 2015.

FOR THE CITY OF NEW YORK:          FOR UNITED FEDERATION OF TEACHERS:

BY                                 BY

ROBERT W. LINN                     MICHAEL MULGREW
Commissioner of Labor Relations    President

APPROVED AS TO FORM:

BY

GEORGIA PESTANA
Acting Corporation Counsel

OFFICE OF LABOR RELATIONS
REGISTRATION

OFFICIAL            CONTRACT

DATE SUBMITTED TO THE FINANCIAL CONTROL BOARD:
2015

NO. 15006                    DATE:
                             June 12, 2015

2007 - 2018 Hearing Officer (Per Session)

11

12

**UNIT:** Hearing Officer (Per Session)

**TERM:** September 25, 2007 – November 30, 2018



**OFFICE OF LABOR RELATIONS**
40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

The City of New York

ROBERT W. LINN
*Commissioner*

RENEE CAMPION
*First Deputy Commissioner*

CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MYRA G. GELL
*General Counsel*

GEORGE DENNER
*Chief of Staff*

GEORGETTE GESTELY
*Director, Employee Benefits Program*

April 29, 2015

Michael Mulgrew
President
United Federation of Teachers
52 Broadway – 14th Floor
New York, NY 10004

RE: 2007-2018 Hearing Officer (Per Session) Agreement

Dear Mr. Mulgrew:

Effective September 1, 2014, the bargaining unit shall have available funds in the amount of $1,698,236.00 in rate to purchase recurring benefits, mutually agreed to by the Parties.

The above amount of funds available is inclusive of spinoffs and pensions. The Parties agree that this obligation is fully satisfied by the additional increase in the hourly rate of pay effective September 1, 2014, in Article III, Section 1 of the parties' collective bargaining agreement.

If the above accords with your understanding, please execute the signature line below.

Very truly yours,

Robert W. Linn

Agreed and Accepted By:

Michael Mulgrew
President
United Federation of Teachers

June 12, 2015
Date

13

14



# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*

RENÉE CAMPION
*First Deputy Commissioner*

CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*

CHRIS BERGER
*Chief of Staff*

GEORGETTE DESTELY
*Director, Employee Benefits Program*

April 29, 2015

Michael Mulgrew, President
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

RE: 2007-2018 Hearing Officer (Per Session) Agreement

Dear Mr. Mulgrew:

This letter confirms certain mutual understandings and agreements regarding the above captioned Agreement:

**Annual Limit on Hours Worked**
Effective July 3, 2011, pursuant to Executive Order 148, the administrative tribunals established by the Board of Health pursuant to Section 558 of the City Charter, and by the Taxi and Limousine Commission pursuant to Section 2303 of the City Charter, together with all matters pending before them, were functionally transferred to OATH.

Per the understanding of the Parties at the time of the functional transfer, Hearing Officers (Per Session) who were employed at more than one administrative tribunal prior to July 3, 2011, and continue to be assigned to more than one administrative tribunal at OATH, shall continue to be subject to an annual 1000 hour cap for each tribunal assigned. The list of Covered Employees who continue to be employed as Hearing Officers (Per Session) is attached hereto as Attachment A. In the event that the administrative tribunals consolidate, the Covered Employees who continue to be employed as Hearing Officers (Per Session) shall be subject to an annual 2000 hour cap.

All other Hearing Officers (Per Session) at OATH will be subject to a total annual cap of 1000 hours of work regardless of what types of cases they are assigned.

If the above accords with your understanding, please execute the signature line provided below.

Sincerely,

Robert W. Linn

Agreed and Accepted By:

Michael Mulgrew
President
United Federation of Teachers

DATED: June 12, 2015

15

16



**OFFICE OF LABOR RELATIONS**
40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*

RENEE CAMPION
*First Deputy Commissioner*

CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
CHRIS BOWER
*Chief of Staff*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

April 29, 2015

Michael Mulgrew, President
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

RE: 2007-2018 Hearing Officer (Per Session) Agreement

Dear Mr. Mulgrew:

This letter confirms certain mutual understandings and agreements regarding the above captioned Agreement:

**Professional Development**
Hearing Officers (Per Session) shall continue to have access to Continuing Legal Education ("CLE") conducted by City agencies on the same basis as full time attorneys employed by OATH. Hearing Officers (Per Session) shall not receive compensation to attend any CLE program except for CLE that is provided as part of mandatory training by OATH. Nothing in this provision shall limit the City's right to make any changes to City-conducted CLE programs including the right to eliminate any or all such programs.

If the above accords with your understanding, please execute the signature line provided below.

Sincerely,

Robert W. Linn

Agreed and Accepted By:

Michael Mulgrew
President
United Federation of Teachers

DATED: June 12, 2015

17

---

**OFFICE OF LABOR RELATIONS**
40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*

RENEE CAMPION
*First Deputy Commissioner*

CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
CHRIS BOWER
*Chief of Staff*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

April 29, 2015

Michael Mulgrew, President
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

RE: 2007-2018 Hearing Officer (Per Session) Agreement

Dear Mr. Mulgrew:

This letter confirms certain mutual understandings and agreements regarding the above captioned Agreement:

**Blood donation**
Employees who donate blood through the New York City Employee Blood Program during hours they are scheduled to work will be paid for actual time used to donate blood, including travel time, up to a maximum of three hours. Employees must notify their manager in advance of the date of their participation in the New York City Employee Blood Program and provide a copy of the receipt from the donation site following their donation.

Any other type of blood donation will not be eligible for payment for time used.

If the above accords with your understanding, please execute the signature line provided below.

Sincerely,

Robert W. Linn

Agreed and Accepted By:

Michael Mulgrew
President
United Federation of Teachers

DATED: June 12, 2015

18



**OFFICE OF LABOR RELATIONS**
40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
Commissioner

RENEE CAMPION
First Deputy Commissioner

CLAIRE LEVITT
Deputy Commissioner
Health Care Cost Management

MAYRA E. BELL
General Counsel

CHRIS KESNER
Chief of Staff

GEORGETTE GESTELY
Director, Employee Benefits Program

April 29, 2015

Michael Mulgrew, President
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

RE: 2007-2018 Hearing Officer (Per Session) Agreement

Dear Mr. Mulgrew:

This letter confirms certain mutual understandings and agreements regarding the above captioned Agreement:

**Jury Duty**
Hearing Officers (Per Session) will be paid for time spent in actual jury duty service during scheduled hours of work in the same manner as provided in Section VIII (D) of the OATH Employee Manual for Full and Part Time Staff Covered by the Career and Salary Plan, except that Hearing Officers (Per Session) who have been issued a summons for jury duty service prior to being scheduled for hours in the period covered by the summons will not be paid for jury duty service for work hours that the Employee requested after the summons was issued.

If the above accords with your understanding, please execute the signature line provided below.

Sincerely,

Robert W. Linn

Agreed and Accepted By:

Michael Mulgrew
President
United Federation of Teachers

DATED: June 12 , 2015

19

---



**OFFICE OF LABOR RELATIONS**
40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
Commissioner

RENEE CAMPION
First Deputy Commissioner

CLAIRE LEVITT
Deputy Commissioner
Health Care Cost Management

MAYRA E. BELL
General Counsel

CHRIS KESNER
Chief of Staff

GEORGETTE GESTELY
Director, Employee Benefits Program

April 29, 2015

Michael Mulgrew, President
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

RE: 2007-2018 Hearing Officer (Per Session) Agreement

Dear Mr. Mulgrew:

This is to confirm certain mutual understandings and agreements regarding the above captioned Agreement:

The Parties acknowledge their shared mutual interest in promoting the adjudicative independence of Hearing Officers (Per Session) in OATH. The procedure set forth in Article V, Section 3 (Scheduling disputes) is established in furtherance of that interest.

This letter expresses the understanding between the Parties that by agreeing to the establishment of this procedure, the City is not recognizing individual due process rights for Hearing Officers (Per Session) under civil service law and does not waive any argument or defense to any future claim of due process rights for Employees in the title of Hearing Officer (Per Session). The Parties agree that the fact of this procedure or the circumstances surrounding its establishment will not be cited as evidence that Employees in the Hearing Officers (Per Session) title are entitled to due process.

If the above accords with your understanding, please execute the signature line provided below.

Sincerely,

Robert W. Linn

Agreed and Accepted By:

Michael Mulgrew
President
United Federation of Teachers

DATED: June 12 , 2015

20

Hyman Reply Dec. Ex. C - 19

# EXHIBIT B



United Federation of Teachers
A Union of Professionals

Allison S. Costanzo
Direct Dial: 212-510-6397
ACostanzo@uft.org

April 15, 2020

Amy Slifka
Deputy Commissioner
Office of Administrative Trials and Hearings
66 John Street, 10th Floor
New York, NY 10038
Aslifka@oath.nyc.gov

Dear Ms. Slifka:

It has come to the UFT's attention that OATH has notified Hearing Officers Per Session of its intention to re-open the borough offices for business effective May 4, 2020. Subsequently, some of our members conveyed to you, as well as the new commissioner, legitimate concerns about safely returning to their work sites during the ongoing pandemic. These concerns result from the hazardous and unacceptable conditions that our members endured in the weeks leading up to the office shutdowns in March, including but not limited to cramped and poorly ventilated hearing rooms, overcrowded public waiting areas, and inadequate access to disinfecting supplies.

In your correspondence dated April 13, you stated that "the agency will implement applicable safety measures recommended by DCAS and DOHMH for the reconstituting of a work force, such as regular disinfection, staggered work hours, and teleworking".   As the authorized bargaining representative for the hearing officers per session, the union demands bargaining over the implementation of these measures and their impact on the health and safety of our members.

Sincerely,

Allison S. Costanzo
Assistant General Counsel
United Federation of Teachers

Cc: Ilene Weinerman, UFT Special Representative

52 Broadway, New York, NY 10004   p: 212.777.7500   www.uft.org

Officers: Michael Mulgrew President, Howard Schoor Secretary, LeRoy Barr Assistant Secretary, Mel Aaronson Treasurer, Thomas Brown Assistant Treasurer
Vice Presidents: Karen Alford, Carmen Alvarez, Evelyn DeJesus, Anne Goldman, Janella Hinds, Richard Mantell, Sterling Roberson

# EXHIBIT C



**OFFICE OF
ADMINISTRATIVE
TRIALS AND HEARINGS**

**100 CHURCH STREET, 12TH FLOOR, NEW YORK, NEW YORK 10007**

**JONI KLETTER**
COMMISSIONER
CHIEF ADMINISTRATIVE LAW JUDGE
(212) 933-3001

**OLGA STATZ**
ACTING GENERAL COUNSEL
(212) 933-3003

April 22, 2020

Allison S. Costanzo
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

Dear Ms. Costanzo:

Your letter to OATH Deputy Commissioner Amy Slifka, dated April 15, 2020, was referred to me for response.

Your concerns regarding the health and safety of your members at OATH's borough offices will be addressed at the appropriate time. As previously advised, DCAS and DOHMH have not yet set forth a plan for the safe reconstitution of the office.

When OATH receives the recommendations, these matters will be discussed with the union in the ordinary course and in a manner consistent with the terms of the contract.

The borough offices will re-open at the earliest on May 15, 2020. The members who are not satisfied with the safety measures announced are under no obligation to schedule themselves to hear matters pending before the Tribunal.

Finally, in order to better address Hearing Officer concerns, I respectfully request that, going forward, your members address their concerns by letter to me, preferably collectively, and not piecemeal in emails sent to various members of OATH executive staff.

Very truly yours,

Olga Statz
Acting General Counsel
ostatz@oath.nyc.gov

CC:    Amy Slifka, OATH Deputy Commissioner
       Matthew Campese, OLR
       Ilene Weinerman, UFT Special Representative
       Cynthia D. Fisher, Assistant General Counsel OATH

# EXHIBIT D



United Federation of Teachers
*A Union of Professionals*

May 2, 2020

Olga Statz
Acting General Counsel
Office of Administrative Trials and Hearings
100 Church Street, 12th Fl.
New York, New York 10007

Dear Ms. Statz,

I am writing in response to your correspondence dated April 22, 2020.

We appreciate that OATH intends to discuss with the Union the recommendations it receives from DCAS and DOHMH concerning reconstitution of the offices. That is precisely why the Union has reached out to OATH now, to ensure that the concerns of our Hearing Officers Per Session members are heard and addressed before plans for re-opening the offices are finalized.

Our members want to return to work. Like all employees, they are entitled to a work environment that is safe and healthy. As reported to the Union, working conditions in the OATH borough offices in the days leading up to the closure clearly did not fit that description, and there is pervasive mistrust of management's willingness to address health and safety issues based on a long history of inaction that predates the current pandemic.

There is now an opportunity to remedy that perception through productive dialogue between the parties about the safety protocols and procedures that will be in place. Toward that goal, the Union repeats its demand to bargain over implementation of these measures. Please advise as to OATH's availability for these discussions to begin.

Sincerely,

Allison S. Costanzo
Assistant General Counsel
United Federation of Teachers

Cc:    Ilene Weinerman, UFT Special Representative
       Matthew Campese, OLR

Officers: Michael Mulgrew *President*, Howard Schoor *Secretary*, LeRoy Barr *Assistant Secretary*, Mel Aaronson *Treasurer*, Thomas Brown *Assistant Treasurer* Vice Presidents: Karen Alford, Carmen Alvarez, Evelyn DeJesus, Anne Goldman, Janella Hinds, Richard Mantell, Sterling Roberson

# EXHIBIT E



**OATH**  OFFICE OF
ADMINISTRATIVE
TRIALS AND HEARINGS

100 CHURCH STREET, 12TH FLOOR, NEW YORK, NEW YORK 10007

**JONI KLETTER**
COMMISSIONER
CHIEF ADMINISTRATIVE LAW JUDGE
(212) 933-3001

**OLGA STATZ**
GENERAL COUNSEL
(212) 933-3003

May 8, 2020

Allison S. Costanzo
Assistant General Counsel
United Federation of Teachers
52 Broadway
New York, N.Y. 10004

Dear Ms. Costanzo:

Thank you for your letter of May 2, 2020.

While we appreciate your concerns, as stated in our letter of April 22, 2020, it is premature at this time to discuss the implementation of any safety procedures and protocols. We are still awaiting the recommendations of DCAS, DOHMH and the Law Department. As stated before, OATH will discuss their recommended policies with staff before implementation.

In addition, please note that OATH has already taken steps to engage employees in the reconstitution process. Specifically, in order to ensure that it has a comprehensive picture of staff concerns and questions, on May 5, the agency distributed an agency wide bulletin soliciting input, concerns and questions on this issue from all employees. Based on those queries and previously expressed concerns, OATH will prepare responses to some Frequently Asked Questions (FAQs) for general distribution.

Again, please be assured that we will reach out to discuss recommended reconstitution policies with all employees before implementation.

Very truly yours,

Olga Statz
General Counsel

CC:  Amy Slifka, OATH Deputy Commissioner
Ilene Weinerman, UFT Special Representative
Matthew Campese, OLR

**EXHIBIT F**



United Federation of Teachers
A Union of Professionals

Ms. Amy Slifka, Deputy Commissioner
Office of Administrative Trials and Hearings
100 Church Street, 12th Fl.
New York, New York 10007

August 18, 2020

RE:    DEMAND FOR BARGAINING

Dear Ms. Slifka:

Since April 2020, the United Federation of Teachers has requested bargaining with New York City and OATH regarding issues relating to remote work and the reconstitution of the workforce due to the pandemic. The City has deferred such discussions as "premature" despite the UFT's insistence on its right to be involved in negotiations over these issues prior to finalization.

You were again notified, before the Labor-Management Meeting held in July 2020, that the UFT continued to demand bargaining if issues were not resolved. Be advised that your failure to bargain with the UFT over these issues, including, but not limited to, at the July 2020 Labor-Management Meeting, constitutes a violation of the New York City Collective Bargaining Law ("NYCCBL") among other relevant laws.

Please be further advised that absent immediate action by New York City and OATH to commence bargaining, the UFT will take all legal action required to ensure that its members' interests are protected.

An information request is being sent to you under separate cover.

Sincerely,

Ilene Weinerman
UFT Special Representative

CC:    Olga Statz, OATH General Counsel
       Matthew Campese, OLR
       Lori Smith, Senior Counsel, NY State United Teachers
       Cynthia Fisher, OATH General Counsel

52 Broadway, New York, NY 10004  p: 212.777.7500  www.uft.org

Officers: Michael Mulgrew President, LeRoy Barr Secretary, Michael Sill Assistant Secretary, Debra Penny Treasurer, Thomas Brown Assistant Treasurer.
Vice Presidents: Karen Alford, Mary Jo Ginese, Evelyn DeJesus, Anne Goldman, Janella Hinds, Richard Mantell, Sterling Roberson

# EXHIBIT G



United Federation of Teachers
A Union of Professionals

Ms. Amy Slifka, Deputy Commissioner
Office of Administrative Trials and Hearings
100 Church Street, 12th Fl
New York, NY 10007

August 18, 2020

Dear Ms. Slifka:

The United Federation of Teachers requests the following information in preparation for upcoming bargaining sessions regarding remote work, "reconstitution" of the workforce and other pandemic related topics and to ensure continued enforcement of the collective bargaining agreement by and between the parties:

1. All documentation, including drafts, notes, working documents, emails or any other writings in any medium ("documents") relating to the safety measures and protocols which New York City and OATH (together "OATH") are reviewing or intend to implement relating to the "reconstitution" of the workforce when OATH offices are reopened.

2. Provide all documentation referred by OATH in its correspondence dated April 13,2020 regarding the "applicable safety measures recommended by DCAS and DOHMH for the reconstituting of a work force, such as regular disinfection, staggered work hours, and teleworking" and any subsequent documents received concerning same or providing details concerning such issues.

3. Provide all schedules submitted by Hearing Officers Per Session for remote work for the period of March 23, 2020 through June 2020. Provide copies of all communications by OATH with Hearing Officers Per Session during this timeframe regarding schedules and the method employed by OATH to select which Hearing Officers were contacted to perform remote work.

4. Provide a copy of "agency wide bulletin soliciting input, concerns and questions" regarding the "reconstitution" process referred to by Olga Statz, General Counsel, OATH, in her letter dated May 8, 2020 including the distribution list for the same.

5. Provide copies of all documents issued by OATH to Hearing Officers Per Session, or available to Hearing Officers Per Session by other sources (and name the source) regarding reconstitution of the workforce, including but not limited to any documents concerning safety and health protocols, reopening of offices, FAQs, guidelines, remote work, equipment required or provided, hours to be worked, scheduling procedures.

6. Provide all documents regarding remote work for Hearing Officers Per Session, including documentation related to the platform to be used for remote hearings, dates such platform was to be in

52 Broadway, New York, NY 10004  p: 212.777.7500  www.uft.org

Officers: Michael Mulgrew President, LeRoy Barr Secretary, Michael Sill Assistant Secretary, Debra Penny Treasurer, Thomas Brown Assistant Treasurer
Vice Presidents: Karen Alford, Mary Jo Ginese, Evelyn DeJesus, Anne Goldman, Janella Hinds, Richard Mantell, Sterling Roberson

operation, training to be provided, type of equipment required to utilize the hearing platform including computer equipment or internet resources, issuance of any equipment to Hearing Officers Per Session for remote work and reimbursement for equipment and supplies.

7. Provide all documents issued to Hearing Officers Per Session notifying them of institution of remote work and its requirements, including technical aspects as well as information regarding submission of schedules for such work.

8. Provide a listing of all Hearing Officers Per Session scheduled for remote hearings during the period of May 23, 2020 to the present, by pay period, with all hours worked each day by each Hearing Officer Per Session during each such pay period.

9. Provide schedules submitted by Hearing Offices Per Session for remote hearings during the Period of May 23, 2020 to the present whether or not such individual was scheduled for remote hearings or work.  Please describe the "agency needs" taken into account in scheduling the Hearing Officers Per Session.

10. Provide documentation regarding the number of cases to be heard by Hearing Officers Per Session from March 23, 2020 the present broken down by pay period.

11. Provide a listing of any Hearing Officers Per Session who are deemed to be essential employees or who have been requested to be physically present at a worksite for OATH.

12. Provide any documentation relating to leave protection for employees who are diagnosed with COVID-19 or required to care for a family member with COVID-19, or quarantined for potential exposure to COVID-19, who cannot appear for scheduled sessions, whether remote or in-person, as a result.

Please provide the requested information no later than August 28, 2020.  This request is continuing and will be modified or amended by the UFT as required.

Thank you in advance for your cooperation.  Please feel free to contact me with any questions or issues which may arise.

Sincerely,

Ilene Weinerman
UFT Special Representative

CC: Olga Statz, OATH General Counsel
Matthew Campese, OLR
Lori Smith, Senior Counsel, NY State United Teachers
Cynthia Fisher, OATH General Counsel

# EXHIBIT H



**OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS**

100 CHURCH STREET, 12TH FLOOR, NEW YORK, NEW YORK 10007

JONI KLETTER
COMMISSIONER
CHIEF ADMINISTRATIVE LAW JUDGE

OLGA STATZ
GENERAL COUNSEL
(212) 933-3003

August 27, 2020

Ilene Weinerman
UFT Special Representative
52 Broadway
New York, NY 10004

RE:   DEMAND FOR BARGAINING

Dear Ms. Weinerman,

By letter dated August 18, 2020, the UFT has demanded bargaining on issues related to remote work and to post-pandemic reconstitution of the workforce. The UFT, however, has no right to bargain on these issues under either the agreement between the union and this agency or under the Collective Bargaining Law. The former makes no specific grant, and the latter allows bargaining over the practical impact of policies adopted, not respecting the policies themselves. The UFT's demand to bargain is therefore declined.

The agency also declines UFT's request for additional information. Much of the information presently sought by the union was provided to it in the aftermath of the Labor Management meeting held between the parties on July 2, 2020. Please make reference to that information.

Please note, however, that OATH is willing to conduct another labor management meeting with the union in the coming weeks.

Very truly yours,

Olga Statz

C:   Matthew Campese, OLR
     Lori Smith, Senior Counsel, NY State United Teachers
     Cynthia Fisher, OATH Assistant General Counsel

# EXHIBIT I



United Federation of Teachers
A Union of Professionals

Ms. Olga Statz, General Counsel
Office of Administrative Trials and Hearings
100 Church Street, 12ᵗʰ floor
New York, NY 10007

September 21, 2020

Dear Ms. Statz:

As you are aware, the United Federation of Teachers ("UFT") has repeatedly requested bargaining, both over decision and impact, of issues related to remote work and post-pandemic reconstitution of the workforce.

While you may disagree over the UFT's right to engage in decisional bargaining, you have agreed, in your letter dated August 27, 2020, that impact bargaining is required upon demand regarding "practical impact of policies adopted." That demand for impact bargaining has been made repeatedly by the UFT, including, but not limited to, in my most recent communication in which I expressly stated that the UFT requested decision *and impact* bargaining.

We strenuously disagree that certain decisions made by OATH are not within the ambit of legally required bargaining. Moreover, absent production of relevant documentation requested by the UFT, it is difficult to determine whether certain decisions made are subject to bargaining. To the extent OATH continues to refuse to engage in any decisional bargaining, the UFT reserves its right to raise this issue before the Office of Collective Bargaining for resolution. It is, however, without challenge that impact bargaining is required under the present circumstances. Accordingly, be advised that this letter is again demanding that bargaining with OATH commence immediately, at a minimum over impact, subject to our reservation of rights stated above.

Please be further advised that your response to the UFT's demand for information is wholly inadequate. The UFT is well within its right to request all documentation issued by OATH to bargaining unit members regarding remote work, re-opening and other related issues, or relevant to a discussion of these matters and the impact upon terms and conditions of employment. Moreover, the substantial majority of documents requested have not been provided, to the UFT or individual bargaining unit members including, but not limited to, schedules submitted for work, hours worked by each assigned Hearing Officer from May 2020 (the date of the last report issued) to the present, basic reopening plans, a copy of the survey issued agency wide soliciting input, concerns and questions, among multiple other documents. I am annexing a copy of the information request and ask that responsive materials be provided immediately.

