UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

J.F., on behalf of himself and his minor child, H.F.;
L.V., on behalf of herself and her minor child, N.F.;
A.M. on behalf of herself and her minor child, O.M.;
M.F., on behalf of herself and her minor child, J.W.;
J.S., on behalf of herself and her minor child, R.S.;
R.H., on behalf of himself and his minor child, M.H.;
and all others similarly situated,

                  Plaintiffs,

          -against-

MAYOR ERIC ADAMS, in his Official Capacity;
THE CITY OF NEW YORK; CHANCELLOR DAVID
C. BANKS, in his Official Capacity; NEW YORK
CITY DEPARTMENT OF EDUCATION; NEW
YORK CITY BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE CITY OF NEW
YORK; COMMISSIONER BETTY ROSA, in her
Official Capacity; NEW YORK STATE EDUCATION
DEPARTMENT; COMMISSIONER ASIM REHMAN,
in his Official Capacity; THE NEW YORK CITY
OFFICE OF ADMINISTRATIVE TRIALS AND
HEARINGS,

                 Defendants.

------------------------------------------------------------------- X

Civ. No. 21-cv-11150 (ALC)

**THIRD AMENDED
CLASS ACTION
<u>COMPLAINT</u>**

## PRELIMINARY STATEMENT

1.     This action seeks declaratory and injunctive relief to, *inter alia*, enjoin and

prohibit the unlawful creation, establishment, and perpetuation of a New York City controlled

special education hearing system, which incorporates a new administrative and operational

bureaucracy intended and designed to effectuate the wholesale transfer of the special education

impartial hearings system from the previously independent hearing system to the City- and

Mayoral-controlled New York City Office of Administrative Trials and Hearings ("OATH") (the

"OATH Plan").

2.      The purposes and objectives of the OATH Plan include superseding the existing impartial hearing process and creating a whole new special education hearing system for the adjudication of special education hearings for New York City.

3.      The OATH Plan is not simply a plan to hire a number of impartial hearing officers ("IHOs"), equip them with administrative resources and staff, and assign them special education due process complaints to adjudicate. The OATH Plan contemplates and initiates an entire bureaucracy of individuals, with the power and authority to assign due process complaints ("DPC") and, in their subjective administrative discretion, reassign DPCs out of the statutorily mandated rotational order.

4.      The new bureaucracy will also include an administrative and organizational structure to supervise, set standards for, evaluate, and as necessary, discipline, the OATH Hearing Officers ("HOs").

5.      At least one result of the supervisory structure and administrative processes, is that HOs will no longer be either independent or for that matter, impartial. Instead, they will act and serve at the pleasure of their supervisors, who ultimately serves at the pleasure of the Mayor.

6.      HOs will be subjected to a set of standards and controls that will undoubtedly require them to carry large caseloads, meet individual case resolution and settlement benchmarks, and necessitate that they meet timetables that emphasize the optics of speedy complaint resolution rather than provide what is in the best interests of the child, or provide families with mandated procedural and substantive due process, or an opportunity to be heard, or, most significantly, an impartial and independent hearing officer to hear and decide their due process complaint that they have filed against the Department of Education ("DOE") because they have been denied a fair appropriate public education ("FAPE"), or an educational program,

or related services, or transportation, or an appropriate placement, or nonpublic school tuition, or some combination thereof.

7.      This articulated eventuality is far from speculative. The OATH Plan though still in its infancy is well on its way to doing exactly what is described. New and unilateral modifications in the previously independent hearings system are being imposed on parents, and o their attorneys and advocates, many of which are inconsistent with if not blatantly violative of the IDEA and its implementing regulations.

**Families with DPCs assigned to OATH HOs are Required to Appear and Participate in Mandatory Settlement Conferences Before an OATH "Settlement" HO**

8.      For example, Plaintiffs appearing before OATH HOs are now required to appear for a mandatory settlement conference before an OATH "settlement" hearing officer, one of whom was up until recently, the Associate Director of the Impartial Hearing Unit of the DOE. Significantly, though the parties are mandated to appear before this "settlement" HO, nowhere in the IDEA or in its implementing regulations is the authority for OATH to require such a conference.

9.      Nor does the mandatory OATH settlement conference replace the statutorily mandated resolution period, which unless an expedited hearing was requested, only serves to delay the due process hearing process at least 30 days.

10.     Anecdotally, problems and issues with this mandatory conference have already begun to bubble up and though the parents' bar.

11.     Notably, and for example, the OATH mandated settlement conference is and has been a non-productive use of time for Plaintiffs, and for their attorneys and/or advocates.[1] The

---

[1] It is also not entirely clear whether the settlement session is billable, since resolution sessions are not, which means that parent attorneys and/or advocates are being forced to "donate" their services.

DOE attorney who appears at the settlement conference has no authority to settle the case, since any proposed settlement can only occur with the consent and authorization of the Comptroller's office.

12.     No representative from the Comptroller's office appears with the DOE representative at the settlement conference. Moreover, it is not entirely clear whether the Comptroller's office was ever notified of the mandatory conference, or whether it received an invitation to appear, or whether it has the necessary personnel or back-office resources to even undertake this new mandatory due process hearing requirement.

**The MOA Fails to Offer Non-English Speaking Families Sufficient Translation Services**

13.     Also violative of the IDEA and its implementing regulations is paragraph 9(e) of the MOA, which offers families fewer protections with respect to translation services as required under the IDEA and – unlike the implementing regulations – puts the onus on families to "request" the translation of documents, including the procedural safeguards notice. Compare MOA ¶ 9(e) with 20 U.S.C. § 1415(d)(2) and 34 C.F.R. § 300.504(d) (which, in turn, requires compliance with 34 C.F.R. § 300.503(c)).

**Summary of Claims**

14.     Plaintiffs are parents of children with eligible disabilities, and their respective children who are entitled to a Free Appropriate Public Education ("FAPE") and related due process protections and safeguards guaranteed by, *inter alia*, the Individuals with Disabilities Education Improvement Act (the "IDEA"), 20 U.S.C. § 1400, *et seq*., the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the New York State Constitution, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794 ("Section 504"), New York State Education Law §§ 2590-b, 2590-h, 4401, *et seq*. (the "New York State Education Laws"), and the regulations promulgated thereunder.

15.     To the extent that Plaintiffs are parents of a child with a disability, they have their own independent rights and entitlements under the IDEA. *See*, *e.g.*, *Winkelman ex rel. Winkelman v. Parma City School Dist*., 550 U.S. 516 (2007).

16.     As alleged herein, this action is brought to enjoin Defendants from implementing an ill-conceived and wholly unlawful plan that would *systemically* violate core statutory mandates and entitlements of Plaintiffs' including Plaintiffs' entitlement to an "impartial hearing" that is presided over by an "impartial hearing officer" who does not have impermissible conflicts of interest.

**Summary of Defendants**

17.     Plaintiffs thus seek declaratory and injunctive relief from the following named Defendants, whose roles and responsibilities in the impartial hearing process are inextricably intertwined: New York City Department of Education ("DOE"), The New York City Board of Education of the City School District of the City of New York (the "Board of Education" or the "Board"), and the Chancellor of the New York City school district (the "Chancellor") (collectively, the "DOE Defendants"); the Mayor of the City of New York, and the Commissioner of the New York City Administrative Trials and Hearings Bureau ("OATH") (collectively, the "City Defendants"); The Commissioner of the New York State Education Department, the New York State Education Department ("NYSED"), and the Chancellor of the New York State Board of Regents (collectively, the "State Defendants").

**The OATH Plan Violates the IDEA**

18.     When disputes arise under the IDEA concerning a student's services, placement, or programming, the IDEA's most important due process entitlement is the right to an impartial hearing presided over by a neutral, unbiased "impartial hearing officer" ("IHO"). The IDEA guarantees the right to an IHO who (1) is free from any conflicts of interest; (2) is not an employee of the school district or the agency financially and/or managerially responsible for the provision of services; and (3) has demonstrable expertise in the area of special education. 20 U.S.C. §§ 1415(f)(3)(A)(i), (ii).

19.     According to the Second Circuit, "[a] system perceived by parents as tainted by biased adjudicators would deter parents from fulfilling their role under the [IDEA]." *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 155 (2d Cir. 1992). The Second Circuit's holding is, in simplest terms, a key impetus for Plaintiffs' request for Emergency Relief.

20.     For decades, IHOs in New York have been independent contractors certified by NYSED.

21.     Since 1993, New York State law has required school districts to appoint IHOs for impartial special education hearings in accordance with an independent rotation system to eliminate even the appearance of conflict.

22.     However, the OATH Plan abandons the entire system of independent IHOs.

23.     Plaintiffs seeks to restrain and enjoin Defendants from taking any further steps to implement their latest plan to degrade, dismantle, and replace the current impartial hearing system in New York City by replacing the NYSED-certified IHOs with full-time employees of OATH.

24.     The OATH employee hearing officers would operate under the control of the Mayor and a Commissioner who serves at the pleasure of the Mayor.

25.      Defendants' OATH Plan ignores one of the most essential procedural safeguard protections under the IDEA: as a matter of law, plaintiffs are entitled to appear before hearing officers who are impartial, neutral, and unbiased, and who possess the independence, autonomy, and expertise that the IDEA mandates. Plaintiffs are entitled to "impartial hearing officers" who are not disqualified for service by reason of some demonstrable conflict of interest.

26.     Defendants' OATH Plan takes the "due" out of due process and makes the "impartial" partial. It replaces the IDEA's impartiality and due process safeguards with a system imbued with systemic, insurmountable conflicts of interest that will subject vulnerable disabled children and their parents to the imminent threat of irreparable harm and deter parents from enforcing their children's substantive rights.

27.     The OATH Plan was hatched and memorialized by Defendants *via* a Memorandum of Agreement dated December 1, 2021 ("MOA") at the 11th hour during the holidays, days before former Mayor de Blasio left office and the New York State Governor signed a new law taking clear and decisive action to clear the current "backlog" of unassigned cases. The MOA is attached hereto as Exhibit ("Ex.") A and incorporated herein by reference herein.[2]

28.     Defendants' latest plan to shift control of the hearing system to OATH was  made under the pretext of addressing the then existing backlog ( or "waiting list") of hearings causing delays in IHO assignments in the City.

---

[2] On January 1, 2022, Mayor Adams issued Executive Order 1, which continued, *inter alia*, EO 91.

29.    In the 2020-2021 school year, NYSED reported that parents in New York City filed approximately 14,000 hearings.

30.    In the 2021-2022 school year, as of January 2022, there were 16,253 pending hearings against New York City.

31.    As of October 2021, NYSED reported a backlog of approximately 7,000 cases in New York City.

32.    Upon information and belief, the backlog was approximately 6,700 cases as of the filing of the First Amended Complaint on January 11, 2022.

33.    By January 2022, the backlog of unassigned cases was 5,269, only four of which were unassigned for more than 90 days.

34.    Upon information and belief, and though conflicting information exists regarding Defendants' information, according to Defendants, as of September 2022, the backlog of unassigned cases has been eliminated.

35.    However, the OATH Plan has not had any material impact on reducing the backlog; rather, the backlog was reduced due to the enormous efforts of the existing independent IHOs as further described herein.

36.    Instead, the current OATH Plan is an attempt by Defendants to circumvent the New York State legislature's *rejection* of proposed amendments to the N.Y. Education Law Section 4404(1)(a) (allegedly authored by DOE's lawyers) to transfer hearings to OATH in June 2021 to allegedly address the backlog.

37.    Rather than allow Defendants to use the then existing backlog as pretext to replace the system of IHOs, the Legislature passed a bill to affect the timely resolution of the backlog of unassigned cases, which the Governor signed into law, and which would effectively

8

default New York City on all cases delayed more than 196 days. *See* Chapter 812 of the New York State Law.

38.    Yet, on December 27, 2021, just two days before Governor Hochul signed the legislation, the former Mayor issued Executive Order 91 ("EO 91"), authorizing the transfer of jurisdiction for federally created IDEA claims to OATH to implement the plan. A copy of EO 91 is attached here to as Exhibit B and incorporated herein by reference.

39.    Defendants have pushed forward with the OATH Plan, which systemically replaces the system of independent IHOs with lower paid, inexperienced city employees who lack impartiality and have insurmountable conflicts of interest.

40.    Further, the OATH Plan was designed to effectively eliminate from consideration as OATH IHOs more than half of the current, experienced hearing officers certified to hear cases in New York City who do not live within the City limits or hear cases on a part-time basis and replace them with lower paid lawyers who are employees of the City.

41.    According to the job descriptions, which are attached hereto as Exhibit C and incorporated herein by reference, the new City-employee IHOs will be controlled, managed, supervised, trained, hired, disciplined, overseen, and even terminated, by an OATH Commissioner. Exs. A-C.

42.    Upon information and belief, OATH began actively interviewing applicants in January 2022, and trainings for new OATH hearing officers were scheduled soon thereafter. Ex. A.

43.    To date, Defendants have claimed to have hired over 40 new OATH HOs.

44.    This is the second time Defendants have tried to grab direct control over the impartial hearings and the IHOs.

9

45.     In 2002, Defendants launched a similar plan to dismantle the IDEA hearing system of independent IHOs and transfer it to OATH under the Mayor's control.

46.     When parents, represented by co-counsel Gary S. Mayerson here, filed suit, Defendants discontinued the plan. *See Does, et al. v. Outgoing Schools, et al.*, 1:02-cv-06495 (JFK). As part of the Honorable John F. Keenan's Order of Dismissal and Settlement dated August 2002 (*see* 1:02-cv-06495, Dkt. No.13), Defendants were obligated to provide Plaintiffs' counsel 45 days' notice if they ever again tried to implement a transfer to OATH. However, Defendants issued the MOA and EO 91 without any notice to Mr. Mayerson.

47.     By hastily implementing their OATH Plan without providing 45 days' notice to Plaintiffs' counsel, Defendants have violated, and continue to flagrantly violate, Judge Keenan's Order.

48.     The Mayor, the City, its agencies, the DOE, and the Board, are inextricably intertwined for purposes of special education services. The Mayor, who appoints both the Chancellor and OATH Commissioner, has been intimately involved in due process hearings and controls both special education policy and funding.

49.     Defendants' transfer of the impartial hearing system in the City to OATH  and deciding to remove independent IHOs and replace them with in former City employees who are inexperienced in special education under the guise of clearing the backlog is pretextual. Among other things, defendants are trying to reduce the amount of money that the City spends on special education claims and are trying to thwart the will of the New York State legislature and the Governor.

10

50.     Defendants are motivated to gain control of the hearings, to try to reduce the costs of the relief ordered that must be borne by the City itself, as the remedy for hearings comes directly from the City's budget. Those costs have been growing exponentially.