I look forward to hearing from you regarding prompt dates for bargaining.

Please feel free to contact me if you have any questions or concerns.

Sincerely,

Ilene Weinerman, Special Representative

CC: Amy Slifka, OATH Deputy Commissioner
    Lori Smith, Senior Counsel, NY State United Teachers
    Matthew Campese, OLR

52 Broadway, New York, NY 10004   p: 212.777.7500   www.uft.org

Officers  Michael Mulgrew President, LeRoy Barr Secretary, Michael Sill Assistant Secretary, Debra Penny Treasurer, Thomas Brown Assistant Treasurer
Vice Presidents  Karen Alford, Mary Jo Ginese, Evelyn DeJesus, Anne Goldman, Janella Hinds, Richard Mantell, Sterling Roberson

STATE OF NEW YORK
BOARD OF COLLECTIVE BARGAINING

In the Matter of

UNITED FEDERATION OF TEACHERS (UFT), LOCAL 2,
AMERICAN FEDERATION OF TEACHERS, AFL-CIO

                  Charging Party,

                  - against -

CITY OF NEW YORK AND OFFICE OF ADMINISTATIVE
TRIALS AND HEARINGS,

                  Respondents.

**AFFIDAVIT OF
ILENE WEINERMAN**

Case No.: _____

**STATE OF NEW YORK** )
                 ) SS.:
**COUNTY OF NEW YORK** )

    **ILENE WEINERMAN,** being duly sworn, deposes and says:

    1.     My name is Ilene Weinerman and I am a Special Representative for the Charging Party, the United Federation of Teachers, Local 2, AFL-CIO ("UFT" or the "Union"). The UFT is an employee organization and exclusive bargaining representative of Hearing Officers (Per Session) ("HOPS") who preside over adjudications at the Office of Administrative Trials and Hearings ("OATH" of the "Employer") and are employed, in this capacity, by the Respondent City of New York.

    2.     On September 27, 2007, the UFT was certified by the Office of Collective Bargaining ("OCB") as the exclusive representative of the HOPS and subsequently entered into a collective bargaining agreement ("CBA").

    3.     In March 2020 OATH closed its offices due to the Covid-19 pandemic. Beginning around March 23, 2020, OATH began to have certain HOPS work remotely by telephone. Prior to March 2020, the substantial majority of hearings were held in person at the offices of OATH. Upon information and belief, although there was a remote unit in the past it was very limited in scope and individuals who were called to work in March were not in the remote unit.

    4.     A limited number of HOPS have been called upon to work remotely. For example, from the period of March 23, 2020 through May 23, 2020 only around 33 HOPS were scheduled out of a roster of around 350. Moreover, for the period of March 23, 2020 through May 23, 2020 the established practice concerning submission of schedules was not observed and the criteria for

selecting these HOPS, and continuing to the present, was said to be based on "agency need" without any description of the qualifications required to meet "agency need" despite requests for further information regarding this issue.

5.    In around April 2020, OATH began to hold remote hearings, Upon information and belief, beginning around late June 2020, HOPS have been submitting their monthly schedules as per past practice, however, it is unclear what criteria the Employer is using to determine which HOPS are assigned to work remotely.

6.    In around April 2020, OATH instituted a remote work platform called "ATAS" that a significant number of HOPS could not utilize due to the lack of proper equipment or training. This has resulted, for all practical purposes, in those HOPS being rendered ineligible for work and removed from the roster contrary to established practice. In around July 2020 the City confirmed that it was not offering training on ATAS but issued a power point to the HOPS.  Although assistance was supposed to be available HOPS have reported that there is no IT support. *See,* Exhibit "A" for email regarding ATAS.

7.    Beginning in around May 2020, OATH unilaterally decided to change the hours of HOPS who are assigned to remote work to the hours of 8:30 a.m. to 4:30 p.m. where pursuant to established practice the HOPS had the ability to work flexible hours less than a full day and starting as early as 8:00 a.m. up to 10:00 a.m.

8.    Beginning in around June 2020, more HOPS were scheduled for remote work. However, as stated above, in order to receive an assignment the City has unilaterally set new requirements for HOPS.  For example, HOPS with Apple computers were not readily able to access the system and were required to have a PC with Internet Explorer if they wanted to work.  By email dated June 10, 2020, a Supervisor in the Bronx unit of OATH notified HOPS that they must "accept and agree" to the following requirements to receive an assignment:

> -Hearing officers must have access to a computer and a cell phone or land line;
> -Must be comfortable adjudicating all types of OATH cases;
> -Must be able to write up all cases on the same day of their hearings; and
> -Must be ready to start hearings at 8:30 a.m. (the assigned hours are from 8:30 a.m. to 4:30 p.m.)

*See,* Email from Joel Tucker annexed hereto as Exhibit "B".  In an effort to receive work, HOPS have reported to me that they have purchased equipment, or an extension for their current computer, at their own expense in order access the remote platform.  For example, HOPS with apple computers were not able to access the system and were required to have a PC if they wanted work.  When assigned work, these employees are not reimbursed for the equipment, paper, printers, ink, phone or other expenses incurred as a result of remote work. In a meeting on June 30, 2020, the Commissioner of OATH stated that some laptops had been distributed but failed to state who received the laptops or how they were selected.

2

9.   Upon information and belief, for those HOPS called to perform remote hearings OATH has unilaterally increased the workload substantially with back to back hearings being required with no or minimal time for preparation between hearings permitted.  HOPS are monitored on-line by the administration and are immediately scheduled for the next matter.  Moreover, HOPS since in around October 2020 HOPS have been required to sign in and out by email every day.  *See,* Email from City dated October 20, 2020 annexed hereto as Exhibit "C".

10.   I have been informed by HOPS that OATH has unilaterally changed the breaks allowed for HOPS which were scheduled in the past.  Now if a break is required for lunch, or personal needs, the HOPS must request permission for the break from OATH.  Moreover, despite the increased workload, OATH unilaterally implemented a limitation on the hours when HOPS are allowed to write decisions.  They cannot write decisions on scheduled days, weekends or holidays.  This has increased the number of hours which HOPS are required to work beyond their scheduled days.  In other communications, the HOPS are required to write up all decisions on the day of the hearings which also requires additional time outside the scheduled working hours.  Others have been told that there is a weekly limitation on hours which can be worked despite these new conditions.

11.   Starting in around October 2020 more HOPS have been returned to work, however, upon information and belief, OATH is requiring those HOPS to adjudicate in areas beyond their previously assigned work.  Adequate training for such work has not been provided, even though it is necessary for continued employment.  *See, DC 37,* 69 OCB 20, at 5-6 (BCB 2002) (Training is a mandatory subject when it is required as a qualification for continued employment or improvement in pay or work assignments).  Moreover, OATH has unilaterally instituted a policy of not paying for mandatory CLE contrary to the agreement.

12.   All of the above unilateral changes have been instituted without prior notice or bargaining with the UFT.

13.   The UFT demanded bargaining on multiple occasions with the City but the City has failed and refused to bargain over these issues or produce relevant information requested by the UFT. See Charge, ¶¶ 13 to 20.

ILENE WEINERMAN

Sworn to before me this
15 day of DEC, 2020

NOTARY PUBLIC

MOHAMMAD RASHID RIAZ
Notary Public - State of New York
No. 01RI6320662
Qualified in Queens County
My Comm. Expires Mar. 9, 20__

3

# EXHIBIT "A"

**From:** Schwecke, Carmena (OATH) <cschwecke@oath.nyc.gov>
**Sent:** Thursday, July 9, 2020 9:09 AM
**To:** Akinrefon, Akinwale (OATH); Badner, Beth (OATH); Brem, Laura (OATH); Brown, Sharon (OATH); Cappello, Dennis S. (OATH); Chen, William (OATH); crawford, keri-Ann (OATH); Dodell, Sue Ellen (OATH); Fairclough, Pamela (OATH); Feinerman, Sheila (OATH); Feinman, Meredith (OATH); Finkel, Melanie (OATH); Follett-Figueroa, Danielle (OATH); Frenkel, Sylvia (OATH); Friedman, Vivian (OATH); Garcia, Elizabeth (OATH); Ghunney, Albert (OATH); Glaser, Pauline (OATH); Glatt, Debra (OATH); Gorman, Michael (OATH); Handler, Alan (OATH); Hudson, Ebonette (OATH); Israel, Herbert (OATH); Julius DiFiore (OATH); Langell, John (OATH); Leader, Rhonda (OATH); Lief, Stephen (OATH); Lotson, Adrienne (OATH); Martinez, Marcelo (OATH); Mercurio, Patrick (OATH); Mono, Henry (OATH); Murray, Clinvern (OATH); Negron, Wanda (OATH); Ojinnaka, Cornelius (OATH); Pierre, Natasha (OATH); Pitter, Janet (OATH); Rizzo, Albert (OATH); Ross, Kristina (OATH); Samotin, Nancy (OATH); Sewell, Jamin (OATH); Shifrin, Ilene (OATH); Spector, Malcolm (OATH); Stern, Patricia (OATH); Stiefel, Howard (OATH); Tabacco, Lucy (OATH); Tolan, Margaret (OATH); Turiel, Robinanne (OATH)
**Subject:** FW: ATAS PowerPoint Training

Good Morning Hearing Officers,

Although OATH will not be offering formal ATAS training, attached is an excellent step-by-step PowerPoint presentation on how to use ATAS.

Please note that if you are scheduled to adjudicate cases remotely, and you experience any operational issues (or any other type of problem), you can always contact Joel or Jerilyn for help by e-mail.

Thank you. Stay safe and Be well.

Carmena

# EXHIBIT "B"

**From:** "Tucker, Joel M. (OATH)" <JTucker8@oath.nyc.gov>
**Date:** June 10, 2020 at 2:52:32 PM EDT
**To:** "Badner, Beth (OATH)" <BBadner@oath.nyc.gov>, "Fairclough, Pamela (OATH)"
<PFairclough@oath.nyc.gov>, "Feinman, Meredith (OATH)" <MFeinman@oath.nyc.gov>, "Frenkel,
Sylvia (OATH)" <SFrenkel@oath.nyc.gov>, "Friedman, Vivian (OATH)" <VFriedman@oath.nyc.gov>,
"Garcia, Elizabeth (OATH)" <EGarcia8@oath.nyc.gov>, "Ghunney, Albert (OATH)"
<Aghunney@oath.nyc.gov>, "Glaser, Pauline (OATH)" <PGlaser2@oath.nyc.gov>, "Gorman, Michael
(OATH)" <MGorman@oath.nyc.gov>, "Handler, Alan (OATH)" <AHandler@oath.nyc.gov>, "Hudson,
Ebonette (OATH)" <EHudson2@oath.nyc.gov>, "Israel, Herbert (OATH)" <HIsrael@oath.nyc.gov>,
"Leader, Rhonda (OATH)" <RLeader8@oath.nyc.gov>, "Mono, Henry (OATH)" <HMono@oath.nyc.gov>,
"Ojinnaka, Cornelius (OATH)" <COjinnaka@oath.nyc.gov>, "Pierre, Natasha (OATH)"
<NPierre@oath.nyc.gov>, "Ross, Kristina (OATH)" <KRoss2@oath.nyc.gov>, "Samotin, Nancy (OATH)"
<NSamotin@oath.nyc.gov>, "Shifrin, Ilene (OATH)" <IShifrin8@oath.nyc.gov>, "Spector, Malcolm
(OATH)" <MSpector@oath.nyc.gov>, "Stiefel, Howard (OATH)" <HStiefel@oath.nyc.gov>, "Tabacco,
Lucy (OATH)" <LTabacco@oath.nyc.gov>, "crawford, keri-Ann (OATH)" <kcrawford@oath.nyc.gov>,
"Julius DiFiore (OATH)" <jdifiore@oath.nyc.gov>, "Feinerman, Sheila (OATH)"
<SFeinerman@oath.nyc.gov>, "Finkel, Melanie (OATH)" <MFinkel@oath.nyc.gov>, "Chen, William
(OATH)" <WChen2@oath.nyc.gov>, "Turiel, Robinanne (OATH)" <RTuriel@oath.nyc.gov>, "Negron,
Wanda (OATH)" <WNegron@oath.nyc.gov>, "Lotson, Adrienne (OATH)" <ALotson@oath.nyc.gov>, "Lief,
Stephen (OATH)" <SLief@oath.nyc.gov>, "Dodell, Sue Ellen (OATH)" <SDodell2@oath.nyc.gov>,
"Sewell, Jamin (OATH)" <JSewell2@oath.nyc.gov>, "Stern, Patricia (OATH)" <PStern@oath.nyc.gov>,
"Martinez, Marcelo (OATH)" <MMartinez02@oath.nyc.gov>, "Murray, Clinvern (OATH)"
<CMurray2@oath.nyc.gov>, "Brown, Sharon (OATH)" <SBrown5@oath.nyc.gov>, "Tolan, Margaret
(OATH)" <MTolan@oath.nyc.gov>, "Brem, Laura (OATH)" <LBrem@oath.nyc.gov>, "Cappello, Dennis S.
(OATH)" <DCappello@oath.nyc.gov>
**Cc:** "Rubin, Jerilyn F. (OATH)" <JRubin@oath.nyc.gov>, "Pitter, Janet (OATH)" <JPitter@oath.nyc.gov>,
"Schwecke, Carmena (OATH)" <cschwecke@oath.nyc.gov>
**Subject:** Schedule

Dear Colleagues,

I hope that you and your families are safe and healthy.

In anticipation of expanding remote hearings for respondents in July 2020, please email me your July
availability by June 15, 2020.

Please note that, at this time, no hearing officers will be allowed to conduct hearings in person at the
hearing office.

Agency needs, and certain requirements and factors, will be considered for selecting hearing officers for
remote hearing work assignments.

Therefore, before requesting remote hearing assignments, please know that you must accept and agree
to the following additional requirements:

- HOs must have access to a computer and a cell phone or land line;

- Must be comfortable adjudicating all types of OATH cases;

- Must be able to write up all cases on the same day of their hearings; and

• Must be ready to start hearings at 8:30AM. (The assigned hours are from 8:30AM to 4:30PM.)

You will be sent an email confirming your assignment(s) before the end of this month.

Thank you for your cooperation.

EXHIBIT "C"

**From:** Schwecke, Carmena (OATH) <cschwecke@oath.nyc.gov>
**Sent:** Tuesday, October 20, 2020 6:18 PM
**To:** Anik, Arthur (OATH); Tucker, Joel M. (OATH); Rubin, Jerilyn F. (OATH); Mitchel, Mary (OATH); Pitter, Janet (OATH); Archer, Simone (OATH); Follett-Figueroa, Danielle (OATH)
**Subject:** New Check-out protocol

Before you sign-out at the end of each  work day you must send an email to Court Call Staff  (Kelly Corso, Joann Rattansingh, Lou Rasso, and James Moore) letting them know you are signing out for the day. Please send the email at least 10 minutes before you actually sign-out in case court call staff needs to contact you. You are required to "check-out" with Court Call Staff every day going forward. Thank you. Carmena

# Carmena B. Schwecke

Assistant Commissioner, OATH Hearings Division

31-00 47th Avenue, Long Island City, NY 11101

Office  718 -393-6020

Cell      347-533-2816

cschwecke@oath.nyc.gov



**VERIFICATION FOR IMPROPER PRACTICE PETITION**

STATE OF NEW YORK )
COUNTY OF ) SS.:

_Lori M. Smith_, being duly sworn, deposes and says that I am the petitioner
or its representative in this matter and that I have read this electronic submission consisting of data entered in the OCB's
electronic improper practice form, this verification and any additional pages that have been attached to the electronic submission.
I am familiar with the facts alleged herein, which I know to be true, except as to those matters alleged upon information and
belief, which matters I believe to be true.

Signature _____   Date _12/21/20_

Subscribed and sworn to before me
21st day of _December_, 2020

_____
Signature of Notary

**INCHOL YO**
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/11/2024
ID Number: 2311188

INCHOL YO
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/1/2024
ID Number 2311188

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING
------------------------------------------------------------------X
In the Matter of the Improper Practice Petition

        - between -

UNITED FEDERATION OF TEACHERS, LOCAL 2,
AFL-CIO

                          Petitioner,

          -and-

CITY OF NEW YORK, NEW YORK CITY
OFFICE OF ADMINISTRATIVE TRIALS & HEARINGS,

                         Respondents.
------------------------------------------------------------------X

**VERIFIED ANSWER TO
IMPROPER PRACTICE
PETITION**


**BCB-4408-20**

      Respondents, by their attorney Steven H. Banks, General Counsel, Office of Labor Relations of the City of New York, by John Supik, Assistant General Counsel, as and for their Verified Answer to the Improper Practice Petition, pursuant to Title 61 of the Rules of the City of New York, respectfully allege as follows:

1.  Admit the allegations contained in Paragraph "1" of the Improper Practice Petition.

2.  Admit the allegations contained in Paragraph "2" of the Improper Practice Petition.

3.  Deny the allegations contained in Paragraph "3" of the Improper Practice Petition and aver that while OATH's physical offices were closed due to the COVID pandemic, their operations and services continued.  Aver that the "remote unit" referenced in Paragraph "3" is a unit that conducted remote hearings from OATH offices prior to the onset of COVID and was not working remotely from their home.

4.  Deny the allegations contained in Paragraph "4" of the Improper Practice Petition, and aver that there is an active roster of 258 Hearing Officers Per Session (HOPS) who are available

Hyman Reply Dec. Ex. C - 49

to be scheduled if they request days. There are roughly 70 HOPS that have declared themselves inactive, meaning they are not available to receive assignments.

5.  Deny the allegations contained in Paragraph "5" of the Improper Practice Petition, and aver that agency need is the only criteria that has ever been used to schedule HOPS, and that there is no past practice of providing any scheduling criteria to the Union.

6.  Deny the allegations contained in Paragraph "6" of the Improper Practice Petition, and aver that the Administrative Tribunal Automated System or "ATAS" is not a program used to access work desktops remotely, but is instead an adjudication platform that has been implemented in OATH offices since 2011, and has been in widespread use since 2016. *See* "ATAS Training PowerPoints'" appended hereto as City Exhibit "2".

7.  Deny knowledge information sufficient enough to form a belief about the truth of the allegations contained in Paragraph "7" of the Improper Practice Petition, and aver that the laptops were distributed to fulltime administrative staff, and that there has never been a past practice of reimbursing employees for equipment, paper, printers, ink, phone or other personal expenses.

8.  Deny the allegations contained in Paragraph "8" of the Improper Practice Petition, and aver that has never been a policy of flexible working hours allowing HOPS to start as late as 10:00 A.M.

9.  Deny the allegations contained in Paragraph "9" of the Improper Practice Petition, and aver that any increase in workload since March 2020 is due to the increase in summons issued by City Agencies.

10. Deny the allegations contained in Paragraph "10" of the Improper Practice Petition, and aver that the Agency permits HOPS to work on days they are not scheduled for hearings, so that they might write decisions, and pays for hours worked on those days.

11. Deny the allegations contained in Paragraph "11" of the Improper Practice Petition, and aver that HOPS are not being "returned" to work, but that HOPS who have already *voluntarily* submitted their available dates are scheduled on those dates *more often* than they previously had been, due to the increasing number of summonses issued since April 2020.

12. Deny the allegations contained in Paragraph "12" of the Improper Practice Petition.

13.  Neither admit nor deny the allegations contained in Paragraph 13 of the Improper Practice Petition, and respectfully refer the Board to Petitioner's Exhibit "B" as best evidence of its contents.

14. Neither admit nor deny the allegations contained in Paragraph 14 of the Improper Practice Petition, and respectfully refer the Board to Petitioner's Exhibits "C" and "D" as best evidence of their contents.

15. Deny the allegations contained in Paragraph "15" of the Improper Practice Petition, and aver that the survey at issue was created by DCAS and sent to all City agencies to be distributed among all City employees.

16. Admit the allegations contained in Paragraph "16" of the Improper Practice Petition.

17. Neither admit nor deny the allegations contained in Paragraph "17" of the Improper Practice Petition, and respectfully refer the Board to Petitioner's Exhibit "F" and "G" as best evidence of their contents.

18. Neither admit nor deny the allegations contained in Paragraph "18" of the Improper Practice Petition, and respectfully refer the Board to Petitioner's Exhibit "H" as best evidence of its contents.

19. Neither admit nor deny the allegations contained in Paragraph "19" of the Improper Practice Petition, and respectfully refer the Board to Petitioner's Exhibit "I" as best evidence of its contents.

20. Admit the allegations contained in Paragraph "20" of the Improper Practice Petition.

21. Paragraphs 21 through 28 of the Improper Practice Petition contains a legal argument and as such does not require a response. To the extent that it is found to contain such factual allegations, Respondents deny those allegations.

## Preliminary Statement

The Improper Practice Petition should be dismissed in its entirety. On March 13, 2020, New York City Mayor Bill DeBlasio issued a state of emergency due to the rising number of cases of the novel coronavirus, COVID-19 (COVID).[1] OATH, under direction from the Department of Mental Health and Hygiene (DOHMH) and the Department of Citywide Administrative Services, took steps to eliminate COVID spread in the office, while continuing to provide services to the New York City public at large. At the heart of this Improper Practice Petition is OATH's decision to close its offices and hold hearings remotely. OATH's decision to move to remote work, necessitating its HOPS to adjudicate cases from the safety of their home, falls squarely within the City's management right under the New York City Collative Bargaining Law (NYCCBL) to "take all necessary actions to carry out its mission in emergencies" and to

---

[1] https://www1.nyc.gov/office-of-the-mayor/news/138-20/mayor-de-blasio-issues-state-emergency

4

"determine the method, means and personnel by which governmental operations are to be conducted."[2]

The Union in its Improper Practice Petition charges that the City changed existing terms and conditions of employment in violation of §§ 12-306(a)(1) and (5) of the NYCCBL. The bulk of these charges concern alleged changes to the Agency's scheduling of HOPS; changes to their hours worked; and changes to the technology they are required to use. The Improper Practice Petition is rife with mischaracterizations about the past practices of the Agency and distortions about changes in current practice. To establish that a unilateral change to a term and condition of employment has occurred, the Union "must demonstrate that (i) the matter sought to be negotiated is, in fact, a mandatory subject and (ii) the existence of such a change from existing policy." *DC 37*, L. 436, 4 OCB2d 31, at 13 (BCB 2011). The Petitioner alleges that the Agency has changed the formula for scheduling HOPS, the schedule submission process, HOPS hours, and the computer platform used to adjudicate summonses. None of these alleged changes have occurred. The Agency has, to the greatest extent practical, tried to make the terms and conditions of employees working at home mirror the terms and conditions of the OATH offices, while maintaining the efficiency of governmental operations.

To the extent the Union's description of the actions taken by OATH were accurate, those actions constitute permissible exercises of OATH's statutory management right. Specifically, NYCBBL § 12-307(b) grants the City the authority to "exercise complete control and discretion over its organization and the technology of performing its work." Similarly, the Board of Collective Bargaining (BCB) makes clear that the City "has the right to assign or reassign its employees, to determine what duties employees will perform during working hours and to

---

[2] NYCCBL § 12-307(b)

5

allocate duties among its employees, unless the parties themselves limited that right in their collective bargaining agreement." *UFA,* 77 OCB 39, at 14 (BCB 2006). Here, the parties have not limited these rights in the collective bargaining agreement between the UFT and the City.

The Union has also included in its Petition charges against OATH and the City for direct dealing and for failing to furnish information to the Union. Both charges are rife with mischaracterizations and outright falsehoods.  Petitioner alleges that by disseminating a survey in May 2020, OATH has subverted its members' representational and organizational rights and therefore engaged in unlawful direct dealing in violation of NYCCBL § 12-306(a)(1) and (4). This survey in fact was disseminated by DCAS and in no way subverts members' rights or the Union's ability to represent its members. Petitioner's claim of direct dealing is based on a misunderstanding of the survey's origin, its contents, and the intention behind its dissemination. An archived version of the survey is appended hereto as City's Exhibit "5". This charge of direct dealing must be dismissed as the city-wide anonymous survey, which does nothing to promise a benefit or threaten a reprisal, on its face does not subvert UFT's representation of its members.