51.     According to the New York City Independent Budget Office, the City has determined that these costs need to be controlled, and "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors" one of which is tuition costs, and the other is "*how often parents succeed when seeking reimbursement for services to meet their children's needs*."

52.     Most recently, Chancellor David C. Banks, who was standing with Mayor Adams and addressing a parent advisory council, stunned members of the public, including specifically parents with children requiring special education, when he announced that the City would be endeavoring to cut hundreds of millions of dollars paid by the City for children with special needs' private school tuition. Chancellor Banks accused parents of special needs children of figuring out how to "game this system," and that if such money could be clawed back, "[w]e wouldn't be having this fight about budget cuts . . . [w]e'd be able to pay for all that after-school programming, all of those kinds of things. This is money that's going out the back door every single day."

53.     In a September 21, 2022, hearing of the Education Committee of the New York City Council, representatives of Chancellor Banks and the DOE provided further insight into the motivation behind the City's efforts to dismantle the independent hearing system.

54.     The DOE and Chancellor's representatives stated that the Defendants' goals were to make changes to OATH to ensure that "cases that proceed to hearing reach consistent,

11

reasonable outcomes and comply with the law," suggesting that they were unhappy with the results of the independent hearing officers.

55.     In fact, Defendants' newest theme is to blame the independent hearing officers for the prior delays, despite the evidence that the backlog of unassigned cases is not the fault of hearing officers, but rather a huge increase in cases, a shortage of hearing officers, and a failure to timely and appropriately pay those hearing officers.

56.     To justify and support the OATH Plan, Defendants claimed that under the independent system "cases as they came in are assigned to independent hearing officers who are essentially independent contractors who could take cases when they feel like it not, take cases when they feel like it. They're overseen by the state and so the length of time and the lack of consistency across that system was really making it very hard for us [the DOE] to move cases."

57.     Defendant DOE's General Counsel claimed that they "think this [the OATH Plan] is going to make a massive difference once they are up to scale" to "finally, *establishing some real oversight to meeting guidelines to having consistent practices* and simply to having the ALJ's you know have consistent practices, *interpretation and application of the law and clear decisions* that can be shared with the public to understand what is or is not a free and appropriate public education."

58.     After receiving tremendous backlash for his remarks, representatives of his office attempted to walk-back his comments, explaining that Chancellor Banks was not talking about the over 18,000 families that filed due process complaints last year. Nonetheless the DOE disclosed that it spent $800 million in private school tuition cases, and that there were 10,204 students in non-approved schools, and 25,000 children with IESPs placed religious and/or secular private schools who receive special education services.

59.     Defendants' OATH Plan violates federal and state law and subjects Plaintiffs and other similarly situated families to the threat of imminent and irreparable harm.

60.     IHOs under the current system are required to be specially trained independent contractors with expertise who are not employees of the City, the DOE, or the Board, or subject to any conflict of interest. In contrast, OATH's hearing officers are required to be employed by and answerable to OATH and can be terminated by OATH and the Mayor and thus would have a disqualifying conflict of interest and not be impartial and independent, as required by federal and state law.

61.     The OATH Plan purports to delegate what are non-delegable duties under the IDEA and state law.

62.     OATH and its judges simply do not have the training and experience needed to adjudicate and reconcile IDEA-based claims and New York law.

63.     Defendants' plan is improper because, *inter alia*, it involves (i) moving the hearings to another City agency with no expertise in the subject matter, (ii) disqualifying and reducing the number of trained and impartial hearing officers who otherwise would have been able to hear and adjudicate such hearings, and (iii) causing a chaotic situation, for which two hearing systems would operate concurrently in New York, affording different due process standards and procedures for different families.

64.     Further, Defendants cannot attempt to clear the backlog by substituting one violation of the IDEA for another, thereby destroying the core protections of the IDEA.

## JURISDICTION AND VENUE

65.     This Court has jurisdiction under 28 U.S.C. § 1331 in that claims are asserted under the laws of the United States, under 28 U.S.C. § 1343(a) in that claims are asserted under

laws providing for the protection of civil rights, and under 20 U.S.C. § 1415, Title II of the ADA, 42 U.S.C. § 12133, 42 U.S.C. § 1983, and 29 U.S.C. § 794, *et. seq*.

66.     This Court has jurisdiction over Plaintiffs' pendent State law claims pursuant to 28 U.S.C. § 1367. Plaintiffs also seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

67.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which defendants are situated and/or reside.

## PARTIES

68.     All Plaintiffs parents and their children live in New York City.

69.     J.F. is the parent of H.F., a child with a disability under the IDEA. J.F. filed four impartial hearings on behalf of his child and amended a pending complaint to include the 2021-2022 school year. After the independent contractor hearing officer assigned to that hearing recused himself, J.F.'s pending hearing was transferred to an OATH hearing officer. J.F., through counsel, filed a motion to recuse the IHO on the grounds that the IHO is a City employee; the motion was denied.

70.     L.V. is the parent of N.F., a child with a disability under the IDEA. L.V. has filed four impartial hearings on behalf of her child. L.V. has a pending due process complaint concerning the 2021-2022 school year. L.V. also has a pending due process complaint concerning multiple, prior school years. The DOE failed to offer N.F. an IEP for several school years. Based on the lack of services and programs offered by the DOE for children with Autism with N.F.'s unique profile, it is not speculative that L.V. will have to file due process complaints in the future.

71.     A.M. is the parent of O.M., a child with a disability under the IDEA. A.M. has filed three prior hearings, all of which were presided over by independent IHOs. A.M. filed a

hearing for the 2021-2022 school year. She was assigned to an OATH IHO. This hearing is currently pending. A.M. filed a motion to recuse the IHO on the grounds that the IHO is a City employee; the motion was denied. It is not speculative that she will have to file a hearing for the 2022-2023 school year, as her child has Autism and receives Applied Behavior Analysis ("ABA") services, after-school services, and push-in services into a state-approved private school. The DOE does not offer any of these services, and like many other parents, she would have to litigate every year to keep her child's services in place.

72.     M.F. is the parent of J.W., a child with a disability under the IDEA. M.F. has filed a due process complaint for the 2022-2023 school year under the IDEA with the DOE and was assigned to an OATH HO. This hearing is currently pending.

73.     M.F. filed a motion to recuse the OATH HO on the grounds that the HO is a City employee; that motion was denied.

74.     It is not speculative that M.F. will have to file for a due process hearing for subsequent school years because her child has Autism and receives ABA services in an ABA-related curriculum, along with other related services at a state-approved nonpublic school. The DOE does not offer any of these services, and like many other parents, she will have to litigate every year to maintain her child's placement and services in place.

75.     M.F. has also applied for pendency on behalf of J.W., which is being contested by the DOE, and for which a hearing has been scheduled before the OATH HO. At the initial pretrial conference, a DOE "consultant," who admitted to being an out of state attorney, stated that he was barred in the State of West Virginia, and purported to appear on behalf of the DOE.

76.     The out of state attorney uses a DOE email address and upon information and belief a DOE return address within the State of New York and is thus presenting the appearance of having a New York Office potentially for the practice of law without a license in this State.

77.     Upon information and belief, the DOE and the attorney appearing on its behalf at the M.F. hearing both have knowledge and awareness that the DOE consultant who appeared is not licensed to practice law in the State of New York, and is accordingly, potentially aiding, abetting, and facilitating this individual's unauthorized practice of law, which is in and of itself a violation of the New York State ethics rules and model rules of professional conduct.

78.     In the State of New York, practicing law without a license is a class E felony and potentially subjects the individual to indictment and criminal prosecution. Further, anyone who knowingly aids or abets the unauthorized practice of law is also a committing a class E felony, which subjects that person to potential indictment and criminal prosecution in the State of New York.

79.     One of Plaintiffs' co-counsel, Advocates for Justice Legal Foundation, Laura D. Barbieri, as special counsel is counsel for M.F. and J.W., and objected to the DOE "consultant's" appearance before the OATH tribunal as an individual who was potentially practicing law without a license in the State of New York. It is not speculative that should the consultant continue to appear and represent the DOE at a pendency hearing that he will be making legal arguments, quoting, or referencing federal or state case law, statutes, laws, regulations, or rules, and will generally be purporting to rendering legal opinions regarding the appropriateness of a recommended placement for J.W.

80.     J.S. is the parent of R.S., a child with a disability under the IDEA. J.S. has filed a

due process complaint for the 2022-2023 school year under the IDEA with the DOE and was

assigned to an OATH HO. This hearing is currently pending.

81.     J.S. filed a motion to recuse the OATH HO on the grounds that the HO is a City

employee; that motion was denied.

82.     It is not speculative that J.S. will have to file a due process complaint again in

subsequent school years because her child has Autism and receives ABA services in an ABA-

related curriculum, along with other related services at a state-approved nonpublic school. The

DOE does not offer any of these services, and like many other parents, she will have to file a

new due process complaint every year to maintain her child's placement in a non-public state

approved school and to keep her child's related services in place.

83.     J.S. also applied for pendency on behalf of her child R.S., to which the DOE

purportedly agreed and for which a pendency form was completed and signed by both counsel.

Despite that agreement, the DOE has failed to implement the agreement on behalf of R.S. despite

repeated requests to do so by Plaintiffs' co-counsel on the family's behalf.

84.     Upon information and belief, the DOE has yet to establish procedures to manage

pendency agreements for cases appearing before OATH, and that the delay in implementing

pendency is an example of a systemic failure of Defendants and the OATH Plan. Moreover, also

upon information and belief, this family is not the only family experiencing delays in the

implementation of DOE pendency stipulations on cases assigned to OATH HOs.

85.     Moreover, despite repeated requests for a pendency order from the OATH HO,

the OATH HO has failed to issue one, despite DOE agreement and consent. Upon information

and belief, the failure of the OATH HO to issue a pendency order in a case involving a clear

pendency agreement between the parties is an example of the lack of experience of OATH HOs in special education cases, and presents a violation of the IDEA, and a systemic failure of Defendants and the OATH Plan.

86.     R.H. is the parent of M.H., a child with a disability under the IDEA. R.H. has filed a due process complaint for the 2022-2023 school year under the IDEA with the DOE and although the complaint was filed more than one month ago, the case has yet to be assigned to a hearing officer. R.H. has also applied for an expedited hearing and for pendency for M.H.

87.     Upon information and belief, because R.H. applied for an expedited hearing, the case will likely be assigned an OATH HO because again upon information and belief, the Defendants have "arranged" for all expedited cases to be assigned to OATH HOs.

88.     It is not speculative that R.H. will have to file a due process hearing for subsequent school years because his child has Autism and receives ABA services in an ABA-related curriculum, along with other related services at a state-approved nonpublic school. The DOE does not offer any of these services, and like many other parents, he will have to file a due process complaint every year to maintain his child's placement and services in place.

89.     All plaintiff children are also qualified individuals with disabilities that impact their major life functioning as those terms are defined under Section 504.

90.     Initials are used throughout this Third Amended Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 ("FERPA").

91.     Defendant MAYOR ERIC ADAMS is the Mayor of New York City as of January 1, 2022, and the successor-in-interest to Mayor Bill de Blasio.

92.     Defendant CITY OF NEW YORK is a municipal corporation and a political subdivision of the State of New York. The City's address is c/o Office of the Corporation Counsel, 100 Church Street, New York, New York 10007.

93.     Defendant THE NEW YORK CITY BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK (the "Board of Education" or the "Board") is also known as the Panel for Educational Policy (the "PEP") within New York City, and the "City Board" according to state law. The Board is a corporate body created by and existing under the laws of the State of New York pursuant to Sections 2551 and 2590 of the New York Education Law. Pursuant to various provisions of law, including Sections 2554 and 2590-g, the Board is charged with special education responsibilities under N.Y. Educ. Law § 2590-b and N.Y. Educ. Law § 4404.

94.     Defendant DAVID C. BANKS is the Chancellor of the New York City School District (the "Chancellor") and is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h, which include the responsibility for the administration and daily operations of the DOE, including its public schools in the New York City public school system. DAVID C. BANKS was appointed by Mayor Adams and succeeded MEISHA PORTER, who was appointed by Mayor de Blasio.

95.     In conjunction with amendments to the New York Education Law enacted in 2002, many powers of the then-New York City Board of Education of the City School District of the City of New York were diverted to the Chancellor, with the then-Board's administrative operations assigned to a body denominated by the mayor as the New York City Department of Education.

96.     Defendant the NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") is a corporate body that manages the operations of the City's public school system. Defendant DOE's central office is located at 52 Chambers Street, New York, New York 10007.

97.     The Local Educational Agency ("LEA") is responsible for providing a FAPE under the IDEA to all disabled children in New York City.

98.     All City Defendants, except OATH, either jointly and/or individually constitute the LEA under the IDEA.

99.     New York State has chosen to receive funding under the IDEA and has established procedures for providing special educational services to children with disabilities, as set forth in N.Y. Educ. Law § 4401, *et seq.* and 8 N.Y.C.R.R. Part 200.

100.    Defendant NEW YORK STATE EDUCATION DEPARTMENT ("NYSED") is the State Educational Agency ("SEA") in New York State pursuant to the IDEA.

101.    Defendant DR. BETTY A. ROSA, COMMISSIONER OF EDUCATION ("Commissioner Rosa"), is in charge of NYSED.

102.    Defendant THE NEW YORK CITY OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS ("OATH") is an entity created under the New York City Charter, is a New York City agency, and is responsible for adjudicating local municipal matters.[3]

103.    Defendant ASIM REHMAN is the current Commissioner and Chief Administrative Law Judge of OATH. ASIM REHMAN was appointed by Mayor Adams and succeeded JONI KLETTER, the prior Commissioner and Chief Administrative Law Judge of OATH who was appointed by Mayor de Blasio.

---

[3] *See* Chapter 45-A, § 1048(2), and *see* https://www.1.nyc.gov/site/oath/about/about-oath.page. A full copy of the New York City Charter may be found at https://codelibrary.amlegal.com/ codes/newyorkcity/latest/NYCcharter/0-0-0-1.

104.    OATH does not provide educational services to students with disabilities and does not constitute a "public agency" as that term is defined by the United States Department of Education's regulation 34 C.F.R. § 300.33.

105.    All individual Defendants are being sued in their official capacity.

106.    The City, the Board, the DOE, NYSED, and the Commissioner are recipients of funding under the IDEA.

107.    The City, the Board, the DOE, NYSED, and the Commissioner are recipients of funding as that phrase is defined under Section 504.

## LEGAL AND STRUCTURAL FRAMEWORK

**Applicable Provisions of the IDEA**

108.    Congress enacted the IDEA to ensure that "all children with disabilities have available to them a free appropriate public education" ("FAPE") and "that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A), (B). Defendants are obligated to ensure that a FAPE is provided to all eligible children, ages three through twenty-one. 20 U.S.C. § 1412(a)(1).