Also at issue is an August 18th information request. Some of the information has been provided, either at a July Labor-Management meeting or with the instant Answer. The majority of the information requested in the August 18th information request does not involve subjects of mandatory bargaining. The information requested is not information that would aid the Union in collective bargaining or in the grievance procedure. Accordingly, the allegation that the City has violated NYCCBL § 12-306(c)(4) must be dismissed as the Petitioner has failed to state a *prima facie* case that the City was obligated to furnish the information requested in its August 18th letter.

6

**Statement of Facts**

22. Respondent City of New York ("City") is a municipal corporation organized under the laws of the State of New York. Bill de Blasio is the Mayor of the City.

23.  The City, pursuant to the Administrative Code of the City of New York, is defined as "a body politic and corporate in fact and in law with power to contract and to be contracted with, to sue and be sued, to have a common seal and to have perpetual succession." N.Y. City Admin. Code § 2-101.

24. Respondent, Office of Administrative Trials and Hearings ("OATH" or "Agency"), is a public employer, having its offices at 100 Church Street, 12th Floor, New York, NY 10007.

25. OATH has five offices, one in each borough. All offices are closed due to the COVID-19 pandemic. [3]

26. The Office of Administrative Trials and Hearings is the City's central, independent administrative law court. OATH has two divisions that are responsible for adjudicating City matters: the OATH Trials Division and the OATH Hearings Division.

27. The OATH Trials Division adjudicates a wide range of issues that can be referred by any City agency, board or commission. Its caseload includes employee discipline and disability hearings for civil servants, Conflicts of Interest Board cases, proceedings related to the retention of seized vehicles by the police, City-issued license and regulatory enforcement, real estate, zoning and loft law violations, City contract disputes and human rights violations under the City Human Rights Law. OATH Trials are conducted by Administrative Law Judges (ALJs) who are appointed to five-year terms.

---

[3] https://www1.nyc.gov/site/oath/hearings/hearing-in-person.page.

28.  In the OATH Hearings Division, hearings are conducted on summonses issued by 25 different City enforcement agencies for alleged violations of law or City rules. These summonses are issued by the Departments of Buildings, Sanitation, Environmental Protection, Consumer and Worker Protection, Health and Mental Hygiene, and the Taxi and Limousine Commission, among others. OATH also has jurisdiction to hold hearings on summonses from certain non-City entities such as the Port Authority of New York and New Jersey. OATH hearings are conducted by Hearing Officers Per Session (HOPS).

29. Prior to the onset of the COVID-19 pandemic, the OATH Hearings Divisions regularly held up to 1,000 hearings per day.

30. HOPS are paid on an hourly basis. HOPS can work no more than 1,000 hours per year and can work no more than 17 hours per week. *See* "Job Specification" appended hereto as City Exhibit "1".

31. HOPS have the discretion to choose to work no hours in a given day or week; they are not required to work any specific day or week.

32. Around the 15th of each month, a Division Manager at the Agency will email HOPS requesting they provide their availability for the upcoming month. When HOPS can promptly provide their availability, the Division Manager schedules them for days in the coming month. HOPS are usually notified of their schedule for the upcoming month by the 25th of the present month. This practice has continued while HOPS are working from home.

33. OATH schedules its hearings for HOPS based on its workload, i.e. based on how many summonses are issued by issuing agencies.

34. HOPS are scheduled to work a seven-hour workday. OATH offices open to the public at 8:00 a.m. and hearings start soon thereafter.

35. The shift to remote work has not changed the hours HOPS are expected to work.

36. There is no policy of allowing employees to show up as late as 10:00 a.m.  It was not uncommon for a childcare issue or a subway problem to delay employees' arrivals by a few minutes, and the Agency is understanding. But there is no policy, written or otherwise, that permits HOPS to regularly miss the first 60–90 minutes of scheduled hearings. Such a policy would wreak havoc on the Agency's daily operations.

37. Hearings can last anywhere from twenty minutes to several hours. HOPS write decisions in between cases or after the last case is heard.

38. When in the office, Managers assign cases by observing which HOPS are currently free. They hand case files to HOPS who are not in a hearing and not on a break. Naturally, if a Hearing Officer is in the bathroom, the hallway, grabbing coffee or stepping away from the desk for any number of reasons, the Manager does not see the Hearing Officer, and accordingly does not assign him or her a case.

39. Managers generally attempt to equitably assign cases to the Hearing Officer who has been free for the longest time, in an attempt to avoid the assignment of cases back-to-back with no opportunity to write a decision in between.

40. While in the office, HOPS use one of three adjudication systems to log, submit, and store their work. One of these is the Administrative Tribunal Automated System or "ATAS". ATAS has been used for Health cases since 2011 and for DCA cases since 2016 when the OATH Hearings Division was created. When the OATH Hearings Division was created, all HOPS were expected to adjudicate cases in ATAS.

41. In 2016, at the direction of the then Commissioner, all  HOPS were expected to begin adjudicating cases in ATAS and explanatory PowerPoints were developed and made

available to them for this purpose. . See "ATAS Training PowerPoints" appended hereto as City Exhibit "2".

***Agency Operations Since the Outset of the COVID-19 Pandemic***

42. In early March 2020, as coronavirus cases in New York City began to spike, OATH began to implement safety measures to prevent the spread of COVID in the office. These included frequent cleaning of high touch point areas, prohibiting use of DCDs to log in, procuring and distributing hand sanitizer and disinfectant wipes to staff, disinfecting areas used by persons identified as having COVID symptoms, and changing HVAC filters.

43. Eventually, on March 23, 2020 OATH decided to close its offices to the public, and cease holding in-person hearings.

44. Because of the need to continue providing services to the public, OATH decided it would be feasible to resume hearings over the telephone, using the platform "Court Call."

45. Around this time, the Agency IT Department assessed the several adjudication platforms used by OATH, and determined that ATAS was the platform best suited to be used by HOPS working from home.

46. Hearings are conducted telephonically, and HOPS concurrently track, log and submit their cases on ATAS in the same manner as they did in the office.

47. Cases are assigned in the largely same manner as well. HOPS email their managers to let them know they are signing into work for the day. Managers see when HOPS sign onto Court Call in the morning, and assign cases based on who is marked as online.

48. However, if a HOPS is marked as online, a Manager is unable to ascertain if they have stepped away from the computer and will still assign that Hearing Officer a case. That means

practically that a Manager will direct a waiting phone call from a respondent to the Hearing Officer, and the respondent will be left waiting for the Hearing Officer to pick up the phone.

49. Because respondents were being left on hold, Managers requested that HOPS notify them when they were stepping away from the computer. HOPS do not need the consent of the Managers to take a break, this is wholly done to alert the Manager that the HOPS is not available at that moment to take a call.

50. Similarly, Managers ask HOPS to notify them when they log on for the day and 10 minutes before they leave for the day. Managers cannot walk around the office and observe which HOPS are running late or which HOPS are leaving early and thus cannot receive cases. Such a notification system is the only way to ensure that respondents, the members of the public served by OATH, are not waiting for an extended period of time.

51. In the early stages of remote work, there were very few summonses to adjudicate because all cases already scheduled were automatically rescheduled to a future date to enable OATH to adjust its processes and communicate to parties how the adjudications were to proceed telephonically.  Moreover, most of the enforcement agencies were not issuing summonses.

52. As these issuing agencies resumed operations, the number of summonses increased, and accordingly the workload of OATH HOPS increased.

53. The process for HOPS submitting their schedules has not changed since the pandemic. Around the 15th of each month, a Division Manager at the Agency will email HOPS requesting they provide their availability for the upcoming month. HOPS are usually notified of their schedule for the upcoming month by the 25th of the present month.

54. The hours HOPS are required to work have not changed since the pandemic.

11

55. Managers still try to adhere to their policy of assigning the newest call to the Hearing Officer who has been available the longest, so no HOPS gets scheduled back-to-back hearings and they have time to write decisions in between.

56. As of right now, there are no concrete plans to re-open OATH offices for full service.

## ARGUMENT

### AS FOR A FIRST DEFENSE

### Petitioners have failed to allege facts sufficient to support an Improper Practice claim, as OATH properly exercised its management prerogative and did not fail to negotiate over a mandatory subject of bargaining.

57. Petitioner's claim that OATH and the City violated NYCCBL §§ 12-306(a)(1) and (a)(4) must fail because OATH has not made a unilateral change to a term or condition of employment, as Respondents are not required to bargain with the Union regarding subjects within their statutory management rights under NYCCBL § 12-307(b).

58. Specifically, NYCCBL § 12-307(b) states:

> It is the right of the city, or any other public employer, acting through its agencies, to determine the standards of services to be offered by its agencies; determine the standards of selection for employment; direct its employees; take disciplinary action; relieve its employees from duty because of lack of work or for other legitimate reasons; maintain the efficiency of governmental operations; determine the methods, means and personnel by which government operations are to be conducted; determine the content of job classifications; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work. *Emphasis added.*

12

1) **OATH Did Not Make a Unilateral Change to a Term and Condition of Employment When it Shifted Its Operations to Remote Work**

59. OATH's decision to close its offices and shift HOPS to work remotely from their homes is a non-mandatory subject of bargaining and does not violate the duty to bargain under NYCCBL § 12-306(a)(4).

60. NYCCBL § 12-307(b) grants the City the authority to "take all necessary actions to carry out its mission in emergencies" as well as "determine the methods, means, and personnel by which government operations are to be conducted."

61. BCB precedent also confirms that the City's direction of its workforce during emergencies is a permissible exercise of the management rights granted by the NYCCBL. In *DC 37*, 6 OCB2d 14 (BCB 2013) the Board addressed a wide-ranging Personnel Services Bulletin that adopted a new time and leave policy during specific weather emergencies. The Bulletin included the relevant language "[E]mployees may be directed to report to authorized alternative work sites or to work staggered or flexible schedules." *Id.* At 21. The Board held that this language instituting alternative work locations and including flexible and staggered hours in a City-wide emergency were managerial prerogatives, and as such did not have to be bargained over. *See also, Manhattan and Bronx Transit Operating Authority*, 40 PERB ¶ 3023 (2007) ("where an employer assigns an employee to perform his or her work duties is a nonmandatory subject of bargaining").

62. By March 23rd, it became clear to the Agency that continuing to hold in-person hearings in the small, windowless hearing rooms[4] was infeasible and it put both employees and

---

[4] For a view of the Hearing Room with Respondents and HOPS face-to-face, *See* "The Judge will Hear your 223,000 Excuses Now" *New York Times* (March 16, 2018). https://www.nytimes.com/2018/03/16/nyregion/the-judge-will-hear-your-excuses-now.html

respondents at serious risk. Like many other City agencies, including the Office of Labor

Relations and the Office of Collective Bargaining, OATH transitioned to a remote operation.

63. The Mayor directed that all non-essential services be performed remotely, and OATH

followed suit.

64. OATH has an obligation to the public and to other City Agencies to adjudicate summons

issued by those Agencies. To ensure that summonses continued to be adjudicated, OATH set

up a remote work system where respondents would call in via Court Call. Under that system,

managers assigned those calls to HOPS, and HOPS conducted hearings and entered the

decision and all other necessary information into ATAS.

65. Because OATH's decision to have its personnel, including HOPS, work from home is so

clearly within the Agency's prerogative to determine the method, means and personnel by

which its operations are conducted, it is a non-mandatory subject that the Agency is under no

obligation to bargain over.

66. Similarly, OATH has no obligation to bargain over its selection of ATAS, a system in

widespread use at the Agency since at least 2016 as the adjudication platform to be used

uniformly by HOPS while they are working remotely from home.

67. The Board has repeatedly stated that "decisions regarding the selection or use of equipment

involve the City's discretion over the methods, means and technology of performing its work,

and [] to the extent a union's demands usurp that discretion, they infringe on the exercise of

managerial prerogative and are rendered non-mandatory." *LEEBA*, 3 OCB2d 29, at 43-44

(BCB 2010) (citing *UFA*, 61 OCB 6, at 7 (BCB 1998).

68. Similarly, PERB has long held that "it is within an employer's discretion to determine the

equipment it needs to carry out its mission of providing services to the public." *County of*

14

*Nassau*, 41 PERB ¶ 4552 (2008) (Maier, ALJ) (The utilization of GPS technology was a management prerogative because it related to the "manner and means by which an employer is providing services to the public).

69. OATH's selection of one software program among several already used in the office is within its "discretion over the methods, means, and technology of performing its work" under NYCCBL § 12-307(b).

70. Similarly, OATH's decision to distribute Agency laptops to full-time administrative staff, and not HOPS, is clearly within the same granted discretion. The agency's resources are not limited and the decision of which available equipment to assign to which employees is a clear management prerogative.

71. Further, OATH's decision not to reimburse HOPS for printing costs or other incidental costs of working from home does not give rise to a violation of NYCCBL §§ 12-306(a)(1) or (a)(4). HOPS are not required to print documents or case files. It is a personal preference to print a document at home rather than view it on a computer screen. None of these incidental effects of the shift to remote work implicate mandatory subjects of bargaining and as such should be dismissed.

### 2) OATH Alleged Changes to HOPS Schedules are Nonmandatory Subjects of Bargaining and as Such, do not Need to be Bargained Over.

72. It is well-settled by the Board that management's decisions regarding scheduling and levels of staffing are not mandatory subjects of bargaining because they fall within an employer's statutory management right.

73. The alleged charges referenced in Paragraphs 4–10 of the Improper Practice Petition relate to the manner in which HOPS were scheduled during the various months of the pandemic.  This

scheduling, along with the number of hours HOPS are required to work, are decisions that are unilaterally made at the discretion the City as it is directly related to staffing and scheduling decisions.

74. When reviewing union challenges to employer staffing decisions, the Board has consistently and unequivocally held that the employer "has the right to assign or reassign its employees, to determine what duties employees will perform during working hours and to allocate duties among its employees, unless the parties themselves limited that right in their collective bargaining agreement." *See UFA*, 77 OCB 39, at 14 (BCB 2006) (*emphasis added*), citing *UFA*, 73 OCB 2, at 6 (BCB 2004); *NYSNA*, 71 OCB 23, at 11 (BCB 2003).

75. Here, the Parties have not limited themselves by Agreement.  As such, the Agency has the absolute right to assign or reassign HOPs; determine the duties that will be performed during working hours; and assign duties amongst HOPS at its discretion.

76. Petitioner in the instant case alleges that between March 23, 2020 and May 23, 2020 "[o]nly 33 HOPS were scheduled out of a roster of 350." While the City asserts that this is untrue,[5] it should be noted that the number of HOPS who mark themselves available for scheduling, that OATH eventually scheduled for hearings, is a matter of management prerogative.

77. Petitioner also alleges a violation of the NYCCBL for an increase in caseloads and the number of cases assigned to each HOPS.  As explained above, OATH experienced a decrease in summonses at the beginning of the pandemic.  As a result, HOPS were assigned fewer cases.  As the number of summonses began to increase, so did the cases assigned to the available HOPS.  The City is not obligated to bargain over work that does not yet exist due to a low number of summonses.  The amount of work assigned to HOPS is directly related to

---

[5] See infra ¶4

the number of summonses it receives. Throughout the instant Petition, Petitioner is in search of some nefarious Agency plot to conceal a trove of summonses. Such a premise is just unmoored from the reality of this pandemic and how in March and April 2020 it forced Agencies to cease issuing summonses.

78. It is clear that OATH's decision to schedule a specific number of HOPS to adjudicate a corresponding number of cases is an employer staffing decision and as such is a nonmandatory subject of bargaining.

79. Similar to the discretion the City is allowed in staffing decisions, the Board allows the City broad discretion in scheduling. The Board has held that "[m]andatory subjects of bargaining generally include . . . hours." _Id_.; *LEEBA*, 3 OCB2d 29, at 5 (BCB 2010). However, other areas, such as scheduling, fall within the managerial prerogative and are not subject to mandatory collective bargaining. *Id*, at 33; *Fire Alarm Dispatchers Benev. Assn.,* 55 OCB 1, at 11 (BCB 1995). Thus, "while the City unilaterally may determine staffing levels and certain aspects of schedules, such as starting and finishing times, it must bargain over the total number of hours employees work per day or per week." *UFOA*, 1 OCB2d 17, at 10 (BCB 2008); *see also PBA*, 15 OCB 23, at 16-17.

80. Here, however, Petitioner has not alleged with specificity that HOPS hours have changed unilaterally due to the pandemic.

81. When Agency offices were open prior to 2020, hearings started at 8:00 A.M but respondents trickled into the office slowly. Due to the elimination of commute time for both employees and respondents, and to in-person queuing time by respondents in OATH offices, more respondents are "on call" at 8:00 A.M.  However, this reality does not support a claim that OATH has unilaterally changed HOPS hours.

82. This issue has come before the Board before in *UFT*, 3 OCB2d 44 (BCB 2010). There, the UFT claimed that OATH imposed unilateral changes that affected HOPS hours in two ways: 1) OATH eliminated evening and early morning hours (in order for HOPS hours to better match their supervisors) effectively limiting the HOPS to working certain hours of the day, and 2) requiring HOPS to work in at least five-hour time blocks and at least two days in a week in which they choose to work. The Board held that the first was a matter of scheduling and not a mandatory subject of bargaining.  However, it ruled that the second was not a matter of scheduling, making it a mandatory subject of bargaining. *Id.* at 9 (BCB 2010).

83. The facts that give rise to this Petition mirror the first requirement in *UFT*, 3 OCB2d 44 (BCB 2010). To the extent there is any change in HOPS' schedules, it is that the start time was strictly enforced. The few reasons (e.g. transit delays) in which specific individuals were granted leeway by managers to arrive after hearings started was no longer germane when employees were no longer commuting. In other words that cushion of several minutes granted due to a transportation delay was eliminated, and eliminated to ensure that respondents were not waiting on Court Call.

84. Petitioner also alleges that the Agency has scheduled HOPS for back-to-back hearings and "unilaterally implemented a limitation on the hours when HOPS are allowed to write decisions. They cannot write decisions on scheduled days, weekends or holidays. This has increased the number of hours which HOPS are required to work beyond their scheduled days. In other communications, the HOPS are required to write up all decisions on the day of the hearings which also requires additional time outside the scheduled working hours" Petitioner's Improper Practice Petition at ¶9, ¶10.

18

85. These claims are outright falsehoods. Petitioner has adduced no evidence to back up these claims. To the contrary, Agency Managers allow HOPS to request, and (if the request is approved) be paid for, days that are solely devoted to writing decisions that were not completed immediately after the case concluded.

86. To the extent any of these claims are accurate, they do not implicate any mandatory subject that must be bargained over as this implicates the City's right "to assign or reassign its employees, to determine what duties employees will perform during working hours and to allocate duties among its employees, unless the parties themselves limited that right in their collective bargaining agreement." *UFA*, 77 OCB 39, at 14 (BCB 2006).

87. To the extent that the any of the Union's claims of alleged changes are accurate, the actions taken by OATH were staffing and scheduling decisions that did not affect hours worked, and as such are not mandatory subjects of bargaining.

### (3) OATH Did Not Make a Unilateral Change to a Term and Condition of Employment When it Required HOPS Employees to use an Adjudication Software That Had Been Used Since 2016 Without Providing Any New Training for It in 2020.

88. Petitioner alleges OATH is required to bargain over the amount, if any, of training necessary to utilize ATAS when working from home.

89. However, the Board has previously held that "the City has the management right to determine the quantity and quality of the services to be delivered to the public, and, therefore, also the quantity and quality of the training required to achieve that service." *See CWA*, 9 OCB 7 at 6 (BCB 1972).   However, the Board has recognized that an exception to this general principle exists when the training is required by the employer as a qualification for continued employment or for improvement in pay or work assignments or when the union demonstrates that there exists a practice and tradition of the employer's encouraging and supporting employee participation in such training or education.  *See UFA*, 37 OCB 43 at 15

19

(BCB 1986). In *NYSNA*, 11 OCB 2 (BCB 1973), the Board found a demand to refund tuition to nurses taking approved education courses was a mandatory subject of bargaining because the matter concerned an improvement in the nurse's pay.  The employer conceded that it granted nurses pay differentials based upon the completion of studies above the minimum requirement level.

90. The case cited by the Petitioner in ¶11 is wholly inapposite to the instant matter. There, the FDNY previously hosted a 16-day training course to prepare EMT for an exam. In 2001, they unilaterally reduced that course to 5 days. The Board determined that since passing the exam was a requirement for a title promotion, that reduction was a unilateral change to a mandatory subject.

91. Gaining familiarity with the ATAS program, which has been in use in the Agency since 2011 and expanded to all HOPS desktops in 2016, cannot be evaluated on a pass/fail basis. It is a computer program more akin to others such as Microsoft Office or Zoom than it is to a test an employee must pass, or is graded on. The more it is used, the more comfortable and proficient one becomes at it.  ATAS is a learning process, as many adjustments to remote work are, but one cannot "fail" at ATAS.

92. More importantly, using ATAS is not a requirement for a promotion to a higher title or to receive a pay differential.

93. The only way a HOPS would be totally unfamiliar with ATAS prior to March 2020, would be if they regularly and purposely refused the assignment of DOHMH and DCA summonses. Additionally, ATAS is not dissimilar from other adjudication platforms previously used by OATH.

94. Moreover, OATH did offer training on ATAS when it became widely implemented in 2016, and distributed detailed PowerPoints describing its use. See City's Exhibit "2".

95. To the extent that knowledge of ATAS is a requirement to HOPS receiving work, that is true in the very literal sense. As is knowing how to turn on a computer or knowing how to check one's emails is a requirement to receiving work. But Petitioner is conflating ATAS with more arduous tests and certifications that City employees, including legal professionals like HOPS, must pass or attain.

96. Again, the City has the broad management right to determine which technology its employees use. OATH and its IT department determined that ATAS was the platform best suited to function in tandem with Court Call. As ATAS already was in use and any HOPS who handled even just one DCA or DOHMH summons would be familiar with it, OATH made the justified decision to shift all its adjudications to ATAS.

97. Continued employment is not contingent on an employee's skill at using ATAS, nor is any promotion or pay raise. As such training in the use of ATAS is not a mandatory subject, and OATH was under no obligation to bargain over the decision to shift all adjudications to ATAS without extra training.

98. Lastly, the Petitioner alleges that "OATH has unilaterally instituted a policy of not paying for mandatory CLE if the HOPS are not scheduled to work contrary to the agreement." *See* Improper Practice Petition ¶11.

99. CLE is mandatory for attorneys who hope to retain their licenses. Normally, attorneys are charged for CLE classes. However, OATH, like a number of other legal employers, provide these classes at no charge. It has never, however, in addition to offering free classes, also pay attorneys to them. It did not do that in the past, does not do that now and has no plans to do in

21

the future.  There are CLE credits that HOPS receive for attending mandatory courses offered by OATH. These are and have always been paid for by OATH. OATH has never paid for HOPS to attain CLE credits, technically mandatory for HOPS in order to keep their license, that are offered outside of OATH. Without any evidence in support of this allegation, this charge of non-payment should be dismissed.

### AS FOR A SECOND DEFENSE

**<u>To the extent that Petitioner's Improper Practice claim relates to practical impact, such claim is premature and must be dismissed.</u>**

100. Bargaining over the impact of an exercise of managerial prerogative does not become mandatory until the Board declares that an impact exists, and the public employer fails to correct or minimize the impact.

101. The Union's Petition confuses two different legal processes, an Improper Practice Petition Pursuant to NYCCBL §12-306 and a Scope of Bargaining Petition alleging practical impact pursuant to NYYCBL §12-307.

102. Nevertheless, Petitioners allege that "The Employer has further failed and refused to bargain with the union over mandatory subjects of bargaining regarding health and safety issues associated with reconstitution of the workforce including but not limited to issues regarding regular disinfection, staggered work hours and continued remote work, issues regarding leave or accommodations, screening processes, impact of potential closures due to infection and other issues relating to safe return to the workplace in violation of §§ 12-306(1) and (4) of the NYCCBL." *See* Petitioner's Improper Practice Petition at ¶ 25.