109.    A FAPE must, *inter alia*, "include an appropriate" *preschool, elementary or secondary education in the State involved*," and be provided pursuant to individualized education programs ("IEPs"). 20 U.S.C. § 1401(9) (emphasis added); *see also* 20 U.S.C. § 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii). A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §§ 1400(d)(1)(A)-(B); *see also Bd. of Educ. v. Rowley*, 458 U.S. 176, 203 (1982) (a FAPE is "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" provided in conformity with an IEP developed pursuant to the IDEA's procedures).

110.    An IEP must be individually tailored and is meant to serve as a blueprint for each

child's program, services, accommodations, and modifications. 20 U.S.C. § 1414(d). By the

beginning of each school year, defendants must have IEPs in place that offer a FAPE to each

eligible child. 20 U.S.C. § 1414(d)(2).[4]

111.    Mandated services under the IDEA include "special education" generally defined

as "specially designed instruction . . . to meet the unique needs of a child with a disability," 20

U.S.C. § 1401(29), and "related services," which are "such developmental, corrective, and other

supportive services … as may be required to assist a child with a disability to benefit from

special education… ." 20 U.S.C. § 1401(26)(A). Defendants must adopt a "continuum of

alternative placements" that must include, *inter alia*, regular class, special classes, special

schools, and instruction at home*,* and must make provision for "supplementary services." 20

U.S.C. § 1401(29); 34 C.F.R. § 300.115.[5]

112.    Under the Act, the SEA, NYSED and its head, the Commissioner, are responsible

for the "general supervision" of implementation of the IDEA in the State. This supervision

includes adopting IDEA-compliant policies, rules, and regulations, and otherwise ensuring that

all of the mandates of the IDEA are met by districts and other responsible agencies. *See* 20

U.S.C. §§ 1407(a)(b), 1412(a)(11).

113.    As such, the State Defendants also have an obligation to monitor and enforce City

Defendants' compliance with the IDEA and ensure that City and DOE Defendants maintain

---

[4] The IDEA and state and federal regulations prescribe, in detail, the process for developing IEPs and their contents. 20 U.S.C. §§ 1414(d)(1)(A), (d)(2); 34 C.F.R. §§ 300.320(a)(2)-(3), 300.324; N.Y. Educ. Law § 4401, *et seq.*; 8 N.Y.C.R.R. § 200.4(d)(2)(iii).

[5] "Supplementary aids and services" are "aids, services, and other supports that are provided" to enable children to be educated in the LRE. 20 U.S.C. § 1401(33). State regulations mandate that certain services are made available for children with autism, including but not limited to services to facilitate their eventual inclusion, to address their language needs as well as parent training and counseling. 8 N.Y.C.R.R. § 200.13.

adequate policies and procedures under the IDEA. *Id.* Moreover, the SEA is the "guarantor" of FAPE, in that it is required to step in when LEAs are unable to comply with the law. 20 U.S.C. § 1412(g).

114. The IDEA requires that each SEA and local educational agency ("LEA") "establish and maintain procedures" to "ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. § 1415. An LEA is defined as a "public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(19)(A).

115. The City Defendants (as the LEA) are required to provide a FAPE in the first instance and to, *inter alia*, "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. §§ 1414, 1415. Woven throughout the IDEA is a complex set of mandated due process rights, notices, and procedural safeguards that are designed to facilitate parental participation and protect plaintiffs' rights.[6] These procedural rights are the cornerstone to ensure that substantive educational rights are afforded to children under the Act.

116. The Second Circuit has described this set of rights as follows:

Rather than detailing the precise substantive rights applicable to all affected children, Congress opted for individually tailored programs—programs crafted by parents and educators working together to determine what is appropriate for each child. Congress recognized that such an unconventional approach would require extensive procedural safeguards to protect the educational rights of children with

---

[6] *See, e.g.*, 20 U.S.C. §§ 1415(b)(1), (b)(3)(B), (d)(2)(E); 34 C.F.R. §§ 300.9(a), 300.322(e); 8 N.Y.C.R.R. § 200.5(d).

disabling conditions. Thus, the scope of these procedural protections … must be determined in light of their role in ensuring the appropriate application of the Act.

*Heldman*, 962 F.2d at 151.

117.    A parent has a right to file a complaint concerning any matter relating to the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which *shall* be conducted by the [SEA] or by the [LEA] as determined by State law or by the [SEA]" 20 U.S.C. § 1415(f)(1)(A) (emphasis added).

118.    New York is one of the only remaining "two-tier" due process systems in which hearings are held at the LEA level, with appeals required at the SEA level, prior to filing an action challenging the LEA decision in court. *See* 20 U.S.C. § 1415(g)(1).[7] In most states, the SEA conducts the due process hearings for the entire state. In New York, the State Review Officer ("SRO") hears appeals from impartial hearings. *See* N.Y. Educ. Law § 4404.

119.    Once it is determined that a child has been denied a FAPE for any reason, a factfinder has broad equitable jurisdiction to award relief, as well as statutory remedies. *See*, *e.g.*, *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015) (citations omitted); *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006).

---

[7] *See* "State Due Process Hearing Systems Under the IDEA: An Update," Perry A. Zirkel, *et al.*, 30 Journal of Disability Policy Studies, at 156-163 (2019) (noting as of 2018 only 7 states had a second-tier level of review). In 2021, North Carolina amended their law to eliminate the second tier. *See* https://www.wral.com/state-overhauls-appeals-system-for-parents-of-disabled-students/20040529/.

120.     The Supreme Court noted in *Rowley* that the IDEA's procedural due process protections are of vital importance to facilitating the Act's goals to provide a FAPE to children. 458 U.S. at 205-206.

121.     In 2007, the Supreme Court reiterated the unique role that the IDEA's procedural rights play in relation to a child's right to a FAPE: the "IDEA's procedural and reimbursement-related rights are intertwined with the substantive adequacy of the education provided to a child." *Winkelman*, 550 U.S. at 531-532.

122.     A deprivation of a hearing that complies with the IDEA amounts to a deprivation of a FAPE.

**Hearing Officers Must Be Neutral, Impartial, and Free from Conflict of Interest**

123.     The IDEA places restrictions on the qualifications of the person conducting a hearing. A hearing officer shall not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A).[8]

124.     The IDEA regulations clarify that source of payment is not determinative as to a hearing officer's status: "[a] person who otherwise qualifies to conduct a hearing under paragraph (c)(1) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer." 34 C.F.R. § 300.511.

125.     The Second Circuit has taken a strong stance on the importance of the IDEA's guarantee of neutral hearing officers. In *Heldman*, for example, the Court held that "IDEA's language, legislative history, structure, and implementing regulations all bear witness that the

---

[8] If an appeal is taken to the SEA, the agency "shall conduct an impartial review of the findings and decision appealed" and "shall make an independent decision upon completion of such review." 20 U.S.C. § 1415(g).

Act prohibits the use of biased adjudicators—a prohibition that section 1415(e) permits parents to enforce in federal court." 962 F.2d at 155.

**Hearing Officers Must Be Experts in Special Education**

126.    In addition, the IDEA requires a hearing officer to: "possess knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to [the IDEA] and legal interpretations of [the IDEA] by Federal and State courts," "possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice" and "possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice." 20 U.S.C. § 1415(f)(3)(A)(ii)-(iv).

127.    The Second Circuit and district courts in the Second Circuit, as well as many courts in other circuits, interpret the IDEA as guaranteeing a hearing officer be an individual with experience and expertise in the area of special education.

128.    This is particularly the case when courts highlight the structural importance of exhausting administrative remedies prior to seeking relief in court.

129.    In *Heldman v. Sobol*, for example, the Second Circuit noted the administrative exhaustion requirement through the impartial hearing process "prevents courts from undermining the administrative process and permits an agency to *bring its expertise* to bear on a problem as well as to correct its own mistakes." 962 F.2d at 159 (emphasis added). Later, in *Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, the Court held that the "[t]he IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply *administrators' expertise* in the area and promptly resolve grievances." 288 F.3d 478 (2d Cir. 2002) (emphasis added).

130.     Further, courts regularly defer to the IHOs' decisions based on the assumption that the IHOs presiding over these proceedings have extensive expertise in IDEA matters and are more experienced and knowledgeable about the IDEA than judges on the federal bench.

131.     Moreover, a parent has a "right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities" in a hearing. 20 U.S.C. § 1415(h)(1). Thus, while lawyers do represent parents in hearings, many parents are assisted by "advocates" who do not attend law school but are sufficiently knowledgeable about special education to advocate on the parent's behalf. Similarly, the DOE is frequently represented at special education hearings by non-attorney administrators.

**Applicable Provisions of Section 504**

132.     Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance." 29 U.S.C. § 794(a).

133.     All City Defendants, except OATH, receive federal financial assistance.

134.     Section 504 and the IDEA are often seen as "complementary" statutes that, to a degree, mandate parallel requirements on schools to provide special education and related services.

135.     Section 504 also mandates that the City Defendants provide students with disabilities with a free appropriate public education.

136.     The Section 504 regulations require City Defendants to set up an impartial hearing system to hear and exhaust Section 504 claims. Specifically, the regulations require City Defendants to:

establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of disability,  need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

34 C.F.R. § 104.36.

137.    The Section 504 regulations provide that compliance with the "procedural safeguards" of Section 1415 of the IDEA is "one means of meeting this requirement."

138.    Section 504 hearing officers must also be neutral, impartial, and free from any conflict of interest.

**Applicable Provisions of New York State Law – Impartial Hearings**

139.    New York apparently adopted Section 4404 of the Education Law pursuant to the IDEA's due process hearing mandate. Section 4404 provides that upon the filing of a complaint by a parent, district, or other authorized party, the "board of education" or a "state agency" "*shall* appoint an impartial hearing officer*" to preside over a hearing and render a decision. N.Y. Educ. Law § 4404(1) (emphasis added).

140.    Section 4404(2) provides for a neutral rotation system for impartial hearing officers:

> Individuals so appointed by a board of education or a state agency shall be selected from a list of available impartial hearing officers who have successfully completed an impartial hearing officer training program conducted by the department according to a rotation selection process prescribed in regulations of the commissioner; *except that a city school district of a city having a population of more than one million inhabitants shall be exempt from such regulations to the extent it maintains its rotational selection process in effect prior to July first, nineteen hundred ninety-three.*

*Id.* (emphasis added).

141.    Each school district must maintain a rotational selection list, with the names of state certified IHOs listed alphabetically. Selection is made on a rotational basis beginning with the first name appearing after the IHO that last served. 8 N.Y.C.R.R. § 200.2(e)(I)(ii).

142.    Upon information and belief, the IDEA creates a floor, and state law and regulations are incorporated by reference into the IDEA and are directly enforceable under the IDEA, or as pendent claims.

143.    Section 4404 provides that the New York State Commissioner of Education (the "Commissioner") "shall establish a department training program which shall be completed to the satisfaction of the commissioner as a condition of certification." N.Y. Educ. Law 4404(c). NYSED is state agency responsible for certifying IHOs. *See* 8 N.Y.C.R.R. § 200.1(x)(4).

144.    Section 4404 also provides that IHOs must have the qualifications set forth in the IDEA § 1415(f), and in the implementing regulations of the Commissioner. N.Y. Educ. Law § 4404(c).

145.    The Commissioner is charged with promulgating regulations to ensure that "no individual employed by a school district, school or program serving students with disabilities placed by a school district committee on special education acts as an impartial hearing officer" within two years of holding that position. N.Y. Educ. Law § 4404(c).

146.    Finally, the Commissioner is charged with setting "maximum rates for the compensation of impartial hearing officers subject to the approval of the director of the division of the budget," rather than "minimum rates." *Id*.

147.    With regard to neutrality, the Commissioner's Regulations mandate that a hearing officer:

> be independent, shall not be an officer, employee, or agent of the school district or of the board of cooperative educational services of which such school district is a

component, or an employee of the Education Department, *shall not have a personal or professional interest which would conflict with his or her objectivity in the hearing*, and shall not have participated in any manner in the formulation of the recommendation sought to be reviewed.

8 N.Y.C.R.R. § 200.1(x)(3) (emphasis added).

148. The New York State regulations were recently amended to further dilute the already watered-down qualifications for IHOs. Under the current version of the regulations, the State Defendants claim an IHO need only be "admitted to the practice of law and currently in good standing with a minimum of *one year* of practice and/or experience in one of the following areas: education, special education, disability rights, civil rights or administrative law." 8 N.Y.C.R.R. § 200.1(x)(1) (emphasis added)

149. In addition to the above, the regulations require the IHO to "possess knowledge of, and the ability to understand, the provisions of federal and State law and regulations pertaining to IDEA and legal interpretations of such law and regulations by federal and State courts" (8 N.Y.C.R.R. § 200.1(x)(4)(iv)); "possess knowledge of, and the ability to conduct hearings in accordance with appropriate standard legal practice and to render and write decisions in accordance with appropriate standard legal practice" (8 N.Y.C.R.R. § 200.1(x)(4)(v)); "have access to the support and equipment necessary to perform the duties of an IHO" (8 N.Y.C.R.R. § 200.1(x)(2)); "successfully complete a training program" by NYSED (8 N.Y.C.R.R. § 200.1(x)(4)(i)); and attend periodic trainings (8 N.Y.C.R.R. § 200.1(x)(4)(ii)).

150. In virtually every other school district except for New York City, IHOs are fully independent and are appointed by the boards of education from the list of certified IHOs as part of a neutral, alphabetically based rotational system.

151. Upon information and belief, in every other school district except for New York City, when an IHO is assigned, that IHO is responsible for all of the work involved in

scheduling, coordinating, managing a hearing, hearing motions, reviewing, and issuing

subpoenas, holding hearings, reviewing briefs, conducting legal research, and issuing decisions.

152.    Upon information and belief, in every other school district except for New York

City, the independent IHOs (many of whom are also certified in New York City) are paid $100

per hour for any and all work that is necessary, within the IHO's discretion to perform, relative

to the hearing process.

153.    Upon information and belief, in every other school district except for New York

City, there are no caps or restrictions on work or types of activities that the IHO can perform

based on payment. This is not the situation in New York City and will be even more improper

after the move to OATH.

## SYSTEMIC FACTS

**New York City, the Mayor, the Chancellor, the DOE, and the Board Are Inextricably Related for Purposes of Special Education and Impartial Hearings in New York City**

154.    During the 2021 fiscal year, New York City's public schools enrolled 1.14 million

public school students, out of which 292,065 received special education services. Of those,

260,482 were school-age public school students and 31,583 were preschool students. Newly

appointed Chancellor Banks has recently called the public school system "fundamentally

flawed," particularly failing significant numbers of students of color.[9] Nowhere is this failure

more evident than in the special education system. The system is plagued with numerous

problems, causing students to be unserved and/or underserved.