103. This Board has clearly defined the process through which a petitioner should assert a claim of practical impact.  In *SBA*, 41 OCB 56 (BCB 1988), the Board stated that a "practical impact

22

claim should be initiated by a scope of bargaining petition in which specific allegations of impact are set forth." This procedure is necessary because the Board must first make a factual determination that a practical impact actually exists, and then determine whether there are any "bargainable issues arising from the impact." *Id*., at 15-16. The Board has specifically noted that "any future attempt to litigate issues of practical impact should conform to the requirements established and repeatedly recited in the decisions of this Board." *See*, *L.300, SEIU,* 45 OCB 36, at 13 (BCB 1990); *See also CWA*, 29 OCB 37 (BCB 1982), *COBA*, 27 OCB 16 (BCB 1981); *L.375, Civil Service Tech. Guild*, 25 OCB 41 (BCB 1980); *UFA & L. 854, UFOA*, 1 OCB 9 (BCB 1968).

104. At the present time, there has been no determination from this Board that a practical impact on safety exists. Thus, the proper channel for Petitioner to bring forth a claimed practical impact is a Scope of Bargaining Petition. Only *after* the Board has determined that there is a practical impact resulting in bargainable issues, and the employer *then* refuses to bargain, may an Improper Practice charge be made.

105. A pre-condition of a hearing on a practical impact claim is "the presentation by a petitioner of sufficiently specific factual details, not merely unsupported allegations." *UFA*, 71 OCB 19 at 7 (2003) (*citing UPOA*, 39 OCB 37 (BCB 1987)); *IOUE*, 51 OCB 25 (BCB 1993) ("[The Board] will not declare that a practical impact exists, nor direct a hearing to consider the matter, solely on the basis of conclusory or speculative allegations.")).

106. Petitioner's instant claim of a practical impact of the on terms of conditions of employment is vague and speculative. This is mainly because there *are* no current plans to reconstitute the workforce or to re-open OATH offices. The guidance OATH has received from DOHMH and DCAS on COVID and on corresponding safety measures to be taken has changed based

23

on how much the City's and the public's understanding of the pandemic have changed. There is no current set date for when OATH will re-open its offices, and as such any claim that there is a set policy, of which its impact must be bargained over, is far too speculative at this point.

107. It is unclear from the Improper Practice Petition whether Petitioner is alleging *only* that the practical impact of the eventual re-opening of offices must be bargained over, or that the initial shift to remote work is a managerial action with an impact on employee safety or workload, and that too must be bargained over. To the extent to which Petitioner is alleging the latter, those claims are also too speculative and vague to support a claim of practical impact.

108. Factors considered in determining whether a practical impact on safety exists include whether the employer has adopted measures that offset any potential threat to safety and whether the employees' adherence to management procedures and guidelines would obviate any safety concerns. *UFA*, 7 OCB 4 (BCB 2014). The Union has the burden to demonstrate that a practical impact on safety exists by demonstrating that the exercise of a management right has created a "clear and present or future threat to employee safety." *Id.* at 9 (quoting *UPOA*, 39 OCB 37, at 5-6 (BCB 1987).

109. A practical impact on workload is established if the Union can provide specific details showing that management's action has resulted in "an unreasonable excessive or unduly burdensome workload as a regular condition of employment." *ADW*, 69 OCB 16 (BCB 2002) (quoting *LBA & SBA*, 51 OCB 45, (BCB 1993); *aff'd*, *Toal v. MacDonald*, 216 A.D.2d 8, 627 N.Y.S.2d 372 (1st Dept. 1995). Whether arguing an increase in workload or the

24

requirement to preform new, additional, and expanded duties, the Union must show a sufficient level to impact workload.

110. A petitioner does not demonstrate a practical impact by enumerating additional duties assigned to employees or by noting a new assignment of duties covered in the job specifications. Additionally, an assertion that, for example, employees are required to work more time than scheduled must include specific details, not bare surmise of increased workload. *NYSNA*, 71 OCB 23 at 13 (BCB 2003).

111. Petitioner has alleged no facts indicating a clear and present danger exists in closing OATH offices and shifting to remote work. Petitioner does however allege an increase in number of cases HOPS must hear. Such an increase, if it does exist, is not so unreasonably excessive or unduly burdensome to impact workload.

112. Petitioner's main claims about an increase in workload appear to really reflect an increase in workload relative to the workload in March and April 2020. In the early stages of remote work, there were very few summonses to adjudicate because, all cases already scheduled were automatically rescheduled to a future date to enable OATH to adjust its processes and communicate to parties how the adjudications were to proceed telephonically. Moreover, most of the enforcement agencies were not issuing summonses.

113. As these agencies began to resume their operations throughout the late spring and summer of 2020, the number of summonses that needed to be responded to at OATH increased. It follows that HOPS who had been consistently informing OATH that they were available to receive cases throughout the spring and summer, would have received more cases on those dates in the summer.

114. Petitioner has not at this point alleged with specificity any practical impact that OATH's actions have had on workload or safety, and as such any claim of impact is premature and must be dismissed.

### AS FOR A THIRD DEFENSE

**Petitioner has failed to allege facts sufficient to support an Improper Practice Claim that the Agency engaged in unlawful direct dealing in violation of NYCCBL § 12-306(a)(1) and (4).**

115. Petitioner alleges that by disseminating a survey in May 2020, OATH has subverted its members' representational and organizational rights and as well as its representation of its members and therefore engaged in unlawful direct dealing in violation of NYCCBL § 12-306(a)(1) and (4).

116. This Board has adopted a direct dealing standard similar to the one employed by the National Labor Relations Board ("NLRB").  In doing so, the conduct of an employer will be examined on a case by case, totality of conduct basis, employing criteria of Section 8(c) of the National Labor Relations Act ("NLRA") to establish if there is a direct dealing violation.  *UFA*, 69 OCB 5 (BCB 2002) (Board found that the City's response of publicizing the Union's rejection of a proposed schedule in employee newsletter constituted direct dealing).

117. The Board has defined direct dealing as an employer's direct communications with union members that "bypass[es] a certified bargaining representative and negotiate[es] directly with members." *UFT*, 4 OCB2d 4, at 22 (BCB 2011); *DC 37*, 5 OCB2d 1, at 15 (BCB 2012) ("An employer engages in direct dealing when an employer "in its communications with employees, obtains or endeavors to obtain the employees' agreement to some matter affecting a term or condition of employment, whether by making either 'a threat of reprisal or

26

promise of benefit,' or 'otherwise subvert[ing] the members' organizational and

representational rights.'").

118. This Board enunciated its standard for determining whether a challenged action constitutes

direct dealing:

> Direct dealing in violation of §12-306(a)(1) and (a)(4) is
> characterized by actions that attempt to mislead employees or to
> persuade them to believe that they will best achieve their
> objectives directly through the employer rather than through the
> union; in other words, the employer, by what it says or does,
> attempts to establish a negotiating relationship with unit employees
> to the exclusion of the employees' bargaining agent.

*PBA*, 77 OCB 10 (BCB 2006), at 14, citing *American Pine Lodge Nursing and*

*Rehabilitation Center v. NLRB*, 164 F.3d 867 (4th Cir. 1999); *City of Buffalo*, 30 PERB ¶

3021 (1997).


119. Passing on factual information does not meet the direct dealing standard of union

circumvention.  *Warren County Deputy Sheriff's Unit v. County of Warren*, 28 PERB ¶ 4624

(1995).

120. The communications at issue in the instant Improper Practice Petition were not directly

issued by the Agency. Instead, the survey at issue was created by DCAS and disseminated to

all City agencies. The email was sent on May 29, 2020 by Rebecca Morales, Chief of Staff,

Human Capital at DCAS. The email body states in relevant part:

> "This email is being sent on behalf of Barbara Dannenberg,
> Deputy Commissioner for Human Capital at the Department of
> Citywide Administrative Services (DCAS).
>
> As New York City plans its "reopening," and private/public
> service delivery is rolled out in phases, we are reaching out to the
> City's workforce to directly inform post-COVID-19 recovery

27

work. COVID-19 has taken a devastating toll on New York City, and there are 27 neighborhoods specifically that were most severely impacted. As the City seeks to recover from this pandemic, we appreciate your thoughts and feedback on ways in which the City can support you as an employee, and support your community.

Please share this information and survey with your agency's employees using the survey link below. The link is accessible via laptop, iPad or mobile phone, and will be available until 5 pm, Friday, June 5th."

*See*, City's Exhibit "3"

121. The attached link was sent in a June 2nd bulletin to all employees email by Labor Relations

Administrator Sharina DeRoberts with the following text:

"Dear OATH Employees:

The Department of Citywide Administrative Services (DCAS) has asked all City employees to fill out an anonymous survey relating to what you feel you need when we return back to work. Please fill it out and submit it to DCAS as soon as possible. The survey will close at 5PM on June 5th. The survey can be found here: http://sgiz.mobi/s3/COVID-19-Recovery-for-City-Employees. OATH will continue to keep you updated as our plan to reopen the agency's offices develops. If you have any questions related to the reopening of the agency, you should send them to returntowork@oath.nyc.gov. In the coming weeks we will be updating the FAQ sheet we circulated with answers to any new questions we receive. Stay healthy and safe!"

*See*, City's Exhibit "4"

122. The attached link has expired, but an archived version of the included survey ("survey") is

attached as City's Exhibit "5".

123. The survey is anonymous and voluntary, and includes eleven questions, eight of which ask

simple biographical information such as the gender, race, and zip code. The questions that

would tend to elicit a more complex response are "What services do you believe are being

28

offered to communities, that are not being offered to yours?"; "What information can the City (as an employer) provide to make you feel safer upon your return to your office/worksite?"; and "What is the single most important thing you need right now as a City employee?" *Id.*

124. No question in this survey is specific to working at OATH, or specific to being represented by UFT or any union in general.

125. At no point is there a reference to union representation, to the collective bargaining process, or to the grievance procedure.

126. No benefit is promised to employees who fill out the survey.  There is no threat of reprisal if an employee does not fill out the survey or fills it out in a manner somehow displeasing to DCAS. There is no promise of benefit or threat of reprisal contained within the survey's questions.

127. Petitioner's claim that the above emails, and the survey they contain, constitutes OATH or any City agency "mislead[ing] employees or  persuad[ing] them to believe that they will best achieve their objectives directly through the employer rather than through the union" is patently absurd.

128. Additionally, on July 2, Allison Costanzo, Assistant General Counsel for the Union, emailed Olga Statz, General Counsel for OATH, stating "the Union appreciates the steps taken by OATH to solicit input from our members regarding safety protocols, remote hearings, and other re-opening procedures." *See* "Costanzo Email" appended hereto as City's Exhibit "6".

129. If the Union truly believed the Agency was undermining its bargaining position by soliciting HOPS input via this survey, Ms. Costanzo would not have then thanked the Agency.

29

130. As Petitioner fails to show that OATH violated §12-306(a)(1) and (a)(4) when it forwarded the survey created and sent to OATH by DCAS, this charge of direct dealing must be dismissed.

### AS FOR A FOURTH DEFENSE

**Petitioners have failed to allege facts sufficient to support an Improper Practice Claim that the Agency violated NYCCBL § 12-306(c) (4) in refusing to furnish information, because the information sought concerned non-mandatory subjects of bargaining.**

131. Pursuant to NYCCBL § 12-306(c)(4), a public employer has a duty to furnish a union, at its request, "data normally maintained in the regular course of business, reasonably available and necessary for full and proper discussion, understanding and negotiation of subjects within the scope of collective bargaining."  The Board has held that this duty to provide information extends to information which is relevant to and reasonably necessary for purposes of collective negotiations or contract administration." *NYSNA*, 3 OCB2d 36, at 13 (quoting DC 37, L. 2507, 73 OCB 7, at 21 (BCB 2004)) (quotation marks omitted). Accordingly, "information relevant to and reasonably necessary for consideration of a potential grievance, or to determine if an improper practice occurred, fall within the ambit of contract administration, and such information must be produced upon request." *NYSNA*, 4 OCB2d 42, at 11–12 (BCB 2011).

132. However, "the duty to disclose such documentation does not attach when the party's request involves a non-mandatory subject of bargaining or cannot be used in contract administration." *NYSNA*, 3 OCB2d 36, at 13–14.  Thus, the obligation to provide information "is not absolute and is circumscribed by the necessity for and relevancy of the

information sought and the reasonableness of the request, including the burden on the

employer and the availability of the information elsewhere." *Id.* (quoting *County of Ulster*,

43 PERB ¶ 4502 (2010)) (quotation and editing marks omitted).

133. Much of the information requested in the August 18th information request does not involve

subjects of mandatory bargaining. As discussed *supra*, information requests ¶1, ¶2 and ¶5 in

the August 18th letter concern the Agency's twin decisions to move to remote work and to

eventually reconstitute its workforce when it is safe and feasible for OATH to reopen its

offices. Specifically, the Union requests:

> "Documents relating to the safety measures and protocols which
> New York City and OATH are reviewing or intent to implement
> relating to the "reconstituting" of the workforce when OATH
> offices are reopened….. [and] all documentation referred by
> OATH in its correspondence dated April 13, 2020 regarding the
> "applicable safety measures recommended by DCAS and DOHMH
> for the reconstitution of a work force, such as regular disinfection,
> staggered work hours, and teleworking, and any subsequent
> documents received concerning same or providing details
> concerning such issues."

> *See* Petitioner's Exhibit "G"

134. The Agency duly responded to this letter on August 27th informing the Union that "much of

the information presently sought by the Union was provided to it in the aftermath of the

Labor Management meeting held between the parties on July 2, 2020."

135. The Agency's decision to reconstitute its workforce, when it does eventually happen, is fully

within its right under NYCCBL § 12-307(b)to "determine the methods, means and personnel

by which government operations are to be conducted….[and] take all necessary actions to

carry out its mission in emergencies."

136. Because the request for information concerns a non-mandatory subject of bargaining, OATH

is under no duty to furnish such information.

31

137. It should also be noted that in the early stages of the COVID-19 pandemic, information about infection risk, the effectiveness of mask-wearing, safety of public transportation, and the airborne qualities of the virus were changing rapidly. OATH was justified in relying in DOHMH's scientific expertise at the time. Petitioner's argument that its current collective bargaining abilities would be impeded if DOHMH guidance from 10 months ago was not furnished, given that the workforce has not been reconstituted and given that so much of what the public knows about the virus has changes in the last 10 months, is absurd.

138. Information requests ¶8, ¶9, ¶10 in the August 18th letter are demands that OATH furnish information on "how" it schedules its HOPS. OATH's truthful response throughout this whole process, that they schedule based on Agency need and on the number of summonses issued by issuing Agencies, is apparently not sufficient to the Union. This request solely concerns matters of scheduling and staffing, which BCB precedent establishes are management prerogatives not subject to mandatory bargaining. *See*, supra ¶82–90.

139. The information sought in information requests ¶4, ¶6 ¶12 are attached to Respondent's Answer as Exhibits "5" "2" "7".

140. The allegation that the City has violated NYCCBL § 12-306(c)(4) must be dismissed as the Petitioner has failed to state a *prima facie* case that the City was obligated to furnish the information requested in its August 18th letter.  As the majority of Petitioner's request for information encompassed mandatory subject of bargaining, OATH was and is under no duty to furnish such information.

32

**WHEREFORE,** Respondents respectfully request that an Order be entered dismissing the Improper Practice Petition in its entirety and that the City of New York be granted such other and further relief as the Board deems just and proper.

Dated:      New York, New York
            January 15, 2020

                                    **STEVEN H. BANKS**
                                    General Counsel
                                    Attorney for Respondent
                                    Office of Labor Relations of the
                                    City of New York
                                    22 Cortlandt St, 14th Floor
                                    New York, New York 10007
                                    (212) 306-7230


                            By:     *John Supik*
                                    _____
                                    John Supik
                                    Assistant General Counsel

33

## **VERIFICATION**

**JOHN SUPIK,** an attorney admitted to practice before the Courts of the State of New York affirms under penalty of perjury and pursuant to Rule 2106 of the Civil Practice Law and Rules, that he has been duly designated as Assistant General Counsel of the Office of Labor Relations of the City of New York and as such that he is an officer of the City of New York, Respondents in this proceeding.  That the foregoing Verified Answer is true based on his own knowledge the source of which is set forth below except as to the matters therein stated to be alleged upon information and belief, and as to those matters, he believes to be true.  Respondents further say that the reason why this verification is not made by the City of New York is that it is a corporation; that the grounds of his knowledge are as follows: information obtained from the books and records of the City of New York and other departments of the city government and from statements made to him by certain officers or agents of the City of New York.

Dated:         January 15, 2021
               New York, New York


*John Supik*
_____
**JOHN SUPIK**

34

# CITY EXHIBIT 1

NC - X,  PART  I                                          CODE NO.  95937
OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS  (820)

# HEARING  OFFICER  (PER  SESSION)

## General Statement of Duties and Responsibilities

Under direction, with broad latitude for the exercise of individual initiative and judgment, conducts hearings concerning allegations of misconduct or violation of the administrative Code of The City of New York and the Rules and Regulations of various Authorities, Agencies and Departments operating within The City of New York.  Performs related work.

## Examples of Typical Tasks

Hears testimony and reads documentary evidence concerning alleged infractions of laws, rules and regulations.

Ensures that an accurate record is made and retained on all hearings.

Examines witnesses and weighs credibility of testimony.

Critically examines supporting documents;  secures necessary evidence by directing the issuance of subpoenas.

Advises respondents of legal rights.

Weighs proof and determines whether allegations have been substantiated.

Analyzes personal and public facts necessary to determine appropriate penalty.

Hyman Reply Dec. Ex. C - 84

NC - X,  PART  I                                                CODE NO.  95937
OFFICE  OF  ADMINISTRATIVE
TRIALS  AND  HEARINGS  (820)

## HEARING  OFFICER  (PER  SESSION)   (continued)

**Examples  of  Typical  Tasks**   (continued)

Files formal findings of fact and conclusions of law.

Reviews and evaluates technical proposals for compliance with environmental codes.
Reports trends in defenses, problems in proof, and suggests procedural improvements.

**Qualification  Requirements**

1.      A license to practice law in the State of New York, which must be maintained;  and

2.      Three  years  of  recent  satisfactory  relevant  legal  experience  subsequent  to
         admission to the bar.

**Lines  of  Promotion**

**None.**                      This class of positions is classified in the Non-Competitive Class.

**NOTE:**       No  incumbent  shall  work  more  than  17  hours  per  week  in  any  two
               consecutive weeks, or more than 1,000 hours per year.

R 05.09.2012                            PAGE  2  OF  2

Hyman Reply Dec. Ex. C - 85

# CITY EXHIBIT 2

1/15/2021



## Administrative Tribunal Automated System (ATAS)

- Allows Petitioner to digitally file NOV with the Hearings Division
- Records hearing audio digitally
- Automatically recalculates points to generate a Letter Grade

1                                                                    2

## What's In ATAS?

- All cases issued by the DOHMH and filed with the Hearings Division.
- NOV, Inspection Report & Scanned Documents (viewable as icons and links)
- Case History
- Case Documents/Case Notes
- Violation History
- License & Permit Information
- Notice of Appearance
- Decision Entry Screen
- Scan/Upload

## Home Page

- Lists all relevant folders, including Today's Hearing Case Folder - these are the cases that are scheduled for hearings that day.
- The Docket search field facilitates searches for specific dockets



3                                                                    4

## "READY" vs. "ACTIVE"

- A case is in READY status when it is scheduled for a hearing, either today or for a future date.
- When a Respondent or its representative appears on the scheduled hearing date and signs a Notice of Appearance at the Reception window, the case becomes ACTIVE and moves into Today's Hearing Case Folder. That means the matter is ready to be adjudicated.

## Today's Hearing Case Folder

5                                                                    6

Hyman Reply Dec. Ex. C - 87

### Selecting Case Takes You to NOV Page



7

### NOV



8

### Inspection Report



9

### Accessing Case History



10



- Contains a chronological list of a particular case's procedural history
- Has hyperlinks to documents/exhibits, case notes, audio recordings, grade cards
- Any action that was taken with respect to the case will be found here

11

### Case History



12

1/15/2021

### Accessing NOA Screen



13

### Notice of Appearance

- Clerk signs in respondents/representatives appearing at the Tribunal
- NOA screen is used to make cases active, settle cases, administrative adjournments and serving decisions
- Before you adjudicate the case you can see who signed it in and who will be appearing before you from the NOA page

1/15/2021                                          14

14



15

### AUDIO

- We record all hearings, as required by our procedural rules.
- All recordings are captured digitally in ATAS and is part of the record.
- You may listen to the hearing from your computer at any time if needed.
- You CANNOT erase the audio once it is recorded.

16

### Audio Reminders

- Always do an audio check in the morning before the first hearing
- Make sure your microphone is on (varies between boroughs)
- Make sure the volume settings are correct on your computer.
- Make sure the recording screen appears before you start the hearing.

1/15/2021                                          17

17

Click on the START AUDIO RECORDING on the DE screen to automatically start the recording.



1/15/2021                                          18

18

3

1/15/2021

A RECORD/PAUSE/STOP/CLOSE window will pop up.
Press STOP when you conclude your hearing.



19

You can check audio from Case History



20

SCANNING

- We are paperless!
- You can scan evidence from your printer. There is no need to retain hard copies of evidence in the file. Return all originals to the witness.
- You can always view the scanned evidence by going to the CASE HISTORY screen.



21

Scan All Evidence in Color



22

- Select Document Type (Always use "Hearing Officer – Exhibits") and mark the evidence (i.e. R1 - Permit or P1 - Aff of Serv)



23

Click on "SCAN" then "SAVE"



24

4

Hyman Reply Dec. Ex. C - 90

1/15/2021

## You can check Case History for scanned item



25

## EMAILING EVIDENCE DURING HEARING

- Respondents or Representatives can now email evidence in most formats (PDF, Word DOC, JPEG, HTML docs. etc.) to a shared email address during their hearing with the Summons Number/Hearings Division location  or your last name in the subject line to ExhibitsHealth@oath.nyc.gov
- Let your managing attorney know you are expecting emailed evidence and s/he will forward the email to you during the hearing.

1/15/2021                                                    26

26

## Uploading Emailed Evidence



- Once you have received the email, save it to your desktop
- You can Upload the exhibits during or after the hearing the same way you scan the physical documents. They will appear in the Case History.



1/15/2021                                                    27

27

- ### Select Upload from Tab



28

## Click "Browse" to find the saved item



1/15/2021                                                    29

29

## Select Document Type (Always use "Hearing Officer – Exhibits")



1/15/2021                                                    30

30

5

1/15/2021

## Identify the evidence in the notes section and click "Upload"



31

---

## ATAS TRIVIA

TRUE OR FALSE?

1. You can view a copy of the summons and IR from the Case History page.

2. The Notice of Appearance page would allow you to see all documents scanned in as the respondent's evidence during a hearing.

3. If you made an error during the hearing you can erase the audio recording and start over.

32

---

## ANSWERS

1. True
2. False – you an see scanned docs in Case History page
3. False – once recorded audio cannot be erased

33

---



## DECISION WRITING IN ATAS

34

---

## Decision Entry Screen



35

---

## Decision Entry Screen

• Where you enter relevant information for all persons appearing before you (I.e. respondent's name or authorized representative), whether Inspector/Attorney is waived, findings of fact, fines imposed, severity levels

• ATAS for NOV's issued on or after 7/18/14, automatically prepopulate the penalty for F (food) and (E) cigarette cases

• Severity Condition Level

36

---

Hyman Reply Dec. Ex. C - 92

1/15/2021

## Notes

- In the "Notes" section under the Summary Disposition code, you can add additional information such as if Language Services were used or if the witness had authority of ownership to appear.



1/15/2021                                                                37

37

## Summary Disposition Codes
Must select before adjudicating individual charges



1/15/2021                                                                38

38

## Disposition Codes for Line Items

- If you sustain any one of the individual line items (even if you dismiss all other charges) you must select the SUSO Summary Disposition Code.



1/15/2021                                                                39

39

## You May Only Use a Dismissal Summary Disposition Code if You Are Dismissing All Charges in an NOV

- Choosing one of the dismissal summary disposition codes will pre-populate all individual line items with that dismissal code.