---

[9] "Incoming Chancellor David Banks says NYC's school system is 'fundamentally flawed' and promises reforms," Chalkbeat, Dec. 9, 2021, published at https://ny.chalkbeat.org/2021/12/9/22826524/david-banks-chancellor-eric-adams (last visited Jan. 9, 2022).

155.     Despite these flaws, even with a recent increase in hearings to approximately 14,000 cases, less than 5% of parents take advantage of due process, primarily due to lack of information and resources for attorneys.

156.     In the context of administrating special education, and impartial hearings with the impartiality and procedural safeguards required by law, the Mayor, the City, DOE, the Board, and Chancellor are inextricably intertwined and impermissibly so relative to the OATH Plan, particularly since the City is the true financial party in interest. This is true regardless of whether or not the DOE is deemed to be an agency of the City.

157.     In the circumstances at bar at the present time, given mayoral control over the city's school system (a) the Chancellor is appointed by and serves at the pleasure of the Mayor, who sets his salary (*see* N.Y. Educ. Law § 2590-h), as well as education policy for the DOE, including how the DOE responds to and handles special education hearings as a party; (b) the DOE is considered a *de facto* municipal agency, which is not even referenced in the state law; (c) the City is financially responsible for the costs of the relief awarded in hearings and the DOE is subject to audit and financial control of the New York City Comptroller in relation to all of its functions, including impartial hearings; (d) the Mayor appoints the OATH Commissioner and oversees OATH; and (e) OATH's new impartial hearing officers are all required to be City employees in the position of agency counsel.

**State Law Authorizes Mayoral Control over the City Board, Appoints the Chancellor, and Exercises Control over the City's Schools in Terms of the DOE's Education Policies and Finances While the Board Oversees Hearings**

158.     As of 2002, the Board was increased from seven to thirteen members, with the Mayor vested with authority to appoint eight members. *See* N.Y. Educ. Law § 2590-b. As of

2020, the Board was increased to fifteen members, with nine members to be appointed by the Mayor. *Id.*

159.    The powers of the Board and the Chancellor are enumerated in state law. *See* N.Y. Educ. Law §§ 2590-b, 2590-h. However, the New York State legislature did not give the Chancellor, the party responsible for special education services and programs, the right to administer impartial hearings.

160.    Impartial hearing functions remained with the "Board" as the entity created by state law. *See* N.Y. Educ. Law § 4404(1).

**Although the DOE was Nominated as such by Mayor Bloomberg, it is Not a City Agency**

161.    The DOE was not created pursuant to the New York City Charter, as were the other city agencies. The DOE also was not created under the New York State Education Law. Rather, the DOE was created by Mayor Bloomberg as part of mayoral control of the Board of Education of the City School District of the City of New York (the Board of Education) accorded to the mayor in 2002 by the State Legislature.

162.    In 2002, the Mayor orchestrated the creation of the DOE as a result of the shift of most of the powers and functions of the Board of Education to the Chancellor, and through proposed changes in the Board's By-Laws, nominated itself as the Panel for Educational Policy (the "PEP"). Through its By-Laws, the Board designated the newly named "DOE" as the governance structure that is comprised of various parts of the governance that makes up the Board:

> The PEP is a part of the governance structure responsible for the City School District of the City of New York, subject to the laws of the State of New York and the regulations of the State Department of Education. Other parts of the structure include the Chancellor, superintendents, community and citywide education

33

councils, principals, and school leadership teams. Together this structure shall be designated as the Department of Education of the City of New York. [10]

163.    While many court decisions conflate the powers and functions of the DOE and the Board, or treat them as one entity, they are distinct legal entities, each with a different power under State law.

164.    Regardless of the distinction between the Board and the DOE, importantly, the City is the real party in interest in special education impartial hearings because the City is financially responsible for the DOE's impartial hearing resolutions, settlements, or hearing losses, and its tuition payments within the special education hearing system.

165.    In this regard, the City Comptroller must approve the special education hearing payments, which are made by the City.

166.    As part of the 2002 changes in mayoral control of the governance of the City school system, state law was amended to give the Comptroller "authority to conduct operational and programmatic audits, in addition to financial audits, of the city district [the Board of Education] to the same extent that such comptroller has such authority for agencies of the city of New York." N.Y. Educ. Law § 2590-t.

167.    As a result, the City Comptroller [and Defendants] treat the DOE as a city agency with respect to the exercise of Comptroller's authority, including its authority pursuant to New York City Charter § 93(i).

168.    For example, the Comptroller actively audits the DOE as a "municipal agency."

169.    Further, the Comptroller assumes and wields authority over the settlement and resolution of every single hearing filed in New York City.

---

[10] *See* Board By-Laws published at https://www.schools.nyc.gov/about-us/leadership/panel-for-education-policy/ pep-bylaws.

170.     According to documents filed by the DOE with State Defendants, "New York City Charter § 93(i) … provides that only the New York City Comptroller may settle claims against or on behalf of the City where there is a monetary component to the settlement terms. The DOE is therefore prohibited from entering into settlements for monetary relief" after an impartial hearing is filed "without Comptroller approval." As such, this provision explains why the DOE insists that the City itself, as well as any of its employees, agents, and assignees, must be a released party as part of any settlement agreement.

171.     Further, DOE Defendants informed NYSED in 2019 that the City's special hearing settlement "process is different from the rest of the state due to the requirements of the City Charter. We understand that NYSED would like for NYCDOE to reduce unnecessary hearings by authorizing staff to enter into settlements at impartial hearings, but because of the City Charter requirement for Comptroller authority, NYCDOE must undertake a detailed legal and financial review of each case in order to make an informed recommendation for Comptroller approval."

172.     As such, a city agency, i.e., OATH, cannot employ, oversee, supervise, manage, or control the hearing officers who preside over the cases. They must remain fully independent and not be infected with an insurmountable conflict of interest.

**OATH Was Created Purportedly Pursuant to the City Charter and Is Controlled by the Mayor**

173.     OATH was created pursuant to provisions enacted under the New York City Charter. The Charter states that "[t]here shall be an office of administrative trials and hearings which shall conduct adjudicatory hearings *for all agencies of the city unless otherwise provided for by executive order, rule, law* or pursuant to collective bargaining agreements." New York

City Charter § 1048(1) (emphasis added). The Mayor appoints the "chief administrative law judge" and Commissioner of OATH. *Id.*

174.    Further, "the mayor shall be authorized to designate by executive order the office of administrative trials and hearings as the tribunal for the impartial administration and conduct of adjudicatory hearings for violations of this charter, the administrative code of the City of New York, rules promulgated pursuant to this charter or such code and any other laws, rules, regulations or other policies enforced or *implemented by the agencies of the city* through the conduct of adjudications." New York City Charter § 1048(2) (emphasis added).

175.    Thus, it is beyond cavil that under the Charter, OATH's jurisdiction is limited to "*agencies of New York City.*" New York City Charter § 1048 (emphasis added).

176.    City agencies must comply with the New York City Administrative Procedures Act ("CAPA") relative to any rulemaking and/or changes in policies, such as the kind of changes at issue here. *See* New York City Charter § 1041.

177.    Notably, the DOE is not and does not consider itself to be a city agency for purposes of CAPA and takes no steps to comply with it in general, or in this instance.[11] It would be impossible for the DOE to be simultaneously excused from CAPA, while still falling under the scope of the Mayor's authority to designate OATH to hear cases for city agencies.

178.    Former Mayor de Blasio appointed former Commissioner Kletter to the Commissioner's position. She is a close ally of the former Mayor, who had "played a central role in shaping" the City's public policy and legislative agenda.[12]

---

[11] *See, e.g.*, *The Beginning with Children Charter School v New York City Dept. of Educ.*, 2016 N.Y. Slip Op. 51184(U), 2016 WL 4198869 (Sup. Ct. Aug. 03, 2016) (unreported and cited here for the purpose of establishing DOE's position that it is not an agency subject to the City Charter).

[12] *See* "Mayor de Blasio Appoints Joni Kletter as Commissioner and Chief Administrative Law Judge of the Office of Administrative Trials and Hearings," March 13, 2020, published at https://www1.nyc.gov/office-of-the-mayor/

179.    After Mayor Adams was sworn in, he replaced Commissioner Kletter with Commissioner Rehman. Upon information and belief, Commissioner Rehman's prior positions before his appointment by Mayor Adams included Chief of Staff of the New York City Law Department, Deputy Commissioner and General Counsel for the Department of Corrections, and General Counsel and Inspector General for the Office of the Inspector General for the New York City Police Department.

180.    OATH's jurisdiction is limited to issues concerning City laws, regulations, and city agency rules and guidance. *See* New York City Charter §§ 1048(1)-(2).

181.    According to the 2021 Mayor's Management Report ("2021 MMR"),[13] OATH has two division to hear "City matters": the Trials Division and the Hearings Division. The Trials Division only hears issues of City law, including employee civil service hearings, City seizures, City-issued license and regulatory enforcement, real estate violations, and City contract disputes.[14]

182.    Upon information and belief, the OATH Trials Division employs approximately seventeen Administrative Law Judges ("ALJs") who earn approximately $161,000 per year. All ALJs hired in the past year were former lawyers for a city agency or senior administrators for a City agency.

183.    It is significant to note, however, that OATH receives less than 2,600 petitions per year and does not have the experience or ability to manage the volume of complaints filed by parents under the IDEA. Upon information and belief, during the last reported year, with almost

---

news/139-20/mayor-de-blasio-appoints-joni-kletter-commissioner-chief-administrative-law-judge-the (last visited Jan. 6, 2021) (last visited Jan. 9, 2022).

[13] *See* https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2021/2021_mmr.pdf.

[14] *Id.*

20 ALJs, OATH held 500 bench trials and 1,500 settlement conferences. Approximately 184-200 cases were "processed" by each ALJ, and the OATH Trial Division closed fewer than 2,400 cases each year. *See* 2020 MMR at 161-165.

184.    In contrast, the "Hearings Division" holds hearings on summonses issued by 25 different City enforcement agencies for alleged violations of law or City rules. *Id*. These all are brief proceedings, with many handled by mail. Each hearing typically involves simple questions of evidence or law, which is in stark contrast to the legal nature of impartial hearings under the IDEA.

185.    Upon information and belief, the Hearings Division is staffed with a variety of full-time, part-time, and per diem "hearing officers."

186.    Pre-COVID, for the fiscal year 2019, the Hearings Division received 837,778 summonses from the various City agencies. Out of those, 340,563 were "adjudicated"; 663,327 were "processed"; and 261,906 cases resulted in decisions. *Id*. OATH does not report Hearing Division caseloads, but the numbers suggest that they would be significantly high.

187.    Further, by definition, and by the statistical reporting, the Hearings Division officers do not have independent adjudication authority. They are "agency" decisionmakers whose decisions may be influenced and/or directed and modified by external individuals. *Accord*, New York City Charter § 1049.

188.    Upon information and belief, the Trials Division is neither neutral nor unbiased in its design and the City prevails in the majority of its cases.

189.    Notably, the City's agencies also prevail (*i.e.*, violations are admitted or upheld) in the overwhelming majority of cases in the Hearings Division, and in some cases one hundred percent of the time.

**Impartial Hearings in New York City**

190.    Since the precursor statute to the IDEA was adopted in the 1970s, special

education hearings have been presided over by independent contractors as hearing officers.

191.    Since at least the mid-1990s, New York City has maintained a list of independent

contractor IHOs certified by NYSED as IHOs. However, at some point on or before 2021, the

NYC IHO unilaterally abandoned the state-mandated rotational system with the consent of

NYSED, yet without an actual change in law.

192.    Aside from eligibility disputes, hearings in New York City generally involve

claims that the DOE has denied a child a FAPE. These hearings seek one or more of the

following types of remedies: (a) reimbursement for, direct payment for or satisfaction of a debt

for private school tuition or private special education or related services; (b) compensatory

education (an equitable remedy for a child who was denied a FAPE); (c) funding for services that

the DOE does not offer on their menu of options through an IEP; (d) funding for services that the

DOE recommended but did not provide; (e) transportation; and (f) payment for independent

evaluations.

193.    As a review of the hearing decisions and the State Review Officer decisions on

NYSED's website demonstrate, impartial hearings can often involve multiple school years,

complex medical, clinical, and legal issues, motion practice, expert witnesses, and thousands of

pages of exhibits.

194.    Hearings may last from one day to multiple days and decisions may be

exceptionally long and include extended legal analysis.

195.     Given the underlying dysfunctionality of the special education system in New York City, and the failure of that system to fulfill its federal and state mandates, most cases are not contested, and either settle or the parent prevails.

196.     For many years, the impartial hearing system has been a challenging issue in the City's political environment, given the amount of money at stake for which the City is responsible as the real party-in-interest. According to the New York City Independent Budget Office ("IBO"), the cost to the City for certain types of remedies in impartial hearings grew from $200 million in 2014 to $700 million in 2020 and reached $807 million in 2021.[15]

197.     The IBO noted that the "rapidly growing cost [of hearings] has drawn increasing attention and *prompted efforts to control future growth*." *Id.* (emphasis added). The IBO noted that "[f]rom the DOE's fiscal perspective," the expenses of the hearing are "difficult to budget for because they are largely determined by two factors that are out of the department's control: private school tuition costs and *how often parents succeed when seeking reimbursement for services to meet their children's needs*." *Id.* (emphasis added).

198.     The Comptroller has issued reports to all City agencies decrying the amount of money spent on special education claims that are filed.

199.     Further, despite the above, in the City's proposed November 2021 budget plan, the City predicts (without providing supporting reasons) that spending on impartial hearings in the City will decrease by $142 million in FY 2022 before falling another $220 million in FY 2023.[16]

---

[15] *See* https://ibo.nyc.ny.us/iboreports/carter-case-spending-for-students-with-special-needs-continues-to-grow-rapidly-march-2021.pdf.

[16] *See* https://www.osc.state.ny.us/files/reports/osdc/pdf/report-16-2022.pdf.

200.    Thus, Defendants have a powerful financial incentive for the City to gain control of the special education due process hearings and the IHOs.