1/15/2021                                                                40

40

## Summary Disposition Codes:

- SUSO: Sustained-credited facts establish a violation to cited code section.
- DISM: Dismissed on the merits-credited evidence establishes defense to properly cited violation
- DISD: Dismissed Defective Summons – the charge is defective on its face
- DISJ: Dismissed No Jurisdiction – for instances where the charge was not served on the respondent (not part of the NOV)
- DISW: Dismissed – Wrong Party Named
- DNPF: Dismissed – No Prima Facie Case – the allegations do not make out a violation of the cited code section

- There are other codes (i.e., adjournment codes) to chose from, depending on the type of case being adjudicated.

1/15/2021                                                                41

41

## Writing Your Decision

- You can magnify the findings box for individual line items by double-clicking.  Be sure to click OK to save.
- You must spell check each line item by using the spell check icon on bottom right of the box.

1/15/2021                                                                42

42



43

## Save Function

- As you are writing, your decision auto-saves every few minutes.
- You also can choose to save your decision by manually clicking on the "Save" button. If you are writing a lengthy decision, this is recommended.
- You may also write in Word and save your decision as a backup in case ATAS incurs any problems.

44

---

## QUIZ

TRUE OR FALSE?

1. For a food NOV issued on 7/20/14, ATAS will automatically prepopulate the penalty in the DE page.

2. In writing your decision you must always enter either a summary disposition code or a decision code for your line items.

45

## ANSWERS

1. True – fines for food and E-cigarette NOVs issued on or after 7/18/14 will prepopulate
2. False – You must always enter both

46

---

## Bundled Charges



- Sometimes DOHMH charges one violation but separates it out into subparts. This is known as a bundled charge.
- For example, a charge for three different hot food items out of temperature may be presented on the NOV as three subparts, numbered as 1a, 1b and 1c. If you are sustaining all subparts, there is one SUSO code only and one penalty only. All other subparts are bundled, with each subpart having a 0 penalty. Bundling all other subparts means you are sustaining subparts that are all part of the same violation.

47

## Bundling Reminders

- Each subpart needs a finding, a disposition and a penalty. The subparts with the disposition BD have a penalty of 0.
- BD dispositions must show the subpart number with which they are being bundled (example: BD #1a) .



48

1/15/2021

## Bundling When One or More Subparts are Dismissed

- If you are sustaining at least one subpart, but not all, use SUSO for one of the subparts.
- If intending to dismiss a violation charged in multiple parts (1a, 1b, 1c), dismiss each line item individually.  Do not bundle them together and dismiss them as bundled.



49

## Severity – F1 Letter Grading Cases

- If you sustain a charge in its entirety, you must  make sure the severity level was correctly charged pursuant to Commissioner's Regs.  24 RCNY, Appendix 23-B.
- Manually reduce the severity if warranted by your articulated findings.
- You cannot increase severity.

50

## Severity in Bundled Charges

- For a multi-part violation, if you sustain all parts of the charge, impose your SUSO disposition for the subpart with the highest severity.
- If you sustain one part of a bundled charge and dismiss another part, you must manually decrease the severity of the sustained violation.
- ATAS will base the letter grade on the severity for the SUSO line item only.



51

## Decision with Severity Reduced



52

## BUNDLING VERMIN VIOLATIONS

- DOHMH treats multiple vermin charges as one violation, despite presenting them as separate line items on an NOV.
- Therefore, vermin violations, if not dismissed, must be bundled, with one penalty only.

  

53

## Decision with Bundled Vermin Violations

54

9

1/15/2021

## Severity – Vermin Violations

- If sustaining multiple vermin charges, SUSO the highest severity line item and "bundle" the rest of the line items into the highest by using the BD disposition code.
- ATAS will determine letter grade based on severity of the SUSO violation and not to the bundled ones.

1/15/2021                                                    55

55

## CONDITIONS CONDUCIVE TO VERMIN

- This charge is not duplicative and heard/sustained separately from the vermin violations.
- Therefore, conditions conducive are not bundled with vermin violations.

 

1/15/2021                                                    56

56

## BUNDLING TRIVIA

TRUE OR FALSE?

1. A line item that can be bundled must always have its own decision code.
2. You must always bundle the highest severity condition level into the lowest.
3. If the line items are not in subparts you cannot bundle them.
4. An allegation of mice activity present and an allegation of holes present, allowing for the movement of mice must be bundle.

1/15/2021                                                    57

57

## ANSWERS

1. True
2. False – lowest into the highest always
3. False – vermin are not charged in subparts
4. False – conditions conducive to pests should not be bundled

1/15/2021                                                    58

58

## Submitting Your Decision

- You need to click the "Submit" button. You'll see the Preview screen again. X out of Preview and click "Submit" a second time. Then click "OK" on the window you'll see next.



1/15/2021                                                    59

59

## Print Preview Screen

If you want to edit, close print preview, make changes on Decision Entry screen, and then open preview again. When you are ready to submit your decision, remember to X out of preview screen.



1/15/2021                                                    60

60

10

1/15/2021

## Submitting Your Decision

- You must click "OK" in order to complete the submission of your decision. If you do not see the "Your Decision Has Been Successfully Saved" window, then it will <u>not</u> be submitted.
- After you properly submit, ATAS automatically returns to "Home."



61

## Do Not Exit by clicking the red X!
Go to "Home" only after properly submitting.



62

## ADJOURNMENTS

- Adjournments are a 2-step process.
- 1st step – Adjournment Decision. Decision Entry Screen will appear. Select appropriate Summary Disposition.
- Be sure to use the proper adjournment code.
- Whenever you are requiring the appearance of the inspector, for any reason, use the appropriate Adjourned for Inspector codes (either by Respondent, Petitioner or Hearing Officer).
- Submit decision. After you submit the Decision, the Adjournment Order will appear. This Order also must be completed and submitted.



63

## Adjournment Decision



64

## Adjournment Order

- 2nd step – After submission of Adjournment Decision, Adjournment Order will appear.
- Note whether the Respondent waives an attorney
- You must specify <u>who</u> is requesting the adjournment and <u>why</u>.
- You must also indicate that the party or parties appearing were notified of Order's contents.
- Explain why you are adjourning the case and what evidence and/or witnesses are needed. If you are requiring the Inspector to appear, you must specify the reason.
- Submit Order. This is your 2nd submit.

65

## Adjournment Order

66

Hyman Reply Dec. Ex. C - 97

1/15/2021

## Reserving a Decision

- Submit in ATAS using RSVD summary disposition code.
- Respondent must be advised to go to waiting room to be called by Reception so the NOA can be served on him/her – this is respondent's proof of appearance at the Hearings Division.
- Let the Managing Attorney know when you are reserving a case.
- Case will be in your "My Queue" folder
- Finish the decision next time you come to work.

1/15/2021     67

67

## My Queue Folder

- Check your "My Queue" daily
- It may contain:
  - Decisions you reserved
  - Cases in need of correction that have been returned to you by QA Unit or Reception
  - Let your MA know when you have submitted

1/15/2021     68

68

## Adding a Case Note

- Use case notes to document important case events that otherwise would not be in ATAS. Example:  if person appearing does not have standing to represent Respondent, add case note indicating who appeared and when, basis for your determination of no standing, and fact that you did not hold hearing or if you have to recuse yourself.

1/15/2021     69

69

## Adding a Case Note

- Access from NOV page by clicking on "Case Notes" Tab
- Click on "Add New Notes"
- Add your note and then click "Submit"



1/15/2021     70

70

## Add New Notes

71

## Add New Notes



72

12

Hyman Reply Dec. Ex. C - 98

### Additional Information Available on ATAS

• Additional information such as other violations issued to Respondent, and license and permit information filed with DOHMH, is available on ATAS.  Consult these screens if they are relevant to issues in the case before you.  However, remember that you must access the information on the record and enter it into evidence, and give the parties before you an opportunity to respond.

73

### License & Permit Information



74

### License & Permit

• Shows dates of issue and expiration, and name of principal.  If considered as evidence, be sure to make it part of record and give opportunity to respond.  Be careful, as some of the information contained in this section may not be current or may be inaccurate.



75

### Violation History



76

### Violation History



77

### QUIZ

TRUE OR FALSE?

1. After writing your decision you will have to click on "submit" twice then "OK" in order to record your submission.

2. When adjourning a case you must choose "SUSO" as a summary disposition code then fill out the Adjournment Order.

3. If you reserve a decision you have up to 90 days to submit it.

78

13

1/15/2021

### ANSWERS

1. True
2. False – SUSO is for sustaining a case.  You must choose an appropriate ADJ code
3. False – you must finish and submit your reserved decision the next time you come to work.

1/15/2021                                                                79

79



80



81

14

### Adjudicating DCA Cases in ATAS



1

### Where to Find a Case

- DCA cases will be in the same ATAS folders that are in use now. DCA cases in ACTIVE status will be in Today's Hearing Case folder and DCA cases in PD status will be in the Pending Default Adjudication folder. There may also be DCA dockets in the Motion to Vacate Defaults folder, Withdrawal Request folder, or your My Queue.

2

### Where to Find a Case

- After you click on a docket in any of the folders, the tool bar at the top of the screen will give you the same access to the NOV page, Case History, Decision Entry and Scan function that you have currently.

3

### Accessing the Summons

- As with any DOHMH live hearing, Hearing Officers access a case by opening Today's Hearing Case Folder and clicking on the radio button next to the selected docket.

4

### Accessing the Summons

- There is no icon for the NOV or Inspection Report. Rather, you need to open Case Documents on the tool bar and click on the "View" hyperlink next to the Notice of Hearing document. The Notice of Hearing, sometimes called the NOH, is the DCA equivalent of a summons or NOV.



5

### Case Documents: The Summons

- The summons and inspection report are accessible in Case Documents. Although our rules only allow for the summons and inspection report (if served) to be filed, there may be additional documents in the Case Documents tab. These should only be considered at an in-person hearing, if introduced by Petitioner as evidence at the hearing.

6

1/15/2021

## Case Documents: The Summons

- Currently, DCA inspectors do not use hand-held devices to summonses.  Summonses are handwritten and DCA data entry personnel later digitally transmit the statutory citations and violation descriptions for each charge into ATAS.  If a statutory citation on the Decision Entry screen does not match the citation on the summons, a docket correction may be needed.

7

## The Decision Entry (DE) Screen



8

## Decision Entry Screen (continued)

- The caption appearing at the top of the Decision Entry (DE) Screen for DCA cases will appear exactly as it does for DOHMH cases, except that DCA is named as the Petitioner.
- DCA docket numbers differ from DOHMH docket numbers - sometimes they start with T or C or consist of 8 numbers and no letter.



9

## DE Screen: Line Item Fields

- As in DOHMH cases, there are fields on the DE screen for Line Item number, Violation Code, Code Section, Violation Description and Hearing Officer's Findings.
- The Violation Code field will be populated simply as "DCA" because currently, DCA does not use violation codes.

10

## DE Screen: Occurrence Field

- DCA does not charge violations based on condition or severity.  That portion of the DE screen will instead be used to indicate whether a charge is a 1st, 2nd or 3rd occurrence.



11

## Occurrences

- The occurrence dropdown will be populated with the number 1, 2 or 3.  A "2" or "3" indicates that Petitioner intends to establish at hearing that Respondent has one or two prior violations of the same charge within a certain period of time.
- You will be able to select the appropriate occurrence from the dropdown on the DE screen. You can decrease the number but you cannot increase the occurrence beyond what you see on the screen.

12

2

Hyman Reply Dec. Ex. C - 102

1/15/2021

## Occurrences

- When a 2nd or 3rd occurrence is displayed, you must also make specific findings of fact in your decision. Be sure to state what Petitioner claimed at hearing as its basis for a 2nd or 3rd occurrence.
- What constitutes a second or third or subsequent violation for the particular charge before you will be defined in the fixed penalty rule. Depending on the charge, the rule may provide that the violation must have occurred within a certain time period, or that the violation must have been committed by the same Respondent or at the same place of business.

13



In this example, Petitioner intends to establish that Respondent has 2 prior violations of the same charge within a certain period of time. The Hearing Officer may keep it at 3, or lower the occurrence to 2 or 1.

14

## Line Items - Violation Description

- The text in the Violation Description that appears on the DE screen is irrelevant, as it may be incomplete or inaccurate. As with DOHMH cases, the text as it appears on the physical summons filed with OATH and accessed via Case Documents, controls!

15

## The Summons Controls

- You must enter a separate decision code, applicable penalty, and any other required action for each line item. In adjudicating the charges, remember to consider the summons, not the violation descriptions on the DE screen.

- Sometimes DCA may issue summonses with multiple "counts" of the same charge. On the summons it most often will be presented as one charge with a specific number of counts, but on the DE screen, multiple counts may appear as separate line items with similar or identical Violation Descriptions.

16

## Summary Dispositions and Line Item Codes

- All Summary Disposition codes for DCA live hearings are the same as in DOHMH live hearings.

- All line item Decision Codes are the same as in DOHMH cases, with the addition of "CURE" and "PLEAD" as dropdown options.

17

## Line Items

- CURE or PLEAD will automatically populate when a line item charge has either been cured or pled to prior to the hearing. When this occurs, CURE or PLEAD will appear in gray and the Hearing Officer will not be able to change it. Cured or pleaded line items are not to be adjudicated.

- The BD Decision Code dropdown option and the C/B # field should be ignored because there is no bundling for DCA cases.

18

3

1/15/2021

## Fixed Penalties

- Most DCA charges will have fixed penalties promulgated by rule.  If a violation of one of these charges is sustained or defaulted, the monetary penalty will automatically prepopulate in the penalty field on the DE screen.  You as the Hearing Officer will be unable to increase or decrease the fixed penalty amount.

19

## Penalties That Do Not Prepopulate

- Some DCA charges you sustain may not result in a prepopulated penalty.  ATAS may not recognize the charge, the summons may have been issued before the effective date of the DCA fixed penalty rule, or the rule may not have included a fixed penalty for that charge.

20

## Manually Entering Penalties

- If you sustain the violation and the penalty does not populate for any reason, you must manually enter a penalty that is either provided for in the fixed penalty law, or if there is no fixed penalty, provided for within the statutory range set forth in the law at issue.
- There is no one penalty range for all DCA violations.  Penalty ranges vary by statute.

21

## Penalties May Vary by Occurrence

- Be aware that the fixed penalty rule, and the statutes at issue, may set forth different penalties for a 1st, 2nd or 3rd occurrence of the same violation, at hearing and on default.
- If ATAS recognizes the charge and the charge carries a fixed penalty, ATAS will prepopulate the correct fixed penalty for the occurrence you select.
- If the penalty does not prepopulate and it needs to be entered manually, be sure to take into account the occurrence in determining the appropriate penalty.

22

## Actions

- In addition to fixed monetary penalties, the promulgated DCA fixed penalty rule will provide that some DCA violations carry either license revocation, revocation that can be mitigated, or license suspension or premises sealing for a range of days or a specific number of days.

23

## Actions - continued

- Actions may vary by occurrence.  For example, in the fixed penalty rule, a 2nd or 3rd occurrence, but not a 1st occurrence, may carry suspension, or the 1st occurrence may carry a 0-15 day suspension and the 2nd occurrence a 15-30 day suspension.
- For DCA violations not carrying a fixed penalty in the fixed penalty rule, you will need to determine if the applicable statute provides for revocation, suspension or sealing.

24

4

1/15/2021

## Action Dropdown and Days Field

- Suspension, revocation or premises sealing is entered in the line item Action field on the DE screen, and the number of days of suspension or sealing is entered in the box below.
- License suspension, License revocation and Premises sealing are options in the Action dropdown.



25

## Actions: Suspension, Revocation, Sealing

- If you sustain a charge and ATAS recognizes that it carries a fixed penalty and a suspension, revocation or sealing action, the Action dropdown will be enabled.

26

## Actions on the DE Screen

- You must select the appropriate Action. If you do not select the appropriate Action for a charge recognized as carrying one, an alert will pop up when you try to submit or go to Print Preview.
- For suspensions and sealing, you must select a number of days. If you do not enter a number consistent with the fixed penalty rule, an alert will also pop up.

27

## Suspensions and Sealing

- If the fixed penalty rule mandates a suspension or sealing at hearing, the rule will specify a range of days for a particular charge. The range may start as low as 0 and end as high as 548 (18 months). As Hearing Officer, you will determine how many days within that range is appropriate.
- A suspension for 0 days will result in no suspension, but you nevertheless must select the suspension Action and enter 0 as the number of days.

28

## Suspension and Sealing on Default

- On default, if the fixed penalty rule provides that the violation carries suspension or sealing, the rule will specify a definite number of days rather than a range.

29

## Revocations

- Many charges in the fixed penalty rule carrying revocation as an Action may also permit the parties to present evidence to mitigate the license revocation. These charges may appear in the rule with a double asterisk next to the revocation penalty.
- On those charges, if you decide to mitigate the revocation to a suspension, ATAS will permit you to impose a suspension within the range of 0-999 days.

30

5

1/15/2021

## Revocations on Default

- On default, the fixed penalty rule will not provide for mitigation of a revocation. If the violation carries a revocation, you will not be able to submit or access Print Preview if you have selected suspension, or if you have entered a number of days.

31

## Action Alerts

- The alert that appears will mirror the action and/or number of days provided for in the fixed penalty rule.
- For example, 6 RCNY 2-262(d) carries a suspension of 0-15 days for a 1st occurrence. If you sustain but you do not enter a suspension action and a number of days within the range and you try to submit or go to Print Preview, you will see this message:



32

## Action Alerts (continued)

- Similarly, you will be alerted if you enter the correct suspension or sealing action but do not enter a number of days, or you enter an incorrect number of days. Continuing with this example, 25 days is outside the range provided for a violation of 6 RCNY 2-262(d). If you select license suspension for that charge but enter 25 as the number of days, when you try to submit or go to Print Preview you will see this message:



33

## What if you sustain a charge but no penalty populates?

- If no monetary penalty populates in ATAS once a charge has been sustained, you should first refer to the DCA fixed penalty rule to determine the monetary penalty and whether an action and/or number of days is mandated for that violation. If the violation is not listed in the fixed penalty rule, you must make your decision based on the penalty parameters set forth in the law at issue.

34

## What If... (continued)

- The Action field and number of days fields will be enabled on the DE screen. If you decide an Action is required, you will be able to manually select the appropriate action from the dropdown and enter a number of days if applicable. However, you will not be alerted to any specific action and/or number of days.

35

## Potential Problems on "Day 1"

- Be aware that on Day 1 there may be system glitches that require docket correction.
- For example, you may sustain a charge and either the wrong penalty populates or a penalty populates but you are prevented from entering an action that is mandated by the fixed penalty rule or the statute.
- In these circumstances, please consult your Managing Attorney; a docket correction may be needed or IT may need to be alerted.

36

6

Hyman Reply Dec. Ex. C - 106

1/15/2021

---

### Actions on Multiple Charges – How they work together at the Case level

- For each line item, select the appropriate suspension, sealing or revocation action option from the dropdown and enter the number of days below, if applicable.
- Again, referring to the prior example, you can see that once the Hearing Officer was alerted that 25 days was too many for line item 1 because the range in the fixed penalty is 0-15, she has now reduced the days to 12. For line item 2, the Hearing Officer determined that the suspension should be for 5 days (the suspension period on that charge is also 0-15).



37

---

### Multiple Suspensions Run Concurrently

- Actions and number of days are entered per line item on the DE screen.  But because the DCA law mandates that multiple suspensions run concurrently, only one suspension period will result from your decision.  12 days suspension on one violation and 5 days on the other will result a suspension of 12 days in total, which will appear on the printed Decision.  ATAS will do this automatically.
- Please note:  "Points" will always be blank on the printed Decision.

Summary Disposition: **SUSO - Sustained**

Action: **License suspension (12 days)**

Points:

Restitution Amount: **$0.00**

| LINE ITEM | OCC | CODE SECTION | FINDINGS | DECISION CODE | TOTAL PENALTY |
|---|---|---|---|---|---|
| 1 | 1 | 6 RCNY § 2-26D(d) | test | Sustained | $800.00 |
| 2 | 1 | 6 RCNY § 2-22F | | Sustained | $1,000.00 |

38

---

### Multiple Actions - Rules

- Premises sealing also runs concurrently if there are multiple violations imposing a sealing action.  Therefore, if you impose a 5 day sealing for one violation and 10 days sealing for the other, the printed Decision will show one, 10 day premises sealing.
- If you impose suspension on one violation and sealing on another, "License suspension (__ days) and Premise sealing (__ days)" will appear in the Action field on the printed Decision.

39

---

### Multiple Actions - continued

- Revocation trumps suspension, so a revocation on one line item and suspension on the other will appear on the printed Decision as License revocation.  If there is a sealing as well as a revocation, the printed Decision will show "License revocation and Premise sealing (__ days)."
- Since the printed Decision will not display action determinations for each individual charge, it is very important that you clearly state in your findings what action you have decided is warranted or not warranted for each line item with possible suspension, revocation or sealing actions.

40

---

### Per Day Penalties

- Some DCA violations carry "per day" penalties.  Most such violations have no base penalty but a $100 per day penalty.  Less frequently, there could be a $1000 base penalty plus a $100 per day penalty.
- The Per Day Penalty field in ATAS will display the amount of the daily penalty, usually $100, and below that, a prepopulated number representing the number of days from the inspection date to the first scheduled hearing date will appear.

41

---

### Per Day Penalties (continued)

- At hearing, you can modify the prepopulated number of days, consistent with your findings of fact.
- The total penalty for that charge will then be calculated automatically by ATAS.

42

---

7

1/15/2021

---

In this example, the prepopulated number of days was 49, and the Hearing Officer decided that 42 was the appropriate number. (The 1st line item carries a base penalty of $1000 plus the daily $100 penalty.)



43

---

## Per Day Penalties on the Printed Decision

- The number of days you find will <u>not</u> be visible in the Per Day Penalty field on the printed Decision; only the total penalty for that violation will appear. Therefore, it is extremely important that you make an explicit findings of fact in your written decision.

- Per day penalties do not vary by occurrence, and the penalties at hearing and on default are identical.

44

---

## Restitution

- For some DCA violations, Petitioner may seek an award of restitution on behalf of a consumer.

- The amount sought must appear on the summons.  It will also appear on the DE screen in ATAS, as either an Individual Restitution Amount or a Lump Sum Restitution Amount.

45

---

## Restitution (continued)

- If there is no restitution claimed, then the restitution field will appear on the DE screen as 0.00.  If you try to enter an amount, you will not be able to submit your decision.

- The Hearing Officer can reduce the prepopulated number down to as low as 0 but cannot increase the prepopulated number.

- The amount of restitution you award will appear on the printed Decision as one Restitution Amount.

46

---

## Restitution (continued)

- In this case, the Hearing Officer opening the DE screen sees $1700 as the prepopulated Individual Restitution Amount. You should ensure that this amount is consistent with what Petitioner alleged in the summons.

47

---

## Restitution (continued)

- Once you have adjudicated the case and made a restitution determination, modify the prepopulated amount on the DE screen if necessary.

- Here, the Hearing Officer reduced the amount of restitution from $1700 to $950.

48

---

8

Hyman Reply Dec. Ex. C - 108

1/15/2021

## Restitution – Printed Decision

- When you make your decision, it is important that you make clear findings of fact on the amount of restitution you are awarding, if any, and the basis of your determination.
- The amount of restitution you award will appear on the printed Decision as one Restitution Amount.

| Summary Disposition: | SUSO - Sustained |
| Action : | |
| Points: | |
| Restitution Amount: | $950.00 |

49

## Recommended Decisions

- Some DCA charges that are brought pursuant to State law require that OATH make a recommended decision, not a final decision.  Not all State charges result in recommended decisions.
- ATAS has been programmed to recognize those State charges that result in recommended decisions.  In those cases, ATAS will automatically convert your "regular" decision into a recommended decision.  You will use the same Summary Disposition and Decision Codes as you do in any ATAS decision, but you will not be able to enter a penalty.

50

## Recommended Decisions in Case History

- In Case History, the case you decided will appear with the same Summary Disposition you submitted. The hyperlink to your decision will be labeled "Decisions", as with any other decision.  The fact that all or part of the decision is recommended will appear on the printed decision only.