201.    Moreover, the City's Mayors are not absent managers, disengaged from the DOE's litigation strategy at hearings. Rather, they have been intimately involved with litigation and policy changes or adjustments concerning how the DOE, as a party, responds to parents when hearing requests are filed. Nothing illustrates this more than the deal made by former Mayor de Blasio and New York State legislators, which the former Mayor and others announced at a press conference in June 2014.[17]

202.    Until 2014, the City assumed an aggressive litigation stance against parents. In June 2014, the Mayor adopted and announced a policy shift in the way DOE staff were to manage special education cases going forward. Specifically, DOE staff were directed to refrain from re-litigating settled or decided cases when, in the future years, they were re-filed, unless there was a defensible change in the IEP placement recommendation. *Id.* The policy shift also directed the DOE to "avoid unnecessary litigation in cases where the agency is unable to offer a placement, or when a child is about to enter the final grade of a school." *Id.*

203.    This agreement by the former Mayor was a political deal made with a broad coalition of legislators to avoid the passage of bill that would have made tuition funding permanent for certain private school families. *Id.* Former Mayor de Blasio issued the following statement on the initiative:

> The special education placement process has been fraught with contention and litigation in recent years. The changes announced today will simplify and expedite the process for families with valid claims. . . The changes were developed in consultation with Speaker Silver and the New York State Assembly…. [F]or years, parents of children with special needs have had to wait for the City to settle

---

[17] *See* "Mayor de Blasio and Speaker Silver Announce New Steps to Help Families of Students with Disabilities," June 24, 2014, published at https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (last visited Jan. 6, 2022).

legitimate claims for tuition reimbursement. Today, we are turning the page, making changes that will ease the burden on these parents. We are cutting red tape, speeding up the process, and reaching outcomes that do right by families. [18]

204.     In a video of a press conference, the former mayor speaks in great detail about the hearings, making it clear that he was intimately involved in revising how the DOE, as the opposing party to the parents, would respond to litigation. He cited the goal of creating "a streamlined, parent friendly, family friendly, respectful approach," which would not depend on a parent's ability to retain an expensive lawyer, but instead would be a process that "tried to address the family's needs."[19] He touted this new policy initiative as a way for the City to "right some wrongs" for those families whose children's needs could not be met by the existing special education hearing system.

205.     He also contrasted the strategy of his predecessor, Mayor Bloomberg, whose more aggressive approach may have represented a "good litigation strategy," but was "not a humane way to run a school system, it was not fair to families, it was not fair to children who had the needs." Former Mayor de Blasio was not the only "involved" mayor regarding the special education hearing system. Former Mayor Bloomberg tried to lobby to change the special education law to shift the burden of proof to families, rather than have it remain on the DOE pursuant to Section 4404.[20] As noted throughout, Mayor Bloomberg also tried to move the hearings to OATH, well before there was any "backlog."

---

[18] *Id.*

[19] *See* https://www1.nyc.gov/office-of-the-mayor/news/306-14/mayor-de-blasio-speaker-silver-new-steps-help-families-students-disabilities#/0 (Last visited January 9, 2022).

[20] *See* https://www.wnyc.org/story/195004-bloombergs-testimony-on-the-state-budget/.

206.    Similarly, former Mayor Giuliani and then-Chancellor Crew were focused on eliminating referrals to special education because it was "providing very little to help students and costing way too much."[21]

207.    The State has also long desired to reduce parent access to due process.

208.    Thus, at the highest government levels, the Mayor, and his mayoral appointed and controlled Chancellor, as well as State politicians, have been privy to the day-to-day operations of the DOE and exerted their respective authority on DOE litigation strategies with the objective of controlling and reducing special education hearing payments and costs.

209.    This political focus on special education costs is the exact type of pressure that Congress sought to protect against when it ensured through the passage of the multiple procedural safeguards provided in the IDEA, including that families had access to independent adjudicators when disputes arose about tuition or the education or resources or services necessary to achieve FAPE by children with eligible disabilities.

**Defendants Are Using the Backlog as a Pretext to Dismantle and Shift Control of the Special Education Hearing System to the Mayoral Controlled OATH and the City**

210.    By 2018, the situation deteriorated.

211.    According to NYSED, the number of hearings in the City increased from 5,000 during the 2015-2016 school year to 9694  during the 2018-2019 school year.

212.    The 2014 Plan was not properly implemented, and, among other things, the Mayor and City failed to allocate adequate resources to the New York City Comptroller and the DOE to effectively manage this reform initiative, and also mismanaged the hearing system.

---

[21] *See* "Rudy Says They've Stemmed Tide Of Special Education," Aug. 19, 1999, published at https://nypost.com/1999/08/19/rudys-say-theyve-stemmed-tide-of-special-education/ (last visited Jan. 8, 2022).

213.    Due to the above, and other factors as alleged herein, a hearing officer shortage occurred, and eventually, over the past two years, a backlog of hearings developed, causing delays in the hearing process.

214.    Rather than taking decisive action to address what were obvious issues, in January 2018, NYSED engaged a consultant, Deusdedi Merced, Esq., to conduct an independent review of the New York City Impartial Hearing Office ("NYCIHO"), which was supposed to manage the administrative operations for hearings (processing complaints, scheduling, and processing orders and payments to IHOs).

215.    Defendants did not act for the entire year the consultant's report was being prepared, even though State Defendant had an obligation to monitor and oversee the DOE and the special education hearing process and should have been and likely was already aware of the systemic issues plaguing the special education hearing system.

216.    The stated purpose of the review was "to better understand the functioning of the NYCIHO and its policies, procedures and practices specific to special education impartial hearings."

217.    In scope, however, the review focused on, though was not limited to, the assignment of hearings to IHOs, the payment structure for IHOs, the specific assistance provided to IHOs by the NYCIHO, and the observation, availability, and suitability of hearing room space.

218.    The report was issued in February 2019 ("Merced Report").[22]

219.    The Merced Report found that despite the large volume of hearings, few cases were fully adjudicated. He noted that in fiscal year 2017, only 11% of cases resulted in a written final decision and 49% of cases were withdrawn, dismissed, or settled.

---

[22] *See* https://www.politico.com/states/f/?id=00000170-9867-d855-a3f7-d8ff5cdb0000.

220.    The Merced Report highlighted a number of deficiencies in the impartial hearing process as operated by NYSED and the DOE.

221.    Among other things, the Merced Report noted that there were insufficient facilities for holding hearings, delays in processing documents, a failure to settle and resolve cases, and unnecessary hearings being held for matters that the DOE should not be contesting.

222.    These results demonstrate that NYSED has long failed to adequately recruit and certify new IHOs for New York City. One of the barriers to recruiting IHOs for New York City, however, was the City Defendants' problematic compensation policy and the delays in payments to IHOs.

223.    The Merced Report found that IHO compensation was severely deficient in that IHOs were not being adequately compensated for their work, while IHOs in other parts of the state were.

224.    The Merced Report highlighted deficient IHO compensation, among other things, as part of the challenge of recruiting qualified IHOs. Mr. Merced concluded that the system was heading toward collapse:

> This review identified substantial deficiencies in the policies, procedures and practices specific to special education impartial hearings in New York City, including the high rate of extensions granted, the considerable number of recusals, the inadequate payment structure for IHOs, and the insufficient number of hearing rooms available to accommodate the day-to-day hearing schedule. Each presents a threat to due process. Collectively, however, they render an already fragile hearing system vulnerable to imminent failure and, ultimately, collapse.

> That it has not yet collapsed is remarkable given the staggering numbers of due process complaints filed in New York City. (See Figure 2, above.) A plausible explanation for this may be the mutually beneficial relationships that have formed to allow IHOs, parties (inclusive of the NYCDOE), and the NYCIHO to coexist by "turning a Nelson's eye." Though the NYCIHO finds itself between the proverbial rock and a hard place, serving two masters, such does not excuse any failure to comply with basic tenets of due process, including, for example, having an adequate number of hearing rooms available to accommodate the elevated

number of hearings on a day day-to-day basis and fairly compensating IHOs
commensurate with their responsibilities.

Merced Report at 22.

225.    Instead of taking decisive action, after the Merced Report issued, State
Defendants began to point fingers at the DOE and the DOE responded in its defense; this back-
and-forth blame-game lasted for over one year.

226.    In May 2019, State Defendants issued the DOE a Compliance Assurance Plan
("CAP").

227.    The CAP was an extensive monitoring report citing the DOE with multiple
violations, including violations in the hearing system, many of which were caused in whole or in
part by State Defendants' actions and inaction.

228.    State Defendants identified "noncompliance with respect to NYCDOE's
obligations to maintain a functioning due process hearing system" including that the DOE (a)
generally ["f]ails to provide parents access to adequate due process after a complaint has been
filed" and (b) "does not defend numerous cases at hearing but rather admits that it did not
provide FAPE and [yet still] does not offer to settle these cases, adding to the unacceptable
number of due process complaints filed." The CAP directed the DOE to provide a "corrective
action plan to correct its failure to provide students with disabilities and their parents all the
rights and procedural safeguards required by federal and State law and regulation."

229.    One of the CAP requirements was for the DOE to revise IHO compensation.

230.    The DOE submitted a Corrective Action Plan in the spring of 2019.

231.    The DOE claimed that it was taking steps to increase staffing at NYCHIO, expand
hearing space, provide adequate payment to IHOs, as well as a reshuffling of the deck, pursuant
to which DOE moved hearings from one DOE division to another.

232.    These negotiations between State and City Defendants continued throughout 2019 and well into 2020.

233.    Notably, DOE – through NYCIHO – had promulgated an elaborate Compensation Schedule, which was insufficient to ensure IHO recruitment and retention, and pursuant to which certain tasks of IHOs were to be compensated, while others were not.

234.    These anomalies were flagged by the State Defendants and their agents as a significant problem for IHO recruitment and retention. As part of the CAP, the DOE revised its compensation policy for IHOs.

235.    Notably, New York City still does not pay IHOs the rate of $100 per hour paid by districts outside of the city for all tasks they believe should be completed within their discretion, but rather micromanages their tasks, still paying for some activities but not others, or capping time allowed to be spent on writing decisions.

236.    In early 2020, rather than fix the underlying issues facing the system, such as paying hearing officers an appropriate and timely wage, eliminating administrative burdens that serve no purpose, implementing minimum caseload requirements and issuing clear procedural rules that were to be followed, or allowing remote witness testimony and hearings (something all parties had wanted but which were prohibited in the past), NYSED attempted to water down the qualifications of IHOs, reverting back to a time when the system almost collapsed from that same procedural defect.

237.    For example, in early 2020, NYSED tried to remove the requirement that IHOs must be lawyers, a mandate added many years ago to the regulations after the due process system almost collapsed from unqualified non-lawyers presiding over hearings. All but seven states require IHOs to be lawyers.

238.     After widespread opposition from the representatives of the families and other stakeholders to watering down due process in this fashion even where the intent was to cure the backlog, the regulations were not amended to allow this change in experience requirement.

239.     In February 2020, a class action was filed against DOE and State Education Defendants alleging that hearings were delayed beyond the mandated timelines. *See J.S.M., et al. v. N.Y.C. Dep't of Educ., et al*., 20-cv-705 (EK)(RLM), Dkt. No. 1.

240.     On June 18, 2020, the Court so ordered a stipulation certifying a class consisting of "[i]ndividuals who file or have filed due process complaints, and the children on whose behalf due process complaints are filed, when the due process complaints are unresolved and the decisions on such complaints have not been timely provided under applicable federal and New York State law." *Id*.

241.     According to the docket, the *J.S.M.* plaintiffs and State and City Defendants were in "settlement discussions" following class certification.

242.     The *J.S.M.* case does not involve any of the issues raised here. The OATH Plan post-dates *J.S.M*, was not negotiated with *J.S.M.* class counsel, and is not a part of that action. Nonetheless, Defendants are pointing to the OATH Plan and the administrative and operational processes created and perpetuated by the OATH Plan, and well as touting its early successes in purportedly reducing the backlog, to defend themselves against the *J.S.M.* case.

243.     Moreover, and though Plaintiffs' counsel are not privy to the settlement negotiations in *J.S.M.*, upon information and belief, and based on the docket filings therein, Defendants in *J.S.M.*, in their settlement negotiations and arguments, are expecting to prevail in this action and thereby continue with the OATH Plan as a proximate result.

244.    By the 2020-2021 school year, as of September 2021, there were 14,266 hearings pending.

245.    Throughout the course of this litigation, the Court ordered the parties to submit bi-weekly updates. As of the last bi-weekly update, on September 13, 2022, Defendants reported "OATH is continuing its efforts to recruit impartial hearing officers and additional administrative staffers." As of that date, Defendants reported that they hired  "40 State-certified hearing officers onboard and being appointed to cases" and "15 individuals have been hired to perform administrative functions."

**The Legislature Rejected the OATH Plan and the Governor Signed an Alternative Solution**

246.    The New York legislature rejected the proposed OATH Plan as set forth below.

247.    The Sponsor Memoranda for Assembly Bill No. A7943 and Senate Bill No. S7183 (the proposed OATH legislation) both cited the backlog as justification for the proposed change in the law. The Sponsor Memoranda further cited a lack of minimum caseloads for hearing officers, and the substantial number of filings.

248.    The Sponsor Memo for Bill No. A7943 noted that "[t]he proposed legislation would replace the current system for the City School District with a full-time administrative adjudicatory system, with the goal of efficaciously eliminating the backlog and providing timely hearings going forward. The New York City Office of Administrative Trials and Hearings ('OATH'), a component of New York City government, not DOE, would be responsible for the new system."

249.    However, after facing stakeholder opposition, *the legislature rejected this amendment*.

250.     Instead, the legislature passed, and, on December 29, 2021, the Governor signed legislation to amend N.Y. Educ. Law § 4404 to provide an expeditious solution to the backlog: starting in 90 days, where an IHO has not been appointed for 196 days, the law provides that an IHO will be assigned for the limited purpose of so-ordering relief proposed by a parent. *See* Chapter 812 of the Laws of 2021.

**Defendants Failed to Allow Time for Remedial Measures to Work and Ignored Solutions from and Concerns of the Representatives of Families with Special Needs Children**

251.     In mid-March 2020, due to COVID-19, the NYCIHO closed their offices and impartial hearings began to be held telephonically.

252.     This shift happened relatively seamlessly, as many witnesses testified by phone even when the hearings were held in person.

253.     As a result, the parents' bar, as well as representatives of the DOE, realized that those remote hearings were effective and should be continued beyond COVID.

254.     The continued practice of holding remote hearings could solve the problem of having an insufficient number of "experts" in special education to preside over hearings in New York City, as IHOs could be recruited from across the state and country and could manage more cases if they were not traveling.

255.     Further, remote hearings solved the facilities challenges that had been plaguing the system.

256.     Hearings have been held successfully by telephone since March 2020.

257.     However, it was generally agreed that video conferencing should be generally available to address hearings.

258.     After months in development, the DOE rolled out a new videoconferencing program for (remote) hearings on December 20, 2021.

259.    In addition, NYSED reported that it certified 107 new hearing officers to work exclusively in New York City since January 2020 through November 2021.