51

## Recommended Charges: Penalties and Actions

- If you sustain or default a "recommended charge," no penalty will appear on the DE screen.  You will not be able to enter an amount.
- Recommended charges do not carry Actions.



52

## The Printed Recommended Decision

- After you submit your decision, the recommended charges will appear on a printed "Recommended Decision" or "Recommended Default Decision."  Whether you sustained, dismissed or defaulted the case, "Recommended" will display as the Summary Disposition on the printed decision.

**RECOMMENDED DECISION**

DEPARTMENT OF
CONSUMER AFFAIRS,
-against-

Acado State
50 WALL ST.
NEW YORK NY 10001

(Respondent)

Summary Disposition: **Recommended**

| Violation/Docket No.: | 730004001 |
| Decision Date: | 4-1-2016 |
| Hearing Officer: | Pfeiffer, Andrea - E45 |
| Respondent's Rep.: | test |
| Petitioner's Rep.: | |
| Type of Hearing: | In Person |

53

## Line Items on Printed Decision

- "Recommended" will also appear in each line item decision (unless the charge was cured or withdrawn).  The penalties will be blank.

| LINE ITEM | OCC | CODE SECTION | FINDINGS | DECISION CODE | TOTAL PENALTY |
|---|---|---|---|---|---|
| 1 | 1 | NY Pub Health § 1399-CC/7/ | test | Recommended/ Sustained | |
| 2 | 1 | NY Pub Health § 1399-CC/7/ | | Recommended/ Sustained | |
| | | | | TOTAL: | |

54

9

1/15/2021

Bifurcated  Decisions

- Sometimes a single summons contains a mix of both recommended and non-recommended charges.
- ATAS will segregate the non-recommended and recommended charges and will print out a single decision in two parts.
- On the printed Decision, be aware that line items may not appear in numerical order.

55

Q & A

56

10

# CITY EXHIBIT 3

**John Supik (OLR)**

| | |
|---|---|
| **From:** | Rebecca H. Morales (DCAS) <RHmorales@dcas.nyc.gov> |
| **Sent:** | Friday, May 29, 2020 12:07 PM |
| **To:** | 'Grant, Lakisha'; Alexander, DeShanna; Louis, Donna; Burke, Jocilyn; Jakubowicz, Maya (MAYOR); SGuglielmi@boe.nyc.ny.us; handrieux@nyccfb.info; Danica You; Kitt Chan; acharles@actuary.nyc.gov; ksnow@actuary.nyc.gov; twong@actuary.nyc.gov; cschaffer@nycers.org; Dwilliams@nycers.org; mbrooks@nycers.org; Lyles, Deirdre (ManhattanBP); DCabrera@bronxbp.nyc.gov; Lwilliams@bronxbp.nyc.gov; Ruiz, Melody (BROOKLYNBP); smarchetti@queensbp.org; HDeMauro@statenislandusa.com; jrazefsky@statenislandusa.com; nandrad@comptroller.nyc.gov; asingh@comptroller.nyc.gov; D'Angelo, Amedeo; ndupree@comptroller.nyc.gov; Stephanie Gutierrez; vgeager@oem.nyc.gov; WittelsL@omb.nyc.gov; ramdatd@omb.nyc.gov; dellacorten@omb.nyc.gov; rallys@omb.nyc.gov; Myrna Hall (OATA); Minerva Rodriguez (OATA); shobbs@law.nyc.gov; kmajerus@law.nyc.gov; TCharles@law.nyc.gov; Niki Stanley (DCP); Manuel Menjivar (DCP); Shayvonne Nathaniel; Simone L. Nkofi; ccrivelli@trs.nyc.ny.us; abennett@trs.nyc.ny.us; aanderson@trs.nyc.ny.us; iguz@trs.nyc.ny.us; Brooks, Jennelle (CCRB); Marie, Jeanine (CCRB); Kadushin, Matthew (CCRB); marisa.caggiano@nypd.org; Alexa.Samarotto@nypd.org; Singh, Tricia (FDNY); Brown, Terryl L. (FDNY); Hamblin, Bridget (FDNY); Massucci, Michael J. (FDNY); Assisi, Jeffrey M. (FDNY); Thornton, Audrey (FDNY); Parker, Jason (DVS); Cherigo, Andre (DVS); Hester, Melissa (ACS); Jones, Evan (ACS); Gorman, Kettia (ACS); Toneatto, Marc (ACS); Mendoza, Yudelka (ACS); Beth.Owens@nychhc.org; wangelj@nychhc.org; lisa.hoffman@nychhc.org; Yvette.Villanueva@nychhc.org; Neal, Mark; williamsdenit@dss.nyc.gov; Neal, Mark; williamsdenit@dss.nyc.gov; Pinnock, Nadene M.; Williams, Ayinde (DOC); Hamilton, Claudette; Chabran, Armando; Adil Tahir (BOC); Gumerova, Regina (BOC); Gregorek, Kristine (MOCS); Halbridge, Jeremy (MOCS); jdominguez@pubadvocate.nyc.gov; cfrancis@council.nyc.gov; kgleason@council.nyc.gov; wrodriguez@council.nyc.gov; Velazquez, Acela (CityClerk); Therese Romero (AGING); Leon Madramotoo (AGING); Nahida Abuhamda (AGING); Cynthia Ingram; dbicchetti@fisa-opa.nyc.gov; AGlick@fisa-opa.nyc.gov; jzerilli@fisa-opa.nyc.gov; dbicchetti@fisa-opa.nyc.gov; AGlick@fisa-opa.nyc.gov; Ksimmonds-cobb@fisa-opa.nyc.gov; inderas@ibo.nyc.ny.us; Yang, Stephanie (EEPC); Ramsukh, Mohini (EEPC); Richards, Joan (NYCCSC); Margaret McMahon (LPC); Lisa Kersavage (LPC); Rojas, Carmen (TLC); Tavis, Jennifer (TLC); Marrero, Melissa (TLC); Andrea Beach (OLR); Neli Quinche (OLR); Onabanjo, Taiwo (CCHR); Stodola, Damion (CCHR); Rozen, David (CCHR); Mragone@nycppf.org; ABassit@nycppf.org; aurora.gabrielperez@nycfirepension.org; Sohn, Michael (NYC Fire Pension); Thornton, Lisa (DYCD); Ward, Jemar (DYCD); bhagwant@coib.nyc.gov; Trasky, Melissa (OCB); Villafane, Amy (OCB); ngrillo22@schools.nyc.gov; MCiniglio@schools.nyc.gov; EWilliams45@schools.nyc.gov; THanna@schools.nyc.gov; VBernst@schools.nyc.gov; KRodi@schools.nyc.gov; mpyram@bers.nyc.gov; Williams Tene; mrunko@nycsci.org; Mapp, Suzette (DOP); Melendez, Zenia (DOP); Negrete, Nelmy (SBS); Schwartz, Andrew (SBS); Edwards, Kimberly (SBS); Walton, Velma (SBS); Soun, Sean (HPD); Mack, Margie  (HPD); Serafina Rutigliano (Buildings); Trisha Munroe (Buildings); smcfarla@health.nyc.gov; Julie Friesen; sheath@health.nyc.gov; Romero, Nancy (OCME); Maniotis, Dina (OCME); Livingston, Karen (OATH); Howard, Cherron (OATH); zcampbell@dep.nyc.gov; herbr@dep.nyc.gov; mpaluszek@dep.nyc.gov; Arias, Teresa (Recovery); Greenstein, Elizabeth (Recovery); Shrouder, Kisha (DSNY); Talukder, Nafisa (DSNY); Haskins, Cindy (BIC); McGruder, Danita (DOF); Dickey, Corinne (DOF); Hyman, Michael (DOF); hholloway@dot.nyc.gov; jstroughter@dot.nyc.gov; lpalacios@dot.nyc.gov; Terhune, David (Parks); Singh, Aretha (Parks); Garcha, Rajinder |

1

| To: | (Parks); Levine, Sara (Parks); Harrison, Dalela (DDC); Gonzalez, Anilexa (DDC); Wuest, Susan (DDC); Brooks, Ayana M.; sabramson@doitt.nyc.gov; Pacheco, Naomi (Records); Chapman, Tampra (DCA); Mateo, Margaret (DCA); Abeles, Sandra (DCA); Monique Knoll (DCAS); Shameka Boyer Overton (DCAS); Shameka Blount (DCAS); argyrosg@dany.nyc.gov; Cunningham, Katricia; isaacs@dany.nyc.gov; Primack, Karen (BronxDA); Mateo Valdez, Ana B. (BronxDA); Pereles, Cynthia (BronxDA); BARTLEY, JACQUELINE; jonesk3@brooklynda.org; Myrna Mateo; Monique Jones(RCDA); ASimmons@snp.nyc.gov; Smiddleton@snp.nyc.gov; Damas, Dahlia (PANY); Santana, Frances (BronxPA); Sanchez, Matilde (BronxPA); Crespo, Virnalisy (BronxPA); Glover, Aaishatu (KingsPA); Buckheit, Richard (KingsPA); susan@queenscountypa.com; Ramos, Jacqueline; psmith@mtabt.org; Arivera@mtabt.org; LKaufma@mtabt.org; LCole@mtabt.org; MNarvaez@mtabt.org; nicole.vangendt@nycha.nyc.gov; Abiodun.Oluwa@nycha.nyc.gov; cherry.mccutchen@nycha.nyc.gov; david.marcinek@nycha.nyc.gov; Kerri.Jew@nycha.nyc.gov; Gerard.Serpico@cuny.edu; samantha.palmer@cuny.edu; richard.gorman@nyct.com; deborah.oconnor@nyct.com; Jennifer.misiti@nyct.com; Marisol.Quinones-Gomez@nyct.com; Michael.Quiery@nyct.com; patricia.lodge@nyct.com; smoran@nycsca.org; ECruz-Ali@nycsca.org |
|---|---|
| Cc: | Barbara Dannenberg (DCAS) |
| Subject: | COVID-19 Recovery for City Employees Survey |

Dear Agency Personnel Officers,

This email is being sent on behalf of Barbara Dannenberg, Deputy Commissioner for Human Capital at the Department of Citywide Administrative Services (DCAS).

As New York City plans its "reopening," and private/public service delivery is rolled out in phases, we are reaching out to the City's workforce to directly inform post-COVID-19 recovery work. COVID-19 has taken a devastating toll on New York City, and there are 27 neighborhoods specifically that were most severely impacted. As the City seeks to recover from this pandemic, we appreciate your thoughts and feedback on ways in which the City can support you as an employee, and support your community.
Please share this information and survey with your agency's employees using the survey link below. The link is accessible via laptop, iPad or mobile phone, and will be available until **5 pm, Friday, June 5th**.

- http://sgiz.mobi/s3/COVID-19-Recovery-for-City-Employees

Thank you.

Hyman Reply Dec. Ex. C - 113

# CITY EXHIBIT 4

**From:** NYC OATH ALERT <noreply@everbridge.net>
**Sent:** Tuesday, June 2, 2020, 1:45 PM
**To:** DeRoberts, Sharina (OATH)
**Subject:** NYC OATH ALERT - Return to Work Survey



Please click here to acknowledge receipt of this message

Dear OATH Employees:

The Department of Citywide Administrative Services (DCAS) has asked all City employees to fill out an anonymous survey relating to what you feel you need when we return back to work. Please fill it out and submit it to DCAS as soon as possible. The survey will close at 5PM on June 5th. The survey can be found here: http://sgiz.mobi/s3/COVID-19-Recovery-for-City-Employees. OATH will continue to keep you updated as our plan to reopen the agency's offices develops. If you have any questions related to the reopening of the agency, you should send them to returntowork@oath.nyc.gov. In the coming weeks we will be updating the FAQ sheet we circulated with answers to any new questions we receive. Stay healthy and safe!

# CITY EXHIBIT 5

# COVID-19 Recovery for City Employees

As the COVID-19 pandemic continues to evolve and impact New York City, City employees have demonstrated once again their commitment to keeping NYC running.

As the City reopens, we are looking to gain insight to gauge what our employees need as the City reopens, and what support employees need as they provide services to the community.

The survey will take approximately three minutes and the results will be anonymous.

Thank you for your continued service.

**1) What services do you believe are being offered to communities, that are not being offered to yours? (*Select all that apply)****

☐ Access to COVID-19 testing

☐ Access to antibody testing

☐ Access to Personal Protective Equipment (PPE)

☐ Clear communication on changes to new rules for social distancing

☐ Other - Write In (Required): [_____]*

**2) What information can the City (as an employer) provide to make you feel safer upon your return to your office/worksite? (*Select all that apply)****

☐ Provide clear guidance regarding temperature screenings

☐ Protocols for use of shared space

☐ Provide Personnel Protective Equipment (PPE)

Hyman Reply Dec. Ex. C - 117

☐ Protocol on cleaning and disinfecting measures

☐ Provide phased return to work approach

☐ Other - Write In (Required): [_____] *

**3) What is the single most important thing you need right now as a City employee?***

○ Childcare

○ Commuting options other than mass transit

○ Personal Protective Equipment (PPE)

○ Social distancing protocols in the workplace

○ Available flexible work schedule/teleworking options

○ Other - Write In (Required): [_____] *

**4)** If you are a resident of a neighborhood below most deeply impacted by COVID-19, what is the single most important thing you need right now?***

| Borough | Neighbohood |
|---------|-------------|
| Brooklyn | Bed-Stuy |
| Brooklyn | Brighton Beach |
| Brooklyn | Brownsville |
| Brooklyn | Bushwick |
| Brooklyn | Canarsie |
| Brooklyn | East Flatbush |
| Brooklyn | East New York |
| Brooklyn | Starrett City |
| Brooklyn | Sunset Park |
| Manhattan | Central Harlem |
| Manhattan | Chinatown |
| Manhattan | East Harlem |

| Manhattan | Hamilton Heights |
|---|---|
| Manhattan | Inwood |
| Manhattan | Lower East Side |
| Manhattan | Morningside Heights |
| Manhattan | Washington Heights |
| Queens | Briarwood |
| Queens | Corona |
| Queens | Jamaica |
| Queens | Queensbridge |
| Queens | Rockaway/Far Rockaway |
| Staten Island | Stapleton-St George |
| The Bronx | Crotona |
| The Bronx | East Tremont |
| The Bronx | Highbridge |
| The Bronx | Hunts Point |
| The Bronx | Jerome Park |
| The Bronx | Longwood |
| The Bronx | Melrose |
| The Bronx | Morris Heights |
| The Bronx | Morrisania |
| The Bronx | Mott Haven |
| The Bronx | Soundview |
| The Bronx | Soundview-Bruckner |
| The Bronx | Van Cortlandt Village |

☐ Job opportunities for a loved one or friend

☐ Childcare

☐ Eldercare

☐ Availability of Personal Protective Equipment (PPEs) and how to get it

☐ Other - Write In (Required): _____ *

☐ I'm not a resident of a neighborhood hard hit by COVID-19

Page **3** of **9**

**5) Are you a caregiver?***

◯  Yes

◯  No

**Logic: Hidden unless: #5 Question "Are you a caregiver?" is one of the following answers ("Yes")**

**6) How many people do you care for?***

|          | 0 | 1 | 2 | 3 | 4 | 5 | More than 5 |
|----------|---|---|---|---|---|---|-------------|
| Children |   |   |   |   |   |   |             |
| Elders   |   |   |   |   |   |   |             |
| Others   |   |   |   |   |   |   |             |

**7) Which agency do you work for?**

◯  Actuary

◯  Administration for Children's Services (ACS)

◯  Administrative Trials & Hearings (OATH)

◯  Aging (DFTA)

◯  Board of Correction (BOC)

◯  Board of Education Retirement System

◯  Board of Elections (BOE)

◯  Borough President - Bronx (BP-BX)

◯  Borough President - Brooklyn (BP-BK)

◯  Borough President - Manhattan (BP-MAN)

◯  Borough President - Queens (BP-QNS)

Hyman Reply Dec. Ex. C - 120

○ Borough President - Staten Island (BP-SI)

○ Buildings (DOB)

○ Business Integrity Commission (BIC)

○ Campaign Finance Board (CFB)

○ City Clerk (CLERK)

○ City Council (COUNCIL)

○ City Commission on Human Rights (CCHR)

○ City Planning (DCP)

○ City University of New York (CUNY)

○ Citywide Administrative Services (DCAS)

○ Civil Service Commission (CSC)

○ Civilian Complaint Review Board (CCRB)

○ Collective Bargaining (OCB)

○ Comptroller

○ Conflicts of Interest Board (COIB)

○ Consumer Affairs (DCA)

○ Correction (DOC)

○ Cultural Affairs (DCLA)

○ Design & Construction (DDC)

○ District Attorney - Bronx County (DA-BX)

○ District Attorney - Kings County (DA-BK)

○ District Attorney - New York County (DA-NY)

○ District Attorney - Queens County (DA-QNS)

○ District Attorney - Richmond County (DA-SI)

○ District Attorney - Special Narcotics (DA-NARC)

○ Education (Administration) (DOE)

○ Emergency Management (NYCEM)

○ Employee Retirement System (NYCERS)

○ Environment Protection (DEP)

○ Equal Employment Practices Commission (EEPC)

○ Finance (DOF)

○ Financial Information Services Agency (FISA)

○ Fire (FDNY)

○ Fire Pension Fund (NYCFPF)

○ Health and Hospitals (H+H)

○ Health & Mental Hygiene (DoHMH)

○ Health and Mental Hygiene (OCME)

○ Homeless Services (DHS)

○ Housing Authority (NYCHA)

○ Housing Preservation & Development (HPD)

○ Human Resources Administration (HRA)

○ Independent Budget Office (IBO)

○ Information Technology & Telecommunications (DoITT)

○ Investigation (DOI)

○ Labor Relations (OLR)

○ Landmarks Preservation Commission (LPC)

○ Law Department (LAW)

○ Management & Budget (OMB)

Page **6** of **9**

○ Mayor's Office (MAYORALTY)

○ Mayor's Office of Contract Services (MOCS)

○ Mayor's Office of Housing Recovery Operations

○ Parks & Recreation (DPR)

○ Payroll Administration (OPA)

○ Police (NYPD)

○ Police Pension Fund (NYCPPF)

○ Probation (DOP)

○ Public Administrator - Bronx County

○ Public Administrator - Kings County

○ Public Administrator - New York County

○ Public Administrator - Queens County

○ Public Administrator - Richmond County

○ Public Advocate

○ Records & Information Services (DORIS)

○ Sanitation (DSNY)

○ School Construction (SCA)

○ Small Business Services (SBS)

○ Tax Commission (TAX)

○ Taxi & Limousine Commission (TLC)

○ Teacher's Retirement System (TRS)

○ Transit Authority (NYCTA)

○ Transportation (DOT)

○ Triborough Bridge & Tunnel (TBTA)

Hyman Reply Dec. Ex. C - 123

○ Veterans' Services (DVS)

○ Youth & Community Development (DYCD)

**8) What is your gender?**

○ Female or woman

○ Male or man

○ Non-binary (not female/woman/male/man)

○ Other (a gender not listed above)

○ I choose not to disclose

**9) Are you Hispanic/Latino?**

○ Yes

○ No

○ I choose not to disclose

**10) What is your Race/Ethnicity?**

○ American Indian or Alaskan Native

○ Asian

○ Black of African American

○ Native Hawaiian or Pacific Islander

○ White

○ Two or More Races

○ I choose not to disclose

Hyman Reply Dec. Ex. C - 124

**11) What zip code do you reside in?***

---

# Thank You!

**Thank you for taking our survey. Your response is very important to us.**

---

Hyman Reply Dec. Ex. C - 125

# CITY EXHIBIT 6

**From:** Allison Costanzo <ACostanzo@uft.org>
**Sent:** Thursday, July 2, 2020 7:41 AM
**To:** Statz, Olga (OATH) <OStatz@oath.nyc.gov>
**Cc:** Slifka, Amy (OATH) <ASlifka@oath.nyc.gov>; Matthew Campese (OLR) <matthew.campese@olr.nyc.gov>; DeRoberts, Sharina (OATH) <SDeRoberts@oath.nyc.gov>; Ilene Weinerman <iweinerman@uft.org>
**Subject:** UFT Hearing Officers

Dear Ms. Statz:

<mark>Since the time of my last letter to you on May 2, 2020, the Union appreciates the steps taken by OATH to solicit input from our members regarding safety protocols, remote hearings, and other re-opening procedures.</mark> It is my understanding that the Hearing Officers Per Session have requested, and management has agreed, to continue discussion of the re-opening plans at a meeting of the labor-management committee scheduled for today, July 2, 2020.

We are hopeful that this meeting can resolve the many ongoing concerns expressed by our members. Please be advised that, to the extent that there is no resolution at the labor-management meeting of issues that are mandatory subjects of bargaining, the Union will continue to demand bargaining over the decisions that have been made, as well as the implementation and impact on our members.

Thank you for your cooperation.

Allison

Allison S. Costanzo, Esq.
Assistant General Counsel
United Federation of Teachers
52 Broadway, 14th Floor
New York, New York 10004
212.510.6397

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message.

*************************************************************************
The views, opinions, and judgments expressed in this message are solely those of the author. The message contents have not been reviewed or approved by the UFT.
*************************************************************************

# CITY EXHIBIT 7



**Citywide Administrative Services**

**Lisette Camilo**
Commissioner

## Updated Guidance for City Agencies on Leave Policy Applicable During the Outbreak of Coronavirus Disease 2019 (COVID-19), eff. January 7, 2021

This document sets forth City leave policy with respect to City employees to mitigate the risk of the spread of Coronavirus Disease 2019 (COVID-19). This Guidance provides leave that meets or exceeds the emergency leave required by Divisions C and E of the Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127.[1] It is effective January 7, 2021 and until further notice, and supersedes the November 25, 2020 guidance.

### I.  Definition

   **A.**  "Symptoms of COVID-19" means the following physical symptoms:[2]

- Fever or chills
- Cough
- Shortness of breath or difficulty breathing
- Fatigue
- Muscle or body aches
- Headache
- Loss of taste or smell
- Sore throat
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

   **B.**  "Health Care Provider" means

   1. A person licensed, when required, to provide health care as a doctor of medicine or osteopathy; podiatrist; dentist; clinical psychologist; optometrist; chiropractor; nurse; nurse practitioner; nurse-midwife; clinical social worker; physician assistant; technician, including, but not limited to medical, laboratory, or radiological technician; pharmacist; and home health-care provider and any employee who works at the Department of Health and Mental Hygiene, a hospital, health care center, health clinic, mobile health facility, nursing facility, nursing home, pharmacy; and

   2. Any other person whose service is necessary to the City's provision of health care in a hospital, clinical, mobile or other appropriate setting, as determined in the discretion of the City agency that employs such person or to which such person has been assigned.

---

[1] Division C of the FFCRA is entitled the "Emergency Family and Medical Leave Expansion Act." Division E of the FFCRA is entitled the "Emergency Paid Sick Leave Act."

[2] This list of symptoms is current as of the publication of this Guidance; please refer to the latest CDC information for the most up-to-date information at https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

3. Whenever this policy requires an employee to submit documented advice provided by a licensed health care provider, such licensed health care provider must be performing within the scope of practice for the license, as defined by the law of the licensing jurisdiction.

**C.** "Emergency Responder" means an employee who is necessary for the provision of transport, care, health care, comfort, and nutrition of patients, or whose services are otherwise needed to limit the spread of COVID-19, including, but not limited to, law enforcement officers, correctional institution personnel, fire fighters, emergency medical services personnel, physicians, nurses, public health personnel, emergency medical technicians, paramedics, emergency management personnel, 911 operators, child welfare workers and service providers, public works personnel and persons with skills or training in operating specialized equipment or the skills needed to provide aid in a declared emergency and well as personnel who work for such facilities employing these individuals and whose work is necessary to maintain the operations of the facility.

**D.** "Two workweeks" means the number of hours that an employee is regularly scheduled to work in a two-week period. Examples: for an employee whose regular schedule is 40 hours per week, two workweeks is 80 hours; for an employee whose regular schedule is 35 hours per week, two workweeks is 70 hours.