260.    Those IHOs were just beginning to accept new cases when the OATH Plan was implemented.

261.    Many of these IHOs (solo practitioners) do not live in New York City; they accepted the position in order to work remotely.

262.    With the new videoconferencing capability, additional experienced hearing officers can now be recruited to work remotely, *i.e.*, the new normal these days.

263.    Defendants also ignored proposed solutions by the legacy independent hearing officers, who have advised NYSED that they could clear and manage the backlog if called upon to do so.

264.    In September 2021, NYSED issued a "Request for Information (RFI) for the Office of Special Education: Impartial Hearing Officer System in New York City."[23]

265.    Upon information and belief, in response to the RFI, sixty-four of the existing experienced and trained IHOs proposed an annual commitment to hear 13,400 cases. This proposal was ignored.

266.    Defendants appear to have similarly ignored recommendations and concerns raised by nonprofit groups, as well as scores of members of the private bar, which focused on (a) reducing hearings; (b) managing the hearing process; and (c) making the necessary changes to implement the mandatory resolution process in the IDEA and resolve most cases within 30 days.

267.    Further, the State Commissioner's Regulations were recently proposed to adopt a new electronic filing system. This new system would allow hearing officers to extend deadlines

---

[23] *See* https://www.p12.nysed.gov/compcontracts/nysed-rfi-21-003-iho-nyc/home.html.

beyond 30 days to a period of 60 days, at their discretion, and to establish minimum and maximum caseloads. *See* New York State Register, Vol XLIII, Issue 48, Dec. 1, 2021.

268.    The electronic filing system, extension provisions, and minimum caseload requirements in fact worked to alleviate the backlog of unassigned cases.

269.    However, the State is proposing a "maximum" caseload of 500 hearings per year, which is far too many to ensure a legally adequate hearing process that is consistent with due process, regardless of whether those IHOs are independent contractors or OATH HOs.

**The MOA and Executive Order Seek Unfair Advantage Over Families with Special Needs Children, Particularly those with Low-Income or Without Financial Means to Hire Counsel**

270.    The MOA was executed on December 1, 2021. *See* Ex. A.

271.    Under the MOA, OATH intended to hire approximately 40 full-time City-employee hearing officers, after which time, all of the current hearing officers who are certified by NYSED will be prevented from accepting hearings in New York City.

272.    Along with the move to OATH, the DOE was approved to hire approximately 75-80 new attorneys to litigate against parents.

273.    This would have a significant adverse impact, especially for parents who file on a *pro se* basis, and for the thousands of parents assisted by non-attorney advocates (one of the rights afforded to them under the IDEA (20 U.S.C. § 1415(h)(1)).

274.    As alleged herein, EO 91 was issued on December 27, 2021, and purports to create "concurrent jurisdiction" to hear special education matters arising under federal and state law.

275.    Further, on January 31, 2022, Chancellor Banks issued a memorandum titled "Transfer of Adjudications Related to Impartial Hearings Under the Education Law to the Office

of Administrative Trials and Hearings." The memorandum states that, "[a]s Chancellor of the City School District of the City of New York (known as the New York City Department of Education), I have determined that the adjudication of impartial hearings … by [OATH] would be in furtherance of the interests and missions of the [DOE] and the students that it serves." Chancellor Banks ratified the MOA and directed that "OATH on behalf of the DOE will appoint impartial hearing officers to adjudicate due process complaints in cases where OATH exercises jurisdiction."

**Defendants Eliminated Independent, Experienced IHOs and Substituted Them with Mostly Inexperienced IHOs who Are Employees of the City, the Real Party-In-Interest**

276.    Defendants' initial job posting sought "full-time" "Special Education Hearing Officers" with a "Civil Service Title" of "Executive Agency Counsel," Title Code 95005, Level M1", an OATH hearing officer *must be a resident of New York City* unless a narrow exception applies.

277.    The OATH job posting sought only "four years" admission to the bar.

278.    The posting did not require that the hearing officer practice, or have specific knowledge of, special education law. *Id.* It did not give preference to individuals who served as hearing officers. *Id.*[24] Further, "Executive Agency Counsel" is the same title held by senior lawyers who represent the City and its agencies.

279.    Thus, OATH HOs are "agency attorneys" for the City, and, as such, owe a duty of loyalty to their employer (*see* N.Y. Rules of Prof. Con. Rule 1.7(1)(1)). This duty of loyalty directly conflicts with their obligations as independent hearing officers.

---

[24] Instead, the posting bizarrely states that "volunteer" experience is preferred. *Id.* Also, it cites managerial experience one of the two requirements, even though most of the current hearing officers operate as solo practitioners. *Id.*

280.     Upon information and belief, more than 50% of the most experienced and/or long-standing hearing officers on the New York City roster were *eliminated* from consideration as OATH hearing officers based on this posting, due to where they live and the fact that only full-time positions are being contemplated. Moreover, many of the 100-plus new HOs that the State Defendants recruited and trained over the past several months, were also ineligible to apply to be OATH hearing officers, simply because they did not live within New York City and were hired to work remotely.

281.     Under the MOA, the new OATH HOs ostensibly were to be trained, certified, and appointed *two-weeks* after being hired. *See* Exhibit A.

282.     In fact, the State provided new OATH HOs only three days of training.

283.     The existing recruiting and training timetable is clearly not sufficient to meet the requirements of the IDEA. Moreover, it is wholly inconsistent with the RFI and Merced Report, both of which underscored the extent of training necessary for new IHOs to be comfortable accepting and handling IDEA cases, including the various challenges of recruiting properly experienced attorneys to serve as hearing officers.

284.     By definition, a four-year law graduate or an individual without any IDEA experience and three days of training cannot be a suitable IDEA hearing officer as required under the law. The lack of experience for certain of these OATH HOs is highly problematic, disconcerting, and overall inconsistent with the requirements of the IDEA and State law.

**The OATH Plan Has Been Almost Fully or Fully Implemented**

285.     Defendants have proceeded to implement the OATH Plan following the filing of Plaintiffs' original complaint on December 29, 2021, the filing of Plaintiffs' First Amended

Complaint on January 11, 2022, and the filing of Plaintiffs' Second Amended Complaint on May 26, 2022.

286.   Defendants began assigning cases to the OATH hearing officers in or around March 2022.

287.   According to Defendants, cases are being assigned to OATH hearing officers on a daily basis.

288.   To date, City Defendants have reported more than forty new OATH HOs have been certified by New York State.

289.   Defendants continue to refuse to make the names and/or qualifications of OATH HOs available to the public and has not agreed to provide that information to Plaintiffs' counsel.

290.   Defendants continue to refuse to publicize the names and/or backgrounds of the OATH HOs, despite the existence of state law, which requires City Defendants to maintain the names of the IHOs with their qualifications on file.

291.   As of the filing of the Second Amended Complaint, Plaintiffs were able to ascertain that only a few OATH HOs out of the new OATH HOs have prior experience working in special education law, as those three IHOs previously practiced special education law. Four other OATH HOs were former OATH ALJs, who had only become special education HOs for less than one year, when they moved back over to OATH as special education IHOs, and only three of those IHOs previously heard any cases.

292.   Upon information and belief, no other new OATH HOs have prior special education experience and instead have completely unrelated experience.

293.   Upon information and belief, many of the OATH HOs certified by State Defendants to date are existing employees of New York City who were assigned to mayoral

agencies. The OATH HOs include at least nine lawyers who previously worked for the New York City Law Department, two attorneys worked for the DOE, three were City or State agency council, a former managing attorney of Hearings at OATH Long Island City location, a former hearing officer for the OATH division handling summons for cases involving the Taxis and Environmental Control Board, a former Managing Attorney of the Health Appeals Unit, Hearings Division Appeals Unit, a former Deputy Commissioner and Chief Clerk at OATH, a former Department of Corrections Intelligence director, two former court attorneys for state judges, and a former CCRB prosecutor.

294.   New York Education Law § 4404 prevents individuals who represented the district from serving as an IHO for at least two years. At the same time, due to this same prohibition, parent's attorneys were rendered ineligible to apply to be OATH IHOs.

295.   Recently, Defendants announced that they were lifting the New York City residency requirement for OATH HOs, while still maintaining the requirement that new hires must be assigned to OATH and work for OATH on a full-time basis.

296.   Moreover, upon information and belief, Defendants are requiring the OATH HOs to be present in the OATH office, rather than work remotely, even though most of the special education hearings are still being held remotely.

297.   Further, the compensation for a full-time OATH special education HO remains far under what the existing independent IHOs are making.

298.   Defendants' current job posting for the position of Special Education Hearing Officer [25] still requires only four years of admission to the bar, does not require that the hearing

---

[25] *See* https://www1.nyc.gov/jobs/index.page (Job ID 520964), last accessed on May 26, 2022.

officer practiced special education law, and does not even give preference to individuals who served as hearing officers.

299.     According to Defendants, as of September 13, 2022, OATH has hired more than 40 State-certified hearing officers.

**Defendants Have Failed to Adequately Support and Monitor the OATH Special Education Unit**

300.     While the DOE maintained a large administrative office, with a centralized system (similar to ECF) for scheduling hearings, processing extensions, processing and issuing decisions, the OATH special education hearings unit does not have these resources.

301.     Further, upon information and belief, the DOE is not maintaining any processes or procedures for tracking and implementing findings of facts and decisions and/or orders issued by Hearing Officers employed by OATH.

**Since the OATH Plan was Implemented, Non-OATH IHOs Are Carrying the Majority of the IHO Cases, and Thousands of New Cases Are Expected to be Newly Assigned**

302.     By January 21, 2022, there were 16,253 pending impartial hearings.

303.     Since Defendants implemented the OATH Plan, non-OATH IHOs were continuing to hear and be assigned thousands of cases.

304.     There are still thousands of pending cases currently assigned to non-OATH IHOs.

305.     Each year, due to the DOE's policies and practices, Plaintiffs' attorneys have to re-file new hearings for the same clients.

306.     The majority of these cases are filed at the start of the month of July, and at the end of August and September.

307.     Thus, upon information and belief, thousands of hearings have been filed by plaintiffs' attorneys in the past two months.

308.    Regardless of the legality of the Defendants' conduct otherwise alleged and the legality of the OATH Plan, Defendants should be required to maintain the current system of independent IHOs until such time as there is an appropriate alternative system in place that can manage both timely and substantively appropriate due process hearings.

309.    Upon information and belief, independent IHOs are being advised that there is no backlog of unassigned cases.

310.    However, again, on information and belief, the case assignment unit reports substantial backlogs in assigning IHOs to filed cases.

311.    Plaintiffs R.H. and his child M.H., for example, have been waiting for at least one month to have an IHO assigned to his due process complaint.

**Despite Defendants' Recognition that IHO Compensation Is Critical to Attracting Adequately Experienced IHOs, OATH HOs Make Less and Have Caseloads Four Times Higher than Independent IHOs in New York State**

312.    As noted herein, both State and City Defendants identified low compensation rates for IHOs as a source of difficulty in recruiting and retaining trained and experienced IHOs.

313.    Yet, the OATH hearing officer position offers a salary of $130,000 per year that, at best, is an hourly equivalent of slightly more than half of the $100 per hour rate that IHOs outside of the City are paid.

314.    Further, upon information and belief, it is far less than what the independent IHOs made in New York City who took full-time caseloads.

315.    Moreover, based on the number of cases being filed and the hiring of at least 40 HOs, unless additional HOs are hired, an OATH HO's projected caseloads could reach approximately 400 cases per OATH HO.

316.    However, most IHOs surveyed by NYSED reported that a far lower number of cases would be appropriate given the work associated with each case.

317.    Given this anticipated caseload per OATH HO, these HOs will be pressured to short-circuit the due process each family is guaranteed by the IDEA.

318.    While the residency requirements were recently lifted, existing senior, experienced IHOs would have to take pay cuts and manage far more cases for significantly less money if they transfer to OATH.

319.    Further, many IHOs will be ineligible to apply as they maintain outside law practices or live too far from the City for a reasonable commute, coupled with a reduction in compensation.

320.    The families who will suffer the most under this grossly unlawful scheme are those parents without financial resources, including families who appear before OATH without the aid, assistance, and advice provided by experienced attorneys and advocates.

**OATH Staff will Assert Improper Supervisory Oversight and Control Over the New HOs**

321.    OATH published many additional job postings, including "Supervising Special Education Hearing Officer," and "Deputy Commissioner" (salary of $170,000-180,000).

322.    The postings demonstrate the City's intent for their staff to "supervise" and "set policy" in relation to the hearings, and to have oversight of the IHOs.

323.    The duties of the Deputy Commissioner, for example, include: (a) "[o]versee[ing] the hearings process so that students and families received impartial hearing decisions in a timely manner," (b) "[a]dvis[ing] the Commissioner and Chief Administrative Law Judge of OATH in formulating appropriate policy, both legal and administrative, regarding issues affecting the adjudication of disputes about the education of children with disabilities and liability for the

payment for such education," and (c) having responsibility "for recruitment, training, and appointment of Special Education Hearings Officers."

324.    The IDEA requirement for IHO independence is violated when the senior staff of the real party-in-interest has management and supervisory authority over the IHOs.

**State Defendants are Eliminating the Rotational System for New York City, and the City Defendants are Currently Violating the Rotational System**

325.    The City Defendants appear to be violating the rotation system required under New York Education Law § 4404, and 8 NYCRR §§ 200.2 and 200.5, as cases are being assigned to both legacy independent IHOs and OATH SEHOs in a manner other than through the neutral rotation system.

326.    Further, State Defendants have passed regulations that permits OATH to reassign previously assigned hearings through the neutral rotation system to other OATH hearing officers in the discretion of OATH. These newly passed regulations effective negate the neutrality of the rotation systems by removing the randomness of case assignments and replace it with discretionary authority to move cases from one OATH hearing officer for "administrative convenience."

327.    The changes include but not be limited to the following:

Any impartial hearing officers employed by, or reporting to, a permanent, standing administrative tribunal employing more than one impartial hearing officer shall be first in an alphabetical rotation when new cases are assigned, and any impartial hearing officer not employed by, or reporting to, a permanent standing administrative tribunal, will be listed in alphabetical order thereafter …. Any certified impartial hearing officer available for appointment may accept more than one case at a time …. Any permanent standing administrative tribunal employing more than one impartial hearing officer at a time may reassign cases between impartial hearing officers employed by, or reporting to such permanent standing administrative tribunal, to manage administrative needs such as workload distribution.[26]

---

[26] *See* https://www.regents.nysed.gov/common/regents/files/322p12d4.pdf

328.    Given that Section 4404 of the Education Law was adopted to address claims by the plaintiff in *Heldman* that districts can choose their IHOs, to the extent that Section 4404 would permit State Defendants to promulgate this type of rotation system, the Plaintiffs and others similarly situated in New York City have the same claims regarding biased hearing officers that the plaintiffs in *Heldman* raised.