## II. Determination of Personnel Performing Essential and Non-Essential Services during the Outbreak

Every agency shall continue to implement and refine as necessary determinations concerning which services it provides that are essential during the COVID-19 outbreak, consistent with the agency's written Restart/Safety Plan outlining how it will reduce the risk of spread of COVID-19 in the workplace developed in accordance with "Managing the Return to the Office in the Age of COVID-19," issued by DCAS on August 11, 2020.

**A.** Essential services are defined as follows in the order of importance:

1. Responding to the COVID-19 Emergency

Delivery of any service or function that is critical to the mitigation of the spread of COVID-19 and emergencies arising because of the outbreak or actions taken to mitigate the outbreak.

2. Lifesaving

The direct, in-person delivery of lifesaving services to the public.
Examples: Emergency medical services technicians and paramedics; 911 operators;

3. Life Protecting, Life Safety, Transportation, Utilities

Direct, in-person delivery of medical care to individuals in any capacity, control and care of incarcerated

2

individuals or others under mandated or self-selected government custody of care of any interval, key personnel required to perform essential court proceedings that cannot be conducted remotely, removal / mitigation of environmental hazards, operation of mobility and transportation systems, and physical inspection or maintenance of properties and regulated public and private facilities to ensure continued public safety and public health and other maintenance, repair, and infrastructure to support lifesavings operations.

Examples: Public Health Nurse, Shelter Workers, Marine Engineer (Ferry); traffic enforcement agents

               4. Workforce and Internal Service Continuity

Functions, systems, and support of critical equipment and networks that enable agency-specific and whole of government workforce productivity; revenue generation.

Examples: Information technology employees who maintain citywide and agency networks and communications, revenue operations, essential services contract administrators; city tax auditors; consumer affairs inspector

   **B.**  Non-essential services:

Agency-specific and whole of government roles, functions, and duties that are not critically essential to the continued performance of the above four categories.

Examples: records management, license processing, grant auditing

## III.    Work Assignments During the COVID-19 Emergency

   **A.**  Employees Currently Performing Non-Essential Services

Employees who currently are not assigned to perform essential services, as defined in Part II of this guidance are designated "employees currently performing non-essential services." Administrative and clerical office-based employees are presumptively performing non-essential services. If their presence at the worksite is necessary for the performance of an essential service, they may be designated by the Agency as an employee providing essential service. For example, an administrative employee who performs a task for an essential service that cannot be made accessible to the employee's home, may be designated as an employee currently providing essential service.

As agencies plan return to the office, they should continue to allow employees who perform non-essential services to telework whenever possible. Agencies may require employees who perform non-essential services to return to the office as part of its Restart/Safety Plan. When determining which employees should return to the office, agencies should give priority to restoring essential services and other important services or functions that have been suspended during the emergency because they cannot be performed remotely.

All personnel who continue to work remotely are required to complete all work assignments which they are assigned by the Agency and which they have the technological capacity to perform at home using personal equipment or equipment provided by the agency (e.g., computer, phone, internet access).

Hyman Reply Dec. Ex. C - 131

Those employees may also be re-assigned to perform essential services within their agencies or by the City in other agencies at a location other than at their home including, but not limited to, at emergency services administered by the Department of Education, food services sites, and nursing care sites for vulnerable students, as circumstances require.

Designation of an employee as performing non-essential services is temporary and may change to essential as the COVID-19 pandemic evolves. An employee who refuses to perform assigned work or to obtain equipment provided by the Agency to perform assigned work shall be charged accrued leave and may be subject to discipline. Agencies must make and document all diligent efforts to identify work that can be performed remotely by an employee designated as performing non-essential services. An employee designated as currently performing non-essential services who in the rare circumstance is unable to work remotely because of inadequate equipment or lack of assignment shall be granted excused leave with pay without charge to leave accruals.

**B.** Employees Currently Performing Essential Services

1. Employees currently performing essential services are required to work at home or other alternate location if the agency has determined that is feasible pursuant to the agency's telework plan implemented in accordance with Personnel Service Bulletin 600-3 (Temporary Citywide Telework Policy for City Employees During the COVID-19 Outbreak), dated March 13, 2020.

2. Employees currently performing essential services at home or other alternate location must ensure that they have the necessary functioning equipment to perform his or her duties. If an employee experiences a service outage (such as equipment failure, loss of power or internet connectivity), the Agency may, at its discretion, assign the employee to the office until the outage is resolved.

3. Employees who are unable to perform essential services at home, for example field workers, must continue to work at the locations to which their agencies have assigned them.

   a. If an employee is exhibiting symptoms of COVID-19, the agency should instruct the employee to go home. Before instructing an employee to go home under this circumstance, the employee's supervisor or manager must notify the agency's human resources department.

## IV.    Leave Policy

### A.  Excused Leave

1. General Provisions

   a. Excused leave at full or partial pay under this Policy is immediately available to an employee who is unable to work or telework without regard to length of service.

4

b.  Length of excused leave: Excused leave for an employee who tests positive for COVID-19 shall be available until the employee is cleared to return to work, such excused leave not to exceed four workweeks (20 workdays); provided that an employee who remains hospitalized or in a rehabilitation facility shall continue to receive excused leave ten workdays after the employee is released from the hospital or rehabilitation facility have passed. All other excused leave provided pursuant to the Emergency Paid Sick Leave Act (Division E of the FFCRA) effective April 1, 2020, is limited to a cumulative total of two workweeks.

c.  Part-time employees may receive excused leave for the number of bi-weekly hours that the employee was expected to work. Where expected hours cannot be readily determined, part-time employees may receive excused leave for the average number of bi-weekly hours that the employee worked over the six months preceding the leave.

d.  Excused leave under this Policy is in addition to existing rules and entitlement regarding leave, e.g. annual leave and sick leave.

e.  An employee may waive excused leave at partial (two-thirds) pay authorized by this policy and use accrued annual leave or sick leave, if applicable, during the period of excused leave at partial pay.

f.  Agencies shall not require employees to charge absences to other accrued leave during the period of excused leave authorized by this policy.

g.  Leave that an employee has taken prior to April 1, 2020 shall not be counted toward the amount of excused leave authorized by this Policy.

h.  An eligible employee may utilize excused leave intermittently as agreed upon by the agency and the employee. This leave must be taken in full-day increments if the employee is not teleworking. Excused leave may be taken in partial-day increments if the employee is teleworking and by agreement between the employee and the agency.

i.  The length of absence that requires an employee to submit required documentation upon return to work is extended from absences of more than three consecutive days to absences of more than five consecutive days, except as required under Section IV.C of this leave policy.

j.  The City's and all Agencies' absence control procedures are suspended until further notice.

k.  After the first workday (or portion thereof) that an employee receives excused leave under this Policy, the agency may require the employee to follow reasonable notice procedures to continue receiving excused leave.

5

l.  All agencies must post the attached bulletin entitled "Employee Rights" at office locations, via e-mail to all employees, and/or by posting on the agency's intranet site.

2.  Excused Leave at Full Pay – An employee is eligible for excused leave at full pay as follows:

    a.  An employee is eligible for excused leave at full pay for a maximum of four workweeks with a documented positive COVID-19 test except that an employee who is hospitalized or in a rehabilitation facility shall continue to receive excused leave for ten workdays after the employee is released from the hospital or rehabilitation facility.

    b.  An employee is eligible for excused leave at full pay for up to two workweeks, with any additional leave charged to applicable leave balances as follows:

        i.  The employee is exhibiting symptoms of COVID-19 but does not, at the time symptoms develop, have a positive COVID-19 test:

            a)  To be eligible for excused leave, an employee must provide documentation that he or she has exhibited symptoms of COVID-19 and is seeking diagnosis of COVID-19 with a Polymerase Chain Reaction (PCR) diagnostic test; provided that an employee who teleworks must provide such documentation only if the absence extends for more than five consecutive days. Documentation obtained from Teledoc or other on-line doctor's services will be accepted.

            b)  If the employee has any documented symptom of COVID-19, the employee must not report to work other than telework, except as permitted under Section IV.C of this leave policy, until all of the conditions are met: (1) it has been at least 10 days since their symptoms began, (2) they have not had a fever for at least 24 hours and (3) other symptoms have improved.[3] An employee with no known exposure to COVID-19 through close contact or travel to a non-contiguous state may return to work earlier if he or she provides a negative polymerase chain reaction (PCR) test (not a rapid antigen test) taken at least 3 days after symptom onset with improving symptoms.

            c)  Employees who exhaust sick leave may be advanced additional sick leave at the discretion of the Agency Head. Until further notice, the provision of advanced sick leave does not require the employee to be a permanent employee or to have more than 10 years of service.

---

[3] See "What New Yorkers Need to Know Now About COVID-19," New York City Department of Health and Mental Hygiene (October 21, 2020) at https:// www1.nyc.gov/assets/doh/downloads/pdf/imm/coronavirus -factsheet.pdf

Hyman Reply Dec. Ex. C - 134

  ii. The employee is subject to a governmental quarantine or isolation order and is unable to telework while observing the governmental quarantine or isolation order.

  iii. The employee has been advised by a licensed health care provider to self-quarantine either because of exposure to COVID-19 or because of heightened risk associated with exposure to COVID-19. The employee must provide documentation from the licensed health care provider stating that the employee is unable to telework as a result of the need to self-quarantine.

3. Excused Leave at Partial Pay. Except as provided in subsection "d" below, employees are eligible for two workweeks of excused leave at partial pay (two-thirds of the employee's regular rate of pay, not to exceed $200 per day or a total of $2,000) as follows:

  a. The employee is caring for an individual subject to a governmental quarantine or isolation order and the employee must demonstrate that the individual depends on the employee for care and that he or she is unable to telework while caring for an individual under the governmental quarantine or isolation order.

  b. The employee is caring for an individual who has been advised by a licensed health care provider to self-quarantine either because of exposure to COVID-19 or because of heightened risk associated with exposure to COVID-19. The employee must provide documentation of the licensed health care provider's advice and must demonstrate that the individual depends on the employee for care and that he or she is unable to telework while caring for an individual in self-quarantine.

  c. The employee is caring for a son or daughter under 18 years of age whose school or place of care has been closed or whose child care provider is unavailable due to COVID-19 precautions. As required by federal regulation, the employee must provide documentation containing the following information:

   i. Employee's name;

   ii. Date(s) for which leave is requested;

   iii. Qualifying reason for the leave;

   iv. Oral or written statement that the employee is unable to work because of the qualified reason for leave (in this case care for a child):

   v. The name and age of the son or daughter being cared for;

   vi. The name of the School, place of care or child care provider that has closed or become unavailable;

Hyman Reply Dec. Ex. C - 135

vii.   A communication from the school that provides the remote/hybrid learning schedules for the child; and

viii.   A representation that no other suitable person will be caring for the child during the period of leave.

d.   Health Care Providers and Emergency Responders are not eligible for excused leave at partial pay.

## B.  Leave to Care for a Child Under the Emergency Family and Medical Leave Expansion Act

1.   Leave to care for a child under the Emergency Family and Medical Leave Expansion Act (Division C of the FFCRA) is available only to employees who have been employed for thirty (30) days or longer.

2.   Health Care Providers and Emergency Responders are not eligible for leave to care for a child under this section.

3.   Eligible employees may take up to 12 weeks of Family Medical Leave to care for a son or daughter whose school or place of care has been closed or whose child care provider is unavailable due to COVID-19 precautions and is unable to telework.

4.   During the first ten work days of such leave, the employee may:

a.   Receive excused leave at two-thirds of the regular rate of pay not to exceed $200 per day or a total of $2,000, in accordance with paragraph IV (A)(3)(c) above, or

b.   Elect to utilize accrued annual leave or compensatory time.

5.   After the first ten workdays of leave to care for a child under this section, leave shall be paid at two-thirds of the regular rate of pay not to exceed $200 per day or a total of $10,000. The employee may not utilize accrued leave or compensatory time during this ten-week period.

6.   An eligible employee may utilize leave to care for a child intermittently as agreed upon by the agency and the employee. This leave must be taken in full-day increments if the employee is not teleworking. Excused leave may be taken in partial-day increments if the employee is teleworking by agreement between the employee and the agency.

7.   The maximum 12 weeks of leave under this section is reduced by the amount of the FMLA leave entitlement taken in that year. If an employee has exhausted his or her 12 weeks of leave, he or she may still take two weeks of partial pay leave for a COVID-19 qualifying reason as outlined in Section IV(A)(3).

8.   As required by federal regulation, the employee must provide documentation containing the following information:

8

a.  Employee's name;

b.  Date(s) for which leave is requested;

c.  Qualifying reason for the leave;

d.  Oral or written statement that the Employee is unable to work because of the qualified reason for leave (in this case care for a child);

e.  The name and age of son or daughter being cared for;

f.  The name of the School, place of care or childcare provider that has closed or become unavailable;

g.  A communication from the school that provides the remote/hybrid learning schedules for the child; and

h.  A representation that no other suitable person will be caring for the child during the period of the leave.

## C. Leave for Vaccine Reactions

Employees shall receive excused leave for reactions to coronavirus vaccination without limitation of any excused leave received for symptoms of COVID-19 as follows:

1.  Employees who exhibit a cough, shortness of breath, runny nose, congestion, sore throat or loss of taste must follow the existing COVID-19 leave policy outlined above.

2.  Employees who exhibit any other symptoms that are consistent with vaccine side effects (fever, headache, chills, muscle aches, joint pain, nausea or vomiting) are eligible for excused leave at full pay as follows:

### i.  Fever

1.  Employees who exhibit a <u>fever lasting less than 24 hours</u> after receiving the vaccine are eligible for excused leave at full pay for up to two workdays.  Such employees may return to work when they are feeling better and they have been fever-free for at least 24 hours.

2.  Employees who exhibit a <u>fever lasting more than 24 hours</u> after receiving the vaccine are eligible for excused leave at full pay for up to eight workdays. Such employees may return to work:

a.  When they have been fever-free for at least 24 hours and have tested negative for COVID-19 using a PCR test (not a rapid antigen test) OR

9

  b. All of the following are met: (1) it has been at least 10 days since their symptoms began, (2) they have not had a fever for at least 24 hours and (3) any other symptoms have improved.

 3. To be eligible for excused leave at full pay, employees who stay out of work for more than two days must provide documentation showing they sought diagnosis of COVID-19 with a PCR diagnostic test during their leave and the date they received their test results. Employees must use their own sick leave for any additional time taken after receiving a negative test result or if they do not seek diagnostic testing.

**ii. Fatigue, a headache, chills, muscle aches, joint pain, nausea or vomiting**

 1. Employees who exhibit fatigue, a headache, chills, muscle aches, joint pain nausea or vomiting (and no fever) after receiving the vaccine and are not feeling well enough to work are eligible for excused leave at full pay for up to eight days.

 2. Employees whose symptoms last less than 2 days may return to work when they are feeling well enough to work. Employees whose symptoms last more than two days may return to work after:
  a. Testing negative for COVID-19 using a PCR test (not a rapid antigen test) with improving symptoms
   OR
  b. All of the following are met: (1) it has been at least 10 days since their symptoms began, (2) they have not had a fever for at least 24 hours and (3) any other symptoms have improved.

 3. To be eligible for excused leave at full pay, employees who stay out of work for more than two days must provide documentation showing they sought diagnosis of COVID-19 during their leave and the date they received their test results. Employees must use their own sick leave for any additional time taken after receiving a negative test result or if they do not seek diagnostic testing.

10

### iii.  Other side effects

1.  Employees who exhibit other symptoms that are consistent with vaccine side effects are eligible for excused leave at full pay for up to two workdays. Employees must use their own sick leave for any additional time taken.
2.  Such employees may return to work when they are feeling better.

11

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING

In the Matter of the Improper Practice Petition

-Between-

UNITED FEDERATION OF TEACHERS, LOCAL 2,
AFL-CIO,

**VERIFIED REPLY
TO ANSWER TO
IMPROPER PRACTICE
PETITION OF THE UFT**

Petitioner,

- And -

**BCB-4408-20**

CITY OF NEW YORK, NEW YORK CITY OFFICE
OF ADMINISTRATIVE TRIALS AND HEARINGS,

Respondents.

Petitioner, UNITED FEDERATION OF TEACHERS, LOCAL 2, AFL-CIO ("UFT"), by

its attorney Robert T. Reilly (Lori M. Smith, Of Counsel), replies to the allegations set forth in the

Verified Answer of Respondents, CITY OF NEW YORK, NEW YORK OFFICE OF

ADMINISTRATIVE TRIALS AND HEARINGS ("OATH" or the "Agency"), as follows:

1.      Realleges all of the allegations set forth in the Verified Petition and, accordingly

denies the allegations contained in Paragraphs 1 through 21 of the Verified Answer, and any other

allegations of the Verified Answer, to the extent they vary in any manner from the allegations set

forth in the Verified Petition.

## AS TO THE "PRELIMINARY STATEMENT"

2.      Deny the allegations contained in the "Preliminary Statement" of the Answer. To

the extent that certain allegations contain legal arguments they do not require a response.

## AS TO RESPONDENT'S STATEMENT OF FACTS

3.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "22" of the Answer.

4.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "23" of the Answer and respectfully direct the Board to the provisions of the Administrative Code for an accurate rendition of their contents.

5.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "24" of the Answer. Aver that OATH has offices throughout the five boroughs of New York City.

6.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "25" of the Answer and respectfully directs the Board to paragraph 5 herein for further information.

7.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "26" of the Answer.

8.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "27" of the Answer.

9.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "28" of the Answer. Aver that Hearing Officers Per Session (HOPS) conduct hearings under the umbrella of OATH arising out of multiple agencies including many not contained in this paragraph.

10.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "29" of the Answer. Aver that HOPS held a high number of hearings per day prior to the offices being closed due to the COVID pandemic. Moreover, an

2

appropriate number of HOPS were given sufficient hours prior to the shutdown in order to draft and render decisions.

11.     Deny the allegations contained in Paragraph "30" of the Answer. Aver that HOPS are hourly employees with an annual cap of 1,000 hours per year with exception of HOPS classified pursuant to the collective bargaining agreement by and between the UFT and the City ("CBA") as "covered" employees pursuant to the letter agreement dated April 29, 2015 (including "Attachment A"). Those covered employees are subject to an annual 2,000 hour cap. HOPS, whether covered or not, are not subject to a restriction of 17 hours per week and are regularly scheduled for greater weekly hours. *See, UFT*, 7 OCB2d 12 (BCB 2014) (weekly cap of 17 hours per week violation of NYCCBL 12-3-6(a)(4) and (5) where evidence demonstrated at least some HOPS "consistently worked more than 17 hours per week). Since remote work many HOPS now routinely work ten or more hours per day in an attempt to complete decision writing on a scheduled day.

12.     Deny allegations contained in Paragraph "31" of the Answer. Aver that HOPS submit schedules of desired hours for the upcoming month and, once scheduled, are expected to adhere to the scheduled hours. Petitioner further avers that during the time period of around March 23, 2020 through May 25, 2020, and possibly thereafter, a select group of HOPS were scheduled to work remotely without following the established practice of submitting desired hours of work in advance. OATH has refused to state what its criteria for providing hours to certain HOPS during that time was based on, or why it unilaterally deviated from the established practice of allowing HOPS to submit hours of work in advance despite multiple requests from the UFT.

13.     Deny allegations contained in Paragraph "32" of the Answer. Aver that prior to the COVID pandemic HOPS would submit the hours they wished to work in the following month on

3

or around the beginning or middle of the prior month and would receive the hours they were scheduled to work prior to the month in which the hours occurred. As stated in paragraph 10 herein, this practice did not continue while HOPS were working from home until sometime beginning in around June/August 2020 when only certain HOPS were requested to submit the hours they desired for the upcoming month. OATH has refused to state what its criteria was and scheduled some HOPS consistently while other HOPS were not given any hours despite submitting their hours of availability. It is solely through this process that HOPS receive hours of work.

14.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "33" of the Answer. Aver that OATH has routinely refused to provide any information regarding the basis of providing hours to HOPS for hearings other than alleged "agency need". Moreover, it has refused every request for information concerning hours requested, numbers of cases scheduled per day, HOPS assigned, and hours per day or week, making it impossible for Petitioner to enforce the CBA and ensure that Respondents are acting in accordance with applicable law.

15.     Deny the allegations of Paragraph "34" of the Answer. Aver that prior to the COVID pandemic, HOPS routinely began their hours anywhere between the hours of 8:00 a.m. to around 10:00 a.m. consistent with the City's longtime practice of allowing flextime to its employees.

16.     Deny the allegations contained in Paragraph "35" of the Answer and respectfully direct the Board to the response contained in paragraphs 13 and 15 herein. Further aver that those HOPS receiving hours are routinely working well beyond the number of hours requested due to the number of cases and the fact that little to no time has been allocated, as it was in the past, to write decisions during requested hours of work.

4

17.     Deny the allegations of Paragraph "36" of the Answer and respectfully direct the Board to the response contained in paragraph 15 herein.

18.     Deny the allegations contained in Paragraph "37" of the Answer. Aver that the length of hearings depends upon multiple factors including but not limited to the complexity of the law being applied, the number of litigants, the number of summonses heard, issues with the ATAS system, together among myriad other issues. Petitioner further avers that prior to the COVID pandemic HOPS would be provided time to write decisions during the hours they requested and were scheduled. After COVID HOPS must routinely work more hours than they requested in order to complete decisions.

19.     Deny the allegations contained in paragraph "38" of the Answer. Aver that HOPS were provided cases when not working remotely by a variety of means including the individual HOPS requesting another case from the "bridge" among other methods. Moreover, managers would give cases to HOPS based upon experience with certain types of adjudications. In addition, since certain types of cases were only assigned on particular days of the week, HOPS scheduled on those days regularly were exposed only to those types of adjudications pre-COVID.

20.     To the extent Paragraph "39" of the Answer refers to the time period when HOPS were not working remotely the Petitioner denies knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "39" of the Answer. Avers that prior to the COVID pandemic HOPS would be provided adequate time to write decisions during the hours they requested and were scheduled. Since the COVID pandemic Respondents have not provided adequate time for HOPS to draft decisions and are regularly assigned back-to-back cases.

21.     Deny the allegations contained in Paragraph "40" of the Answer and aver that prior to the COVID pandemic OATH utilized NYSERV for cases arising out of multiple agencies and

5

used ATAS for health and consumer affairs cases. The use of ATAS by the HOPS was linked to the cases being assigned to them by management. This often was a function of the day of the week that HOPS worked, or based upon a manager's preference in assigning certain matters to HOPS who had worked in that area before.

22.     Deny the allegations contained in Paragraph "41" of the Answer and respectfully direct the Board to paragraph 21 herein. Aver that certain HOPS were not allowed access to ATAS and were no provided with credentials to sign in. Moreover, training provided to HOPS since going remote has been inadequate and was limited to a single PowerPoint presentation (which is not the same as that annexed to the Answer). Moreover, HOPS were required to do the PowerPoint on their own time without compensation.

23.     Deny the allegations contained in Paragraph "42" of the Answer. Aver that any observed efforts at "sanitizing" the office were wholly inadequate and often did not exist. HOPS were required to clean their own space.

24.     Admits the allegations contained in Paragraph "43" of the Answer.

25.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "44" of the Answer.

26.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "45" of the Answer.

27.     Deny the allegations contained in Paragraph "46" of the Answer in their entirety and aver that only in those cases which formerly utilized ATAS (i.e., health and consumer affairs cases) were HOPS conducting cases using the same platform as before the COVID pandemic.

28.     Deny the allegations contained in Paragraph "47" of the Answer and respectfully direct the Board to paragraph 19 herein.

6

29.     Deny the allegation contained in Paragraph "48" of the Answer. Aver that litigants are assigned conference numbers by OATH and, are routinely required to wait long periods of time in a "virtual waiting room" by the agency for their cases unrelated to the availability of any particular HOPS. Further aver that OATH is responsible for scheduling all cases and have the capability to stagger cases to eliminate waiting time for litigants.

30.     Deny the allegations contained in Paragraph "49" of the Answer and respectfully direct the Board to paragraph 29 herein. Aver that HOPS were told not to miss a single call.