329.    Further, the State Defendants' amendments, which allow the City controlled OATH special education hearing system to circumvent the neutral rotational system, violate the IDEA in the same manner as the pre-1993 IHO assignment procedures.

330.    This new regulation permitting discretionary reassignments of hearings applies to case assignments in New York City only, which creates yet another aspect of the OATH Plan's special education hearing process that violates both the equal protection and due process clauses of the United States and New York State Constitutions.

**The OATH Plan Creates a Structural Conflict Prohibited by the IDEA**

331.    As noted herein, IHOs may not be "an employee of the State educational agency or the local educational agency involved in the education or care of the child" or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A).

332.    The legislative history of the IDEA reflects that hearings will not be conducted by the agency, but rather "at the appropriate agency level, by an impartial hearing officer since the State or local agency or *intermediate unit will be a party to any complaint presented*." Sen. Rept. No. 94-95 (Nov. 14, 1975) at 49 (emphasis added).

333.    The language of the IDEA was designed to ensure that employees of entities that were responsible for funding and providing special education, but were not LEAs, were also prevented from serving as IDEA hearing officers.

334.    While New York City is not a named party to the hearings, the City is the real party-in-interest at the special education hearings since the City is financially responsible for paying claims of parents and their attorneys should they prevail at the hearings.

335.    Moreover, the DOE must prepare detailed memoranda for submission to the City Comptroller for a considerable number of its proposed settlements or resolution agreements prior to reaching any agreement with parents to obtain the necessary authorization from the City to settle special education claims.

336.    According to the Comptroller's Annual Claims Report for FY21, 90% of all law settlements and judgments for FY 21 are related to claims for special education tuition, services reimbursements, and attorneys' fees.

337.    Now, Defendants' OATH Plan, which authorizes the use of City attorney employees to decide the outcome of special education claims for which the City will be held financially responsible, and which the City has repeatedly stated that such cases are costing the City "too much" money, blatantly violates Plaintiffs' fundamental right to an impartial due process hearing.

338.    Further, OATH has created and effectuated an administrative bureaucracy that not only decides who gets assigned cases, and can shift cases to particular OATH hearing officers out of the regular impartial rotation, but the new OATH process decides how many cases OATH hearing officers must carry, determines and evaluates the length of time each employee spends on each case, which subjects the OATH attorney employee to potential criticism if not discipline

for exceeding recommended timelines and/or failing to "move the case along" to resolution, settlement, or final hearing determination.

339.    Upon information and belief, OATH hearing officers are highly focused on the optics of "proving" that the OATH Plan is "best" for the special education hearing system by creating a false view of OATH hearing resolutions or settlements as compared with the resolution or settlements by legacy IHOs.

340.    For example, upon information and belief, all new cases filed by parents that seek expedited hearings are fast tracked to OATH so that it gets the "credit" when reporting the numbers of resolutions and settlements accomplished by OATH versus the cases resolved or settled by legacy IHOs.

341.    Such time pressures on parents and their advocates creates and perpetuates a "tainted" special education hearing system that works to chill and deter parents from filing claims. Parents and advocates are forced into positions of having to withdraw their claims without prejudice or suffer the hearing officer's wrath of dismissing the case with prejudice for failing to move the claim forward due to legitimate reasons, which in other and past circumstances would qualify for legitimate extensions in the time parameters established for the particular case.

342.    Overall, OATH's hearing officers' ability to control the speed of the special education hearing process from start to finish, including by threatening to dismiss cases unless the parents and their attorneys comply with OATH hearing officer demands for resolution or "trial," at a minimum creates unnecessary and often ill-advised decision-making by parents, who often must wait until hearing dates to request necessary evaluations, and which elevates speedy

resolution of special education claims over achieving due process – an opportunity to be heard, which is one of the most important components of special education hearing system.

343.     The Second Circuit has taken a strong stand on the importance of, at the time, the IDEA's guarantee of neutral and impartial hearing officers. *See Heldman*, 962 F.2d at 154-155. In *Heldman,* a parent brought a structural challenge to the hearing system, alleging that the New York State rotational system for selecting hearing officers violated the IDEA because it permitted boards of education to choose hearing officers. *Id.* at 154. The plaintiff argued that the system created "a powerful economic and professional incentive for officers to rule in the board's favor" and that "[s]uch an economic stake in the outcome of a hearing … is liable to distort the outcome of the hearing." *Id.*

344.     The Second Circuit held that the plaintiff had standing and the right to lodge a systemic challenge to the legality of the impartial hearing system.

345.     According to the Court, "the central role of the IDEA process rights bears witness that Congress intended to create procedural rights the violation of which would constitute injury in fact." *Id.* at 155. One of these undeniable rights is the right to an unbiased adjudicator. *Id.* at 155 (the IDEA "prohibits the use of [a] biased adjudicator.").

346.     On July 21, 1993, the New York State Legislature amended Section 4404 to create the IHO rotational system. *See Heldman on Behalf of T.H. v. Sobol*, 846 F. Supp. 285 (S.D.N.Y. 1994). The legislative history for the 1993 amendments shows that the legislature intended to ensure that the hearing system across the state would comply with the IDEA, with respect to its goals of minimizing partiality and potential conflicts, as well as the appearance of impartiality, which arose when financially interested school districts had the discretion to select and appoint IHOs at will.

347.     This concept is consistent with judicial rules of disqualification. *See* 28 U.S.C.A. § 455 ("[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned").

348.     The IDEA presumes that the agency delivering special education services is the financially responsible party. Here, however, although the cases are filed against the DOE, which is delivers the education services, it is the City which bears the cost of the hearings *and is the real party in interest*.

349.     Further, it is beyond cavil that the City-employee-as-hearing officer arrangement "might reasonably" be questioned relative to its impact on impartiality.

350.     Further, although the IDEA does not expressly prohibit a second-tier review officer from being an employee of a state agency, the Second Circuit has interpreted the IDEA to prohibit that situation. The Second Circuit has held that the Commissioner (a named Defendant here) would not be sufficiently neutral to preside over individual appeals of impartial hearings. *See Burr by Burr v. Ambach*, 863 F.2d 1071 (2d. Cir. 1988), *vacated on other grounds*, *Sobol v. Burr*, 492 U.S. 902 (1989); *see also Holmes by Holmes v. Sobol*, 690 F. Supp. 154 (W.D.N.Y. 1988) (the Commissioner "cannot be presumed to be impartial and independent" even though not technically a NYSED employee); *Louis M. by Velma M. v. Ambach*, 714 F. Supp. 1276 (N.D.N.Y. 1989) (NYSED employees engaged in monitoring could not be review officers).

351.     Given that courts have held that the Commissioner would be inadequately neutral to preside over a single child's hearing, this Court should find the Commissioner to be in a similar conflict relative to whether hearing officers should be City employees.

352.     This is particularly true since NYSED and the Commissioner have, for years, sought to reduce the cost of due process by reducing the limitations period for parents to file hearings below the federal floor.

353.     In sum, Defendants' OATH Plan to use City employees as hearing officers violates the IDEA because the OATH employees undoubtedly will be subject to the same type of pressure that Board and/or DOE employees would experience if not more so, since the City is the financially responsible party.

**The OATH Plan Violates Plaintiffs' Right to Hearing Officers with Expertise and Adequate Training in Special Education**

354.     Both the plain language of the IDEA, and applicable judicial interpretation, establish that the IDEA requires hearing officers to have "expertise" in the area of special education, and further, to be "experts" in issues of special education law and policy.

355.     As alleged herein, City Defendants are not just seeking to control, oversee, supervise, and maintain the power to hire and fire hearing officers. They also are intentionally trying to clear the bench of virtually all of the *existing*, experienced hearing officers in New York City.

356.     With a hearing backlog of thousands of cases, it makes no sense for any agency to purge all of the experienced, independent IDEA hearing officers in favor of replacing them with inexperienced lawyers who are beholden to OATH, the City, the Mayor, the DOE, and/or the Chancellor. Unless, of course, Defendants' real objective is to "stack the deck" against the interests of Plaintiffs and others similarly situated and their entitlement to procedural and substantive due process in the special education hearings.

**Defendants Lack Jurisdiction or Authority for the OATH Plan and Are Improperly Delegating Their Respective Duties and Responsibilities Under the IDEA and State Law**

357. By executing the MOA, the State Defendants abdicated their responsibility and obligation to supervise and guarantee IDEA procedural safeguards and a FAPE to every child with eligible disabilities, including to Plaintiffs and others similarly situated in New York City. 20 U.S.C. §§ 1412(g), 1415(a).

358. By executing the MOA, the State Defendants abdicated their responsibility and obligation under the IDEA as a SEA.

359. The OATH Plan also violates the IDEA and New York State law because none of the signatories had authority to execute the MOA.

360. The OATH Plan also violates the IDEA and New York State law because neither the Mayor, the DOE, the Chancellor, nor the NYSED have the authority to implement it.

361. Neither the DOE, the Board, nor the Chancellor are vested with any authority under the IDEA or State law to delegate the responsibilities and obligations of the impartial hearing system to OATH.

362. The IDEA requires that the SEA and LEA "shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of" a FAPE. 20 U.S.C. § 1415(a).

363. The IDEA does not authorize delegation of this function or the impartial hearing function to any other individual or entity.

364. The IDEA expressly provides that the hearing "shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A) (emphasis added).

365.    By attempting to transfer and/or by transferring the special education due process hearing system to OATH, Defendants have abrogated their duties and responsibilities to conduct due process hearings pursuant to the IDEA. *Id.*

366.    The OATH Plan also deprives Plaintiffs of neutral, independent hearing officers as defined by New York State Educ. Law Section 4404 which, as alleged herein, was amended by the State Legislature expressly for the purpose of bringing New York State's due process system into compliance with the IDEA.

367.    Moreover, by its recently amending State law, the State Legislature was expressing its intention to establish and ensure the independence of the IHOs, who as independent contractors are not subject to conflicts of interest or the appearance of conflicts of interests.

368.    NY State Educ. Law Section 4404 is enforceable as a federal right under the IDEA because the IDEA "incorporates by reference state standards, be they substantive or procedural, that exceed the federal basic floor of meaningful, beneficial educational opportunity." *Burlington v. Dep't of Educ.*, 736 F.2d 773, 789 (1st Cir. 1984).

369.    The responsibility for the IDEA impartial hearing system remains with Defendant Board of Education under Section 4404. N.Y. Educ. Law § 4404(1)(a).

370.    OATH was established under the New York City Charter to hear cases involving "agencies of the city" concerning City laws, regulations, rules, and policies. *See* New York City Charter §1098(1).

371.    None of the Defendants had authority under the IDEA or State law to either (a) vest OATH with "concurrent" jurisdiction over federal and state law special education claims, or (b) transfer the impartial hearing functions and IHOs to Defendant OATH.

372.    Defendants' unilateral actions in creating, effectuating, and perpetuating the OATH Plan are preempted by the IDEA because Defendants' actions conflict with its provisions. 20 U.S.C. § 1415(a).

373.    The Charter could not authorize the transfer to OATH because it would directly conflict with the IDEA's mandate that the LEA conduct the hearings, using neutral, experienced hearing officers and the doctrine of preemption would apply. 20 U.S.C. § 1415(f)(1)(A).

374.    Further, the New York State Municipal Home Rule Law ("MHRL") § 11 prohibits enactment of any local law that supersedes a state statute "if the local law applies to or affects 'the maintenance, support or *administration of the educational system in such local government*." (emphasis added).

375.    Pursuant to MHRL, the Mayor and other Defendants can point to no authority allowing the Chancellor, Mayor, or NYSED to vest OATH with that jurisdiction, or transfer impartial hearings from the DOE to OATH. This is the case even if the former Mayor were to have complied with the City Charter, or the DOE with their rule-making obligations, neither of which occurred.

**Defendants Failed to Give Public Notice or Hold Public Hearings**

376.    As alleged herein, the City Charter created OATH to hear disputes between City agencies and its employees involving New York City laws, rules, and regulations.

377.    Even assuming arguendo that the OATH Plan could potentially comply with the City Charter and would not be preempted by federal and/or state law, the City and the Mayor did not comply with the Charter in the transfer of special education hearings to OATH or in issuing EO 91.

378.    Before the Mayor can transfer an agency's hearing functions to OATH – again, even assuming he had the authority to transfer special education due process hearings, which is disputed herein, the Mayor must first convene a committee to study the proposed transfer and the committee must issue a report regarding its findings and recommendations. New York City Charter §§ 1048(4)(a)-(b).

379.    After the committee review process is completed, the Mayor must arrange for the issuance of notice to the public and for public hearings to be held. *Id.*

380.    Plaintiffs are not aware of the City or the Mayor convening such a review committee nor of public notice being given or a public hearing being held.

381.    Upon information and belief, the Mayor did not take any of the actions described here as required by the City Charter.

382.    Further, Defendant OATH is subject to the New York City Administrative Procedures Act ("CAPA").

383.    Plaintiffs have no knowledge of OATH complying with its CAPA rule-making requirements regarding any aspect of the OATH Plan.

384.    Upon information and belief, Defendant OATH failed to comply with its CAPA rule-making requirements regarding its issuance of rules and regulations effectuating the OATH Plan.

385.    Upon information and belief, Commissioner Rehman admits that OATH violated CAPA in making the transfer of hearing cases to OATH. Specifically, Commissioner Rehman stated: "While this transfer was designed to improve the system, I understand that when it took place at the end of the last administration, there was little outreach to parents, lawyers and advocates."

386.    Similarly, Defendant Board of Education has its own rule-making procedure requirements pursuant to N.Y. Educ. Law § 2590(d).

387.    Plaintiffs similarly have no knowledge of Defendant Board complying with its state-mandated rule-making requirements regarding the OATH Plan.

388.    Upon information and belief, Defendant Board failed to comply with its state mandated rule-making requirements regarding its issuance of any rules and regulations effectuating the OATH Plan, either applicable to the DOE, the Chancellor, or any special education hearing functions.

389.    Defendants individually and collectively failed to "ensure[] that there [we]re public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public" before adopting the OATH Plan as required by 20 U.S.C. § 1412(a)(19).

390.    Defendants also individually and collectively failed to "ensure[] that there [we]re public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public" regarding any of the administrative or operational procedures, policies, rules, or regulations, concerning the OATH Plan as required by 20 U.S.C. § 1412(a)(19).

391.    Accordingly, the implementation of the OATH Plan in and of itself is unlawful under the IDEA.

392.    For the same reasons, each and all of its administrative and operational functions and processes adopted, used, and/or in existence to effectuate the OATH Plan are similarly unlawful under the IDEA.