31.     Deny the allegations contained in Paragraph "50" of the Answer. Aver that HOPS have been required, in writing, to log in and out 10 minutes prior to the conclusion of their hours, however, in practice HOPS are often required to provide such information significantly earlier. And further aver that Respondents are fully aware when HOPS log onto their computers absent such required log in/out procedure.

32.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "51" of the Answer. Aver that hours were still being assigned to a select group of HOPS during the "early stages of remote work" however, OATH has repeatedly refused to respond to Petitioner's requests for the criteria used to select the specific HOPS chosen other than "agency need".

33.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "52" of the Answer. Aver that the workload, and specifically hours worked per day by individual HOPS, has beginning in around August 2020 to the present, increased exponentially due to back-to-back hearings, providing too few hours and HOPS to handle the workflow and not permitting HOPS appropriate time to draft their decisions during their

7

scheduled hours. As a result of the increased workload managers have also stepped in to act as full time HOPS.

34.     Deny the allegations contained in Paragraph "53" of the Answer and respectfully directs the Board to paragraphs 12-13 herein.

35.     Deny the allegations contained in Paragraph "54" of the Answer and respectfully directs the Board to paragraphs 16, 18 and 36 herein. Aver upon information and belief that certain HOPS are receiving no hours, while those receiving hours are required to work well beyond the hours allotted in order to complete decision writing.

36.     Deny the allegations contained in Paragraph "55" of the Answer. Aver that HOPS are routinely assigned back-to-back hearings for all hours working and are provided insufficient, or no, time during their scheduled hours to write decisions which corresponds with the nature and complexity of the matters assigned. Decisions are often written after the hours requested by the HOPS, or on a day on which they are scheduled for no hours. HOPS will frequently not request payment for the additional hours as they have been notified that they "must be able to write up all cases on the same day of their hearings". OATH is fully aware that the working day is filled with hearings leaving HOPS with little to no hours to write their decisions. *See, Affidavit of Ilene Weinerman* dated December 15, 2020 at ¶ 9-10 (submitted with the initial Improper Practice Petition).

37.     Deny knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph "56" of the Answer.

38.     Paragraphs "57" through "140" of the Answer contain legal argument and as such do not require a response. To the extent they are found to contain factual allegations, Petitioner denies those allegations.

8

## REPLY TO ARGUMENT OF RESPONDENTS

39.     Respondents' Answer sadly demonstrates the outright disregard of OATH for the working conditions of its employees -- specifically those affecting the HOPS. Respondents have argued alternatively that they either have the unfettered right to make the stated changes in the HOPS' terms and conditions of employment, or even more startling, merely assert that no such changes have taken place. Neither of these positions pass muster.

### AS TO THE FIRST DEFENSE

### PETITIONER HAS CLEARLY ESTABLISHED THAT THE EMPLOYER IMPLEMENTED LAWFUL UNILATERAL CHANGES TO MANDATORY SUBJECTS OF BARGAINING WITHOUT NEGOTIATING

40.     The hours, and other terms and conditions of the HOPS have undergone a sea change since March 23, 2020. However, there is one issue that both parties can agree upon. The offices of OATH had to be closed on March 23, 2020. Frankly, it would likely have been far safer to do so earlier. However, this decision was not one made by OATH in an exercise of managerial discretion. The closing was mandated by law and therefore, not truly within the realm of what is ordinarily called managerial discretion. In fact, management erroneously initially took the position that HOPS were essentially workers and would be required to report.

41.     Regardless, once the determination was made to work remotely, the terms and conditions of employment which were in place must continue. This has not occurred, and multiple, illegal, unilateral changes have been implemented since March 23, 2020 without notice or bargaining, despite multiple requests for bargaining by Petitioner.

### The Unilateral Changes

42.     The BCB has long held that "if a unilateral change is found to have occurred in a term and condition of employment which is determined to be a mandatory subject then this [Board]

9

will find the change to constitute a refusal to bargain in good faith and, therefore, and improper practice. *DC 37*, 79 OCB 20, at 9 (BCB 2007). As acknowledged by Respondents, "to establish that a unilateral change to a term and condition of employment has occurred, the Union must demonstrate that:

    (i)    the natter sought to be negotiated is, in fact, a mandatory subject and

    (ii)    the existence of such a change from existing policy."

*DC 37, L. 436,* 4 OCB2d 31, at 13 (BCB 2011). *See also, DC 37, Local 1549,* 7 OCB2d 3, at 17 (BCB 2014).

43.    Mandatory subjects of bargaining generally include wages, hours, working conditions, and any subject with a significant or material relationship to a condition of employment. NYCCBL § 12-307(a).

### Failure to Provide Necessary Equipment

44.    Respondents spend much of their argument defending the selection and use of Court Call and ATAS exclusively for matters assigned to HOPS for remote work, arguing that it is within their managerial prerogative to determine the equipment and means of technology for its work. However, this sidesteps the issue being argued by the HOPS.

45.    The instant case is not about the exercise of a managerial prerogative to determine what technology should be used, but the failure of Respondents to provide the equipment necessary for the HOPS to perform their jobs. Many HOPS have MAC based computers which cannot be used with the technology implemented by OATH. In addition, costs of other materials are now the financial responsibility of HOPS. This failure to provide the needed equipment to perform the job has precluded some HOPS from working at all. *Verified Petition* at ¶ 6.

10

46.     In other cases, HOPS have, at their own expense purchased computers, improved internet, printers, toner, paper, pens, pens, pads and numerous other routinely required materials that had formerly been available to them at OATH without cost. Moreover, cell phone usage for these individuals has increased with much work, particularly early in the process, being performed on their personal cell phones. *Verified Petition* at ¶ 7.

47.     The Board has long held that allowances for uniforms or provision of necessary equipment are encompassed within the meaning of "wages". *Local 1182, CWA*, 7 OCB2d 5, at 11 (BCB 2014). Things as minimal in expense as whistles have been found to be mandatory subjects of bargaining. *Id.* Here, Respondents have failed to provide the most rudimentary equipment needed to perform the job. At the same time, Respondents have freely admitted to distribution of laptops to the full-time administrative staff claiming that such a determination "is clearly within the same granted discretion". Respondents continue to claim that the HOPS' "incidental costs of working from home [do] not give rise to a violation". *See, Answer* at ¶ 71-72.

48.     While HOPS were working on-site at OATH they used computers, printers, and all the routine office supplies. If Respondents unilaterally decided, while HOPS were working on-site, to remove all equipment and tell HOPS they had to purchase and provide their own computers and equipment to continue working, it would be ludicrous for OATH to argue that it was not a unilateral change – regardless of the alleged reasoning behind it. The present circumstances are identical to this. HOPS have been sent to their homes and told to shoulder the entire expense of the, formerly provided, office equipment, supplies and services without reimbursement or provision of the needed equipment by Respondents.

49.     This is not a matter of OATH exercising discretion over the "methods, means and technology of performing its work" as Respondents have repeatedly argued. *See e.g., Answer* at ¶

11

67-71. HOPS *are* using the methods, means and technology required by OATH. However, their provision of the equipment utilized impacts wages in the most basic sense. OATH's failure to provide the necessary equipment, or to compensate the HOPS for their purchase of the same, has resulted in total loss of income for some HOPS. For others, it has resulted in substantial expenditure to supply the equipment without compensation. A clearer violation of NYCCBL § 306(a) is hard to envision.

## Changes in Submissions of Schedules

50, Respondents also instituted unilateral changes in the scheduling process for hours of work which has long been the practice at OATH under the CBA. The scheduling practice, as tacitly acknowledged by OATH, is for management to request hours from the HOPS in the month prior to that being scheduled, receive the hours requested by each HOPS and issue a schedule prior to the beginning of the next month of hours. *See e.g., Answer* at ¶ 32.

51. During the time period of March 23, 2020 through May 25, 2020 no schedules were requested from the HOPS using this established method although work was being assigned during this period. The law is clear that established practice cannot be unilaterally changed by an employer and that to do so is a violation of the NYCCBL. Moreover, it is clear that this change relates to a mandatory subject of bargaining – that being hours of work—as it is solely through this process that HOPS request and receive hours of work. *See,* ¶¶ 42-43 herein.

52. Respondents have argued that an employee's work schedule is solely a matter of management prerogative under the NYCCBL and not a mandatory subject of bargaining. However, this statement is inaccurate and overbroad. First, this is an established practice under the CBA and is required to continue as such. Moreover, as noted in *UFOA,* 1 OCB2d 17 (BCB 2008) at 10:

12

> It is well established that while the City unilaterally may determine
> staffing levels and certain aspects of schedules, such as starting and
> finishing times, it must bargain over the total number of hours
> employees work per day or per week.

Accordingly, the Respondents failure to allow employees to be enter request for hours violates the

NYCCBL as they unilaterally eliminated the HOPS ability to request and receive hours of work.

## Changes in Hours

53.     Beginning around August 2020, OATH unilaterally decided to change the hours of

HOPS from 8:30 a.m. to 4:30 p.m. Prior to this time HOPS had flexibility to work few or more

hours per day and were able to come in during staggered hours. *Verified Petition* at ¶ 8.

54.     After moving to remote operation, the hours allowed for decision writing have also

changed unilaterally. In the past HOPS would write decisions between hearings or be allowed to

write up decisions using part, or all, of a scheduled day. Now HOPS have received varying

instructions regarding writing decisions from on a scheduled day only, to not on scheduled days,

weekends or holidays. This has resulted in a substantial increase in hours on scheduled days since

the present method of allocating back-to-back cases leaves little or no time during the hours

submitted to write decisions. Accordingly, in order for HOPS to comply with management's

demands, hearings must be completed and written within a workday they are now forced to work

additional hours or complete additional days which are beyond the hours submitted to work.

*Verified Petition* at ¶ 10.

55.     Respondents' argue that Petitioner's claims regarding decision writing are "outright

falsehoods", and that managers allows HOPS to request to be paid for days devoted to writing, is

entirely at odds with the email issued by the Manager in the Bronx office of OATH which stated

13

that, in order to be eligible for hours, HOPS "must be able to write up all cases on the same day of their hearings". *See, Affidavit of Ilene Weinerman* at ¶ 10 and Exhibit "C" thereto.

56.     A limitation on hours worked per day has been deemed to be a mandatory subject of bargaining. This Board held, with regard to this very HOPS title, that changes which required HOPS to work at least 5 hours per day and at least twice per week related to hours and therefore must be bargained. *See, UFT,* 3 OCB2d 44 (BCB 2010) at 9. Here OATH is requiring HOPS to work in 8-hour blocks of time with possible unpaid time off for breaks and lunch. This is at variance with past hours which were flexible and non-conforming. Moreover, when decision-writing is included the number of hours increases far beyond the hours requested by the HOPS. By unilaterally implementing such changes, and refusing bargaining, Respondents violated NYCCBL § 12-306(a)(4) and (5). *See also, UFT, L, 2,* 4 OCB2d 54 (BCB 2011) (requiring HOPS to work 7 hour days unlawful unilateral change); *(UFOA,* 1 OCB2d 17, at 17 (BCB 2008).

## Assignments and Training

57.     In order for HOPS to receive remote work, OATH has set preconditions including that they adjudicate in areas beyond their previously assigned work.     *See Affidavit of Ilene Weinerman* at ¶ 11 and Exhibit "C" thereto.

58.     Prior to remote work, CLE was routinely provided to HOPS on areas in which they were required to adjudicate and on technology to be employed. This CLE was deemed to be mandatory and the HOPS were paid for attendance or time watching the material. *Id.*

59.     Even assuming *arguendo,* that this is not deemed to be a mandatory subject of bargaining Respondents are still in violation as adequate training for such work has not been provided even though it is necessary for continued employment. *See, DC 37,* 69 OCB 20, at 5-6

14

(BCB 2002) (Training is a mandatory subject when it is required as a qualification for continued employment or improvement in pay or work assignments).

60.     Since the COVID pandemic CLE regarding areas in which the HOPS are required to adjudicate or on technology required to perform their jobs has not been provided or is only available for them to watch, without pay, during hours they are not working. Respondents' profound misreading of both Petitioner's Improper Practice and the cited caselaw mandates correction. OATH's bald denial that the case cited by Petitioner is "wholly inapposite" is patently false. In that case the Board stated:

> The board has previously held that "the City has the management right to determine the quantity and quality of the services to being delivered to the public, and therefore, also the quantity and quality of the services to achieve that service. *However, we have recognized that an exception to this general principal exists when the training is required by the employer as a qualification for continued employment or for improvement in pay or work assignments or when the union demonstrates that there exists a practice and tradition of the employer's encouraging and supporting employee participation in such training or education.*

*Id.* at 5-6 (citations omitted). In the instant case mandatory CLE provided for in the agreement included CLE required for the HOPS to perform their duties – including law for different types of adjudications and technological requirements. Such training, under the cited Board precedent, is not just required for promotion but for continued employment as HOPS must now adjudicate within all areas of OATH practice.

61.     The cases, the CBA and the practice demonstrate that training in different areas of adjudication and technology is longstanding. Respondents state that the only time a HOPS would be totally unfamiliar with ATAS prior to March 2020 would be if they "regularly and purposely refused the assignment of DOHMC and DCA summonses." See, Answer at ¶ 93. This statement is false and insulting. However, ironically it amounts to a tacit admission that knowledge and use

15

of ATAS was not routinely required of most HOPS pre-pandemic as its use was limited to a minority of cases heard. However, the failure to use ATAS was far from "purposeful" by any HOPS and was, instead, a function of elements beyond their control. *See e.g.,* paragraphs 19 and 21 herein. It is for precisely this reason that training was required when all cases required knowledge of ATAS, and all HOPS were required to adjudicate all cases. *See, Affidavit of Ilene Weinerman,* at ¶ 8. Continued employment is plainly contingent on an employee's skill at using ATAS and their knowledge of all areas heard by OATH Hearing. Accordingly, the facts demonstrate that the failure of Respondents to offer paid training to the HOPS is inconsistent with well-established practice. Moreover, it is essential for HOPS to maintain continued employment. Accordingly, the failure to provide such training is in violation of NYCCBL § 12-306(a)(4) and (5).

## Change in lunch/breaks

62.     Since around July 2020, OATH has unilaterally changed breaks, including lunch breaks, which were an established practice under the CBA. Prior to remote work, HOPS would be able to take a one-hour lunch, and breaks, as required and only notify the Respondents that they were not available for longer breaks. Now if a break is required for lunch, or personal needs, the HOPS must request advance permission, at the beginning of the day. This has resulted in many instances in HOPS working continuously throughout their hours without interruption.

63.     The Board has held that unilateral changes to employees' lunch periods constitutes an improper practice under NYCCBL § 12-306. This also would apply to breaks which are provided for either by the language of the CBA or established practice. As noted in *L. 858, IBT v. OTB,* 49 OCB 38, at (BCB 1992):

> The public employer's duty to bargain in good faith encompasses
> the obligation to refrain from making unilateral changes in

16

> mandatory subjects of negotiation.  According, we find that the
> failure of OTB to bargain before implementing a unilateral change
> in the employee's designated lunch period constitutes an improper
> practice within the meaning . . . of the NYCCBL

### Demands for Bargaining

64.    Petitioners repeatedly demanded bargaining over the changes which were
unilaterally implemented by Respondents.  Letters were sent April 15, 2020, May 2, 2020, and
again in August and September.  Respondents repeatedly refused to meet with Petitioner regarding
the myriad issues raised.  See, Improper Practice Petition at ¶¶ 13-20 and Exhibits "B" through
"I".

17

## IN RESPONSE TO THE SECOND DEFENSE

## EVEN ASSUMING, *ARGUENDO*, CERTAIN OF PETITIONER'S CLAIMS RELATE TO PRACTICAL IMPACT, SUFFICIEINT EVIDENCE OF THAT IMPACT HAS BEEN DEMONSTATED

65.     As noted in the Improper Practice Petition, even assuming *arguendo*, that certain issues raised in the Petition fall within Respondents' exercise of managerial discretion they still come within the scope of bargaining as the decisions have had a real and palpable "practical impact" on the HOPS.

66.     It is well established even in the case of the City's lawful exercise of managerial discretion certain issues, for instance workload and staffing issues, may come within the scope of bargaining.

67.     As to the practical impact of workload and staffing the Board has held that it has defined "practical impact" as creating "an unduly excessive and unreasonable workload as a regular and continuing condition of employment". *UFA*, 7 OCB2d 4, at 23 (BCB 2003).

68.     In the instant case practical impact is clearly demonstrated by the extra hours HOPS have been required to work in order to meet the demands of their remote work. Hours well beyond those scheduled are required to write decisions, to become familiar with new areas of adjudication without training and to utilize the ATAS system itself which requires many steps to complete simple tasks.

69.     In addition, the scheduling of back to back hearings without interruption or breaks and constant monitoring without sufficient time off HOPS to hear matters has resulted in required hours well in excess of those worked prior to going remote. *DC 37, L3621 & 2507,* 11 OCB2d 10 (BCB 2018) (program created practical impact where it required employees to work overtime in order to complete their job duties). This is not merely the impact of more summonses being issued after March and April 2020 as claimed by OATH, but complete revision of how cases are handled,

18

how many are allocated to each HOPS, lack of adequate staffing among all other issues cited by Petitioner both in this Reply and in the Improper Practice Petition itself. The claims are not vague and speculative but will be attested to by multiple HOPS who have seen their workload and expected hours increase exponentially.

70.     The reconstitution of the workforce in the age of this pandemic is also one which poses a clear threat to employees. Despite multiple requests concerning safety measures to be implemented, and the myriad other issues which arise regarding reopening the offices, OATH has refused to engage in any discussion or serious information sharing. The Board has held that the existence of a clear threat to employee safety can warrants the imposition of a duty to bargain over the alleviation of the impact of a management decision even prior to the time the decision is to be implemented. *Uniformed Firefighters Ass'n v City of NY,* Dec. No. B-6-91 (BCB 1991).

71.     The requirement that HOPS provide their own equipment to perform the job creates a clear practical impact (even assuming the result of a legitimate exercise of managerial prerogative) as it is, tantamount to laying off large numbers of HOPS who do not have the equipment available to perform the work. Similarly other changes, such as requiring knowledge of all areas of OATH adjudication and changed hours of work have rendered multiple HOPS unable to perform the requirements of the newly designed job – and for all practical purpose has resulted in their being laid off from future employment.

72.     It is well established that practical impact is implicit in any layoff. While the decision to lay off employees is within the scope of an employer's rights, the exercise of that gives rise to a per se practical impact on the laid-off employees requiring immediate bargaining. *CWA,* 63 OCB 19 (BCB 1999). Certainly, even assuming these issues relating to the HOPS were within

19

the scope of Respondents management rights, as asserted, the exercise of that right gives rise to a per se practical impact on those employees rendered ineligible to work as a result.

73      Finally, as to OATH's claim that an improper practice must be filed as a scope of bargaining petition rather than as an improper practice petition is inaccurate. Cases cited by Respondents were those in which the Union's allegations were found to be wholly conclusory. *See, L. 300 SEIU,* 45 OCB 36, at 7-8 (BCB 1990). That is not true in the instant case in which specific, fact-based practical impact has been detailed in the filings of the Union and which will be further illuminated at hearing (or through affidavits).

74.     Contrary to the assertions of Respondents, the Board has plainly held that it values substance over form. Accordingly, when it comes to pleading under the NYCCBL it will consider claims filed as improper practices even where scope of bargaining issues are raised:

> Finally, we address the City's contention that a claim of practical impact does not state an improper practice under the NYCCBL. We have long held that the authority for Board determination of questions of practical impact derives from our statutory mandate to decide whether a matter is within the scope of collective bargaining. As it is the policy of the Board to eschew strict adherence to technical rules of pleading, however, we have considered claims of practical impact asserted in an improper practice petition. . . [c]onsistent with this policy, we have considered the allegations of practical impact presented in the USA's improper practice petition in the instant matter.

*USA,L.831, IBT,* 39 OCB 6, at 16 (BCB 1987).

## IN RESPONSE TO THE THIRD DEFENSE

### RESPONDETS ENGAGED IN DIRECT DEALING

75.     Despite the repeated requests to meet and discuss the issues made by Petitioner, Respondents chose instead to issue a survey directly to bargaining unit employees throughout the City, including to HOPS – who to date had no access to information or discussion. Although the survey was claimed to be anonymous, individuals were required to click on a link (which potentially catalogs responses). Due to the time the document issued to HOPS, while bargaining was being demanded and requests ignored, the survey issued directly to the bargaining unit members subverted their representational rights and under those circumstances constituted impermissible direct dealing particularly since it was issued simultaneous with unheeded requests for bargaining. *See, Uniformed Firefighters Ass'n,* Dec. No. B-5-2002 (BCB 2002); *Walkill Valley General Hospital,* 288 NLRB 103, 206 (1988).

21

## IN RESPONSE TO THE FOURTH DEFENSE

## DEMAND FOR INFORMATION

76.     Petitioner's repeated requests for information relevant to representation of its members, to collective bargaining, and contract administration were ignored by Respondents in violation of NYCCBL.

77.     Respondents' claims that the demands were over non-mandatory subjects of bargaining is without merit.

78.     A review of the request for information (annexed to the Verified Petition as Exhibit "G") demonstrates that each and every paragraph requests information directly relevant to Petitioner's representation of its members and policing of their rights under CBA and the law. Moreover, all concern mandatory subjects of bargaining including:

- safety issues regarding return to work including disinfection protocols, issues regarding staggered work hours and possible continued teleworking (¶¶ 1-2);

- requests for schedules submitted by HOPS for hours of work to determine who received work, what criteria were used in providing hours or work to HOPS, how hours of work were distributed, among other issues (¶ 3);

- request for the survey distributed to employees to determine how it was issued, whether it was anonymous, whether it encroached on areas of bargaining, among other issues (¶ 4);

- all documents issued to HOPS regarding the above issues including, as well, issues regarding equipment required of HOPS and/or provided to HOPS to perform work (¶ 5);

22

- documents describing the remote platform, equipment required to access the platform including internet access or equipment required (¶ 6);

- documents issued to HOPS describing their remote working conditions and requirements (¶ 7);

-Listing of HOPS scheduled for hours from May 23m 2020 to the present broken down various markers and schedules submitted by HOPS for work (¶ 8-9);

-Number of cases heard broken down by pay period (¶ 10);

-Any HOPS required to be present at the site or deemed to be essential workers (¶ 11);

- Documentation describing leave protections for quarantined individuals or those with COVID or requiring leave for family members and other issues related to absence due to pandemic related illness (¶ 12).

79     Each and every request meets the requirements of the NYCBBL and is reasonable, and directly relevant to Petitioner's role in the workplace. Moreover, it is instructive to note that in its response to the request, the City did not challenge the demands but merely stated that "much" of the information had been provided to the Union – a statement which is wholly untrue. *See, Verified Petition* at Exhibit "H".

23

**WHEREFORE,** based upon the Verified Petition, the attachments to the Verified Petition, the Affidavit of Ilene Weinerman and attachments thereto, and this Verified Reply, respectfully requests that its Verified Petition be upheld in all respects and that the full relief requested therein be granted.

Dated: Montclair, New Jersey
        February 12, 2021

ROBERT T. REILLY
Attorney for Respondent
52 Broadway, 9th Floor
New York, New York 10004
(201) 207-8156

By: _____
Lori M. Smith
Of Counsel

24

## VERIFICATION

**STATE OF NEW YORK** )
                      ) ss.:
**COUNTY OF NEW YORK**)

Deponent, Ilene Weinerman, being duly sworn deposes and says that she is the representative of the Petitioner above-named, and that she has read the Verified Reply consisting of this and 24 additional pages, and is familiar with the facts alleged herein, which she knows to be true, except as to those matters alleged upon information and belief, which matters she believes to be true.

Dated: February 12, 2021

ILENE WEINERMAN

Subscribed and sworn to before me
On the 12 day of February 2021

Signature of Notary

MOHAMMAD RASHID RIAZ
Notary Public – State of New York
No. 01RI6320662
Qualified in Queens County
My Comm. Expires Mar. 9, 20 25