**The OATH Plan Violates the IDEA Pendency Provision**

393.    Notwithstanding the above, an injunction to preserve the *status quo* here is fully consistent with and warranted pursuant to the IDEA's "pendency" provision, also known as the

"stay put" provision. 20 U.S.C. § 1415(j). Under the IDEA, when a case is filed, the child at issue is entitled to an automatic injunction, without regard to merit, to maintain the current program and placement until the dispute is resolved. *Id.*

394.    A significant, material change in the due process hearing procedures, several of which have already occurred to date, and additional changes are not unanticipated, risks depriving Plaintiffs and others similarly situated of a core substantive right to pendency and potentially to a FAPE.

395.    Plaintiffs have no administrative forum in which to enjoin the OATH Plan under the pendency provision because hearing officers in an administrative forum lack jurisdiction to address systemic policies or practices complaints.

396.    Thus, the pendency provision should attach here, as all Plaintiffs have filed for due process hearings, and several Plaintiffs, specifically J.S. on behalf of R.S. and M.F. on behalf of J.W. sought pendency, which as of this filing, have yet to be ordered by the OATH hearing officer despite appropriate requests.

**The OATH Plan Violates the Due Process Clauses of the United States and New York State Constitutions**

397.    The OATH Plan creates a separate and unequal system of due process for children with disabilities inside New York City, compared to their peers outside of the City, including in suburbs like Scarsdale or Great Neck, which relies and rests solely on the residence of the State's children with special needs.

398.    Yet, in the far more expensive jurisdiction of the City, families who seek due process will only have access to less experienced hearing officers who are paid half or less than

half of what an IHO is paid anywhere else in the state, and who will be employed, trained by, supervised, managed, overseen, and restricted by the City.

399.    There is no rational basis for the decision to eliminate independent IHOs for the City's children and this decision should be subject to strict scrutiny, as it violates the Equal Protection Clause of both the federal and New York Constitutions. U.S. Const. Amend. XIV, § 1; NY Const. Art. I, § 11.

400.    Further, as the OATH Plan contemplates that the OATH IHOs will be employed, controlled, and managed by the real party-in-interest, that is, the City, it renders the plan infirm under the Due Process Clause of both the federal and New York Constitutions. *Id.*

**The OATH Plan Violates Section 504**

401.    Significant numbers of parents seek to exhaust their claims under Section 504 and other federal statutes pursuant to 20 U.S.C. 1415(l).

402.    All of the claims, including under the IDEA, Section 504, or Section 1983, are included in one complaint.

403.    Further, Section 504 requires City Defendants to operate a hearing system similar to the IDEA system.

404.    Historically, Defendant DOE used the IDEA due process hearing system for parents to file Section 504 claims.

405.    The MOA does not address Section 504 claims or hearings and does not appear to contemplate a transfer of claims relative to Section 504 or the other types of federal statutes that may have to be exhausted along with IDEA claims.

406.    The OATH IHOs have not been granted jurisdiction over Section 504 claims, although the independent IHOs do have Section 504 jurisdiction.

407.     The OATH IHOs have not been trained to evaluate or adjudicate Section 504 claims.

408.     This failure will significantly increase the volume of due process hearings and prevents parents from having an avenue by which to exhaust all their claims in one proceeding.

409.     Even if Defendants afforded the OATH IHOs jurisdiction, such a plan would similarly destroy the impartiality of Section 504 hearing officers.

**Plaintiffs Are Not Required to Further Exhaust Their Administrative Remedies, as the Administrative Process Will Be Futile, Ineffective, and Cannot Achieve Necessary Remedies**

410.     Plaintiffs are not required to exhaust their administrative remedies for individual and collectively applicable reasons.

411.     Plaintiffs challenge the due process processes and procedures themselves, and, therefore, exhaustion is futile.

412.     Plaintiffs face irreparable harm and thus do not need to further exhaust their administrative remedies.

413.     Plaintiffs' claims are systemic in nature and allege violations in policies, procedures, and practices, as well as to the administrative system as a whole, which courts have held do not need to be exhausted.

414.     IHOs do not have jurisdiction to hear the challenges and claims raised by Plaintiffs.

415.     Due to the alleged backlog of unassign or unresolved due process complaints, Plaintiffs would not have access to IHOs in time to prevent the OATH Plan (even if they had the jurisdictional ability to do so, which they upon information and belief do not).

416.    Plaintiffs need discovery that is not available through the administrative hearings process and can only be obtained through federal court civil procedures.

417.    Exhaustion is not required because it would be futile or the due process hearing procedures and remedies are not available to exhaust all claims that are raised.

## CLASS ACTION ALLEGATIONS

418.    The Class members' claims for relief with respect to Defendants' systemic practices, policies, procedures, actions, and failures to act are brought on behalf of themselves, and on behalf of all those similarly situated, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure.

419.    Defendants have acted, or refused to act, on grounds generally applicable to the named Class Plaintiffs and Class members, making relief appropriate, and able to be granted, to the Class as a whole.

420.    The putative Class is defined as: Parents of children with IEPs who live in New York City who are entitled to impartial due process hearings, facilitated by the SEA and conducted by the LEA, and presided over by hearing officers who (a) are neutral, independent, and free from an existing conflict or an appearance of a conflict; (b) are not employees of the Defendants, or its agencies, including OATH, or any contracted agency or division over whom any of the Defendants would have control, management, oversight, supervision, or influence; and (c) otherwise satisfy the requirements of 20 U.S.C. § 1415(f)(3)(A) and New York State Education Law Section 4404.

421.    The Class is so numerous that joinder of all members is impracticable.

422.    Upon information and belief, there are more than ten thousand Class members per year.

423.    The exact number of the members of the Class and each subclass is unknown but upon information and belief it is approximately 14,000 per year.

424.    The exact number could be easily identified as both the NYSED and City Defendants maintain computerized data systems that have the specific information available.

425.    Requiring thousands of Class members to litigate their rights would be futile, as individuals cannot litigate the systemic violations or systemic solutions necessary in this case. Further, doing so would impose a significant economic burden on the federal, state, and local educational and judicial systems.

426.    There are questions of law and fact in common among named Plaintiffs and the members of the Class, including but not limited to whether Defendants, by creating or implementing or failing to stop the OATH Plan from proceeding, violated the IDEA and its corresponding regulations, Section 504, the Due Process and Equal Protection Clauses of the United States Constitution, the Due Process and Equal Protection Clauses of the New York State Constitution, the New York State Education laws and its corresponding regulations, and/or New York City law.

427.    Plaintiffs' claims are typical of those of the Class that they seek to represent.

428.    Plaintiffs have the same interests as the other Class members in prosecuting claims.

429.    A class action is superior to other available methods for the fair and efficient adjudication of the matter at this time.

430.    Class actions involving similar types of claims and relief are often certified.

431.    The expense and burden of individual litigation make it extraordinarily difficult for Class members to redress the wrongs done to them individually.

432.     Common issues predominate over individual questions and generalized proof will resolve the legal and factual questions raised by Class members.

433.     The named Plaintiffs will adequately represent and protect the interests of the Class, and Plaintiffs know of no conflict of interest among the Class members.

434.     Class Counsel is qualified to represent the classes and subclasses

435.     Class Counsel is experienced in litigating federal systemic actions and class actions on behalf of children with special needs, and their parents, in New York.

436.     Class Counsel has served as counsel on several systemic and class action cases in New York.

**FIRST CLAIM FOR RELIEF**
**THE IDEA**

437.     Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

438.     Defendants have violated Plaintiffs' rights to a FAPE under the IDEA.

439.     Defendants have violated the rights of Plaintiffs who are entitled to an impartial due process system that complies with the IDEA in terms of (a) IHO impartiality; and (b) IHO qualifications.

440.     The State Defendants have failed to supervise, oversee, and guarantee due process rights and FAPE to Plaintiffs and others similarly situated to ensure that all IHOs will be qualified and impartial.

441.     Defendants, by agreeing to, participating in, or being responsible for the OATH Plan, are financially motivated to reduce parents' access and ability to prevail at impartial due process hearings.

442.     Defendants are violating Plaintiffs' stay-put (pendency) rights under the IDEA.

443.    Defendant DOE and the State Defendants have improperly delegated their obligations under the IDEA in violation of the IDEA.

444.    Defendants are violating the IDEA by failing to maintain a neutral rotation system for the assignment of impartial due process hearings.

445.    Defendants are violating the IDEA by terminating or intentionally facilitating the termination of the cadre of experienced, neutral, IHOs who are integral to ensuring that due process hearings in New York City remain impartial.

446.    Defendant DOE and the State Defendants have abdicated their duties and obligations under the IDEA.

447.    Defendants have violated N.Y. Educ. Law Section § 4404, which is incorporated by reference into and enforceable under the IDEA.

448.    To the extent that New York State law permits the OATH Plan to be implemented (which it does not), the IDEA preempts state law and would conflict with it.

449.    To the extent that New York City Law permits the OATH Plan to be implemented (which it does not), the IDEA preempts local law and would conflict with it.

450.    Plaintiffs have suffered and will suffer injury and irreparable harm as a result of Defendants' violations of law.

451.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm unless Defendants are enjoined from their unlawful conduct.

**SECOND CLAIM FOR RELIEF**
**SECTION 504 OF THE REHABILITATION ACT**

452.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

453.    Defendants' conduct is knowing, intentional, reckless, and gross.

454.    Plaintiffs are qualified individuals with disabilities entitled to protection under Section 504.

455.    City Defendants violated Section 504 by implementation of the OATH Plan.

456.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm unless Defendants are enjoined from their unlawful conduct.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983

457.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

458.    Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

459.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm unless Defendants are enjoined from their unlawful conduct.

## FOURTH CLAIM FOR RELIEF
### DUE PROCESS (US & NY)

460.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

461.    Defendants are denying Plaintiffs the right to Due Process as guaranteed by the Fourteenth Amendment of the United States Constitution and by the New York State Constitution.

462.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing the OATH Plan.

463.     As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm unless Defendants are enjoined from their unlawful conduct.

## FIFTH CLAIM FOR RELIEF
## EQUAL PROTECTION (US & NY)

464.     Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

465.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

466.     The New York State Constitution provides its citizens with protections similar to those of the federal equal protection clause under the law.

467.     Defendants' OATH Plan, which includes eliminating IHOs certified by NYSED and delegating to OATH the responsibility for conducting impartial due process hearings in New York City treats children with disabilities, including Plaintiffs and others similarly situated who reside in New York City differently from similarly situated children with disabilities who live outside of the City.

468.     Defendants have no rational basis for eliminating legacy IHOs certified by NYSED only as to Plaintiffs and other children with disabilities who reside in New York City.

469.     Upon information and belief, Defendants' OATH Plan is motivated by an intent to discriminate against Plaintiffs and others similarly situated in New York City and deprive them of their rights under the IDEA and New York law.

470.     Specifically, upon information and belief, Defendants seek to expand mayoral control over the special education hearing process replacing NYSED certified IHOs with City employees, hired by or assigned to OATH, to conduct special education hearings, unilaterally create and perpetuate administrative and operational processes to *inter alia* limit the awards and expenses made under the current impartial hearing system in New York City.

471.     Defendants' plan thus violates Plaintiffs' equal protection rights under the Fourteenth Amendment of the United States Constitution and under the NY State Constitution.

472.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing this plan.

473.     As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm unless Defendants are enjoined from their unlawful conduct.

## SIXTH CLAIM FOR RELIEF
## NEW YORK STATE LAW

474.     Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

475.     Defendants have violated New York State Education Law, including but not limited to §§ 2590-b, 2590-h, 4401, and 4404, as well as the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200, *et seq.*

476.    To the extent that the New York City Charter or other local law purportedly permits implementation of the OATH Plan (which it does not), it would not be enforceable pursuant to the MHRL § 11.

477.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs have suffered and will continue to suffer harm unless Defendants are enjoined from their unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Assume jurisdiction over this action;

2.    Issue a Temporary Restraining Order and preliminary injunction to:

a.    Enjoin Defendants from taking any further steps to implement and effectuate the OATH Plan and EO 91 and continuing to operate the now Defendant-controlled OATH special education hearing system;

b.    Enjoin Defendants from hiring any new OATH SEHOs who lack experience in special education and who are employees of New York City;

c.    Enjoin Defendants from terminating the system of independent IHOs;

d.    Enjoin Defendants from operating and administering the special education hearing system in contravention of a neutral rotational system that allows for the impartial assignment of IHOs;

3.    Issue a preliminary and permanent injunction to

a.    Enjoin Defendants from further establishing the OATH Plan and special education hearing bureaucracy, including further implementation and effectuation of the OATH Plan and the Mayor's Executive Order No. 91;

b. Direct Defendants to modify their policies, procedures, and practices to ensure that

    i. impartial hearings in New York City are presided over by impartial hearing officers who:

        1. are neutral, impartial, independent contractors who are free from oversight, supervision, management, or the threat of termination by any of the City Defendants;

        2. have the expertise and specialized training required by federal and state law;

        3. continue to be assigned pursuant only to the neutral, alphabetical, rotational system required by state law;

        4. are free from any actual, potential, or appearance of conflict of interest and whose appointment and assignment otherwise comport with federal and state law;

    ii. the impartial hearing system is implemented consistent with the requirements of federal and state law with respect to the responsible entity with appropriate jurisdiction;

4. Issue a preliminary and permanent injunction directing appointment of an independent monitor to oversee the special education hearing system due to the systemic failure to ensure a functioning due process adjudication system that complies with the IDEA;

5. Issue a Declaratory Judgment on behalf of the Plaintiffs that the policies, procedures, and practices as alleged herein violate the applicable federal, state, and city laws;

6. Award Plaintiffs attorneys' fees and costs incurred with respect to this action; and

7.      Award such other different, and further, relief as to the Court may seem just

and proper.

Dated: December 16, 2022
       New York, New York

                              Respectfully submitted,

                              ADVOCATES FOR JUSTICE
                              LEGAL FOUNDATION

                              By: /s/ *Laura Dawn Barbieri*
                                    Laura D. Barbieri
                                    225 Broadway, Suite 1902
                                    New York, NY 10007
                                    (212) 285-1400 (office)
                                    (914) 819-3387 (cell)
                                    212-285-1410 (fax)
                                    Lbarbieri@advocatesny.com

                              THE LAW OFFICE OF ELISA HYMAN, P.C.

                              By: /s/ *Elisa Hyman*
                                    Elisa Hyman, Esq.
                                    The Law Office of Elisa Hyman
                                    1115 Broadway, 12th Floor
                                    New York, NY 10010
                                    Phone: (646) 572-9064
                                    Fax: 646-572-9065
                                    elisahyman@gmail.com

                              *Co-counsel for Plaintiffs*